# Nos. 21-2683 and 21-2700
# CONSOLIDATED CIVIL APPEALS

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| BERNICE CURRY-MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| v. | ) | WDNY Civil Docket No.: 18-cv-6450 (*Malcolm III*) Honorable David G. Larimer, J. |
| ROCHESTER CITY SCHOOL DISTRICT, BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No.: 21-2683, Lead Docket Number |

| | | |
|---|---|---|
| BERNICE C MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| | ) | WDNY Civil Docket No.: 17-cv-6878 (*Malcolm I*) Honorable David G. Larimer, J. |
| ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER ("ASAR"), TIMOTHY CLIBY, President and Individually, and John Rowe, Vice President and Individually, ROCHESTER CITY SCHOOL DISTRICT, BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No. 21-2700, Consolidated Member |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK (ROCHESTER)
17-cv-6878, (*Malcolm I*), Lead Docket Number; 18-cv-6450 *(Malcolm III)*, Consolidated Member
(Honorable David G. Larimer, J. )

## BRIEF AND SPECIAL APPENDIX
## FOR
## PLAINTIFF-APPELLANT BERNICE CURRY-MALCOLM

Mrs. Bernice Curry-Malcolm, *Pro se* Plaintiff-Appellant
6 Gingerwood Way
West Henrietta, New York 14586

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES --------------------------------------- *v, vi, vii, viii, ix*

STATUES AND REGULATIONS ------------------------------------ *x, xi*

STATEMENT OF THE SUBJECT MATTER JURISDICTION----------- 1-9

STATEMENT OF ISSUES ------------------------------------------- 9-10

PRELIMINARY STATEMENT ---------------------------------------- 10-15

STATEMENT OF FACTS-------------------------------------------- 15-24

ARGUMENT ------------------------------------------------------- 24-30

     STANDARD OF REVIEW ---------------------------------------- 30-31

POINT I

WHETHER HONORABLE DAVID G. LARIMER SHOULD HAVE RECUSED
HIMSELF AS SET FORTH IN 28 U.S.C. §455, AND RULE 1.1 AND CANNON
3C(1)------------------------------------------------------------------ 31-34

POINT II

WHETHER THE DISTRICT COURT ERRED AND ABUSED ITS
DISCRETION AND JUDICIARY POWER BY IMPROPERLY REINSTATING
A LEAVE-TO-FILE SANCTION----------------------------------------- 34-38

POINT III

WHETHER THE DISTRICT COURT APPLIED AN UNDULY HIGH
PLEADING STANDARD WHEN IT HELD THAT PLAINTIFF'S SECOND
AMENDED COMPLAINT FAILED TO STATE A PLAUSIBLE CAUSE OF
ACTION UNDER FED. R. CIV. PROC. 12(B)(6)---------------------------- 38- 43

*i*

TABLE OF CONTENTS CONTINUES...

Page

POINT IV

WHETHER PLAINTIFF-APPELLANT ESTABLISHED AGE-BASED
DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN
EMPLOYMENT ACT, 29 U.S.C. § 621, et seq. ("ADEA"), TITLE VII OF THE
CIVIL RIGHTS ACT OF 1964 ('TITLE VII"), AND NEW YORK STATE
HUMAN RIGHTS LAW ("NYSHRL") ------------------------------------- 43- 45

POINT V

WHETHER PLAINTIFF-APPELLANT ESTABLISHED RACE-BASED
DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS
ACT OF 1964 ('TITLE VII"), AND NEW YORK STATE HUMAN RIGHTS
LAW ("NYSHRL") ----------------------------------------------------------- 45-46

POINT VI

WHETHER PLAINTIFF-APPELLANT ESTABLISHED DISPARATE
TREATMENT UNDER TITLE VII --------------------------------------------- 46-48

POINT VII

WHETHER PLAINTIFF-APPELLANT ESTABLISHED HOSTILE WORK
ENVIRONMENT UNDER TITLE VII AND NEW YORK STATE HUMAN
RIGHTS LAW------------------------------------------------------------------- 48-49

VIII

WHETHER PLAINTIFF-APPELLANT ESTABLISHED RETALIATION
UNDER TITLE VII, ADEA, NYSHRL ----------------------------------- 49-50

IX
THE UNION BREACHED ITS FAIR DUTY OF REPRESENTATION
--------------------------------------------------------------------------------------- 51- 53

*ii*

TABLE OF CONTENTS CONTINUES...

Page

POINT X

PLAINTIFF ESTABLISHED BREACH OF CONTRACT------------------ 53-55

POINT XI

EQUAL PROTECTION AGAINST ALL DEFENDANTS-APPELLEES-------------- 55-56

POINT XII

PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION
UNDER TITLE VII, NEW YORK STATE EXECUTIVE LAW §290 et. Seq.,
NYSHRL, ADEA, EQUAL PROTECTION, AND 42 U.S.C. §1983 AGAINST
ALL DEFENDANTS------------------------------------------------------------ 56-58

POINT XIII

PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION
UNDER 42 U.S.C. § 1983------------------------------------------------- 58-59

POINT XIV

PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION
UNDER 42 U.S.C. § 1981 ------------------------------------------------- 59-60

POINT XV

PLAINTIFF-APPELLANT WAS TENURED --------------------------- 60-61

POINT XVI

PLAINTIFF-APPELLANT ESTABLISHED A CAUSE OF ACTION UNDER
THE CONTINUING VIOLATION DOCTRINE------------------------------- 61-62

*iii*

TABLE OF CONTENTS CONTINUES…

Page

POINT XVII

PLAINTIFF-APPELLANT WAS WRONGFULLY TERMINATED -----62-65

CONCLUSION

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

CASES

Page

*Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 70 n.2 (2d Cir. 2004) -------------------------------------- 58

*Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002))------------------------- 49

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) --------------------------------- 31

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 572 (2007)_____ 31

*B*lack *v. Anheuser-Busch In Be*v, 220 F. Supp. 3d 443, 449 (S.D.N.Y. 2016) (quoting Tomney v. Int'l Ctr. for the Disabled , 357 F. Supp. 2d 721, 738 (S.D.N.Y. 2005)) ------------------------------- 54-55

*Branson v. Price River Coal Co.*, 853 F.2d 768, 770 (10th Cir.1988)------ 43

*Brennan v Metropolitan Opera Assn., Inc.*, 192 F3d 310, 318 [2d Cir 1999].){**17 Misc 3d at 784}------------------------------------------- 28

*Bucalo v. Shelter Island Union Free Sch. Dis*t., 691 F.3d 119, 129 (2d Cir. 2012) ----------------------------------------------------------------- 29

*Bucalo, 691 F.3d at 129; Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) ----------------------------------------------------------------- 49

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742 (1998)----------------------- 56

*Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105-07 (2d Cir. 2001) ----------------------------------------------------------------- 63

Canzona v Atanasio, 118 AD3d 837, 838, quoting Dee v Rakower, 112 AD3d 204, 208-209)----------------------------------------------------- 54

*v*

TABLE OF AUTHORITIES CONTINUES…

Page

*Caputo v. Nat'l Ass'n of Letter Carriers*, 730 F. Supp. 1221, 1229
(E.D.N.Y. 1990)----------------------------------------------------------------- 51

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000)------- 63

Concord Assocs. L.P. v. Entm't Prop. Trust, 817 F.3d 46, 52
 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc.,
 282 F.3d 152 (2d Cir. 2002)) ----------------------------------------------- 40

*Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2nd Cir., 1994) ----------------- 61

*Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993) ---------------- 61

EEOC v. Ethan Allen, Inc., 44 8 F.3d 116, 120 (2d Cir. 1994) ---------------- 63

*Epos Tech.*, 636 F. Supp.2d 57, 63 (D.D.C. 2009) (quoting
*Bell Atlantic* v. *Twombly*, 550 U.S. 544, 555 (2007)) --------------------------- 39

*Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)---------------- 25

*Feingold v. New York*, 366 F.3d 138, 158 n.19 (2d Cir. 2004) ---------------- 55

*Galabya*, 202 F.3d 636 at 640 ------------------------------------------------- 42

*Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)--------- 29

Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997) -------------- 29

Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102
(2d Cir. 2010) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149
(2d Cir. 2006)) ------------------------------------------------------------- 49

*Hilton v. Wright*, 673 7 F.3d 120, 128 (2d Cir. 2012) -------------------------- 63

*vi*

TABLE OF AUTHORITIES CONTINUES…

Page

*Hogan v. State of Connecticut Judicial Branch*, 220 F. Supp.2d
111, 119(D.Conn. 2002), aff'd without pub'd opinion, 64
Fed. Appx. 256 (2d Cir. 2003)------------------------------------------- 47-48

In re *International Bus. Mach. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995)------ 32

Jackson v. Norwalk Board of Education, No. Civ.3:02CV1777,
2004 WL 2472223, at *5 (D.Conn. Sept. 9, 2004) (citing, *inter alia,
Shumway v. United Parcel Service*,118 F.3d 09, 63 (2d Cir. 1997))----------- 47

*Lauture v. Int'l Bus. Machs. Corp.*, 216 F.3d 258, 261 (2d Cir. 2000)-------- 60

*Little v. NBC*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002)-------------------- 42

*Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) ----------- 41

*Malcolm v. Rochester City School Dist., et al.*, 17-CV-6873 (W.D.N.Y. 2017) – 3

*Malcolm v. Rochester City School Dist., et al.*, No. 19-2409
slip op. at 4 (2d. Civ. Nov. 12, 2020) ("*Malcolm II*") -------------------------- 3

*Malcolm II* to 17-cv-6878, *Malcolm I*. U.S.A.C. Dkt. # 21-2700,
Doc. # 28. --------------------------------------------------------------------- 3

Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR), No. 19-2412,
(2d. Cir. Oct 14, 2020) ("Malcolm I"), Malcolm . Rochester City School Dist., et
al., No. 19-2409 slip op. at 4 (2d. Civ. Nov. 12, 2020) ("Malcolm II"), Curry-
Malcolm v. Rochester City School Dist., et al., No. 19-2416 (2d. Cir. Nov. 12,
2020) ("Malcolm III") ------------------------------------------------------------ 4

*Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020
U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147
F.3d 207, 209 (2d Cir. 1998)) ---------------------------------------------37-38

*vii*

TABLE OF AUTHORITIES CONTINUES...

Page

*Martin v. Citibank, N.A.*, 762 F.2d 212, 216-17 (2d Cir. 1985)------------------60

*Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)------------------------------------------------------------- 60

*Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) --------- 49

*Moore v. Roadway Express, Inc.*, No. 07-CV-977, 2008 WL 819049, at *4-5 (E.D.N.Y. Mar. 25, 2008) --------------------------------51-52

*Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)-------------------------- 30

*NLRB v. Local 282, Int'l Bhd. of Teamsters*, 740 F.2d 141, 147 (2d Cir. 1984) ------------------------------------------------------------------- 51

*N.Y. State Dep't of Educ.*, 131 F. 3d 326, 329 (2d Cir. 1997))---------------- 40

O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, ___, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996) ----------------------------- 43

*Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) -------------- 60

*Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005--------------------------- 56

Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 156-57 (2d Cir. 1998)------------------------------------------------------------ 63

*Rippo v. Baker* ----------------------------------------------------------------- 24

*Salgado v. The City of New York*, 2001 WL 290051(S.D. N. Y.2001) ----- 61

*Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998)----- 53

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510 (2002) ---------------------- 39

*viii*

TABLE OF AUTHORITIES CONTINUES...

Page

Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002);
accord Atchison, Topeka & Santa Fe Ry. v. Buell, 480
U.S. 557, 568 n.15 (1987) ------------------------------------------------------ 39

Tsirelman v. Daines, 794 F.3d 310, 313 (2d Cir. 2015) (quoting
Jaghory v. Tomka v. Seiler Corp., 66 F.3d 1295, 1317 (2d Cir. 1995)------- 56

Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (citation omitted)----- 57

Vaca, 386 U.S. at 190 (citation omitted)------------------------------------- 51

Vaca, 386 U.S. at 191 ------------------------------------------------------ 51

Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015)-- 41

Vega, 801 F.3d , 72 at 85 (quoting Galabya v. New York City Bd. of Educ.,
202 F.3d 636, 640 (2d Cir. 2000)) -------------------------------------------- 42

Vélez v. Thermo King, 585 F.3d 441 (1st Cir. 2009) --------------------------- 63

Viola v. United States, 481 Fed. App'x. 30, 31 (2d Cir. 2012)
(unpublished opinion) --------------------------------------------------------Pg 37-38

Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) ----------- 57

White v. White Rose Food, 237 F.3d 174, 179 (2d Cir. 2001) ----------------- 5

Yagman v. Republic Insurance, 987 --------------------------------------------- 33

Yerdon v. Henry. 91 F.3d 370, 375 (2d Cir. 1996) ---------------------------- 53

# STATUES AND REGULATIONS

Page

28 U.S.C. _1331 ------------------------------------------------------------------- 7

28 U.S.C. _1291------------------------------------------------------------------- 8

28 U.S.C. _ 1343 ------------------------------------------------------------------ 8

28 U.S.C. _ 1367 ------------------------------------------------------------------ 8

28 U.S.C. _144; 28 U.S.C. § 455------------------------------------------------- 33

29 U.S.C. _ 631(a)------------------------------------------------------------- 43. 44

42 U.S.C. _2000e et seq. (Title VII) -------------------------------------------- 8

42 U.S.C. _ 703 et seq. (Title VII) --------------------------------------------- 8

42 U.S.C. _ 2000e- 2 (a)(1)------------------------------------------------------- 41

42 U.S.C. _ 2000e-2(c)(I)--------------------------------------------------------- 53

42 U.S.C. _1981----------------------------------------------------------------- 8, 59

42 U.S.C. 1983------------------------------------------------------------------- 8, 58

Title VII of the Civil Rights Act of 1964 ------------------------------------------- 8

ADEA------------------------------------------------------------------------------- 8

New York State Human Rights Law, N.Y. Exec. Law15 __ 296 et seq.
("NYSHRL") ------------------------------------------------------------------------ 8

New York State Constitution, Article 1, §11------------------------------------- 8

Fifth and Fourteenth Amendments------------------------------------------------ 61

x

STATUES AND REGULATIONS CONTINUES…

Page

N.Y. 15 EXEC. LAW § 296(6) ----------------------------------------------- 55

Fed. R. Civ. Proc. 8, 10, 11, 12(b)(1), (2), (3), (6)----------------------------- 25

Education Law _3020-a , Fifth, Fourteenth Amendment----------------------- 60

CBA--------------------------------------------------------------------------------- 61

# JURISDICTIONAL STATEMENT

Plaintiff-Appellant, Bernice Curry-Malcolm (hereinafter, "Plaintiff-Appellant, Curry-Malcolm" or "Plaintiff-Appellant"), proceeding as an unrepresented *pro se* litigant, and appeals from the Decision and and Order entered by the United States District Court for the Western District of New York on October 19, 2021(Honorable David G. Larimer, J.) (18-cv-6450, Dkt. # 32, SPA 78-96), dismissing her civil complaint against the Defendants-Appellees, Rochester City School District and Barbara Deane-Williams, Superintendent of Schools, and entered October 25, 2021 (Dkt. # 33), by the Office of the Clerk, [Mary C. Loewenguth, Clerk of Court by Lisa M. Duque, Deputy Clerk, United States District Court, Western District of New York, Rochester, New York, Monroe County]. The prior case in this Court on remand was 19-2416 (*Malcolm III*) and referenced on appeal in this consolidated instant appeal as 21-2683 as the lead case of be referenced.

Further, in this consolidated case, Plaintiff-Appellant, Curry-Malcolm appeals from the Decision and and Order entered by the United States District Court for the Western District of New York on October 19, 2021(Honorable David G. Larimer, J.) (17-cv-6878, Dkt. # 59, SPA 58-76), and entered October 25, 2021 (Dkt. # 33, # 60, SPA 77, 97) (18-cv-6450, Dkt. # 32, SPA 78-96) by the Office of

1

the Clerk, [Mary C. Loewenguth, Clerk of Court by Lisa M. Duque, Deputy Clerk,

United States District Court, Western District of New York, Rochester, New York,

Monroe County, dismissing her civil complaints against the Defendants-Appellees,

Association of Supervisors and Administrators of Rochester ("ASAR"), Timothy

Cliby, ASAR President, John Rowe, ASAR Vice President, Rochester City School

District, Barbara-Deane Williams. The prior case in this Court on remand was 19-

2412 (*Malcolm I*) and referenced on appeal in this consolidated instant appeal as

21-2700.

The consolidated decision and order (17-cv-6878, *Malcolm I*, 18-cv-6450,

*Malcolm III*) dated October 19, 2021 (Honorable David G. Larimer, J.) dismissed

Plaintiff-Appellant's Second Verified Amended Complaint (17-cv-6878, Dkt. #

43), in its entirety for failure to state a plausible cause of action and granted the

defendants-appellees' motion to dismiss (17-cv-6878, Dkt. ## 44, 46). See 17-cv-

6878, Dkt. # 59. 18-cv-6450, Dkt. # 32. The decision and order further dismissed

Plaintiff-Appellant's causes of action arising out of her initial employment with the

District, which ended in or about July 2017, in its entirety with prejudice. The

decision and order further dismissed Plaintiff-Appellant's claims that are alleged to

have arisen after her rehire by the District, in and after November 2017 without

prejudice. SPA 58-76, SPA 78-96.

2

Plaintiff-Appellant" also appeals from the Decision and Order entered by the United States District Court for the Western District of New York on October 19, 2021(Honorable David G. Larimer, J.), entered October 25, 2021, dismissing her civil complaints against the Defendants-Appellees, Association of Supervisors and Administrators of Rochester ("ASAR"), Timothy Cliby, ASAR President, and John Rowe, ASAR Vice President, Rochester City School District and Barbara Deane-Williams, Superintendent of Schools, WDNY Civil Docket No.: 17-cv-6878, Dkt. # 59, SPA 58-76 and referenced in this Court on remand as *Malcolm I*, with *Malcolm II* instructions on remand to include added parties, Sandra Simpson, former Chief of Specialized Services and former Interim Executive Director of Specialized Services, Mary Pauly, Executive Director of Specialized Services, and Teresa Root, Zone Director of Specialized Services to *Malcolm I*. See *Malcolm v. Rochester City School Dist., et al.,* 17-CV-6873 (W.D.N.Y. 2017), *Malcolm v. Rochester City School Dist., et al.,* No. 19-2409 slip op. at 4 (2d. Civ. Nov. 12, 2020) ("*Malcolm II*").

Plaintiff-Appellant made motion to amend the caption on appeal to include and add Sandra Simpson, Mary Pauly and Teresa Root, who were all parties to 17-cv-6873, *Malcolm II* to 17-cv-6878, *Malcolm I*. See U.S.A.C. Dkt. # 21-2700, Doc. # 28. By Order dated January 20, 2022, this Court referred the matter to the panel

3

that will determine the merits of the appeal, U.S.C.A. Dkt. # 21-2700, Doc. #31.

The decision by the lower court, Western District of New York (Honorable David G. Larimer, J.) was made upon paper submission only. The cases did not at any time come to trial or a hearing before the Court. The matters regarding the leave-to-sanction and/or motion to dismiss did not at any time come to a hearing before the Court. No oral arguments were permitted. The decision was made by the decision and order of the Honorable David G. Larimer. See, *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR),* 17-cv-6878 (W.D.N.Y. 2017) (*Malcolm I*), Dkt. # 59, *Curry-Malcolm v. Rochester City School Dist., et al.,* (ASA 58-76), 18-CV-6450 (W.D.N.Y. 2018) (*Malcolm III*), Dkt. # 32. SPA 78-96.

The instant appeals before the Court are in result of prior appeals before this Court that were remanded to the district court. SPA 1-36. See *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)*, No. 19-2412, (2d. Cir. Oct 14, 2020) ("*Malcolm I*"), *Malcolm v. Rochester City School Dist., et al.,* No. 19-2409 slip op. at 4 (2d. Civ. Nov. 12, 2020) ("*Malcolm II*"), *Curry-Malcolm v. Rochester City School Dist., et al.,* No. 19-2416 (2d. Cir. Nov. 12, 2020) ("*Malcolm III*"). On remand, the district court consolidated the actions, (17-cv-6878, Dkt. # 34, *Malcolm I,* (W.D.N.Y. 2017), 18-cv-6450, Dkt. #18, *Malcolm III,* (W.D.N.Y. 2018) by decision and order dated December 30, 2020 (Honorable David G.

4

Larimer, J.) for the purpose of determining the issues on remand from the United States Court of Appeals for the Second Circuit. SPA 1-36.

Plaintiff-Appellant Curry-Malcolm appeals the dismissal of her amended complaint dated March 30, 2021. (17-cv-6878, Dkt. # 39, 18-cv-6450, Dkt. # 22). Vol. I of II, ASA 90-199, Vol. II of II, ASA 200-221.

On March 30, 2021, Plaintiff-Appellant, Curry-Malcolm filed a Verified Amended Complaint. ASA 90-221. Three parties were added below to *Malcolm I* as per the panel's instruction in *Malcolm II*. Those parties, who were original parties to the proceedings in *Malcolm II* were Sandra Simpson ("Simpson"), Chief of Specialized Services and Interim Executive Director of Specialized Services, Mary Pauly ("Pauly"), Executive Director of Specialized Services and Teresa Root ("Root"), Zone Director of Specialized Services. See 17-cv-6878, Dkt. # 39, 18-cv-6450, Dkt. # 22, SPA 36. The district court abused its discretion and erred when it would not add Simpson, Pauly and Root to the action even though they were parties in the amended complaint and throughout the proceedings and on appeal. See *Malcolm v. Rochester City School Dist., et al.,* No. 19-2409 slip op. at 4 (2d. Civ. Nov. 12, 2020) ("*Malcolm II*"). SPA 33-36.

Plaintiff-Appellant filed an Amended Complaint on March 30, 2021, 17-cv-6878, Dkt. # 39, 16-cv-6450, Dkt. # 22. Vol. I of II, ASA 90-199. Plaintiff-

5

Appellant also made motion for recusal of Honorable David G. Larimer, J., 17-cv-

6878, Dkt. # 40, 18-cv-6450, Dkt. # 23 (Text Order denying Dkt. #23), SPA 102-

115. By motion dated March 30, 2021, 17-cv-6878, Dkt. # 40, SPA 98-101,

Plaintiff-Appellant's Affidavit dated March 30, 2021, SPA 102-115.  In her

affidavit, Plaintiff-Appellant also responded to the district court's order dated

December 30, 2020, in regard to the prefiling sanction and answered the five

questions asked by the district court as to why she should not have been

sanctioned.

By Decision and Order dated April 6, 2021(Honorable David G. Larimer,

J.), dismissed Plaintiff-Appellant's Verified Amended Complaint dated March 30,

2021, in its entirety, without prejudice, and reinstated the leave-to-file sanctions

imposed in *Malcolm I*. See 17-cv-6878, Dkt. # 41, SPA 128-139, 18-cv-6450, Dkt.

# 24, SPA 116-127. The district court denied Plaintiff-Appellant's motion for

recusal, 17-cv-6878, Dkt. # 41, SPA 128- 139, 18-cv-6450, Dkt. ## 24, 25. SPA

116-127.

The April 9, 2021, Amended Notice of Appeal was preserved below pending

resolution of the consolidated case (s) below. By Notice of Appeal dated April 9,

2021, (17-cv-6878, Dkt. # 42, Vol. I of II, ASA 78-83) (18-cv-6450, Dkt. # 26,

Vol. I of II, ASA 84-87). Plaintiff-Appellant preserved the dismissal of the

6

Verified Amended Complaint, 17-cv-6878, Dkt. # 39, 18-cv-6450, Dkt. # 22.

Plaintiff-Appellant also preserved by notice opposition to the district court's

reinstatement of the leave-to-file sanctions imposed by the court in *Malcolm I.*

Plaintiff-Appellant also preserved by notice opposition to the denial of her motion

for recusal of Honorable David G. Larimer, as well as opposition to failure to

comply with the lower court's decision and order dated December 30, 2020, and

including, but not limited to other matters included in the amended notice of

appeal, 17-cv-6878, Dkt. # 42, 18-cv-6450, Dkt. # 26. All parties were properly

served the amended notice of appeal. None of the parties objected to and/or file in

opposition to the preservation of the amended notice of appeal.

Plaintiff-Appellant filed a second Verified Amended Complaint in the

consolidated action on April 26, 2021,17-cv-6878, Dkt. # 43, 18-cv-6450, Dkt. #

43, Vol. II of II, ASA 222-299, the district court dismissed the consolidated actions

(17-cv-6878, Dkt. # 59, 18-cv-6450, Dkt. # 32) by Decision and Order dated

October 19, 2021 (Honorable David G. Larimer, J.), 17-cv-6878 ("*Malcolm I*",

Dkt. #59, 18-cv-6450, Dkt. # 32 (*"Malcolm III"*).

The district court had over Plaintiff-Appellant, Curry-Malcolm's civil

cases' federal claims and supplemental jurisdiction over Plaintiff-Appellant's state

claims. The district court's jurisdiction is invoked pursuant to 28 U.S.C. Section

7

1331, 28 U.S.C. Section 1343, 42 U.S.C. Section 1983 and U.S.C. Section 1981,

and is authorized, instituted and/or regulated or statured pursuant to Title VII of the

Civil Rights Act of 1964, as amended, codified 42 U.S.C. Sections 2000e and

703et seq., ("Title VII") and New York State Human Rights Law, N.Y. Exec. Law

15, Sections 296, et seq., as well as federal and state laws, and constitutional law of

the State of New York and the United States Constitution. The district court has

supplemental jurisdiction pursuant to 28 U.S.C. Section 1367 and venue was

proper. Vol. II of II, ASA 224-225, ¶¶ 9-11.

Plaintiff-Appellant, Curry-Malcolm filed a timely notice of appeal, 17-cv-

6878, Dkt. # #61, 65, on October 25, 2021, Plaintiff-Appellant, Curry-Malcolm

filed a timely notice of appeal, 18-cv-6450, Dkt. ## 34, 38 on October 28, 2021.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

This appeals further arises from the district court's dismissal of the plaintiff-

appellant's civil complaint and causes of action in violation of Title VII and the

Equal Protection Clauses of the United States and New York State Constitution

based on racial discrimination, disparate treatment, hostile work environment, age-

based disparate treatment under the ADEA, retaliation in violation of Title VII and

the ADEA, 42 U.S.C. § 2000e, et seq., §1981, 983, unlawful employment

discrimination, unlawful retaliation, wrongful termination, and breach of contract

against defendants-appellees without the opportunity to be heard and without the opportunity for discovery. One or more of the acts complained of relates back to the claims in the original complaint (s), *Malcolm I, Malcolm II, Malcolm III*.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW:

1. WHETHER HONORABLE DAVID G. LARIMER SHOULD HAVE RECUSED HIMSELF AS SET FORTH IN 28 U.S.C. §455, AND RULE 1.1 AND CANNON 3C(1)?

2. WHETHER THE DISTRICT COURT ERRED AND ABUSED ITS DISCRETION AND JUDICIARY POWER BY IMPROPERLY REINSTATING A LEAVE-TO-FILE SANCTION?

3. WHETHER THE DISTRICT COURT APPLIED AN UNDULY HIGH PLEADING STANDARD WHEN IT HELD THAT PLAINTIFF'S SECOND AMENDED COMPLAINT FAILED TO STATE A PLAUSIBLE CAUSE OF ACTION UNDER FED. R. CIV. PROC. 12(B)(6)?

4. WHETHER PLAINTIFF-APPELLANT ESTABLISHED AGE-BASED DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 621, et seq. ("ADEA"), TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ('TITLE VII"), AND NEW YORK STATE HUMAN RIGHTS LAW ("NYSHRL")?

5. WHETHER PLAINTIFF-APPELLANT ESTABLISHED RACE-BASED DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ('TITLE VII"), AND NEW YORK STATE HUMAN RIGHTS LAW ("NYSHRL")?

6. WHETHER PLAINTIFF-APPELLANT ESTABLISHED DISPARATE TREATMENT UNDER TITLE VII?

7. WHETHER PLAINTIFF-APPELLANT ESTABLISHED HOSTILE

9

WORK ENVIRONMENT UNDER TITLE VII AND NEW YORK STATE HUMAN RIGHTS LAW?

8. WHETHER PLAINTIFF-APPELLANT ESTABLISHED RETALIATION UNDER TITLE VII, ADEA, NYSHRL?

9. WHETHER THE UNION BREACHED ITS FAIR DUTY OF REPRESENTATION?

10. WHETHER PLAINTIFF-APPELLANT ESTABLISHED BREACH OF CONTRACT?

11. WHETHER PLAINTIFF-APPELLANT EQUAL PROTECTION AGAINST ALL DEFENDANTS-APPELLEES

12. WHETHER PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER TITLE VII, NEW YORK STATE EXECUTIVE LAW §290 et. Seq., NYSHRL, ADEA, EQUAL PROTECTION, AND 42 U.S.C. §1983 AGAINST ALL DEFENDANTS?

13. WHETHER PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER 42 U.S.C. § 1983?

14. WHETHER PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER 42 U.S.C. § 1981?

15. WHETHER PLAINTIFF-APPELLANT WAS TENURED?

16. PLAINTIFF-APPELLANT ESTABLISHED A CAUSE OF ACTION UNDER THE CONTINUING VIOLATION DOCTRINE?

17. PLAINTIFF-APPELLANT WAS WRONGFULLY TERMINATED

## PRELIMINARY STATEMENT

This is an appeal from a final judgment Decision and Order dated October

19, 2021 (Honorable David G. Larimer, J.) of the United States District Court for

the Western District of New York (Rochester) and entered by the Office of the

Clerk on October 25, 2021. This Court has jurisdiction under U. S.C. ¶ 1291. This

action stems from a vacatur and remand by this Court as a result of appeals 19-

2412 (17-cv-6878, *Malcolm I*, which include parts of 19-2409, (17-cv-6873,

*Malcolm II* to add parties to *Malcolm I*) and 19-2416 (18-cv-6450). The *Malcolm I*

panel retained jurisdiction over this appeal.

By Decision and Order dated December 30, 2020 (17-cv-6878, Dkt. # 34,

18-cv-6450, Dkt. # 18) the district court consolidated *Malcolm I* (17-cv-6878) and

*Malcolm III* (18-cv-6450) for the purposes of determining the issues on remand

and permitting the filing a new Amended Complaint. By Decision and Order dated

October 19, 2021 (Honorable David G. Larimer, J.) dismissed the second amended

complaint in its entirety for failure to state a plausible cause of action (17-cv-6878,

Dkt. # 43, 18-cv-6450, Dkt. # 32). The decision and order further dismissed in their

entirety with prejudice, causes of action arising out of Plaintiff-Petitioner initial

employment with the Rochester City School District, which ended in or about July

2017. The decision and order further dismissed Plaintiff-Appellant's claims

without prejudice that were alleged to have arisen after her rehire by the Rochester

City School District, in and after November 2017. Plaintiff-Appellant filed timely

11

notices of appeals on October 25, 2021(17-cv-6878, Dkt. ## 61, 65) (18-cv-6450, Dkt. ## 34, 38). ASA 54-77. One or more acts complained of relates back to the original charges of discrimination dated March 16, 2017, March 30, 2017, April 25, 2017, and August 24, 2017. One or more of the acts complained of relates back to the original internal complaints of discrimination, the original charges of discrimination and/or the original pleadings before the Court, the Division and EEOC, thereby giving Defendants RCSD and ASAR sufficient notice, awareness, and actual knowledge of the nature of Plaintiff's claims. Defendant RCSD and Defendant ASAR had actual knowledge of Plaintiff's claims. One or more of the acts complained of, including the ones that are complained of subsequently to the filing of charges of discrimination and the filing of her original pleadings before this Court relates back to the original charges of discrimination and original pleadings in Plaintiff's lawsuit against the defendants-appellees.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiff-Appellant Curry-Malcolm exhausted her administrative remedies. More than 240 days to a year prior to the institution of the lawsuits, a charge of discrimination was filed with the Division with dual filing with the EEOC alleging violation of Title VII by the Defendants-Appellees Rochester City School District and the Association of Supervisors and Administrators of Rochester.

12

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") with dual filing with the Equal Employment Opportunity Commission ("EEOC") against defendants-appellees Rochester City School District on March 16, 2017, NYSDHR Case No. 10186902. SPA 140-141, SPA 142-146. Plaintiff-Appellant received a notice of right to sue on December 4, 2019. SPA 141.

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") with dual filing with the Equal Employment Opportunity Commission ("EEOC") against defendants-appellees Rochester City School District on March 30, 2017, NYSDHR Case No. 10187117. SPA 152-160. Plaintiff-Appellant received a notice of right to sue on December 4, 2019. SPA 147, 148.

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") with dual filing with the Equal Employment Opportunity Commission ("EEOC") against defendants-appellees the Association of Supervisors and Administrators of Rochester on March 30, 2017, NYSDHR Case No. 10187122. SPA 152-160, SPA 149-150 Plaintiff-Appellant received a notice of right to sue on September 22, 2017. SPA 151.

13

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") with dual filing with the Equal Employment Opportunity Commission ("EEOC") against defendants-appellees Rochester City School District on April 25, 2017, NYSDHR Case No. 10187620. SPA 165-172. Plaintiff-Appellant received a notice of right to sue on September 22, 2017. SPA 161-163, 164.

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint with the New York State Division of Human Rights ("NYSDHR") with dual filing with the Equal Employment Opportunity Commission ("EEOC") against defendants-appellees Rochester City School District on August 24, 2017, NYSDHR Case No. 10189668. Plaintiff-Appellant received a notice of right to sue on February 14, 2018. SPA 173-174, SPA 175.

Two of the discrimination complaints (NYSDHR Case No. 10186902 dated March 16, 2017, and NYSDHR Case No. 10187117 dated March 30, 2017, against the defendants-appellees Rochester City School District was scheduled for a public hearing before the Division's Administrative Law Judge, Michael T. Groben ("ALJ Groben") on November 14, 2018, and November 15, 2018, respectively. During the two-days hearing on the matter claims arising after plaintiff-appellant's unlawful termination of July 1, 2017, and post July 1, 2017, including but not

14

limited to November 2017, and post November 2017, including plaintiff-appellant's unlawful termination of April 2018, and post employment, including the school district's retaliation.

ALJ Groben issued his Recommended Findings of Fact, Opinion and Decision and Order recommending dismissal of the complaint on June 10, 2019. SPA 179-199. The Division by and through Commissioner Angela Fernandez ("Commissioner Fernandez") adopted ALJ Groben's Recommended Findings of Fact, Opinion and Decision and Order dated June 10, 2019, and issued a Notice and Final Order dismissing the complaint on October 3, 2019. SPA 176-199. The EEOC issued notice of rights to sue on December 4, 2019. SPA 141, SPA 148.

## STATEMENT OF FACTS

Plaintiff-Appellant, Bernice Curry- Malcolm ("Plaintiff-Appellant Curry-Malcolm" or "Plaintiff-Appellant") is a former probationary and tenured employee within the Rochester City School District ("Rochester City School District" or School District") holding the title of Coordinating Administrator of Special Education ("CASE"). Plaintiff-Appellant Curry-Malcolm discovered later that the Rochester City School District granted tenure to numerous probationary employees. In the granting of tenure, the school district, counted the probationary employees' history of work experiences as a professional educator and

15

administrator. Using the same formula that the Rochester City School District uses to grant tenure to other similarly situated probationary employees, Plaintiff-Appellant acquired tenure by estoppel by February 2017 because she had previously worked as a professional educator for the school district from August 31, 1998, to September 22, 2000, and again from August 2015 through June 30, 2017. Plaintiff-Appellant was tenured when the school district wrongfully terminated her employment on June 30, 2017, with an effective date of July 1, 2017. Plaintiff-Appellant was tenured when the school district wrongfully terminated her employment on March 20, 2018, with an effective date of April 23, 2018. Plaintiff-Appellant Curry-Malcolm was granted tenure by the Honeoye Falls-Lima Central School District (another New York School District) on September 1, 2004. She had worked for the Rochester City School District for more than four (4) years as a professional educator and administrator prior to her termination of July 1, 2017. Plaintiff-Appellant Curry-Malcolm acquired tenure and was a tenured employee by the time the school district terminated her employment on July 1, 2017. She was also a tenured employee when the school district wrongfully terminated her employment in April 2018. Plaintiff Curry-Malcolm is not a probationary employee within the Rochester City School District ("RCSD" or "School District") holding the title of Coordinating Administrator of

16

Special Education ("CASE") as claimed by the ASAR Defendants. Def., Mem. of Law, Dated May 19, 2021 (Docket No. 46-1) at pg., 2, ¶1).

      Plaintiff-Appellant Curry-Malcolm is a sixty-four-year-old Black/African American married female and member of the Baptist faith. Plaintiff, Curry-Malcolm was employed with the Rochester City School District as a salaried full time regular" active" certificated administrator holding the title of Coordinating Administrator of Special Education (CASE) within the tenured area, Bracket IV, Administrator. Plaintiff and the school district had a binding contractual employment relationship. At all relevant times, Plaintiff was a member of the Association of Supervisors and Administrators of Rochester ("ASAR"). When Plaintiff commenced employment with the school district, she was assigned to salary bracket IV ($65,000 to $85,000).

Within the Rochester City School District, administrators are classified within four recognized tenure area brackets. Effective July 1, 2006, the administrative title of record for each bracket was (1) Bracket I, School Principal, Supervising Director, and Coordinating Director; (2) Bracket II, Director; (3) Bracket III, Assistant School Principal; and (4) Bracket IV, Administrator, and those titles remain the same in accordance with the Collective Bargaining Agreement that governs. Art. 5(2).

The tenure area Bracket IV, Administrator is a recognized administrative title in accordance with the parties CBA, and remains an active administrative title, and has not been eliminated or done away with by the school district or union. The Rochester City School District are still appointing, approving, and ratifying appointments to the tenure area, Bracket IV, Administrator, (Board of Education meeting dated July 23, 2020, Resolution 2020-21: 31, Christopher Golamb, Bracket IV (Coordinator of Health, PE, and Athletics).

Twenty-two CASE probationary CASE administrators' positions were not eliminated as claimed by the Rochester City School District and ASAR.

The title of CASE and its associated work belong to the unincorporated labor union ASAR, which has been duly recognized by the Rochester City School District to represent both certificated and civil service administrative and supervisory titles and operates pursuant to a collective bargaining agreement ("CBA") with the district. At all times relevant herein, Defendant Dr. Timothy Cliby ("Dr. Cliby") has served as ASAR's duly elected President and Defendant John Rowe ("Rowe") has served as the elected Vice President. Both individuals are employees of the Rochester City School District but are on leaves of absences from their positions in the district to serve exclusively as ASAR officers. Both individuals are employees of the Rochester City School District, and their salaries

18

are paid by the Rochester City School District. As a member of the Association of

Supervisors and Administrators ("ASAR"), the terms and conditions of

employment was governed by a Collective Bargaining Agreement ("CBA"). Pl.,

Second Combined Verified Amended Complaint Dated April 26, 2021., pg. 19, ¶¶

139-141.; Pl., Affidavit dated April 26, 2021, pg., 7, ¶¶ 54.

Plaintiff, Curry-Malcolm was a full time regular active salaried employee

within the Rochester City School District public educational organization and was

not an "at-will" employee. Pl., Affidavit dated April 26, 2021, pg. 5, ¶ 36, pg., 6, ¶

50. Plaintiff entered an employment contractual agreement with the school district

on August 21, 2015. On August 27, 2015, the Rochester City School District Board

of Education approved, bind, and ratified the employment contractual relationship

between the school district and the Plaintiff.  Pl., Second Combined Verified

Amended Complaint Dated April 26, 2021, pg., 30, ¶¶ 214-216, Pl., Affidavit

Dated April 26, 2021, pgs., 21, ¶¶ 142-143.

Beginning in 2015, Plaintiff-Appellant Curry-Malcolm was employed as a

regular full-time "employee" by the Rochester City School District in the position

of administrator. The District employed Curry-Malcolm as a Coordinating

Administrator of Special Education ("CASE") in the tenure area, CASE, Bracket

IV. At all times relevant and prior to the School District's unlawful employment

19

actions, unlawful discrimination and unlawful retaliation, Plaintiff-Appellant was an exemplary employee and a credit to her profession. At all times relevant to the School District's unlawful employment actions, unlawful discrimination and unlawful retaliation, Plaintiff-Appellant was a member of the local union, the Association of Supervisors and Administrators of Rochester ("ASAR"). SPA 305-307, ¶¶ 50, 53, 57-60. Vol. II of II, ASA 248, ¶ 192, ASA 251-252, ¶¶ 214-217, ASA 253, ¶ 227. ASAR was and presently is a local labor union of Defendants-Appellees' administrative personnel.

Plaintiff-Appellant Curry-Malcolm was qualified and certified for the administrative position she held She has earned a Bachelor of Business Administration degree from Delta State University, Cleveland, MS, a Bachelor of Science in Education degree from Delta State University, Cleveland. MS; a Master of Education degree in Special Education from Delta State University, Cleveland, MS; a Certificate of Advanced Study degree in Educational Administration in both School Administrator Supervisor ("SAS") and School District Administration ("SDA") from the State University of New York College at Brockport and has nine credit hours toward a doctoral degree from the University of Rochester Margret Warner School of Educational Leadership. As an educator, Plaintiff-Appellant continues to be diligent in ensuring that her educational licenses are current by

keeping up with the latest trends in education. Plaintiff-Appellant is licensed and

certified by both the Department of Education in New York State and the

Mississippi Department of Education. Vol. II of II, ASA 250-251, ¶¶ 208-213, Vol.

II of II, ASA 244, ¶ 165, Vol II of II, ASA 307, ¶¶ 61-66, Vol. II of II, ASA 308,

¶¶ 70-72.

Plaintiff-Appellant Curry-Malcolm loves education and loves educating our

youth to become the best of themselves as students, adults, citizens and human

beings. Plaintiff-Appellant Curry-Malcolm is a long-time and life-long veteran

educator with more than twenty-six (26) years of educational and tenured

experience in the filed of education and special education. Plaintiff-Appellant

Curry-Malcolm is a member of the New York State Teachers' Retirement System

("NYSTRS"). Plaintiff-Appellant joined the NYSTRS as a Tier 4 member on

September 1, 1997.

The collective bargaining agreements that governed were from July 1, 2009,

through June 30, 2014. SPA- 200-267 and July 1, 2014-June 30, 2018, with an

extension agreement by the parties through June 30, 2019. SPA- 268-345. At all

relevant times, Plaintiff-Appellant Curry-Malcolm was an exemplary educator and

administrator who performed her duties satisfactorily. Plaintiff-Appellant's

Response in Opposition to Motion to Dismiss dated August 20, 2021, (17-cv-6878,

21

Dkt. # 56) (18-cv-6450, Dkt. # 30), pg. 382. Plaintiff-Appellant was wrongfully

terminated based on her race (Black/African American), color (Black/African

American), age (plaintiff-appellate was fifty-eight (58) years old when the

discriminatory events begin), sex (female, excludes sexual harassment and sexual

violence), and gender (female).

Plaintiff-Appellant engaged in a protective activity when she complained of

and opposed unlawful discrimination throughout the 2015-2016, 2016-2017 and

2017-2018 school years. Plaintiff-Appellant complained of and opposed unlawful

discrimination and retaliation to several district high-ranking level supervisors,

including but not limited to Harry Kennedy (Kennedy"), then Chief of Human

Capital Initiatives ("HCI"), Sandra Simpson ("Simpson"), then Chief of

Specialized Services and Interim Executive Director of Specialized Services,

Theresa Woods ("Woods"), then Interim Director of Specialized Services, Mary

Pauly ("Pauly"), then Executive Director of Specialized Services, Dr. Timothy

Cliby ("Dr. Cliby"), then ASAR President, John Rowe ("Rowe"), then ASAR Vice

President, now currently ASAR President. Plaintiff-Appellant also engaged in

protective activity when she filed two internal complaints of discrimination

(December 26, 2016, and March 1, 2017). Plaintiff-Appellant was unlawfully

terminated on July 1, 2017. Plaintiff-Appellant continued to engage in protective

activity of the filing of several discrimination complaints against the school district
(NYSDHR, with dual filing with EEOC, Case No. 10186902 filed March 16, 2017,
against the Rochester City School District (SPA 142-146), NYSDHR, with dual
filing with EEOC, Case No. 10187117 filed March 30, 2017 against the Rochester
City School District (SPA 152-160), NYSDHR, with dual filing with EEOC, Case
No. 101887122 filed March 30, 2017, against the Association of Supervisors and
Administrators of Rochester (SPA 149-150), NYSDHR, with dual filing with
EEOC, Case No. 10187620 filed April 25, 2017, against the Rochester City
School District (SPA 165-172), NYSDHR, with dual filing with EEOC, Case No.
10189668 filed August 24, 2017, against the Rochester City School District (SPA
173-174).

Plaintiff-Appellant continued to engage in protective activity, including
post-employment from unlawful retaliation by the Rochester City School District,
including her local labor union. One or more of the discriminatory and retaliatory
acts relate back to the original complaints of *Malcolm I*, *Malcolm II*, and *Malcolm
III*, including continuing post-employment. Plaintiff-Appellant Affidavit dated
April 26, 2021, Dkt. # 43-1, Vol. II of II, ASA 308, ¶ 69. Plaintiff-Appellant's
Reply Affidavit dated August 20, 2021 (17-cv-6878, Dkt. #56, 18-cv-6450, Dkt. #
30) pg. 14, ¶ 38.

23

Plaintiff-Appellant Curry-Malcolm filed a discrimination complaint against the defendants-appellees Rochester City School District on March 16, 2017. SPA 142-145. The New York State Division of Human Rights found probable cause against the Rochester City School District (NYSDHR Case No. 10186902. SPA 140. The United States Equal Opportunity Commission issued notice of rights letters on December 4, 2019. SPA 141.

Plaintiff-Appellant Curry-Malcolm exhausted her administrative remedies. SPA 141, 147-148, 149-150, 151, 152-160, SPA 164, 165-171, SPA 173-174, SPA 175.

## ARGUMENT

Honorable David G. Larimer should have recused himself to avoid a manifest injustice. Rule 2.11 of the Code of Conduct and as pursuant to 28 U.S.C. § 455 and Cannon 3C(1) of the Code of United State Judges states that a judge shall disqualify or recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, The Supreme Court ruled that "Recusal is required when, objectively speaking, "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable". See R*ippo v. Baker*. Honorable David G. Larimer's conduct towards *prose* Plaintiff-Appellant Curry-Malcolm was too high to be constitutionally tolerable.

24

The defendants-appellees Rochester City School District and the Association of Supervisors and Administrators of Rochester were not entitled to dismissal as a matter of law. The district court abused its discretion, misapplied the applicable standard, and committed error of law when it improperly dismissed Plaintiff-Appellant Curry-Malcolm's complaints as pursuant to Fed. R. Civ. Proc. 8, 10, 11, 12(b)(1), (2), (3), (6), and/or for failure to comply with the Court's prior orders. (17-cv-6878, Dkt. # 44, #46). SPA 59-60, SPA 58-76 (17-cv-6878, Dkt# 59), SPA 79-80, SPA 78-96 (18-cv-6450, Dkt. # 32). In reviewing a Rule 12(b)(6) motion, a court must "draw all reasonable inferences in Plaintiff['s] favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

The district court abused its discretion and judiciary power when it failed to allow Plaintiff-Appellant the opportunity to be heard by the making of false claims that her in-person and telephonic interactions with the Court and its staff members had been marked by abusive and disrespectful conduct and verbiage. The district court abused its discretion and judiciary power when it improperly reinstated a leave-to-file sanction against Plaintiff-Appellant when it refused to consider her affidavit by claiming that she did not submit one. (17-cv-6878, Dkt. #34) (18-cv-6450, Dkt. # 18).

Defendant-Appellees Rochester City School District had no legitimate

25

reason for the actions it took since race and age was the "but for" reason for

Plaintiff termination. Any reason (s) proffered by the school district was pre-

textual, willful and intentional and done in bad faith. Plaintiff-Appellant Curry-

Malcolm alleges a continuous pattern and practice of unlawful discrimination. The

Rochester City School District defendants' actions were pretextual, done in bad

faith and malice, and but-for Plaintiff's race, color, age, sex/gender the adverse

action would not have occurred. And, but-for the ASAR defendants'

discriminatory misconduct and lack of duty of a fair representation on account of

Plaintiff's race, color, age, sex/gender the adverse action the Rochester City School

District took against the Plaintiff would not have occurred.

Plaintiff-Appellant Curry-Malcolm was a unit member of the local labor

union of the Defendants-Appellees Association of Supervisor and Administrators

of Rochester which is a local labor union of the defendants-Appellees Rochester

City School District's administrative personnel whose salaries are paid by the

school district. ASAR did not provide Plaintiff-Appellant with a fair duty of

representation based on her race and age.

Had Plaintiff-Appellant Curry-Malcolm been a white woman, ASAR would

have provide her with the standard of care owed to a unit member and would have

provided her with a fair duty of representation. ASAR admitted to the New York

26

State Division of Human Rights that it had provided non-unit members and white unit members a fair duty of representation during the layoff by accompanying them to meetings with the school district.

Plaintiff-Appellant was treated less well and/or less favorable than other similarly situated employees. Other similarly situated white employees that were younger than Plaintiff-Appellant Curry-Malcolm were not laid off, were retained in the school district employment as CASEs throughout the summer (July-August 2017), did not have to make application to the positions in which they were freely promoted to, were not added to the preferred eligibility list because they were not terminated and continued employment as of July 1, 2017. Vol. II of II, ASA 259-260, ¶¶ 275-276, ASA 260-261, ¶¶ 285-295, ASA 261-262, ¶¶ 300-302, 304-307. SPA 195-196. Those younger white CASEs outside of the protective class included, but not limited to Rosa Bellone, female, white, then 37 years of age, Yajaria Nguyen, female, white, then 30 years of age, Jason George, male, white, then 35 years of age. Plaintiff-Appellant was then fifty-eight (58) years of age. Vol. II of II, ASA 273-274. Kittelberger, younger, female, white, then 47 years of age nor George, younger, male, white then 35 years of age were not more qualified than Plaintiff-Appellant. Vol. II of II, ASA 244, ¶ 165, ASA 307, ¶ 61. ASA 308, ¶ 70.

The defendants-appellees Rochester City School District intentionally, willfully and in bad faith created a coalition-charged hostile working environment and subjected Plaintiff-Appellant Curry-Malcolm to a hostile work environment by empowering its officers, employees, supervisors, and agents by permeating a culture and community of workplace harassment, discrimination and retaliation. This was done over a course of years through intimidation, embarrassment, hostility, humiliation and abuse of power. The defendants-appellees did nothing over years to remedy the situation. The determination of hostility depends on whether a reasonable person would find the work environment to be hostile and whether a plaintiff subjectively perceived it to be so. (*Brennan v Metropolitan Opera Assn., Inc.*, 192 F3d 310, 318 [2d Cir 1999].){**17 Misc 3d at 784} To establish a hostile work environment, plaintiff must prove that the incidents were sufficiently continuous and concerted to be considered pervasive and must also demonstrate that he was subjected to hostility because of his membership in a protected class. (*Id.*).

The defendants-appellees created a culture and community of unlawful retaliation that it promoted it in the workplace by empowering its officers, employees, supervisors and agents. The retaliation continued post-employment.

Plaintiff-Appellant sufficiently established that the defendants-appellees

28

discriminated against her based on her race, and but for her race. To establish a

prima facie case of discrimination, a plaintiff must show that: (1) she was within

the protected age group; (2) she was qualified for the position; (3) she suffered an

adverse employment action; and (4) the surrounding circumstances permit an

inference of discrimination. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93,

107 (2d Cir. 2010); Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119,

129 (2d Cir. 2012).

Plaintiff-Appellant sufficiently established that the defendants-appellees

discriminated against her based on her age and bit for her age. In order to state a

*prima facie* claim of age-based discrimination in violation of the ADEA, a plaintiff

must allege that: (1) she is a member of a protected class (e.g., over the age of

forty); (2) her job performance was satisfactory; (3) she suffered adverse

employment action; and (4) the circumstances surrounding that action permit an

inference of discrimination based on age. See Grady v. Affiliated Cent., Inc., 130

F.3d 553, 559 (2d Cir. 1997).

The district court improperly dismissed Plaintiff-Appellant second amended

complaint (17-cv-6878, Dkt. # 43) (18-cv-6450, in 17-cv-6878, Dkt# 43). and

improperly reinstated a leave-to-file sanction against her. The district court

improperly dismissed the complaint for failure to state a cause of action and

29

improperly granted defendants-appellees Rochester City School District and the

Association of Supervisors and Administrators of Rochester's motion to dismiss

the complaint (17-cv-6878, Dkt. # 44, # 46).

This Court should vacate the district court's Orders and remand the case

with instructions to vacate the leave-to-file sanction, for recusal of Honorable

David G. Larimer, for discovery, and for any other such relief that this Court

deems just and proper.

## STANDARD OF REVIEW FOR MOTION TO DISMISS

The district court abused its discretion, applied an incorrect standard and

improperly dismiss the complaints as pursuant to Fed. R. Civ. Proc. 8, 10, 11,

12(b)(1), (2), (3), (6), and/or for failure to comply with the Court's prior orders.

(17-cv-6878, Dkt. # 44, #46). SPA 59-60, SPA 58-76 (17-cv-6878, Dkt# 59), SPA

79-80, SPA 78-96 (18-cv-6450, Dkt. # 32). A motion to dismiss for failure to state

a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v.*

*Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Plaintiff-Appellant complied with the district court's prior order dated

December 30, 2020. (17-cv-6878, Dkt. # 34) (18-cv-6450, Dkt. # 18). Plaintiff-

Appellant complied with the district court's order dated April 6, 2021 (17-cv-6878.

Dkt. # 41) (18-cv-6450. Dkt. # 24). In considering whether the complaint is

30

sufficient to state a claim, the court must accept as true all of the factual allegations

contained in the complaint. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). In

deciding a motion to dismiss, a court "must accept as true all of the factual

allegations contained in the complaint," *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544,

572 (2007) (quoting another source), and "draw all reasonable inferences in

Plaintiff's favor." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

POINT I

## WHETHER HONORABLE DAVID G. LARIMER SHOULD HAVE RECUSED HIMSELF AS SET FORTH IN 28 U.S.C. §455, AND RULE 1.1 AND CANNON 3C(1)

Honorable David G. Larimer ("Judge Larimer") should have recused

himself. Plaintiff-Appellant Curry-Malcolm has long made request that Judge

Larimer recuse himself, but he refused. This is not the first time that Plaintiff-

Appellant made request for the recusal of Judge Larimer. The request for recusal

had more to do with bias and prejudice as opposed to adverse rulings.

By affidavit dated March 30, 2021, Plaintiff-Appellant Curry-Malcolm made

motion for the recusal of Judge Larimer and responded in opposition of the leave-

to-file sanction. SPA 102 -115. (17-cv-6878, Dkt. # 40) (18-cv-6450, Dkt# 23).

Plaintiff-Appellant's Affidavit, SPA 105 -109.  Plaintiff-Appellant Curry-Malcolm

following the district court's directive timely answered the questions through the

31

submission of her affidavit. SPA 102-115 (17-cv-8678, Dkt# 40) (18-cv-6450, Dkt. #23). Plaintiff-Appellant Curry-Malcolm also through the timely submission of her second amended complaint submitted another affidavit answered the same five questions again. Vol. II of II, ASA 300-362 (17-cv-6878, Dkt. # 43-1) (18-cv-6450, in 17-cv-6878 Dkt. # 43-1). The relevant standard for evaluating a motion for recusal is set forth in 28 U.S.C. §455(a), which provides that, "[a] judge is required to recuse in any proceeding in which his impartiality might reasonably be questioned, and the test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts." In re *International Bus. Mach. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) (internal quotations and citations omitted).

Plaintiff-Appellant Curry-Malcolm's claims for recusal are supported, rational and are not speculation. Even though Plaintiff-Appellant Curry-Malcolm submitted through affidavit her responses to the five questions on March 30, 2021, Judge Larimer in his decision and order dated April 6, 2021, states "Plaintiff was afforded the opportunity to be heard and show cause why sanctions should not be imposed, but has declined to offer any objection, or any explanation for her course of conduct." This was not accurate because Plaintiff-Appellant Curry-Malcolm submitted her affidavit on March 30, 2021, through, Dkt. # 40. SPA 102-115.

32

Plaintiff-Appellant Curry-Malcolm after the grant of an extension of time also provided the district court with a second affidavit on April 26, 2021. Vol. II of II, ASA 300-362 (17-cv-6878, Dkt. # 43-1) (18-cv-6450, in 17-cv-6878 Dkt. # 43-1). Plaintiff-Appellant answered all the questions. Plaintiff-Appellant again answered all the questions by submission of her affidavit on April 26, 2021, because she had been given an extension of time. It was Plaintiff-Appellant's Curry-Malcolm's understanding that the extensions of time to file her amended complaint and/or her second amended complaint also extended the time to response to the Court 34 order. By text order, "Plaintiff's response to the Court's 34 Order should be filed on or before 2/26/21 (Vol. I of 2, ASA 18) (Text Order 36). By text order, "Plaintiff's response to the Court's 34 Order should be filed on or before 3/30/21 (Vol. I of 2, ASA 18) (Text Order 38).

Judge Larimer's bias and prejudice conduct toward *pro se* Plaintiff-Appellant Curry-Malcolm clearly rendered his ability to be objective, fair and impartial thereby making it impossible as a decisionmaker to judge fairly. A federal judge should recuse himself if "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." 28 U.S.C. §144; 28 U.S.C. § 455; *Yagman v. Republic Insurance*, 987.

33

POINT II

**WHETHER THE DISTRICT COURT ERRED AND ABUSED ITS DISCRETION AND JUDICIARY POWER BY IMPROPERLY REINSTATING A LEAVE-TO-FILE SANCTION**

By Decision and Order dated December 30, 2021 (Honorable David G. Larimer, J.) made false allegations against *pro se* Plaintiff-Appellant Curry-Malcolm by claiming that she had been abusive and disrespectful to the court and its staff. SPA 55 (18-cv-6540, Dkt. #18), SPA 49(17-cv-6878, Dkt. 34). The claims by Judge Larimer were unwarranted, offensive, unwanted and not true.

Plaintiff-Appellant complied with the district court's decision and order dated December 30, 2020. On March 30, 2021, Plaintiff-Appellant filed an Amended Complaint. Vol. I of II (ASA 90-199) Vol. II of II (ASA 200-221), (17-cv-6878, Dkt. # 39) (18-cv-6450, Dkt. #22). Plaintiff-Appellant also moved for recusal of Judge Larimer through affidavit, as well as submitted an affidavit in opposition to the leave-to-file sanction in response to the district court's December 30, 2021, order. SPA 102-115 (17-cv-6878, Dkt. # 40) (18-cv-6450, Dkt. # 23), SPA 103, ¶¶ 3-8, SPA 104, ¶ 12, SPA 105, ¶ 16, SPA 110, ¶¶ 38-39, SPA 110-111, ¶¶ 40-41, SPA 111, ¶¶ 42-43, SPA 111, ¶ 44, SPA 112, ¶ 46, Vol. II of II ASA 357-358, ¶¶ 355, 362-363, 366-367.

Plaintiff-Appellant points to the bias and prejudice in the judge's December

34

30, 2020, and April 6, 2021, decision and orders in which he makes unfounded and

unwarranted claims of misconduct against her through lies and personal biases and

prejudice and makes claims that Plaintiff-Appellant did not oppose, provide any

objection, or any explanation for her course of conduct in regard to why sanctions

should not be imposed. Judge Larimer improperly reinstated and imposed a leave-

to-file sanction against Plaintiff-Appellant and managed to discredit and disparage

her just so that he could reinstate the leave-to-file sanction against her by making

false allegations against her, and just so that her did not have to provide her an in-

person opportunity to be notice and heard.

### Decision and Order dated December 30, 2020:

> "The Court observes that Malcolm's prior in-person and telephonic
> interactions with the Court and its staff members have been marked
> by abusive and disrespectful conduct and verbiage by plaintiff, and
> concludes that an in-person hearing is therefore unlikely to be
> productive or helpful to plaintiff or to the Court.

Plaintiff-Appellant has not at any time being abusive and/or disrespectful to

the court and/or it staff whether in-person and/or through telephonic interactions.

(Plaintiff-Affidavit dated March 30, 2021, Dkt. # 40), SPA 107-108, ¶¶ 24-30.

### Decision and Order dated April 6, 2021:

> "Plaintiff subsequently requested two extensions of time to respond to
> the December 30, 2020 Decision and Order (Dkt. #35, #37), both of
> which were granted (Dkt. #36, #38). The deadline for plaintiff's
> response has now passed, and plaintiff has failed to request an

35

additional extension of time, to file an affidavit as directed, or
otherwise to express any opposition or reaction to the potential
reinstatement of leave-to-file sanctions."

Plaintiff-Appellant expressed opposition. (Plaintiff-Affidavit dated March 30,

2021, Dkt. # 40), SPA 110-111, ¶¶ 37-40, SPA 111, ¶ 41-45, SPA 112, ¶ 46.

"Plaintiff was granted an opportunity to be heard concerning whether
they should be imposed relative to the instant defendants, and the
Court, in its December 30, 2020 Decision and Order, listed the factors
it was required to consider, so that plaintiff might tailor her response
to be of maximum helpfulness to the Court and to her own interests.
Despite multiple extensions of time, she has failed to do so, and
has ignored the portion of the Court's order of December 30, 2020
relating to sanctions."

Plaintiff-Appellant did not ignore the portion of the Court's order of

December 30, 202 relating to sanctions. (Plaintiff-Affidavit dated March 30, 2021,

Dkt. # 40), SPA 110-111, ¶¶ 37-40, SPA 111, ¶ 41-45, SPA 112, ¶ 46, SPA 103, ¶¶

3-8, SPA 104, ¶ 12, SPA 105, ¶ 16, SPA 110, ¶¶ 38-39, SPA 110-111, ¶¶ 40-41,

SPA 111, ¶¶ 42-43, SPA 111, ¶ 44, SPA 112, ¶ 46. Plaintiff-Appellant also

submitted another affidavit dated April 26, 2021 (17-cv-6878, 18-cv-6450, Dkt. #

43-1), in opposition to the leave-to-file sanction. Vol. II of II ASA 357-358, ¶¶

355, 362-363, 366-367.

"Plaintiff was afforded the opportunity to be heard and show
cause why sanctions should not be imposed, but has declined to offer
any objection, or any explanation for her course of conduct."

Plaintiff-Appellant offered objections and opposition to the leave-to-file

36

sanction. (Plaintiff-Affidavit dated March 30, 2021, Dkt. # 40), SPA 110-111, ¶¶ 37-40, SPA 111, ¶ 41-45, SPA 112, ¶ 46, SPA 103, ¶¶ 3-8, SPA 104, ¶ 12, SPA 105, ¶ 16, SPA 110, ¶¶ 38-39, SPA 110-111, ¶¶ 40-41, SPA 111, ¶¶ 42-43, SPA 111, ¶ 44, SPA 112, ¶ 46.

By Decision and Order dated April 6, 2021, in its continuation of bias and prejudice against Plaintiff-Appellant Curry-Malcolm, the district court improperly reinstated a leave-to-file sanction against her by falsely accusing her of misconduct of being abusive and disrespectful to the district court and its staff to avoid having to conduct an in-person hearing before the court. Plaintiff-Appellant Curry-Malcolm also provided an affidavit which answered the five questions posed by the court. SPA 102-115, Vol. II of II, ASA 300-362 (17-cv-6878, Dkt. # #40, 43-1) (18-cv-6450, Dkt. ## 23, in 17-cv-6878, Dkt. # 43-1). The court's claim that Plaintiff-Appellant did not object and/or provide any explanation was bias and prejudice and neither did the court consider the Plaintiff-Appellant's affidavit prior to reinstatement of the leave-to-file sanction, which was an abuse of discretion. The court denied the Plaintiff-Appellant notice and opportunity to be heard. The district court did not apply the proper standard regarding imposing a leave-to-file sanction as provide by this court. *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147 F.3d

37

207, 209 (2d Cir. 1998)). See also *Viola v. United States*, 481 Fed. App'x. 30, 31

(2d Cir. 2012)(unpublished opinion).

## POINT III

### WHETHER THE DISTRICT COURT APPLIED AN UNDULY HIGH PLEADING STANDARD WHEN IT HELD THAT PLAINTIFF'S SECOND AMENDED COMPLAINT FAILED TO STATE A PLAUSIBLE CAUSE OF ACTION UNDER FED. R. CIV. PROC. 12(B)(6)

The district court had personal and subject matter jurisdiction and venue was

proper, contrary to defendants-appellees' claim. Vol. II of II, ASA 224-225, ¶¶ 9-

11. Plaintiff-Appellant complied with the December 30, 2020, court's orders, and

dismissal pursuant to Rule 41 was not proper as the Plaintiff-Appellant did not fail

to prosecute the case matters before the district court. Plaintiff made two

extensions of time to respond to the court's Order 34. On March 30, 2021, she filed

an Amended Complaint for 17-cv-6878 and 18-cv-450, together with an Affidavit

in opposition to the leaver-to-file sanction dated March 30, 2021, Dkt. # 40. In the

affidavit, Plaintiff-Appellant made request for the recusal of Judge Larimer and

also responded in opposition to the leave-to-file sanction. SPA 102-115. The

defendants-appellees Rochester City School District nor the Association of

Supervisors and Administrators of Rochester submitted any response to why they

believed that the sanction was appropriate. By Decision and Order on April 6,

2021, the district court dismissed the amended complaint and reinstated a leave-to-

file sanction against Plaintiff-Appellant.

Plaintiff-Appellant exhausted her administrative remedies. Vol. II of II, ASA 225-243, ¶¶12-138. The Collective Bargaining Agreements ("CBA") that governed was dated July 1, 2009-June 30, 2014; July 1, 2014- June 30, 2018. Vol. II of II, ASA 240-241, ¶¶ 139-146. Plaintiff-Appellant made a plausible claim of discrimination. (*Swierkiewicz* v. *Sorema, N.A.*, 534 U.S. 506, 510 (2002).

Plaintiff-Appellant's allegations were sufficient at the pleading stage to survive a Rule 12(b)(6) motion for dismissal. The complaint gave the defendants-appellees fair notice of the nature of the claims against them. The Supreme Court has explained that a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz* v. *Sorema N.A.*, 534 U.S. 506, 512 (2002); accord *Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 568 n.15 (1987) (under Federal Rule 8, claimant has "no duty to set out all of the relevant facts in his complaint"). "Specific facts are not necessary in a Complaint; instead, the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Epos Tech.*, 636 F. Supp.2d 57, 63 (D.D.C. 2009) (quoting *Bell Atlantic* v. *Twombly*, 550 U.S. 544, 555 (2007)).

Plaintiff -Appellant's complaint complied with the district court's orders of

39

December 20, 2021, and April 6, 20121. There is no guidance for a *pro se* on

length of page requirements and/or numbered paragraphs for a complaint and/or

consolidated complaints in local rules and/or Fed. R. Civ. Proc., at the lower

courts. Plaintiff-Appellant's complied with Rules 8, 10 and Plaintiff's second

amended complaint was clear, concise, and comprehensible and gave the

Defendants-Appellees sufficient and actual fair notice of the nature of the claims

against them. In reviewing a motion to dismiss under Rule 12(b)(6), a court must

construe the complaint liberally, "accepting all factual allegations in the complaint

as true and drawing all reasonable inferences in the plaintiff's favor." Concord

Assocs. L.P. v. Entm't Prop. Trust, 817 F.3d 46, 52 (2d Cir. 2016) (quoting

Chambers v. Time Warner, Inc., 282 F.3d 152 (2d Cir. 2002)); see also Tsirelman

v. Daines, 794 F.3d 310, 313 (2d Cir. 2015) (quoting Jaghory v. N.Y. State Dep't

of Educ., 131 F. 3d 326, 329 (2d Cir. 1997)).

Title VII of the Civil Rights Act of 1964 forbids employment discrimination

based on "race, color, religion, sex, or national origin," 42 U. S. C. §2000e–2(a),

and its anti-retaliation provision forbids "discriminat[ion] against" an employee or

job applicant who, inter alia, has "made a charge, testified, assisted, or participated

in" a Title VII proceeding or investigation, §2000e–3(a). Title VII makes it

unlawful for an employer to "fail or refuse to hire or to discharge any individual, or

40

otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Stating a claim of discrimination in violation of Title VII requires the plaintiff to allege two elements: "(1) [that] the employer took adverse employment action against [the plaintiff]; and (2) [that plaintiff's] race, color, religion, sex, or national origin was a motivating factor in the employment decision." Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015)(emphasizing that at the pleadings stage of an employment discrimination case, a plaintiff has the "minimal burden" of alleging facts "suggesting an inference of discriminatory motivation")(quoting Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)).

Plaintiff-Appellant stated a claim under Title VII. She plead that the defendants-appellees Rochester City School District took several adverse employment actions against her. Vol. II of II, ASA 257, ¶¶256-257, ASA 258, ¶271, ASA 259, ¶¶ 274-276, 279-280. Plaintiff-Appellant would not learn and/or discover until post the filing of *Malcolm I, Malcolm II* and post employment, including her termination on July 1, 2017, and April 23, 2018, of several adverse actions that school district had taken against her. Plaintiff-Appellant had no way of knowing and could not have known the extent to which the discriminatory and

41

retaliatory actions and adverse employment actions were taken against her because the information and documentary evidence were in the sole and exclusive possession of the defendants-appellees Rochester City School District, and including her local labor union, ASAR. Plaintiff-Appellant have only been able to discover after the development of *Malcolm I*, *Malcolm II*, *Malcolm III*, and *Malcolm IV* of the magnitude of the school district's unlawful discrimination, retaliation and adverse employment actions because of the school district filings, as well as her local labor union filings in other agencies and/or court matters, including through 2021.

An adverse employment action occurs when an employee "endures a materially adverse change in the terms and conditions of employment." Vega, 801 F.3d 72 at 85 (quoting Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000)). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities," Galabya, 202 F.3d 636 at 640, and includes (but is not limited to) such acts as discharge or demotion, denial of a promotion, assignment of additional responsibilities, involuntary transfer to an inferior position, and denial of benefits. See Little v. NBC, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).

42

Plaintiff-Appellant plead materially facts that she was subjected to concrete adverse change in the terms and conditions of employment, and that those changes included, but not limited to unfavorable work performance evaluation, involuntary transfer, demotion, denial of promotion, loss of wages, stop payment of plaintiff's union dues, and termination. Vol. II of II, ASA, 259, ¶¶ 275-276, 285, 287, 288, 291-294, 299, Vol. II of II, ASA 261-262, ¶¶ 300-304.

POINT IV

**WHETHER PLAINTIFF-APPELLANT ESTABLISHED AGE-BASED DISCRIMINATION IN VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT, 29 U.S.C. § 621, et seq. ("ADEA"), TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 ("TITLE VII"), AND NEW YORK STATE HUMAN RIGHTS LAW ("NYSHRL")**

To establish a prima facie case under the ADEA, a plaintiff must show that: (1) he was within the protected class; (2) he was performing his work satisfactorily; (3) he was discharged; and (4) his position was filled by a person who was substantially younger. Branson v. Price River Coal Co., 853 F.2d 768, 770 (10th Cir.1988); see O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, ___, 116 S. Ct. 1307, 1310, 134 L. Ed. 2d 433 (1996). The "protected class" for purposes of the ADEA is that class of individuals who are at least 40 years of age. 29 U.S.C. § 631(a). Plaintiff-Appellant plead that she was a fifty-eight (58) years old female, Black/African American and that the two employees that the

43

school district chose for the director's position were less qualified than she was and that they were both white and younger than she was. Karl Ann Kittelberger, female, white was 47 years old. Jason George, male, white was 35 years old. But for her age, the adverse employment actions would not have occurred. Plaintiff-Appellant plead that she was terminated because of her age. Vol. II of II, ASA 260, ¶ 286. ASA 265, ¶327, ASA 271, ¶¶ 361-363, ASA 292, ¶ 493. The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). The ADEA also prohibits an employer from "discriminat[ing] against any of his employees ... because such individual ... has opposed any practice made unlawful under [the ADEA]," or has caused, testified, or participated in an official investigation under the ADEA. 29 U.S.C. § 623(d). Title VII provides that it is an "unlawful employment practice for an employer ... to discriminate against any individual ... because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Like the ADEA, Title VII also prohibits employers from retaliating against employees who oppose any practice made unlawful by Title VII (i.e. race and age discrimination). 42 U.S.C. § 2000e–3(a).

44

POINT V

**WHETHER PLAINTIFF-APPELLANT ESTABLISHED RACE-BASED
DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL
RIGHTS ACT OF 1964 ('TITLE VII"), AND NEW YORK STATE HUMAN
RIGHTS LAW ("NYSHRL")**

Plaintiff-Appellant made out a *prima facie* case of unlawful discrimination.

Plaintiff-Appellant plead that she is a Black/African American female over 60

years old and that she is a member of several protected classes. She was qualified

for her position as CASE and the defendants-appellees Rochester City School

District took more than several adverse employment actions against her which

occurred under circumstances giving rise to an inference of unlawful

discrimination based on her race. Plaintiff-Appellant sufficiently laid out numerous

of adverse employment actions that the school district took against her, including,

but not limited to involuntary transfer, denial of promotion, demotion, intentionally

rating her with a "developing" performance job performance rating when she had

actually received a higher rating of highly effective, and termination of her

employment based on her race and but for her race. Vol, II of II, ASA 243, ¶ 164,

ASA 264, ¶¶ 316-317, 321, ASA 266, ¶ 330, ASA 270, ¶¶ 350-356, ASA 293, ¶¶

495-497, ASA 301, ¶¶ 7-9. The Rochester City School District's proffered basis

for her termination was was pretextual and false. Twenty-two probationary CASE

administrators were not laid-off and/or terminated. Plaintiff-Appellant's Affidavit

45

dated April 26, 2021, Dkt. # 43-1, Vol. II of II, ASA 347, ¶ 284. Plaintiff-Appellant was subjected to race-based discrimination that was motivated by discriminatory animus.

## POINT VI

### WHETHER PLAINTIFF-APPELLANT ESTABLISHED DISPARATE TREATMENT UNDER TITLE VII

Plaintiff-Appellant was denied the same employment, promotion and employment opportunities was available to other employees or applicants. Plaintiff-Appellant was treated less favorable than other similarly situated school district employees and with the administrative unit member for ASAR, including less favorable younger white unit members. Vol. II of II, ASA 260, ¶¶ 285-288, ASA 261-262, ¶¶ 298-299, ASA 270, ¶ 357, ASA 273-274, ¶ 381. Plaintiff-Appellant's Reply Opposition to Motion to Dismiss (17-cv-6878, Dkt. # 56, 18-cv-6450, Dkt. # 30), pgs., 14-15, ¶ 40, pgs. 39-40, ¶¶ 104-105, pg. 52, ¶ 136, pg. 56, ¶ 155, pgs. 60-61, ¶¶ 167-170, pg. 82, ¶ 240, pg., 83, ¶ 243. The defendants-appellees treated Plaintiff-Appellant less well than it did other similarly situated employees. Plaintiff-Appellant's Reply Opposition to Motion to Dismiss (17-cv-6878, Dkt. # 56, 18-cv-6450, Dkt. # 30), pgs. 71-72, ¶¶ 208-210, pg. 378.

Plaintiff-Appellant was denied promotions that other similarly situated employees were freely given and without making application to those positions,

46

including but not limited to Director of Alternative Special Education
Programming (NorthStar), Assistant Principal, Zone Director of Specialized
Services, Coordinating Administrator of Special Education (July 1, 2017 through
November 19, 2017), Principal, Academy Director, Director, Executive Director of
Teaching and Learning Special Initiatives, Principal on Assignment, Administrator
on Assignment, under circumstances giving rise to the inference of discrimination.
Plaintiff-Appellant was qualified and certified for the vacant positions. Plaintiff-
Appellant's Reply In Opposition to Defendants-Appellees' Motion to Dismiss, 17-
cv-6878, Dkt. # 56, 18-cv-6450, Dkt. # 30, pg. 57, ¶ 158, pg. 61-62, ¶ 171, pg. 66,
¶¶ 190-191, Vol. II of II, ASA 261-261, ¶¶ 330-302, ASA 262, ¶303-307.

  "An *inference* of *discrimination may arise* if a plaintiff can show that he was
treated differently than similarly situated employees of a different race[.]" Jackson
v. Norwalk Board of Education, No. Civ.3:02CV1777, 2004 WL 2472223, at
*5 (D.Conn. Sept. 9, 2004) (citing, *inter alia*, Shumway v. United Parcel
Service,118 F.3d 09, 63 (2d Cir. 1997)) (emphasis added). "To be `similarly
situated' for the purposes of Title VII, the individuals with whom plaintiff
compares himself must be similarly situated in all material respects." Hogan v.
State of Connecticut Judicial Branch, 220 F. Supp.2d 111, 119(D.Conn.

47

2002), aff'd without pub'd opinion, 64 Fed. Appx. 256 (2d Cir. 2003) (internal

quotation marks and citation omitted).

## POINT VII

### WHETHER PLAINTIFF-APPELLANT ESTABLISHED HOSTILE WORK ENVIRONMENT UNDER TITLE VII AND NEW YORK STATE HUMAN RIGHTS LAW

Plaintiff-Appellant plead that the Rochester City School District promoted,

condone and encouraged a workplace culture of discrimination, harassment,

intimidation and retaliation and that the school district created an abusive work

environment over years which sufficiently altered the condition of her

employment, including treating her less well and/or favorable that similarly

situated employees. Plaintiff-Appellant's Affidavit, 17-cv-6878, Dkt. # 56, pg. 14-

15, ¶ 40, pg. 39-40, ¶¶ 104-105, Vol. II of II, Plaintiff-Appellant's Affidavit dated

April 26, 2021 (17-cv-6878, Dkt. # 43-1, Vol. II of II, ASA 326, ¶¶ 173-175, ASA

339-340, ¶¶ 250-251, ASA 340, ¶ 256.

In order to establish a hostile work environment, claim under Title VII or the

NYSHRL, a plaintiff must "show that 'the workplace is permeated with

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or

pervasive to alter the conditions of the victim's employment and create an abusive

working environment.'" Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d

48

Cir. 2010) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)). "To decide whether the threshold has been reached, courts examine the casespecific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 203 (2d Cir. 2014) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). The Court analyzes whether an employer's remedial actions were sufficient based on the totality of the circumstances. Id. (citing Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998)).

## VIII

### WHETHER PLAINTIFF-APPELLANT ESTABLISHED RETALIATION UNDER TITLE VII, ADEA, NYSHRL

To establish a prima facie case of retaliation, a plaintiff must show that: (1) she participated in a protected activity; (2) the defendant knew of the protected activity; (3) she suffered an adverse employment action; and (4) there exists a causal connection between the protected activity and the adverse employment action. See Bucalo, 691 F.3d at 129; Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003). Plaintiff's amended complaint sufficiently alleges that she was within a protected class. See Amended Complaint at pg., 22, ¶162-164, pg. 43, ¶ 316, ¶321, pg. 66, ¶ 467, pg. 67, ¶ 471. The Defendants knew of the protected activity. See, Amended Complaint, pg., 15, ¶ 115, pgs., 16-17, ¶¶ 122-123, pg. 118, ¶ 135, pg.,

49

29, ¶ 203, pg., 38, ¶¶ 277-280. Defendant Rochester City School District terminated the Plaintiff effective July 1, 2017. The school district's actions were in closed proximity to the filings of Plaintiff-Appellant's internal complaints and discrimination complaints. Vol. II of II, ASA 259, ¶¶ 275-280, 287-288.

Defendants-Appellees Rochester City School District intentionally in retaliation changed the Plaintiff-Appellant's name and caused all kind of adverse actions, including making false claims that she had somehow stolen her own identify, the school district also intentionally changed her social security number in its accounting system to show that she literally was another person, a Bernice Malcom. The school district's actions triggered unwarranted and unwanted heightened false claims of identity thief against the Plaintiff-Appellant. The school district adverse employment actions did not stop there, it officers, employees, supervisors and agents made false misrepresentations to agencies, social security, the New York State Teachers' Retirement System and other agencies. Their false claims of identity thief caused a heightened presence of law enforcement across states. Vol. II of II, ASA 259, ¶ 277, Plaintiff-Appellant's Affidavit Reply In Opposition to Motion to Dismiss dated August 20, 2021, pg. 15, ¶¶ 41- 42, pgs. 34-35, ¶¶ 93-95, pgs., 51-52, ¶¶ 130-137, pgs. 64-65, ¶ 184.

50

IX

## THE UNION BREACHED ITS FAIR DUTY OF REPRESENTATION

To establish a claim for breach of the duty of fair representation, a plaintiff must satisfy two elements. First, the plaintiff must demonstrate that the "union's conduct toward [him as] a member of the collective bargaining unit [was] arbitrary, discriminatory, or in bad faith." Vaca, 386 U.S. at 190 (citation omitted). Second, the plaintiff must demonstrate "a causal connection between the union's wrongful conduct and [the plaintiff's] injuries." White v. White Rose Food, 237 F.3d 174, 179 (2d Cir. 2001) (internal quotation marks and citation omitted). Arbitrary conduct includes both intentional conduct and "acts of omission which, while not calculated to harm union members, may be so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary." NLRB v. Local 282, Int'l Bhd. of Teamsters, 740 F.2d 141, 147 (2d Cir. 1984) (internal quotation marks and citations omitted). For instance, "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." Vaca, 386 U.S. at 191; see also Caputo v. Nat'l Ass'n of Letter Carriers, 730 F. Supp. 1221, 1229 (E.D.N.Y. 1990) ("[T]he failure to act does make out a claim ... because it is not the result of an error of judgment, given that it was not the result of a 21 deliberative process, but rather an omission which is properly characterized as arbitrary."); see, e.g., Moore v. Roadway Express, Inc.,

No. 07-CV-977, 2008 WL 819049, at *4-5 (E.D.N.Y. Mar. 25, 2008) (denying

motion to dismiss where plaintiff alleged that the union failed to respond to and

conduct any investigation into his complaints).

Plaintiff-Appellant sufficiently plead that ASAR actions were arbitrary,

discriminatory and done in bad faith based on her protected class, Black/African

American, female and age. Plaintiff-Appellant also plead that her local labor union

aided and abetted the school district in its unlawful discrimination and retaliation

against her and that her union personally and individual participated and was

directly involved and treated her less well than it did other similarly situated

district employees in administrative positions, including Karl Ann Kittelberger,

female white, then age 47. She also plead that her union treated her less well than

unit members outside the protected class, including, but not limited to, Jason

George, male white, then age 35, and Yajaira Walker (now Nguyen), female,

white, then age 30. Plaintiff-Appellant also plead that her union intentionally based

on her race and age allowed the school district to discriminate against her by

terminating her employment, demoting her, not calling her to vacancies, denial of

promoting her, providing several reasons for her termination, refusing to pay her

union dues, loss of ages, not fairly representing her, but nit limited to. Dkt# 43-1,

52

Vol. II of II, ASA 301, ¶¶ 7-9, ASA 336-338, ¶¶ 238-247, ASA 247-248, ¶¶ 184-190, ASA 257, ¶ 263, ASA 260, ¶ 286.

Discrimination by unions is prohibited by Title VII, which makes it "an unlawful employment practice for a labor organization ... to exclude or to expel from its membership, or otherwise discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.c. § 2000e-2(c)(I); see Yerdon v. Henry. 91 F.3d 370, 375 (2d Cir. 1996) (holding labor union liable under Title VII).

A union, as the exclusive bargaining representative of all employees in the bargaining unit, is statutorily obligated "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967) (citation omitted). "A union breaches its duty of fair representation if its actions can fairly be characterized as so far outside a wide range of reasonableness that they are wholly arbitrary, discriminatory, or in bad faith." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998) (internal quotation marks and citations omitted).

POINT X

**PLAINTIFF ESTABLISHED BREACH OF CONTRACT**

53

Plaintiff-Appellant sufficiently plead that there was an employee-employer relationship between her, and the school district and that the employment contract was binding. Vol. II of II, ASA 248, ¶ 192, ASA 251-251, ¶¶ 241-217, ASA, 253, ¶ 227, Dkt. 43-1, ASA 306-307, ¶¶ 53-60, Plaintiff-Appellant's Reply dated August 20, 2021, pg. 34, ¶¶ 91-92, pgs. 54-55, ¶ 147, pgs., 55-56, ¶ 152.

There also existed a CBA between the school district and the union. Dkt. # 43, Vol. II of II, ASA 240- 243, ¶¶ 139-161. Plaintiff has sufficiently pleaded a breach of contract claim against the defendants. "The essential elements of a breach of contract cause of action are 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach'" (*Canzona v Atanasio*, 118 AD3d 837, 838, quoting *Dee v Rakower*, 112 AD3d 204, 208-209). Here, Plaintiff has indeed alleged a breach of contract under her union's Collective Bargaining Agreement ("CBA"), however, "[i]t is well-settled that an employee may maintain a breach of contract action based upon a CBA directly against the employer only if the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." Black v. Anheuser-Busch In Bev, 220 F. Supp. 3d 443, 449 (S.D.N.Y.

2016) (quoting Tomney v. Int'l Ctr. for the Disabled, 357 F. Supp. 2d 721, 738

(S.D.N.Y. 2005)).

## POINT XI

### EQUAL PROTECTION AGAINST ALL DEFENDANTS-APPELLEES

Plaintiff-Appellant Curry-Malcolm sufficiently plead a cause of equal

protection against all defendants-appellees. She plead that they all acted under

color of law and were state actors. She plead that the defendants-appellees

personally and individually with awareness and knowledge of their unlawful

actions actually participated in, engaged in, aided and abetted in, and condone the

unlawful actions against her and empowered their employees, officers, supervisors

and agents based on her race and age. Vol. II of II, ASA 245, ¶¶ 169-171 (Deane-

Williams), ASA 245, ¶¶ 172-174 (Simpson), ASA 246, ¶ 175-177 (Pauly), ASA

246-247, ¶¶ 178-183, 193 (Root), ASA 257, ¶¶ 249-262, ASA 326, ¶¶ 173-175

(Root), ASA 248-249, ¶¶ 191, 194-196 (Cliby), ASA 248-249, ¶¶ 191, 197-200,

Plaintiff-Appellant's Reply Affidavit In Opposition to Motion to Dismiss, pgs. 5-7,

¶¶ 13-18 (Deane-Williams), pgs. 8-9, ¶¶ 19-20 (Simpson), pgs., 9-10, ¶¶ 21-22,

(Pauly), pgs. 10-12, ¶¶ 23-33 (Root), pgs., 12-13, ¶¶ 34-35 (Cliby), pg., 13, ¶¶ 36,

37, pg. 380 (Pauly). N.Y. 16EXEC. LAW § 296(6); see also Feingold v. New

York, 366 F.3d 138, 158 n.19 (2d Cir. 2004). Thus, an individual defendant "who

55

actually participates in the conduct giving rise to a discrimination claim may be

held personally liable under [NYSHRL]." Tomka v. Seiler Corp., 66 F.3d 1295,

1317 (2d Cir. 1995), abrogated on other grounds, Burlington Indus., Inc. v. Ellerth,

524 U.S. 742 (1998).

POINT XII

### PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER TITLE VII, NEW YORK STATE EXECUTIVE LAW §290 et. Seq., NYSHRL, ADEA, EQUAL PROTECTION, AND 42 U.S.C. §1983 AGAINST ALL DEFENDANTS

Plaintiff-Appellant sufficiently and factual plead that her equal protection

rights were violated by the defendants-appellees, including the Rochester City

School District, ASAR, Barbara Deane-Williams, Timothy Cliby, John Rowe,

Teresa Root, Sandra Simpson and Mary Pauly. "To prove a violation of the Equal

Protection Clause ... a plaintiff must demonstrate that he was treated differently

than others similarly situated as a result of intentional or purposeful discrimination

... [and] that the disparity in treatment cannot survive the appropriate level of

scrutiny ...." Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) (citations

omitted). Plaintiff-Appellant Curry-Malcolm plead that she was within the

protected age group of 40 and above. She plead that she was qualified for her

position, that she was terminated based on her age and race, and that the

circumstances surrounding her terminations gave rise to an inference of

discrimination and that she was treated less favorable than other similarly situated district employees. Vol II of II, ASA 261-262, ¶¶ 300-302, ASA 262, ¶ 303, ASA, 262, ¶¶ 304-307, ASA 241, ¶¶ 149-161, ASA 250-251, ¶¶ 208-213, ASA 307, ¶¶ 61-66, ASA 308, ¶¶ 70-72, Plaintiff-Appellant's Reply In Opposition to Motion to Dismiss, pgs. 14-15, ¶ 40, pgs. 39-40, ¶¶ 104-105, pg. 62-63, ¶¶ 172-175, pg. 82, ¶ 240, pg. 83, ¶ 243, pg. 52, ¶ 136, pg. 56, ¶ 155, pgs. 60-61, ¶¶ 167-170, pg., 65, ¶ 186, pg. 382.

To establish a prima facie case of discrimination, a plaintiff must show that: (1) she was within the protected age group; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the surrounding circumstances permit an inference of discrimination. See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010); Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 129 (2d Cir. 2012).

"[C]laims brought under [NYSHRL] are analytically identical to claims brought under Title VII. Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (citation omitted); see also Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims brought under Title VII ... [and] New York Executive Law § 296 ...." (citations omitted)). Likewise, NYSHRL claims are analyzed under the same standard as

claims brought under the ADEA. See id. at 1304 n.4; see also Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist., 374 F.3d 66, 70 n.2 (2d Cir. 2004) ("Since the [NYSHRL] statute mirrors the requirements of the ADEA, violation of one necessarily implies violation of the other." (citations omitted)). However, unlike Title VII and the ADEA, it is also unlawful "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NYSHRL]."

## POINT XIII

## **PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER 42 U.S.C. § 1983**

Plaintiff-Appellant Curry-Malcolm sufficiently and factual plead that her termination constituted a deprivation of his property without due process. Plaintiff-Appellant Curry-Malcolm had a constitutionally protected property interest in her position as a CASE, professional educator and administrator. Plaintiff-Appellant was not an at-will employee, and her employment was governed by the parties collective bargaining agreement, as well as the employer-employee contractual relationship between plaintiff-appellant and the defendants-appellees Rochester City School District.

Plaintiff-Appellant Curry-Malcolm established a claim under 42 U.S.C. §1983. In order to state a claim under § 1983, plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color

58

of state law, and (2) that such conduct deprived plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993). Plaintiff has sufficiently pleaded a cause of action for race and age discrimination, disparate treatment, equal protection, 42 U.S.C. §1981, 42 U.S.C, §1983, against all Defendants, and breach of contract and retaliation under Title VII of the Civil Rights Act of 1964 "Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and New York State Human Rights Law ("NYSHRL"), and wrongful termination.  See Plaintiff-Appellant's Amended Complaint, Vol. II of II, ASA 222-299, Reply In Opposition, pgs. 40-41, ¶ 108, pg. 41, ¶ 109.

## POINT XIV

## PLAINTIFF-APPELLANT SUFFICIENTLY STATES A CAUSE OF ACTION UNDER 42 U.S.C. § 1981

Section 1981 protects each individual's right "to make and enforce contracts ... including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, 23 terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)- (b). "To establish a § 1981 claim, a plaintiff ... must show: (1) that [he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination concerned one or more of the activities enumerated in § 1981."

59

Lauture v. Int'l Bus. Machs. Corp., 216 F.3d 258, 261 (2d Cir. 2000) (citation

omitted). Claims under § 1981 operate under the same McDonnell Douglas

burden-shifting framework as Title VII and ADEA claims do. See Martin v.

Citibank, N.A., 762 F.2d 212, 216-17 (2d Cir. 1985). This is because "[m]ost of

the core substantive standards that apply to claims of discriminatory conduct in

violation of Title VII are also applicable to claims of discrimination in employment

in violation of § 1981." Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir.

2004).

Defendants-Appellees intended to discriminate on the basis of Plaintiff-

Appellant's race and age. To state a claim under section 1981, a plaintiff must

allege facts in support of the following elements: (1) the plaintiff is a member of a

racial minority; (2) an intent to discriminate on the basis of race by the defendant;

and (3) the discrimination concerned one or more of the activities enumerated in

the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).

See Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1087 (2d

Cir. 1993). Plaintiff-Appellant's In Opposition on Motion to Dismiss, pg., 48, pg.

123, pgs. 48-49, ¶ 124. Plaintiff-Amended Complaint.

POINT XV

**PLAINTIFF-APPELLANT WAS TENURED**

60

Under the parties collective bargaining agreement, Plaintiff-Appellant could not be terminated without due process of law. CBA, Art. 15 and 16, SPA 238-241, CBA, Art. 23, SPA 245-246, CBA, Art. 24, SPA 247-250, CBA, Art. 25, SPA 251. Plaintiff-Appellant Curry-Malcolm was tenured. Plaintiff-Appellant's Affidavit and Second Amended Complaint dated April 26, 2021, Vol. II of II, ASA 340, ¶ 256, ASA 346-347, ¶¶ 280-281, ASA 252, ¶ 218, ASA 253, ¶ 226, Plaintiff-Appellants' Reply In Opposition to Motion to Dismiss, pg. 35, ¶ 96, pg. 67, ¶ 193, pg. 81-83, ¶¶ 237-238.

POINT XVI

## PLAINTIFF-APPELLANT ESTABLISHED A CAUSE OF ACTION UNDER THE CONTINUING VIOLATION DOCTRINE

"Under the continuing violation doctrine, the existence of a continuous policy or practice delays the commencement of the statute of limitation until the last act in furtherance of the policy or practice." Salgado v. The City of New York, 2001 WL 290051(S.D. N. Y.2001). See, Cornwell v. Robinson, 23 F.3d 694, 703-04 (2nd Cir., 1994). Plaintiff-Appellant plead the defendants-appellees Rochester City School District continued a pattern and practice of unlawful discrimination and retaliation against her. Vol. II of II, ASA 250, ¶¶ 203-204, ASA 261, ¶¶ 296-297, ASA 261-262, ¶¶ 298-299, Amended Complaint dated April 26, 2021, Vol. II of II, ASA 326, ¶¶ 173-175. Rochester City School District's reasons proffered for

the adverse action that it took against Plaintiff-Appellant was not the real reason, and neither was the adverse action taken for any legitimate business, and/or economic reason.

POINT XVII

## PLAINTIFF-APPELLANT WAS WRONGFULLY TERMINATED

Plaintiff-Appellant Curry-Malcolm was terminated for illegal reasons and was pretextual due to her race and age. Plaintiff-Appellant did not violate any of the school district policies and the firing was not due to misconduct on her part. Neither was twenty-two (22) CASE probationary CASE positions abolished, and neither was twenty-two (22) probationary CASEs laid off and/or placed on a preferred eligibility list. Plaintiff was not eleven (11) of the twenty-two (22) individuals laid off effective July 1, 2017. ASAR Defendants claim that prior to March 2017, the school district has an outside audit of its Special Education Department is not accurate. Judith Elliot did not submit her recommendations to the school district until April 2017. The audit referenced by the ASAR defendants were completed after March 21, 2017. Plaintiff was the only impacted probationary CASE fired as of July 1, 2017, the only Black/African American, oldest, and only female. Plaintiff was the only Black/African American female in the CASE position that job was terminated on April 23, 2018. The school district

62

defendants-appellees gave several different shifting reasons for the Plaintiff-Appellant was terminated. "The fact that the employer gave different reasons at different times for its action surely supports a finding that the reason it ultimately settled on was fabricated," the First Circuit concluded. See Vélez v. Thermo King, 585 F.3d 441 (1st Cir. 2009).

A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, non- retaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason. See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 105-07 (2d Cir. 2001)(age and gender discrimination); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (age discrimination); Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 156-57 (2d Cir. 1998) (disability discrimination), superseded by statute on other grounds as stated in Hilton v. Wright, 673 7 F.3d 120, 128 (2d Cir. 2012); EEOC v. Ethan Allen, Inc., 44 8 F.3d 116, 120 (2d Cir. 1994) (age discrimination) (collecting 9 cases).

The Rochester City School District unlawfully terminated Plaintiff's employment by and through an official Board of Education meeting held on March

20, 2018, with an effective date of April 23, 2018, Board Resolution 2017-2018:

649. Pl., Second Combined Verified Amended Complaint Dated April 26, 2021,

pg., 4, ¶ 309; Pl., Affidavit Dated April 26, 2021, pg. 7, ¶ 52

The School District did not provide Plaintiff -Appellant with any notice that

it was going to terminate her employment on March 20, 2018, at its scheduled

Board of Education Meeting. Pl., Affidavit Dated April 26, 2021, pg., 4, ¶ 32; pg.,

5, ¶ 33, ¶ 35, ¶ 37. This was in violation of the parties collective bargaining

agreement ("CBA"), Art. 15, and Art. 16.

In regard to the April 23, 2018, unlawful termination of Plaintiff's

employment, the ASAR Defendants seems to be now conceding that the Plaintiff is

currently still an active employee with the Rochester City School District as a

probationary CASE/Associate Director of Special Education, and active unit

member. Def., ASAR's Mem. of Law (Docket No. 46-1) at ¶ 1). Plaintiff contends

that she was a tenured employee.

The defendants-appellees' actions were arbitrary, capricious, intentional,

willful, done in bad faith and deprived Plaintiff-Appellant Curry-Malcolm of her

rights to constitutional due process. Defendants-Appellees Rochester City School

District's adverse actions taken against plaintiff-appellant were discriminatory and

retaliatory and based on race and age and plaintiff-appellant's sex (female,

64

excludes sexual harassment and sexual violence) and gender (female, minority).

Vol. II of II, ASA pgs., 262-263, ¶ 309, ASA 255, ¶ 241, ASA 306, ¶ 52, Plaintiff-

Appellant Reply In Opposition to Motion to Dismiss, pg. 62-62, ¶¶ 172-175, pg.

75, ¶¶ 225-236, pgs. 72-73 ¶ 214, pg., 85, ¶ 253, pgs. 86-78, ¶¶ 257-260, pg. 370,

pg. 371, pg. 372. Defendants-Appellees failed to remedy the matter but allowed it

to continue over years, including the 2017-2018 school year. Plaintiff-Appellant's

Memo. of Law, pgs. 7-8.

## CONCLUSION

For the reason stated above, Plaintiff-Appellant Curry-Malcolm urge this

Court to reverse the district court's decision and remand this case with instructions

for further proceedings, vacate the reinstatement of the leave-to-file sanction,

recusal of Honorable David G. Larimer, for discovery, and for any other relief that

the Court deems to be just and proper.

Respectfully submitted, this the 24th day of May 2022.

DATED:     May 24 2022
           West Henrietta, New York
           Monroe County

                           BY: *Mrs. Bernice Curry-Malcolm*
                              Bernice Curry-Malcolm, *pro se*
                              6 Gingerwood Way
                              West Henrietta, New York 14586

                              *Pro se Plaintiff-Appellant*

65

COPY TO:

Rochester City School District Department of Law
Attention: Alison Moyer, Counsel for the Defendants-Appellees Rochester City
School District, Barbara-Deane Williams, Superintendent of Schools, Sandra
Simpson, Chief of Schools, Interim Executive Director of Specialized Services,
Teresa Root, Zone Director of Specialized Services
131 West Broad Street,
Rochester, New York, 14614
Telephone: (585) 262-8550
Email: Alison.moyer@rcsdk12.org

School Administrators Association of New York State ("SAANYS")
Counsel for the Association of Supervisors and Administrators of Rochester
("ASAR"
Attention: Jennifer Carlson, SAANYS; Deputy Counsel
8 Airport Park Blvd.
Latham, New York 12110
Telephone (518) 782-0600
Email: jcarlson@saanys.org

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of the Appellate Procedure 32 (a) (7) (B), I certify

that this brief was prepared using Times New Roman font, 14 point, and complies

with the type-volume limitation of less tan 14, 000 words and 1,400 lines. This

Brief contains  13, 985 words and 1,347 lines from the Jurisdictional Statement

through the Conclusion, as determined by the Microsoft Office Word Suite word

counting program.

 ORIGINAL

# Nos. 21-2683 and 21-2700
# CONSOLIDATED CIVIL APPEALS

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| BERNICE CURRY-MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| v. | ) | WDNY Civil Docket No.: 18-cv-6450 (*Malcolm III*) Honorable David G. Larimer, J. |
| ROCHESTER CITY SCHOOL DISTRICT, BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No.: 21-2683, Lead Docket Number |

| | | |
|---|---|---|
| BERNICE C MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| | ) | WDNY Civil Docket No.: 17-cv-6878 (*Malcolm I*) Honorable David G. Larimer, J. |
| ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER ("ASAR"), TIMOTHY CLIBY, President and Individually, and John Rowe, Vice President and Individually, ROCHESTER CITY SCHOOL DISTRICT, BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No. 21-2700, Consolidated Member |

## CERTIFICATE OF SERVICE

I, Mrs. Bernice Curry-Malcolm, hereby certify under the penalty of perjury that on

the 24th day of May 2022, that I served by United States Postal Express Overnight mail

and United States Priority Mail the Plaintiff-Appellant Brief w/Special Appendix and

Appellant Separate Appendix on the following as follows:

68

(via U.S. Postal Service Overnight Priority Express Mail)
United States Court of Appeals
For the Second Circuit
Thurgood Marshall U.S. Court House
40 Foley Square
New York, New York 10007

(via U.S. Postal Priority Mail)

Rochester City School District Department of Law
Attention: Alison Moyer, Counsel for the Defendants-Appellees Rochester City
School District, Barbara-Deane Williams, Superintendent of Schools, Sandra
Simpson, Chief of Schools, Interim Executive Director of Specialized Services,
Teresa Root, Zone Director of Specialized Services
131 West Broad Street,
Rochester, New York, 14614
Telephone: (585) 262-8550
Email: Alison.moyer@rcsdk12.org

School Administrators Association of New York State ("SAANYS")
Counsel for the Association of Supervisors and Administrators of Rochester
("ASAR"
Attention: Jennifer Carlson, SAANYS; Deputy Counsel
8 Airport Park Blvd.
Latham, New York 12110
Telephone (518) 782-0600
Email: jcarlson@saanys.org

Bernice Curry-Malcolm, *pro se*
6 Gingerwood Way
West Henrietta, New York 14586

*Pro se Plaintiff-Appellant*

69

# SPECIAL
# APPENDIX

# TABLE OF CONTENTS FOR SPECIAL APPENDIX

                                                                    Page

Table of Contents ----------------------------------------------------- *i,ii,iii,iv*

United States Court of Appeals For the Second Circuit
Mandate Order, 19-2416  (18-cv-6450, *Malcolm III*) Dated
December 4, 2020 ----------------------------------------------- SPA- 1-6


United States Court of Appeals For the Second Circuit
Certified Copy of Summary  Order, 19-2416  (18-cv-6450, *Malcolm III*)
Dated November 12, 2020 -------------------------------------------- SPA- 7-12


United States Court of Appeals For the Second Circuit
Certified Copy of Summary  Order, 19-2412 (17-cv-6878, *Malcolm I*)
Dated October 14, 2020 ------------------------------------------ SPA- 12-20


United States Court of Appeals For the Second Circuit
Mandate Order, 19-2412  (17-cv-6878, *Malcolm I*) Dated
November 16, 2020 ------------------------------------------------ SPA- 21-28


United States Court of Appeals For the Second Circuit
Mandate Order, 19-2409  (17-cv-6873, *Malcolm II*) Dated
December 3,  2020 -------------------------------------------------- SPA- 29-32


United States Court of Appeals For the Second Circuit
Certified Copy of Summary  Order, 19-2409  (17-cv-6873, *Malcolm II*) Dated
November 12, 2020 --------------------------------------------------- SPA- 33-36


United States District Court, Western District of New York
Decision and Order (17-cv-6873, *Malcolm II*)
Dated July 11, 2019, Honorable David G. Larimer, J.)----------------- SPA- 37-45



United States District Court, Western District of New York
Decision and Order (17-cv-6878, *Malcolm I*)
Dated December 30, 2020, Honorable David G. Larimer, J.)---------- SPA- 46-51

*i*

TABLE OF CONTENTS FOR SPECIAL APPENDIX …

Page

United States District Court, Western District of New York
Decision and Order (18-cv-6450, *Malcolm III*)
Dated December 30, 2020, Honorable David G. Larimer, J.)---------- SPA- 52-57

United States District Court, Western District of New York
Decision and Order (17-cv-6878, *Malcolm I*)
Dated October 19, 2021, Honorable David G. Larimer, J.)---------- SPA- 58-76

Entry of Judgment dated October 25, 2021 (18-cv-6450) -------------- SPA- 77

United States District Court, Western District of New York
Decision and Order (18-cv-6450, *Malcolm III*)
Dated October 19, 2021, Honorable David G. Larimer, J.)---------- SPA- 78-96

Entry of Judgment dated October 25, 2021 (17-cv-6878) ------------- SPA- 97

Notice of Motion For Recusal of
Honorable David G. Larimer Dated March 30, 2021------------------- SPA-98-101

Plaintiff's Affidavit Dated March 30, 2021-------------------------- SPA-102-115

United States District Court, Western District of New York
Decision and Order (18-cv-6450, *Malcolm III*)
Dated  April 6, 2021, Honorable David G. Larimer, J.)---------- SPA- 116-127

United States District Court, Western District of New York
Decision and Order (17-cv-6878, *Malcolm I*)
Dated  April 6, 2021, Honorable David G. Larimer, J.)---------- SPA- 128-139

New York State Division of Human Rights Probable Cause
Dated August 29, 2017 (NYSDHR Case No. 10186902,
Against the Rochester City School District) ------------------------- SPA- 140

*ii*

## TABLE OF CONTENTS FOR SPECIAL APPENDIX...

Page

United States Equal Employment Opportunity Commission
Dismissal and Notice of Rights Dated December 4, 2019---------     SPA-141

Plaintiff-Appellant's NYSDHR/EEOC Complaint dated
March 16, 2017------------------------------------------------------     SPA-142-146

New York State Division of Human Rights Probable Cause
Dated August 29, 2017 (NYSDHR Case No. 10187117------------     SPA- 147

United States Equal Employment Opportunity Commission
Dismissal and Notice of Rights Dated December 4, 2019---------     SPA-148

New York State Division of Human Rights Determination
Dated August 29, 2017 (NYSDHR Case No. 10187122,
Against the Association of Supervisors and Administrators of
Rochester ("ASAR) ---------------------------------------------------     SPA- 149-150

United States Equal Employment Opportunity Commission
Dismissal and Notice of Rights Dated September 22, 2017---------     SPA-151

Plaintiff-Appellant's NYSDHR/EEOC Complaint dated
March 30, 2017----------------------------------------------------------     SPA-152-160

New York State Division of Human Rights Determination
Dated August 30, 2017 (NYSDHR Case No. 10187620,
Against the Rochester City School District) ------------------------     SPA- 161-163

United States Equal Employment Opportunity Commission
Dismissal and Notice of Rights Dated September 22, 2017---------     SPA-164

Plaintiff-Appellant's NYSDHR/EEOC Complaint dated
25, 2017-------------------------------------------------------------------     SPA-165-172

*iii*

TABLE OF CONTENTS FOR SPECIAL APPENDIX...

                                                    Page

New York State Division of Human Rights Determination
Dated February 14, 2018 (NYSDHR Case No. 10189668,
Against the Rochester City School District) ------------------------    SPA- 173-174

United States Equal Employment Opportunity Commission
Dismissal and Notice of Rights Dated March 20, 2018---------          SPA-175

New York State Division of Human Rights Notice and
Final Order Dated October 3, 2019-----------------------------------    SPA-176-199

Collective Bargaining Agreement Between the City School
District of Rochester, New York, and the Association of Supervisors
and Administrators of Rochester Dated
July 1, 2009- June 30, 2014----------------------------------------------    SPA- 200- 267

Collective Bargaining Agreement Between the City School
District of Rochester, New York, and the Association of Supervisors
And Administrators of Rochester Dated
July 1, 2014- June 30, 2018----------------------------------------------    SPA- 268-345

Association of Supervisors and Administrators of Rochester
Constitution  -------------------------------------------------------------    SPA- 346-352

Rochester City School District Superintendent's
Regulation 0100-R Dated August 12, 2015 -------------------------    SPA- 353-359

Rochester City School District 0100.0 Policy Prohibiting
Discrimination or Harassment of Students or Employees
Dated March 28, 2015, Adopted June 15, 2006, June 28, 2012,
February 14, 2013, July 29, 2013 --------------------------------------    SPA-360-369

Rochester City School District 0100.0 Policy Prohibiting
Discrimination or Harassment of Students or Employees
Amended, October 26, 2017 -----------------------------------------    SPA-370-379

*iv*

MANDATE

19-2416
Curry-Malcolm v. Rochester City School District

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT.  CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1.  WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER").  A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of November, two thousand twenty.

PRESENT:
      ROBERT D. SACK,
      ROBERT A. KATZMANN,
      WILLIAM J. NARDINI,
          *Circuit Judges.*

---

Bernice Curry-Malcolm,

        *Plaintiff-Appellant,*

      v.                             19-2416

Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually and Collectively,

        *Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:          Bernice Curry-Malcolm, pro se, West Henrietta, NY.

FOR DEFENDANTS-APPELLEES:        Alison Moyer, Rochester City School District, Rochester, NY.

SPA – 1

MANDATE ISSUED ON 12/04/2020

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED IN PART** and the case **REMANDED** for further proceedings.

Appellant Bernice Curry-Malcolm, [1] proceeding pro se, appeals the district court's judgment dismissing her discrimination complaint against the Rochester City School District ("RCSD") and its superintendent, Barbara Deane-Williams. In December 2017, Ms. Malcolm filed two nearly identical complaints in district court, initiating: (1) an action against RCSD, Deane-Williams, Ms. Malcolm's union, and union officials, which the district court designated *Malcolm I*, and (2) an action against RCSD, Deane-Williams, and other RCSD officials, which the district court designated *Malcolm II*. In June 2018, Ms. Malcolm filed the instant action against RCSD and Deane-Williams, which the district court designated *Malcolm III*. The *Malcolm III* complaint primarily reiterates and expands on Ms. Malcolm's allegations in *Malcolm I* and *Malcolm II*, but it also adds claims based on subsequent events, including RCSD's firing of Ms. Malcolm in March 2018. Specifically, *Malcolm III* raises distinct retaliation and discrimination claims under Title VII, the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and 42 U.S.C. § 1983, as well as a breach of contract claim, a wrongful termination claim under N.Y. Educ. Law § 3020-a, and a free speech retaliation claim under the New York Constitution.

---

[1] For consistency with our prior orders in related cases, we continue to refer to the plaintiff as Ms. Malcolm.

2


SPA-2

Case 6:18-cv-20605-DGB Document ... 05/26/2022 ...  Page ... of ...

Case 21-2683, Document 54, 05/26/2022, 3324938, Page89 of 468

The defendants moved to dismiss each of the three actions and, on the same day in July 2019, the district court dismissed all of the actions with prejudice and without leave to amend. The issue in this appeal is whether the district court properly dismissed *Malcolm III*. We assume the parties' familiarity with the underlying facts.

We review *de novo* the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).[2] To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152. We afford a pro se litigant "special solicitude" and interpret her complaint "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

First, the district court properly dismissed all of Ms. Malcolm's claims in *Malcolm III* insofar as they relate to events alleged to have occurred prior to December 2017. These allegations are duplicative of those raised in *Malcolm I* and *Malcolm II*, both of which actions name RCSD and Deane-Williams as defendants, and so any such claims may not be maintained here as well. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time.").

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

3

SPA-3

We also conclude that the district court properly dismissed for failure to state a claim all of Ms. Malcolm's claims arising from subsequent events.[3] *See* Fed. R. Civ. P. 12(b)(6). As for her discrimination claims under Title VII, the Age Discrimination in Employment Act (the "ADEA"), and the New York State Human Rights Law (the "NYSHRL"), we agree with the district court that Ms. Malcolm fails to allege any details that might raise an inference of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–87 (2d Cir. 2015) (holding that a plaintiff must allege facts that give rise to a minimal inference of discriminatory motivation). We reach the same conclusion with respect to Ms. Malcolm's equal protection claims. *See Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014) (holding that, in discrimination cases "brought pursuant to § 1983, liability for an Equal Protection Clause violation requires personal involvement by a defendant, who must act with discriminatory purpose").

Next, although Ms. Malcolm claims in a conclusory manner that her firing amounts to a breach of the collective bargaining agreement or another unspecified contract, her complaint fails to specifically allege which provision of which contract was violated. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (holding that, to state a breach of contract claim, a plaintiff must allege, *inter alia*, "the existence of an agreement, . . . [and] breach of contract by the defendant"). As for her wrongful termination claim under N.Y. Educ. Law § 3020-a, even assuming that this issue was preserved for appeal, the district court

---

[3] Ms. Malcolm also alleges that, during the relevant time period, the defendants engaged in identity theft and subjected her to law enforcement monitoring. These speculative allegations are insufficient to support any of the causes of action brought in her complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a complaint is insufficient if it contains only "labels and conclusions" and "naked assertions devoid of further factual enhancement").

4

SPA-4

properly determined that the claim fails because Ms. Malcolm, by her own admission, was not tenured at the time of her firing. *See* N.Y. Educ. Law § 3020-a(1) (applying to "person[s] enjoying the benefits of tenure").

Moving to Ms. Malcolm's claims that RCSD fired her in March 2018 in retaliation for her exercise of her right to free speech, we agree with the district court that Ms. Malcolm did not allege that she engaged in protected speech on matters of public concern; instead, she alleged only that she made personal discrimination complaints, which amount to unprotected "personal grievances[.]" *See Massaro v. Dep't of Educ. of the City of N.Y.*, 121 A.D. 3d 569, 569–70 (1st Dep't 2014). We accordingly affirm the dismissal of this and all the preceding claims.

As in *Malcolm I*, however, we respectfully disagree with the district court's decision to dismiss all of these claims with prejudice. *See Malcolm v. ASAR*, No. 19-2412, slip op. at 6–7 (2d. Cir. Oct. 14, 2020). We generally review a district court's denial of leave to amend for abuse of discretion, *see Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), but a *pro se* litigant should be "grant[ed] leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). We therefore vacate this portion of district court's order and remand with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend those claims that do not fail as a matter of law.[4] We retain jurisdiction over any subsequent appeal of a

---

[4] Specifically, leave to amend may not be futile with respect to the following claims, insofar as they relate to events occurring after the filing of the *Malcolm I* and *Malcolm II* complaints: (1) Ms. Malcolm's Title VII, ADEA, and NYSHRL claims against RCSD, (2) her § 1983 and NYSHRL claims against Deane-Williams, and (3) any claim that RCSD fired Ms. Malcolm in March 2018 in retaliation for her earlier complaints of discrimination under Title VII, the ADEA, and the NYSHRL. Ms. Malcolm's Title VII and ADEA claims against Deane-

SPA-5

denial of leave to amend.[5] *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

We have considered all of the parties' remaining arguments and find in them no basis to disturb the conclusions above. Accordingly, we **VACATE** the district court's decision to deny leave to amend certain claims, **AFFIRM** the district court's judgment in all other respects, and **REMAND** the case for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk



A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

Williams fail as a matter of law because only employers are liable under these statutes, *see Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). Ms. Malcolm's § 1983 claim against RCSD fails as a matter of law because RCSD is a New York State entity. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). As explained in our order in *Malcolm I*, any NYSHRL claim may not be maintained if the matter is duplicative of one subject to administrative adjudication, *see York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 127 (2d Cir. 2002), nor may any breach of contract claim arising out of a purported breach of the collective bargaining agreement between Ms. Malcolm's union and her employer, *see Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009).

[5] If, however, the district court exercises its discretion to consolidate *Malcolm I* and *Malcolm III* on remand, any subsequent appeal of either case may be heard by the *Malcolm I* panel.

6

SPA-6

19-2416
Curry-Malcolm v. Rochester City School District

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of November, two thousand twenty.

PRESENT:
> ROBERT D. SACK,
> ROBERT A. KATZMANN,
> WILLIAM J. NARDINI,
> *Circuit Judges.*

--------------------------------------------------

Bernice Curry-Malcolm,

> *Plaintiff-Appellant,*

v.                                                             19-2416

Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually and Collectively,

> *Defendants-Appellees.*

--------------------------------------------------

FOR PLAINTIFF-APPELLANT:                 Bernice Curry-Malcolm, pro
                                                          se, West Henrietta, NY.


FOR DEFENDANTS-APPELLEES:              Alison Moyer, Rochester
                                                          City School District,
                                                          Rochester, NY.


SPA-7

CERTIFIED COPY ISSUED ON 11/12/2020

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED IN PART** and **VACATED IN PART** and the case **REMANDED** for further proceedings.

Appellant Bernice Curry-Malcolm,[1] proceeding pro se, appeals the district court's judgment dismissing her discrimination complaint against the Rochester City School District ("RCSD") and its superintendent, Barbara Deane-Williams. In December 2017, Ms. Malcolm filed two nearly identical complaints in district court, initiating: (1) an action against RCSD, Deane-Williams, Ms. Malcolm's union, and union officials, which the district court designated *Malcolm I*, and (2) an action against RCSD, Deane-Williams, and other RCSD officials, which the district court designated *Malcolm II*. In June 2018, Ms. Malcolm filed the instant action against RCSD and Deane-Williams, which the district court designated *Malcolm III*. The *Malcolm III* complaint primarily reiterates and expands on Ms. Malcolm's allegations in *Malcolm I* and *Malcolm II*, but it also adds claims based on subsequent events, including RCSD's firing of Ms. Malcolm in March 2018. Specifically, *Malcolm III* raises distinct retaliation and discrimination claims under Title VII, the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and 42 U.S.C. § 1983, as well as a breach of contract claim, a wrongful termination claim under N.Y. Educ. Law § 3020-a, and a free speech retaliation claim under the New York Constitution.

---

[1] For consistency with our prior orders in related cases, we continue to refer to the plaintiff as Ms. Malcolm.

2


SPA-8

The defendants moved to dismiss each of the three actions and, on the same day in July 2019, the district court dismissed all of the actions with prejudice and without leave to amend. The issue in this appeal is whether the district court properly dismissed *Malcolm III*. We assume the parties' familiarity with the underlying facts.

We review *de novo* the dismissal of a complaint under Fed. R. Civ. P. 12(b)(6). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).[2] To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). We construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152. We afford a pro se litigant "special solicitude" and interpret her complaint "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

First, the district court properly dismissed all of Ms. Malcolm's claims in *Malcolm III* insofar as they relate to events alleged to have occurred prior to December 2017. These allegations are duplicative of those raised in *Malcolm I* and *Malcolm II*, both of which actions name RCSD and Deane-Williams as defendants, and so any such claims may not be maintained here as well. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000) ("[P]laintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time.").

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

SPA-9

We also conclude that the district court properly dismissed for failure to state a claim all of Ms. Malcolm's claims arising from subsequent events.[3] *See* Fed. R. Civ. P. 12(b)(6). As for her discrimination claims under Title VII, the Age Discrimination in Employment Act (the "ADEA"), and the New York State Human Rights Law (the "NYSHRL"), we agree with the district court that Ms. Malcolm fails to allege any details that might raise an inference of discrimination. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–87 (2d Cir. 2015) (holding that a plaintiff must allege facts that give rise to a minimal inference of discriminatory motivation). We reach the same conclusion with respect to Ms. Malcolm's equal protection claims. *See Raspardo v. Carlone*, 770 F.3d 97, 125 (2d Cir. 2014) (holding that, in discrimination cases "brought pursuant to § 1983, liability for an Equal Protection Clause violation requires personal involvement by a defendant, who must act with discriminatory purpose").

Next, although Ms. Malcolm claims in a conclusory manner that her firing amounts to a breach of the collective bargaining agreement or another unspecified contract, her complaint fails to specifically allege which provision of which contract was violated. *See Eternity Global Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (holding that, to state a breach of contract claim, a plaintiff must allege, *inter alia*, "the existence of an agreement, . . . [and] breach of contract by the defendant"). As for her wrongful termination claim under N.Y. Educ. Law § 3020-a, even assuming that this issue was preserved for appeal, the district court

---

[3] Ms. Malcolm also alleges that, during the relevant time period, the defendants engaged in identity theft and subjected her to law enforcement monitoring. These speculative allegations are insufficient to support any of the causes of action brought in her complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that a complaint is insufficient if it contains only "labels and conclusions" and "naked assertions devoid of further factual enhancement").

4

SPA-10

properly determined that the claim fails because Ms. Malcolm, by her own admission, was not tenured at the time of her firing. *See* N.Y. Educ. Law § 3020-a(1) (applying to "person[s] enjoying the benefits of tenure").

Moving to Ms. Malcolm's claims that RCSD fired her in March 2018 in retaliation for her exercise of her right to free speech, we agree with the district court that Ms. Malcolm did not allege that she engaged in protected speech on matters of public concern; instead, she alleged only that she made personal discrimination complaints, which amount to unprotected "personal grievances[.]" *See Massaro v. Dep't of Educ. of the City of N.Y.*, 121 A.D. 3d 569, 569–70 (1st Dep't 2014). We accordingly affirm the dismissal of this and all the preceding claims.

As in *Malcolm I*, however, we respectfully disagree with the district court's decision to dismiss all of these claims with prejudice. *See Malcolm v. ASAR*, No. 19-2412, slip op. at 6–7 (2d. Cir. Oct. 14, 2020). We generally review a district court's denial of leave to amend for abuse of discretion, *see Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), but a *pro se* litigant should be "grant[ed] leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). We therefore vacate this portion of district court's order and remand with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend those claims that do not fail as a matter of law.[4] We retain jurisdiction over any subsequent appeal of a

---

[4] Specifically, leave to amend may not be futile with respect to the following claims, insofar as they relate to events occurring after the filing of the *Malcolm I* and *Malcolm II* complaints: (1) Ms. Malcolm's Title VII, ADEA, and NYSHRL claims against RCSD, (2) her § 1983 and NYSHRL claims against Deane-Williams, and (3) any claim that RCSD fired Ms. Malcolm in March 2018 in retaliation for her earlier complaints of discrimination under Title VII, the ADEA, and the NYSHRL. Ms. Malcolm's Title VII and ADEA claims against Deane-

5

SPA - 11

denial of leave to amend.[5] *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

We have considered all of the parties' remaining arguments and find in them no basis to disturb the conclusions above. Accordingly, we **VACATE** the district court's decision to deny leave to amend certain claims, **AFFIRM** the district court's judgment in all other respects, and **REMAND** the case for further proceedings consistent with this order.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk



---

Williams fail as a matter of law because only employers are liable under these statutes, *see Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). Ms. Malcolm's § 1983 claim against RCSD fails as a matter of law because RCSD is a New York State entity. *See Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). As explained in our order in *Malcolm I*, any NYSHRL claim may not be maintained if the matter is duplicative of one subject to administrative adjudication, *see York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 127 (2d Cir. 2002), nor may any breach of contract claim arising out of a purported breach of the collective bargaining agreement between Ms. Malcolm's union and her employer, *see Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009).

[5] If, however, the district court exercises its discretion to consolidate *Malcolm I* and *Malcolm III* on remand, any subsequent appeal of either case may be heard by the *Malcolm I* panel.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

6

SPA-12

19-2412
Malcolm v. Association of Supervisors and Administrators of Rochester

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of October, two thousand twenty.

PRESENT:
> PIERRE N. LEVAL,
> ROBERT A. KATZMANN,
> RAYMOND J. LOHIER, JR.,
> *Circuit Judges.*

---

Bernice Malcolm,

*Plaintiff-Appellant,*

v.                                                                            19-2412

Association of Supervisors and Administrators of Rochester, ASAR, Timothy Cliby, President and Individually, John Rowe, Vice President and Individually, Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually,

*Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:                Bernice Malcolm, *pro se,*
                                        West Henrietta, NY.

FOR DEFENDANTS-APPELLEES Association of    Jennifer L. Carlson, Arthur P.
Supervisors and Administrators of Rochester, ASAR,    Scheuermann, School

SPA-13

CERTIFIED COPY ISSUED ON 10/14/2020

| | |
|---|---|
| Timothy Cliby, President and Individually, John Rowe, Vice President and Individually: | Administrators Association of New York State, Latham, NY. |
| | |
| FOR DEFENDANTS-APPELLEES Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually: | Alison Moyer, Associate General Counsel, Rochester City School District, Rochester, NY. |

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment is **AFFIRMED IN PART** and **VACATED IN PART**, and the case is **REMANDED** for further proceedings consistent with this order.

Appellant Bernice Malcolm, proceeding *pro se*, appeals the district court's judgment dismissing her discrimination and labor claims against her union, the Association of Supervisors and Administrators of Rochester ("ASAR"), her employer, the Rochester City School District ("RCSD"), and certain RCSD and ASAR officials. The defendants moved to dismiss the complaint, arguing, *inter alia*, that Ms. Malcolm failed to state a claim, that her claims were unexhausted or barred by the election of remedies doctrine, and that the suit was duplicative of two other discrimination suits filed by Ms. Malcolm. In her opposition brief, Ms. Malcolm sought leave to amend her complaint and raised new factual allegations in support of her claims. The district court dismissed the complaint with prejudice, holding that Ms. Malcolm's claims were meritless for several reasons, and denied leave to amend on the ground that she had not filed a proper motion seeking that relief nor submitted proposed amendments to the complaint, and that amendment would be futile. The court also *sua sponte* imposed a leave-to-file sanction on Ms. Malcolm, permanently enjoining her "from commencing any further *pro se* actions in federal court

2

SPA-14

against the RCSD, any RCSD employees which [action] arises out of her employment with the RCSD, the ASAR, or any ASAR representatives or members which [action] arises out of her employment with the RCSD without prior leave of court." We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## I.   Dismissal of Complaint

We review *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1] We afford a *pro se* litigant "special solicitude" and interpret her complaint "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

Applying these standards, we agree with the district court that all of Ms. Malcolm's claims should be dismissed. As to Count One, there is no federal subject matter jurisdiction over a fair-representation claim under the Labor Management Relations Act against a public school district or the union representing its employees. *See Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam); *Smith v. United Fed'n of Teachers*, 162 F.3d 1148, at *1 (2d Cir. 1998) (summary order). Ms. Malcolm alleges that she is an employee of the RCSD, a public school district, which is a political subdivision of the state of New York and therefore not an "employer" within the meaning of the Labor Management Relations Act. *See* 29 U.S.C. § 152(2). Even if this claim were construed as a state-law claim for breach of the duty of fair

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

3



representation, *see* N.Y. Civ. Serv. Law § 209-a(2) & (3), and assuming we had jurisdiction, such a claim would still fall outside the four-month statute of limitations imposed by state law. *See* N.Y. C.P.L.R. § 217(2). Ms. Malcolm's termination, the latest event on which her claim is predicated, occurred in March 2017, but the instant suit was filed approximately nine months later in December 2017. Moreover, Ms. Malcolm's claims for breach of the collective bargaining agreement, breach of contract, and breach of the implied covenant of good faith and fair dealing (Counts Two through Four) are all subsumed under state law into a breach of fair representation claim and are therefore untimely for the same reason.[2] *See Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009) ("Under New York law, a union member has no cause of action against his union for breach of a collective bargaining agreement between his employer and his union.").

The district court also correctly dismissed Ms. Malcolm's Title VII and ADEA claims (Counts Five through Eight and Count Ten). First, these claims cannot be brought against individual defendants Cliby, Rowe, and Deane-Williams because only employers are liable under Title VII or the ADEA. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). Second, although Ms. Malcolm may raise such claims against ASAR and the RCSD, her complaint lacks sufficient factual detail to support her allegations. In general, we "must accept as true all of the allegations contained in a complaint" when evaluating its sufficiency against a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, we need not "accept as true a legal conclusion couched

---

[2] As to Counts Three and Four in particular, we note that Ms. Malcolm does not allege the breach of any contract other than the collective bargaining agreement.

4

SPA - 16

as a factual allegation." *Id.* Here, Ms. Malcolm's complaint contains only "threadbare recitals" of the elements of a cause of action for discrimination, "supported by mere conclusory statements." *Id.* The complaint fails to include any factual detail that would support even a minimal plausible inference that Ms. Malcolm was discriminated against because of her age, race, gender, or any other protected category. For this reason, the district court properly granted the defendants' motions to dismiss these counts. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–87 (2d Cir. 2015) (holding that a plaintiff must allege facts that give rise to a minimal inference of discrimination).

Next, the district court properly dismissed Ms. Malcolm's claims under the New York State Human Rights Law ("NYSHRL") (Counts Nine and Ten), because she elected to pursue those claims before the New York State Division of Human Rights ("NYSDHR"). Under the election of remedies doctrine, a plaintiff may not bring NYSHRL claims in federal court if those claims have already been adjudicated before the NYSDHR. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 127 (2d Cir. 2002). Thus, to the extent Ms. Malcolm raised the same NYSHRL claims before the NYSDHR, those claims are barred.

Finally, we also agree with the district court's decision to dismiss Ms. Malcolm's equal protection claims (Counts Eleven and Twelve). The Equal Protection Clause of the United States Constitution "regulates only the Government, not private parties," *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263 (2d Cir. 2014), and "the Equal Protection Clauses of the federal and New York Constitutions are coextensive." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 n.3 (2d Cir. 2007). Ms. Malcolm does not plausibly allege that ASAR or its officials are "state actors" under 42 U.S.C. § 1983 or the New York Constitution, *see*

*Malcolm v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 107 (W.D.N.Y. 2010), nor does she allege any theory of "entwinement" that might render them liable, *see Grogan*, 768 F.3d at 268–69. And with respect to RCSD and its officials, who are state actors, Ms. Malcolm's complaint, for the same reasons as above, includes no factual detail that raises a plausible inference of discrimination. *See Vega*, 801 F.3d at 87–88.

## II.  Leave to Amend

Although we agree with the district court's decision to dismiss all of Ms. Malcolm's claims, we respectfully disagree with its decision to dismiss all of these claims with prejudice. We generally review a district court's denial of leave to amend for abuse of discretion, *see Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), but a *pro se* litigant should be "grant[ed] leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

For the reasons above, Ms. Malcolm's labor claims against all defendants, her NYSHRL claims against all defendants, and her ADEA and Title VII claims against Cliby, Rowe, and Deane-Williams fail as a matter of law, and so the district court properly dismissed these claims with prejudice. However, the defects in the Title VII and ADEA claims against ASAR and RCSD, as well as her equal protection claims against all defendants, could conceivably be cured in a new complaint that includes more detailed factual allegations of discrimination (and of state action, with regard to the equal protection claims against ASAR, Cliby, and Rowe).[3] We therefore vacate

---

[3] Any duplication of claims between this action and the *Malcolm II* or *Malcolm III* actions may be grounds to dismiss or stay two of the three lawsuits, but of course would not be grounds to dismiss all three. We leave to the district court on remand the task of consolidating the claims

6

SPA-18

as much of the district court's order as dismissed these claims with prejudice. We remand with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend these claims, and we retain jurisdiction over any subsequent appeal of a denial of leave to amend.[4] *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

## III.  Leave-to-File Sanction

Finally, we respectfully disagree with the district court's *sua sponte* decision to impose a leave-to-file sanction on Ms. Malcolm. We review the imposition of such a sanction for abuse of discretion. *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009). A district court may impose a leave-to-file sanction against "litigants who abuse the judicial process," such as by filing "repetitive and frivolous suits." *Shafii v. Brit. Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996). Before doing so, however, a court must give notice and opportunity to be heard. *See Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998) (per curiam). We share the district court's concern with Ms. Malcolm's history of duplicative and harassing litigation, a history which has already forced one other district court to impose a similar sanction. We note, however, that this action (along with *Malcolm II* and *Malcolm III*) are the first lawsuits against the current set of defendants. At the very least, Ms. Malcolm was entitled to an opportunity to be heard before a sanction was imposed. *See Moates*, 147 F.3d at 209. We therefore vacate the leave-to-file sanction pending such a hearing by

---

that survive here with any that survive the pending appeals in *Malcolm II* and *Malcolm III*. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).

[4] Because Ms. Malcolm may bring her Title VII and ADEA claims in federal court only if she has exhausted her remedies with the EEOC, the district court on remand should take stock of any right-to-sue letters that have been issued by the EEOC during the pendency of this proceeding. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001).

SPA- 19

the district court.

We have considered all of the parties' remaining arguments and find in them no reason to disturb the conclusions above. Accordingly, we **AFFIRM** the judgment in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this order. The panel retains jurisdiction as noted above.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

8

GPA-20

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

# MANDATE

19-2412
Malcolm v. Association of Supervisors and Administrators of Rochester

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of October, two thousand twenty.

PRESENT:
 PIERRE N. LEVAL,
 ROBERT A. KATZMANN,
 RAYMOND J. LOHIER, JR.,
 *Circuit Judges.*

---

Bernice Malcolm,

 *Plaintiff-Appellant,*

 v.                                                    19-2412

Association of Supervisors and Administrators of Rochester, ASAR, Timothy Cliby, President and Individually, John Rowe, Vice President and Individually, Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually,

 *Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:                   Bernice Malcolm, *pro se*,
                                            West Henrietta, NY.

FOR DEFENDANTS-APPELLEES Association of      Jennifer L. Carlson, Arthur P.
Supervisors and Administrators of Rochester, ASAR,   Scheuermann, School

SPA-21

MANDATE ISSUED ON 11/16/2020

| Timothy Cliby, President and Individually, John Rowe, Vice President and Individually: | Administrators Association of New York State, Latham, NY. |
| FOR DEFENDANTS-APPELLEES Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually: | Alison Moyer, Associate General Counsel, Rochester City School District, Rochester, NY. |

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment is **AFFIRMED IN PART** and **VACATED IN PART**, and the case is **REMANDED** for further proceedings consistent with this order.

Appellant Bernice Malcolm, proceeding *pro se*, appeals the district court's judgment dismissing her discrimination and labor claims against her union, the Association of Supervisors and Administrators of Rochester ("ASAR"), her employer, the Rochester City School District ("RCSD"), and certain RCSD and ASAR officials. The defendants moved to dismiss the complaint, arguing, *inter alia*, that Ms. Malcolm failed to state a claim, that her claims were unexhausted or barred by the election of remedies doctrine, and that the suit was duplicative of two other discrimination suits filed by Ms. Malcolm. In her opposition brief, Ms. Malcolm sought leave to amend her complaint and raised new factual allegations in support of her claims. The district court dismissed the complaint with prejudice, holding that Ms. Malcolm's claims were meritless for several reasons, and denied leave to amend on the ground that she had not filed a proper motion seeking that relief nor submitted proposed amendments to the complaint, and that amendment would be futile. The court also *sua sponte* imposed a leave-to-file sanction on Ms. Malcolm, permanently enjoining her "from commencing any further *pro se* actions in federal court

2



against the RCSD, any RCSD employees which [action] arises out of her employment with the RCSD, the ASAR, or any ASAR representatives or members which [action] arises out of her employment with the RCSD without prior leave of court." We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

## I.     Dismissal of Complaint

We review *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6). *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). To survive a motion to dismiss, the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1] We afford a *pro se* litigant "special solicitude" and interpret her complaint "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

Applying these standards, we agree with the district court that all of Ms. Malcolm's claims should be dismissed. As to Count One, there is no federal subject matter jurisdiction over a fair-representation claim under the Labor Management Relations Act against a public school district or the union representing its employees. *See Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009) (per curiam); *Smith v. United Fed'n of Teachers*, 162 F.3d 1148, at *1 (2d Cir. 1998) (summary order). Ms. Malcolm alleges that she is an employee of the RCSD, a public school district, which is a political subdivision of the state of New York and therefore not an "employer" within the meaning of the Labor Management Relations Act. *See* 29 U.S.C. § 152(2). Even if this claim were construed as a state-law claim for breach of the duty of fair

_____

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

3

SPA-23

representation, *see* N.Y. Civ. Serv. Law § 209-a(2) & (3), and assuming we had jurisdiction, such a claim would still fall outside the four-month statute of limitations imposed by state law. *See* N.Y. C.P.L.R. § 217(2). Ms. Malcolm's termination, the latest event on which her claim is predicated, occurred in March 2017, but the instant suit was filed approximately nine months later in December 2017. Moreover, Ms. Malcolm's claims for breach of the collective bargaining agreement, breach of contract, and breach of the implied covenant of good faith and fair dealing (Counts Two through Four) are all subsumed under state law into a breach of fair representation claim and are therefore untimely for the same reason.[2] *See Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009) ("Under New York law, a union member has no cause of action against his union for breach of a collective bargaining agreement between his employer and his union.").

The district court also correctly dismissed Ms. Malcolm's Title VII and ADEA claims (Counts Five through Eight and Count Ten). First, these claims cannot be brought against individual defendants Cliby, Rowe, and Deane-Williams because only employers are liable under Title VII or the ADEA. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). Second, although Ms. Malcolm may raise such claims against ASAR and the RCSD, her complaint lacks sufficient factual detail to support her allegations. In general, we "must accept as true all of the allegations contained in a complaint" when evaluating its sufficiency against a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, we need not "accept as true a legal conclusion couched

---

[2] As to Counts Three and Four in particular, we note that Ms. Malcolm does not allege the breach of any contract other than the collective bargaining agreement.

SPA-24

as a factual allegation." *Id.* Here, Ms. Malcolm's complaint contains only "threadbare recitals" of the elements of a cause of action for discrimination, "supported by mere conclusory statements." *Id.* The complaint fails to include any factual detail that would support even a minimal plausible inference that Ms. Malcolm was discriminated against because of her age, race, gender, or any other protected category. For this reason, the district court properly granted the defendants' motions to dismiss these counts. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85–87 (2d Cir. 2015) (holding that a plaintiff must allege facts that give rise to a minimal inference of discrimination).

Next, the district court properly dismissed Ms. Malcolm's claims under the New York State Human Rights Law ("NYSHRL") (Counts Nine and Ten), because she elected to pursue those claims before the New York State Division of Human Rights ("NYSDHR"). Under the election of remedies doctrine, a plaintiff may not bring NYSHRL claims in federal court if those claims have already been adjudicated before the NYSDHR. *See York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 127 (2d Cir. 2002). Thus, to the extent Ms. Malcolm raised the same NYSHRL claims before the NYSDHR, those claims are barred.

Finally, we also agree with the district court's decision to dismiss Ms. Malcolm's equal protection claims (Counts Eleven and Twelve). The Equal Protection Clause of the United States Constitution "regulates only the Government, not private parties," *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263 (2d Cir. 2014), and "the Equal Protection Clauses of the federal and New York Constitutions are coextensive." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 n.3 (2d Cir. 2007). Ms. Malcolm does not plausibly allege that ASAR or its officials are "state actors" under 42 U.S.C. § 1983 or the New York Constitution, *see*

5

SPA-25

*Malcolm v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 107 (W.D.N.Y. 2010), nor does she allege any theory of "entwinement" that might render them liable, *see Grogan*, 768 F.3d at 268–69. And with respect to RCSD and its officials, who are state actors, Ms. Malcolm's complaint, for the same reasons as above, includes no factual detail that raises a plausible inference of discrimination. *See Vega*, 801 F.3d at 87–88.

## II.    Leave to Amend

Although we agree with the district court's decision to dismiss all of Ms. Malcolm's claims, we respectfully disagree with its decision to dismiss all of these claims with prejudice. We generally review a district court's denial of leave to amend for abuse of discretion, *see Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012), but a *pro se* litigant should be "grant[ed] leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

For the reasons above, Ms. Malcolm's labor claims against all defendants, her NYSHRL claims against all defendants, and her ADEA and Title VII claims against Cliby, Rowe, and Deane-Williams fail as a matter of law, and so the district court properly dismissed these claims with prejudice. However, the defects in the Title VII and ADEA claims against ASAR and RCSD, as well as her equal protection claims against all defendants, could conceivably be cured in a new complaint that includes more detailed factual allegations of discrimination (and of state action, with regard to the equal protection claims against ASAR, Cliby, and Rowe).[3] We therefore vacate

---

[3] Any duplication of claims between this action and the *Malcolm II* or *Malcolm III* actions may be grounds to dismiss or stay two of the three lawsuits, but of course would not be grounds to dismiss all three. We leave to the district court on remand the task of consolidating the claims

SPA-26

as much of the district court's order as dismissed these claims with prejudice. We remand with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend these claims, and we retain jurisdiction over any subsequent appeal of a denial of leave to amend.[4]  *See United States v. Jacobson*, 15 F.3d 19, 22 (2d Cir. 1994).

### III. Leave-to-File Sanction

Finally, we respectfully disagree with the district court's *sua sponte* decision to impose a leave-to-file sanction on Ms. Malcolm. We review the imposition of such a sanction for abuse of discretion. *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009). A district court may impose a leave-to-file sanction against "litigants who abuse the judicial process," such as by filing "repetitive and frivolous suits." *Shafii v. Brit. Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996). Before doing so, however, a court must give notice and opportunity to be heard. *See Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998) (per curiam). We share the district court's concern with Ms. Malcolm's history of duplicative and harassing litigation, a history which has already forced one other district court to impose a similar sanction. We note, however, that this action (along with *Malcolm II* and *Malcolm III*) are the first lawsuits against the current set of defendants. At the very least, Ms. Malcolm was entitled to an opportunity to be heard before a sanction was imposed. *See Moates*, 147 F.3d at 209. We therefore vacate the leave-to-file sanction pending such a hearing by

---

that survive here with any that survive the pending appeals in *Malcolm II* and *Malcolm III*. *See Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).

[4] Because Ms. Malcolm may bring her Title VII and ADEA claims in federal court only if she has exhausted her remedies with the EEOC, the district court on remand should take stock of any right-to-sue letters that have been issued by the EEOC during the pendency of this proceeding. *See Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001).

7


SPA-27

the district court.

    We have considered all of the parties' remaining arguments and find in them no reason to disturb the conclusions above. Accordingly, we **AFFIRM** the judgment in part, **VACATE** in part, and **REMAND** for further proceedings consistent with this order. The panel retains jurisdiction as noted above.

                    FOR THE COURT:
                    Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

8

SPA-28

19-2409
Malcolm v. Rochester City School District

# MANDATE

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12th day of November, two thousand twenty.

PRESENT:
> ROBERT D. SACK,
> ROBERT A. KATZMANN,
> WILLIAM J. NARDINI,
> *Circuit Judges.*

---

Bernice Malcolm,

*Plaintiff-Appellant,*

v.                                                                                    19-2409

Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually, Sandra Simpson, Chief of Specialized Services and former Interim Director of Specialized Services, Individually, Mary Pauly, Executive Director of Specialized Services, Individually, Theresa ("Teresa") Root, Zone Director of Specialized Services, Individually,

*Defendants-Appellees.*

---

FOR PLAINTIFF-APPELLANT:          Bernice Malcolm, pro se, West Henrietta, NY.

FOR DEFENDANTS-APPELLEES:          Alison Moyer, Rochester City School District, Rochester, NY.

MANDATE ISSUED ON 12/03/2020          SPA-29

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Appellant Bernice Malcolm, proceeding pro se, appeals the district court's judgment dismissing her discrimination complaint against Rochester City School District ("RCSD") and several RCSD officials: Barbara Deane-Williams, Superintendent of RCSD schools; Sandra Simpson, Chief of Specialized Services and Former Interim Director of Specialized Services; Mary Pauly, Executive Director of Specialized Services; and Theresa ("Teresa") Root, Zone Director of Specialized Services. In December 2017, Ms. Malcolm filed two nearly identical complaints in district court, initiating: (1) an action against RCSD, Deane-Williams, Ms. Malcolm's union, and union officials, which the district court designated *Malcolm I*, and (2) the present action, which the district court designated *Malcolm II*. Ms. Malcolm also filed a third complaint against RCSD and Deane-Williams in June 2018, initiating a lawsuit that the district court designated *Malcolm III*. The defendants moved to dismiss all three complaints and, on the same day in July 2019, the district court dismissed the actions with prejudice and without leave to amend. The issue in this appeal is whether the district court properly dismissed *Malcolm II*. We assume the parties' familiarity with the underlying facts, and for the following reasons, we affirm.

First, we conclude that the district court correctly dismissed all of Ms. Malcolm's claims against RCSD and Deane-Williams in *Malcolm II* as duplicative of *Malcolm I*. We review this decision for abuse of discretion. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).[1] It is

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

2



well established that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time," and so "a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Id.* at 138–39. *Malcolm I* and *Malcolm II* were filed within one day of each other in the same court and contained identical allegations and claims against RCSD and Deane-Williams. Thus, the district court had the authority to dismiss *Malcolm II* as duplicative.

Second, we affirm the district court's dismissal of all claims against Simpson, Pauly, and Root. The district court dismissed these causes of action for failure to state a claim, a decision which we review *de novo. Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Because "we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court," *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 n.4 (2d Cir. 2018), we hold simply that the district court would have been well within its authority to dismiss these claims as duplicative of *Malcolm I* as well. Although Simpson, Pauly, and Root were not named as defendants in *Malcolm I*, the facts relied upon and the claims asserted in both actions were virtually identical. Moreover, Simpson, Pauly, and Root, as RCSD employees, were in privity with RCSD, which was named as a defendant in *Malcolm I*. Ms. Malcolm accordingly may not maintain these two separate lawsuits. *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504–07 (2d Cir. 2019) (holding that the rule against duplicative litigation may be invoked where each action relies on the same facts, asserts the same rights, and is brought against parties that are the same or are in privity with each other); *Malcolm v. Bd. of Educ. of Honeoye Falls-Lima Cent. Sch. Dist.*, 506 F. App'x 65, 68 (2d Cir. 2012) (summary order) (holding, in the claim preclusion context, that "[a]lthough this action adds defendants who were not part of the prior actions, because all of the defendants named in this

3


SPA-31

action are either current or former agents or employees of the school district, the principle of privity bars relitigation of these claims against these new defendants as well.").

We note, finally, that because a prior panel of this Court remanded certain claims in *Malcolm I* with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend those claims, Ms. Malcolm will have an opportunity to amend her complaint in *Malcolm I* to add any claims against Simpson, Pauly, and Root that could be cured through more precise pleading.[2]

We have considered all of Ms. Malcolm's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[2] We agree with the district court that claims under Title VII or the Age Discrimination in Employment Act cannot be maintained against Simpson, Pauly, and Root because only employers are liable under these statutes. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). As explained in our decision in the appeal of *Malcolm I*, *see Malcolm v. ASAR*, No. 19-2412, slip op. at 3–4 (2d. Cir. Oct. 14, 2020), any breach of contract claim arising out of a purported breach of the collective bargaining agreement between Ms. Malcolm's union and her employer is also barred. *See Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009). Ms. Malcolm's other claims against Simpson, Pauly, and Root could potentially be re-raised in an amended complaint in *Malcolm I*, and we instruct the district court to consider whether to grant leave to amend accordingly in the remand of *Malcolm I*.

4

SPA-32

19-2409
Malcolm v. Rochester City School District

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

# <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 12ᵗʰ day of November, two thousand twenty.

PRESENT:
      ROBERT D. SACK,
      ROBERT A. KATZMANN,
      WILLIAM J. NARDINI,
        *Circuit Judges.*

_____

Bernice Malcolm,

      *Plaintiff-Appellant,*

    v.                                  19-2409

Rochester City School District, Barbara Deane-Williams, Superintendent of Schools, Individually, Sandra Simpson, Chief of Specialized Services and former Interim Director of Specialized Services, Individually, Mary Pauly, Executive Director of Specialized Services, Individually, Theresa ("Teresa") Root, Zone Director of Specialized Services, Individually,

      *Defendants-Appellees.*

_____

FOR PLAINTIFF-APPELLANT:             Bernice Malcolm, pro se, West Henrietta, NY.

FOR DEFENDANTS-APPELLEES:       Alison Moyer, Rochester City School District, Rochester, NY.

CERTIFIED COPY ISSUED ON 11/12/2020

SPA-33

Appeal from a judgment of the United States District Court for the Western District of New York (Larimer, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

Appellant Bernice Malcolm, proceeding pro se, appeals the district court's judgment dismissing her discrimination complaint against Rochester City School District ("RCSD") and several RCSD officials: Barbara Deane-Williams, Superintendent of RCSD schools; Sandra Simpson, Chief of Specialized Services and Former Interim Director of Specialized Services; Mary Pauly, Executive Director of Specialized Services; and Theresa ("Teresa") Root, Zone Director of Specialized Services. In December 2017, Ms. Malcolm filed two nearly identical complaints in district court, initiating: (1) an action against RCSD, Deane-Williams, Ms. Malcolm's union, and union officials, which the district court designated *Malcolm I*, and (2) the present action, which the district court designated *Malcolm II*. Ms. Malcolm also filed a third complaint against RCSD and Deane-Williams in June 2018, initiating a lawsuit that the district court designated *Malcolm III*. The defendants moved to dismiss all three complaints and, on the same day in July 2019, the district court dismissed the actions with prejudice and without leave to amend. The issue in this appeal is whether the district court properly dismissed *Malcolm II*. We assume the parties' familiarity with the underlying facts, and for the following reasons, we affirm.

First, we conclude that the district court correctly dismissed all of Ms. Malcolm's claims against RCSD and Deane-Williams in *Malcolm II* as duplicative of *Malcolm I*. We review this decision for abuse of discretion. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000).[1] It is

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

2


GPA -34

well established that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant[s] at the same time," and so "a district court may stay or dismiss a suit that is duplicative of another federal court suit." *Id.* at 138–39. *Malcolm I* and *Malcolm II* were filed within one day of each other in the same court and contained identical allegations and claims against RCSD and Deane-Williams. Thus, the district court had the authority to dismiss *Malcolm II* as duplicative.

Second, we affirm the district court's dismissal of all claims against Simpson, Pauly, and Root. The district court dismissed these causes of action for failure to state a claim, a decision which we review *de novo. Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Because "we may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court," *Lanning v. City of Glens Falls*, 908 F.3d 19, 24 n.4 (2d Cir. 2018), we hold simply that the district court would have been well within its authority to dismiss these claims as duplicative of *Malcolm I* as well. Although Simpson, Pauly, and Root were not named as defendants in *Malcolm I*, the facts relied upon and the claims asserted in both actions were virtually identical. Moreover, Simpson, Pauly, and Root, as RCSD employees, were in privity with RCSD, which was named as a defendant in *Malcolm I*. Ms. Malcolm accordingly may not maintain these two separate lawsuits. *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 504–07 (2d Cir. 2019) (holding that the rule against duplicative litigation may be invoked where each action relies on the same facts, asserts the same rights, and is brought against parties that are the same or are in privity with each other); *Malcolm v. Bd. of Educ. of Honeoye Falls-Lima Cent. Sch. Dist.*, 506 F. App'x 65, 68 (2d Cir. 2012) (summary order) (holding, in the claim preclusion context, that "[a]lthough this action adds defendants who were not part of the prior actions, because all of the defendants named in this

SPA-35

action are either current or former agents or employees of the school district, the principle of privity bars relitigation of these claims against these new defendants as well.").

We note, finally, that because a prior panel of this Court remanded certain claims in *Malcolm I* with instructions for the district court to reconsider whether to grant Ms. Malcolm leave to amend those claims, Ms. Malcolm will have an opportunity to amend her complaint in *Malcolm I* to add any claims against Simpson, Pauly, and Root that could be cured through more precise pleading.[2]

We have considered all of Ms. Malcolm's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

---

[2] We agree with the district court that claims under Title VII or the Age Discrimination in Employment Act cannot be maintained against Simpson, Pauly, and Root because only employers are liable under these statutes. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam); *Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011) (summary order). As explained in our decision in the appeal of *Malcolm I*, *see Malcolm v. ASAR*, No. 19-2412, slip op. at 3–4 (2d. Cir. Oct. 14, 2020), any breach of contract claim arising out of a purported breach of the collective bargaining agreement between Ms. Malcolm's union and her employer is also barred. *See Ifill v. N.Y. State Court Officers Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009). Ms. Malcolm's other claims against Simpson, Pauly, and Root could potentially be re-raised in an amended complaint in *Malcolm I*, and we instruct the district court to consider whether to grant leave to amend accordingly in the remand of *Malcolm I*.

4

SPA-36

Case 21-2683, Document 54, 05/26/2022, 3324938, Page123 of 468

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BERNICE C MALCOLM,

                              Plaintiff,

v.

ROCHESTER CITY SCHOOL DISTRICT, BARBARA
DEANE-WILLIAMS, Superintendent of Schools,
Individually, SANDRA SIMPSON, Chief of Specialized
Services and Former Interim Director of Specialized
Services, Individually, MARY PAULY, Executive Director
of Specialized Services, Individually, and THERESA
("TERESA") ROOT, Zone Director of Specialized
Services, Individually,

                              Defendants.

---

DECISION AND ORDER[1]
(Malcolm II)

17-CV-6873-DGL

## **INTRODUCTION: MALCOLM II**

Plaintiff Bernice C. Malcolm ("plaintiff"), proceeding *pro se*, brings this action against

defendants Rochester City School District ("RCSD"), its superintendent, Barbara Deane-Williams

("Deane-Williams"), Chief of Specialized Services and Former Interim Director of Specialized

Services, Sandra Simpson ("Simpson"), Executive Director of Specialized Services, Mary Pauly

("Pauly"), and Zone Director of Specialized Services, Theresa Root ("Root"). This action was

commenced on virtually the same day as *Malcolm I* (17-CV-6878). The complaint is virtually

identical to Malcolm's complaint in *Malcolm I*.

Plaintiff is a 61-year-old African-American woman who has been employed with the

RCSD starting in April of 2015. Plaintiff was hired as a Central Office Coordinating

---

[1] Two other decisions filed by the same plaintiff (17-CV-6878 and 18-CV-6450) have been filed this date.

SPA-37

Administrator of Special Education ("CASE").   Not long after she was hired, Plaintiff began to have difficulties with her supervisor, Root, and made complaints to her supervisors at the RCSD. Plaintiff alleges that Root, among other things, "sabotaged her career" by giving her a developing performance evaluation without notifying her.

In March 2017, the RCSD, faced with budgetary concerns, conducted an audit that led them to restructure the special education administrators.   This included laying off twenty-two CASE positions.   Plaintiff was one of the affected employees.   Those employees were then placed on a preferred eligibility list for seven years, meaning they could be recalled and resume employment if a position was open.   Plaintiff was recalled from the preferred eligibility list and rehired by the RCSD on November 20, 2017 in her same position, about a month before commencing this lawsuit.

As mentioned in *Malcom I*, plaintiff then filed five charges within the New York State Department of Human Rights ("NYSDHR").   In the first two charges against the RCSD, the NYSDHR determined there was probable cause, and the case is pending and is still unresolved. These two charges were dually filed in the EEOC.   The third, fourth and fifth charges against plaintiff's union and RCSD were dismissed with the NYSDHR finding no probable cause, with the EEOC adopting the same findings as the NYSDHR for her federal claims.   Upon receipt of her right to sue letter from the EEOC in her fourth charge, plaintiff then filed the present lawsuit, and two other actions in this district regarding similar claims.[2]   The second action, filed the day after the present lawsuit was filed, has been dismissed for various reasons, including a failure to exhaust administrative remedies and failure to state a claim.

---

[2] *See Malcolm v. Ass'n of Supervisors and Adm'rs of Rochester*, 17-CV-6878 (W.D.N.Y. 2017); *Malcolm v. Rochester City School District*, 18-CV-6450 (W.D.N.Y. 2018).


SPA-38

In the present lawsuit, plaintiff alleges defendants discriminated against her with respect to her employment in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Age Discrimination in Employment Act of 1967 ("ADEA"), 42 U.S.C. § 1988; New York Human Rights Law ("NYHRL"), N.Y. Exec. Law § 290 et seq.; 42 U.S.C. § 1983; and the New York Constitution's Equal Protection clause, N.Y. Const. Art. I, § 11. Plaintiff also alleges a state law breach of contract claim against defendants.

In lieu of an answer, defendants moved to dismiss the complaint pursuant to Fed. R. Civ. Proc. 12(b)(1), 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6). Plaintiff, in her complaint and in her reply papers, requested a stay in the proceedings, and as she did in *Malcolm I*, moved to amend her complaint.

For the reasons set forth below, defendant's motion to dismiss (Dkt. #6) is granted, and the Complaint is dismissed. Plaintiff's motion to amend the complaint (Dkt. #11) is denied, and plaintiff's request to stay proceedings (Dkt. #1) is denied.

## DISCUSSION: MALCOLM II

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. Proc. 12(b)(6). In deciding a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), the court's review is limited to the complaint, and those documents attached to the complaint or incorporated therein by reference. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23, 127 S. Ct. 2499, 168 L. Ed.2d 179 (2007). A court must "accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994), *citing Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987). However, "bald assertions and



conclusions of law will not suffice" to defeat a motion to dismiss. *See Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 126 (2d Cir. 2007). "A plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Where a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [plaintiff's] complaint must be dismissed." *Ashcroft v. Iqbal*, 556 U.S. 662, 680, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009).

**I.     Plaintiff's claims against the RCSD and Deane-Williams**

"A district court may stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). A suit is duplicative if the parties, claims against the parties, and the relief sought do not differ significantly from one action to the other. *Morency v. Village of Lynbrook*, 1 F. Supp. 3d 58, 61 (E.D.N.Y. 2014).

Plaintiff's claims against the RCSD and Deane-Williams are identical to the lawsuit filed against RCSD and Deane-Williams in *Malcolm I*. Plaintiff's entire complaint is repeated in her second lawsuit, as she has copied word-for-word the same factual claims from one suit to the next. Additionally, the factual allegations as pleaded in both *Malcolm I* and the present action are identical, particularly pertaining to allegations regarding RCSD and Deane-Williams. Paragraphs 22 through 79 of *Malcolm I* are identical to paragraphs 22 through 79 of the present action. The only differences between the two complaints pertain to allegations pleaded against ASAR defendants. Plaintiff's first through ninth causes of actions are identical to causes five through twelve as pleaded in *Malcolm I*. The Court therefore dismisses causes of action one through nine against Defendants RCSD and Deane-Williams for the same reasons it dismissed the claims in *Malcolm I*.



## II.   Plaintiff's ADEA, Title VII, and NYSHRL claims against individual defendants Pauly, Simpson and Root

The ADEA and Title VII do not provide for personal liability against individuals.  *See Guerra v. Jones*, 421 F. App'x 15, 17 (2d Cir. 2011); *Sassaman v. Gamache*, 566 F.3d 307, 315 (2d Cir. 2009).   The NYSHRL provides for personal liability as long as the conduct that gave rise to the claim involved direct participation from the individual defendant.   *See Malcolm v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 106 (W.D.N.Y. 2010); *see also Bickerstaff v. Vassar Coll.*, 160 F. App'x 61, 63 n. 2 (2d Cir. 2005).

I find that plaintiff's Title VII and ADEA claims against the individual defendants are dismissed, as both statutes do not provide liability for individuals.   As for plaintiff's NYSHRL individual claims against Pauly and Simpson, plaintiff did not allege direct participation in conduct that gave rise to her discrimination claim anywhere in her complaint.   Pauly and Simpson are mentioned fewer than five times in the complaint, the only factual allegations being that plaintiff complained to Pauly and Simpson along with several other supervisors of her issues with Root. Compl. ¶ 61.   The fact that plaintiff made a complaint alone does not suggest that any individual defendant furthered, or directly participated in, a discriminatory employment action.   Because plaintiff essentially pleads no facts regarding Pauly's and Simpson's actions, plaintiff has pled no cause of action and plaintiff's remaining NYSDHR claims against Pauly and Simpson are dismissed.

Similarly, nowhere in plaintiff's complaint does she sufficiently plead how Root is personally involved with the alleged discrimination.   Plaintiff does not allege that Root played an individual role in the elimination of plaintiff's position, let alone that she did so with discriminatory animus.   Plaintiff merely makes conclusory and speculative statements saying she was treated disparately by Root, without detailed factual contentions as to how Root was personally involved.

5


SPA-41

Some of the things that plaintiff claims rise to the level of discrimination include giving plaintiff a developing performance evaluation and failing to warn plaintiff she would receive such a rating. However, plaintiff does not say how this performance rating is connected in any way to plaintiff's race, age or gender. Instead, plaintiff repeatedly makes speculative and conclusory allegations against Root, claiming she sabotaged plaintiff's career and harassed plaintiff without any underlying factual basis. For these reasons, Plaintiff's remaining NYSHRL claims against Root are dismissed.

### III. Plaintiff's Equal Protection Claims under 42 U.S.C. § 1983 and the N.Y. Constitution

Plaintiff also alleges that she was deprived of her constitutional rights while the defendants were acting "under color of law," in violation of 42 U.S.C. § 1983 and the New York State Constitution, NYS Cons. Art I, Sec. 11. Liability under § 1983 extends only to state actors. *See Williams v. N.Y.C. Hous. Auth.*, 335 F. App'x 108, 110 (2d Cir. 2009). To establish liability under § 1983, a defendant must be (1) acting under color of state law and (2) defendant's actions resulted in a deprivation of constitutional rights. *Washington v. County of Rockland*, 373 F.3d 310, 315 (2d Cir. 2004). Merely stating that a party is acting "in color of law" is not enough to show the nexus required to state a claim under § 1983 or the New York Constitution. Establishing a defendant's personal involvement in the alleged constitutional deprivations is a prerequisite to damages under § 1983. *Brown v. City of Syracuse*, 197 F. App'x 22, 25 (2d Cir. 2006). For an individual defendant to be liable, an official must be personally involved by, (1) directly participating in the constitutional violation, (2) failing to remedy the constitutional violation after being informed of the violation, (3) creating a policy that allowed for unconstitutional violations or allowing for unconstitutional violations under the policy, (4) supervising employees who committed wrongful acts with gross negligence, or (5) exhibiting deliberate indifference towards

SPA-42

the rights of others.   42 U.S.C. § 1983; *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246,

254 (2d Cir. 2001).   The same framework applies to a New York state constitutional violation.

*Town of Southold v. Town of East Hampton*, 477 F.3d 38, 53 n. 3 (2d Cir. 2007); *Weber v. City of

New York*, 973 F. Supp. 2d 227, 274 (E.D.N.Y. 2013).   An equal protection claim is then analyzed

under the same framework as a Title VII employment discrimination claim.   *Id.*, *see Feingold v.

New York*, 366 F.3d 138, 159 (2d Cir. 2004).

As discussed above, plaintiff has not pled facts sufficient to state a claim that any of the

individual defendants personally violated any of plaintiff's constitutional rights, just as she had

not done enough to plead that the individual defendants had individually discriminated against

plaintiff under NYSHRL.   Because plaintiff has failed to allege that Pauly, Simpson or Rowe's

actions deprived plaintiff of any constitutional right, plaintiff's seventh and eighth claims against

Pauly, Simpson and Rowe are dismissed.

**IV.   Plaintiff's Breach of Contract claims**

In order to have a breach of contract claim, plaintiff must have been operating under some

contract.   Any collective bargaining agreement that RCSD and plaintiff's union were under

would not be covered by a breach of contract action.   *See Ifill v. New York State Court Officers

Ass'n*, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009).   Plaintiff does not plead that she and RCSD,

nor any of the individual defendants, were bound by any employment contract, what contract was

supposedly breached, or how even a collective bargaining agreement would have been breached.

Because plaintiff's complaint is utterly devoid of any semblance of a plausibly pled breach of

contract claim, her breach of contract cause of action is therefore dismissed.

**V.   Plaintiff's Request to Stay Proceedings**

Plaintiff requested, as part of her complaint, to stay the current proceedings until her

unexhausted claims are resolved within the NYSDHR and EEOC.   Compl. ¶¶ 20-21.   When

considering a request for a stay of proceedings, the court should consider whether (1) plaintiff is likely to prevail on the merits, (2) the plaintiff will suffer irreparable harm if no stay is granted, (3) other parties will suffer substantial harm if no stay is granted; and (4) public interest supports a stay. *Rochester-Genesee Reg'l Transp. Auth. v. Hynes-Cherin*, 506 F. Supp. 2d 207, 213 (W.D.N.Y. 2007).

Plaintiff argues that a stay is warranted because of the ongoing NYSDHR proceedings and that a stay is legally and economically necessary to avoid injustice. Plaintiff admits that the NYSDHR has jurisdiction over the claims, but instead is seeking additional relief here in federal court before completing the hearing process in the NYSDHR. As defendants suggest in their motion to dismiss, public interest instead calls for a denial of plaintiff's request to stay, as plaintiff should be required to exhaust her administrative remedies just like every other litigant who files a claim with the NYSDHR and the EEOC. Dkt. #6-10, p. 9. Because I conclude that the causes of action should be dismissed above for failure to exhaust administrative remedies upon which plaintiff bases her request to stay, and plaintiff's complaint is dismissed for failure to state a claim, her request to stay proceedings is denied.

## VI.    Plaintiff's Motion to Amend the Complaint

Plaintiff also has moved to amend the complaint (Dkt. #12). Leave to amend, while it should be freely granted, may be denied where amendment would be futile. *Malcolm*, 678 F. Supp. 2d at 109. The Federal Rules of Civil Procedure detail the baseline for what is necessary in order to request leave to amend, including a notice of motion and a statement "with particularity the grounds for seeking the order" which may include a proposed amended complaint. Fed. R. Civ. P. 15(a), 6(c)(1), 7(b)(1)(B). Failing to attach a proposed amended complaint may warrant dismissal. L. R. Civ. P. 15; *Murray v. New York*, 604 F. Supp. 2d 581, 588 (W.D.N.Y. 2009).

SPA-44

Plaintiff has not submitted a proposed amendment to her complaint that would warrant leave to amend.   While plaintiff has asserted additional factual contentions in her later declarations and memoranda (*see* Dkt. #11, 12), none are presented in the form of a proposed amended complaint, and none indicate plaintiff has exhausted her administrative remedies or suggest any additional claims of discrimination.   Because I conclude that the complaint must be dismissed, and plaintiff has not suggested any proposed amendments that address any of defendants' arguments, amendment of the complaint would be futile. Plaintiff's motion for leave to amend is denied.

### CONCLUSION: MALCOLM II

For the foregoing reasons, I find that Plaintiff has failed to exhaust her administrative remedies and failed to state a claim against any defendant with respect to her Title VII, ADEA, NYSDHR and Equal Protection claims.   Accordingly, defendants' motion to dismiss the complaint (Dkt. #6) is granted, and the complaint is dismissed, with prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
July 11, 2019.

9

SPA-45

Intentionally Blank

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BERNICE MALCOLM,

                              Plaintiff,                    DECISION AND ORDER

                                                           17-CV-6878L

            v.


ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                              Defendants.

_____

BERNICE CURRY-MALCOLM,

                              Plaintiff,

                                                           18-CV-6450L

            v.


ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                              Defendants.

_____

        Plaintiff Bernice Curry-Malcolm ("plaintiff" or "Malcolm") was employed by the

Rochester City School District (the "District"), beginning in 2015 and continuing through the end

of the 2016-17 school year. She has previously brought several lawsuits against various District

entities and employees arising out of that employment, alleging discrimination in violation of state

SPA-46

and federal anti-discrimination statutes, as well as miscellaneous claims sounding in contract. All of these matters were initially dismissed by this Court, and the Court presumes the reader's familiarity therewith. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 at Dkt. #28; *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 at Dkt. #14; *Curry-Malcolm v. Rochester City Sch. Dist. et al.*, ("*Malcolm III*"), 389 F.Supp.3d 189 (W.D.N.Y. 2019); *In re Curry-Malcolm* ("*Malcolm IV*"), 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020).

Plaintiff appealed the Court's decisions in *Malcolm I, II, III,* and *IV*. On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III*, but reversed the Court's imposition of sanctions in *Malcolm I* in order to permit plaintiff to be heard, and remanded *Malcolm I* and *III* solely for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. The plaintiff's appeal in *Malcolm IV* remains pending.

The Court hereby consolidates *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand and permitting the filing of a new Amended Complaint.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education. Plaintiff claims that she was thereafter subjected, inter alia, to a discriminatory hostile work environment, harassment, disparate treatment and/or retaliation by the *Malcolm I, II* and *Malcolm III* defendants, culminating in the retaliatory termination of her employment on or about July 1, 2017. Malcolm's four prior lawsuits against the District and related parties attempted to raise a host of claims, including: (1) claims under Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29


SPA-47

U.S.C. §621 et seq. ("ADEA") and New York Human Rights Law ("NYHRL"), including discriminatory disparate treatment, hostile work environment, and retaliatory discharge; (2) violations of the New York State Education Law; (3) denial of Equal Protection in violation of the United States Constitution and New York State Constitution, pursuant to 42 U.S.C. §1983 ("Section 1983"); (4) violation of the Labor Management Relations Act; (5) breach of the implied covenant of good faith and fair dealing; and (6) miscellaneous contractual claims.

## DISCUSSION

### I.     Leave-To-File Sanction

Given its familiarity with plaintiff's prior engagement in a series of frivolous and duplicative lawsuits against a different school district, and recognizing that it now confronted three duplicative lawsuits arising out of plaintiff's employment with the Rochester City School District, this Court previously sanctioned Malcolm against initiating further lawsuits against the District and related defendants, without leave of court. *See* 17-CV-6878 at Dkt. #28 ("*Malcolm I*").[1]

On October 14, 2020, the Second Circuit reversed the imposition of leave-to-file sanctions in *Malcolm I*, reasoning that although Malcolm had a concerning "history of duplicative and harassing litigation," *Malcolm I* had been the first of the instant lawsuits against this particular group of defendants, and as such, Malcolm "was entitled to an opportunity to be heard before a sanction was imposed." *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147 F.3d 207, 209 (2d Cir. 1998)).[2] *See also Viola v. United States*, 481 Fed. Appx. 30, 31 (2d Cir. 2012)(unpublished opinion).

---

[1] *Malcolm I* was the not the first occasion in which this Court determined that the imposition of sanctions against plaintiff was appropriate. On September 14, 2010, the Court issued identical sanctions related to plaintiff's flurry of duplicative federal and state litigation against a different former employer, the Honeoye Falls-Lima Central School District. *See Malcolm v. Bd. of Educ. of the Honeoye Falls-Lima Central Sch. Dist.*, 737 F. Supp. 2d 117 (W.D.N.Y. 2010), *aff'd*, 506 Fed. Appx. 65 (2d Cir. 2012).

[2] In point of fact, the complaint in *Malcolm I* was filed on December 20, 2017, one day after the complaint in

3

SPA-48.

The Court notes that Malcolm is and has been explicitly notified that the pursuit of frivolous and repetitive litigation can and will result in leave-to-file sanctions. The Court, then, turns to consideration of the most effective manner in which plaintiff can respond. The Court observes that Malcolm's prior in-person and telephonic interactions with the Court and its staff members have been marked by abusive and disrespectful conduct and verbiage by plaintiff, and concludes that an in-person hearing is therefore unlikely to be productive or helpful to plaintiff or to the Court. The Court accordingly directs plaintiff to file a sworn affidavit stating why she believes the imposition of leave-to-file sanctions is not appropriate at this juncture, after no less than four lawsuits have been filed against the instant defendants, three of which involved the same conduct.

In so doing, the Court reminds plaintiff of the factors the Court must consider in determining whether such sanctions are appropriate, which plaintiff may wish to speak to in her affidavit. These include: (1) the plaintiff's history of litigation; in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the plaintiff's motive in pursuing the litigation, e.g., does the plaintiff have an objective good faith expectation of prevailing?; (3) whether the plaintiff is represented by counsel; (4) whether the plaintiff has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. *See Safir v. United States Lines, Inc.*, 792 F.2d 19, 23 (2d Cir. 1986).

After the Court has reviewed plaintiff's submissions, the Court will determine whether the re-imposition of leave-to-file sanctions is appropriate. Ultimately, the question the Court must

---

*Malcolm II.* The Court notes that at the time it issued its July 11, 2019 Decision and Order assessing sanctions (*Malcolm I*, 17-CV-6878 at Dkt. #28), Malcolm's count of duplicative actions against the District and related defendants had grown to three. This Court's decisions dismissing all three cases were filed on the same day.

4



SPA-49

answer is whether plaintiff is likely to continue to abuse the judicial process and harass the parties in question. *Id.*

## II.    Leave to Amend

The Second Circuit determined that insofar as she relies upon events occurring *after the filing of the Malcolm I and Malcolm II complaints*, plaintiff might potentially assert facts sufficient to state or cure the following claims: (1) Title VII, ADEA and NYSHRL claims against the District and ASAR, including retaliatory termination claims against the District; and (2) Section 1983 and NYSHRL equal protection claims against all defendants. *See Curry-Malcolm v. Rochester City School District et al.*, 2020 U.S. App. LEXIS 35730 at *5 fn.5 (2d Cir. 2020)(affirming in part and remanding in part *Malcolm I*); *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 (2d Cir. 2020)(affirming and remanding *Malcolm III*).

The Court accordingly grants plaintiff leave to file an Amended Complaint with respect to these matters, against any appropriate defendants, in the manner and to the extent set forth below.

## CONCLUSION

For the reasons set forth above, the Court's imposition of leave-to-file sanctions in *Malcolm I* is reversed for reconsideration. Plaintiff is directed to file, within thirty (30) days of entry of this Decision and Order, an affidavit demonstrating why the Court should not reissue leave-to-file sanctions requiring plaintiff to obtain leave of Court before initiating future litigation against the Rochester City School District and related entities. Within fifteen (15) days of plaintiff's filing, defendants may file a response as to why they believe the sanction is appropriate.

5

SPA-50

Plaintiff is also granted leave to file, within thirty (30) days of entry of this Decision and Order, a single Amended Complaint which consolidates her claims in the above-referenced actions for which leave to amend has been granted, as set forth above in Section II.

Should plaintiff opt to file an Amended Complaint, she shall not attempt to reassert any of the claims for which dismissal with prejudice was affirmed by the Second Circuit. While plaintiff may opt to retain or amend certain factual allegations related to those claims for background purposes, they shall not be deemed to state (or to re-state) any causes of action inconsistent with the Second Circuit's affirmances in *Malcolm I*, *Malcolm II* and/or *Malcolm III*. Plaintiff is further granted leave to assert new and previously-unadjudicated claims (if any) against the defendants or related parties, for which right-to-sue letters were issued subsequent to the commencement of *Malcolm IV*.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
December 30, 2020.

SPA-51

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BERNICE MALCOLM,

                                    Plaintiff,

v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                                    Defendants.

---

BERNICE CURRY-MALCOLM,

                                    Plaintiff,

v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                                    Defendants.

---

DECISION AND ORDER

17-CV-6878L

18-CV-6450L

Plaintiff Bernice Curry-Malcolm ("plaintiff" or "Malcolm") was employed by the
Rochester City School District (the "District"), beginning in 2015 and continuing through the end
of the 2016-17 school year. She has previously brought several lawsuits against various District
entities and employees arising out of that employment, alleging discrimination in violation of state

and federal anti-discrimination statutes, as well as miscellaneous claims sounding in contract. All of these matters were initially dismissed by this Court, and the Court presumes the reader's familiarity therewith. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 at Dkt. #28; *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 at Dkt. #14; *Curry-Malcolm v. Rochester City Sch. Dist. et al.*, ("*Malcolm III*"), 389 F.Supp.3d 189 (W.D.N.Y. 2019); *In re Curry-Malcolm* ("*Malcolm IV*"), 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020).

Plaintiff appealed the Court's decisions in *Malcolm I, II, III,* and *IV*. On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III*, but reversed the Court's imposition of sanctions in *Malcolm I* in order to permit plaintiff to be heard, and remanded *Malcolm I* and *III* solely for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. The plaintiff's appeal in *Malcolm IV* remains pending.

The Court hereby consolidates *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand and permitting the filing of a new Amended Complaint.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education. Plaintiff claims that she was thereafter subjected, inter alia, to a discriminatory hostile work environment, harassment, disparate treatment and/or retaliation by the *Malcolm I, II* and *Malcolm III* defendants, culminating in the retaliatory termination of her employment on or about July 1, 2017. Malcolm's four prior lawsuits against the District and related parties attempted to raise a host of claims, including: (1) claims under Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29

2

SPA-53

U.S.C. §621 et seq. ("ADEA") and New York Human Rights Law ("NYHRL"), including discriminatory disparate treatment, hostile work environment, and retaliatory discharge; (2) violations of the New York State Education Law; (3) denial of Equal Protection in violation of the United States Constitution and New York State Constitution, pursuant to 42 U.S.C. §1983 ("Section 1983"); (4) violation of the Labor Management Relations Act; (5) breach of the implied covenant of good faith and fair dealing; and (6) miscellaneous contractual claims.

## DISCUSSION

### I.  Leave-To-File Sanction

Given its familiarity with plaintiff's prior engagement in a series of frivolous and duplicative lawsuits against a different school district, and recognizing that it now confronted three duplicative lawsuits arising out of plaintiff's employment with the Rochester City School District, this Court previously sanctioned Malcolm against initiating further lawsuits against the District and related defendants, without leave of court. *See* 17-CV-6878 at Dkt. #28 ("*Malcolm I*").[1]

On October 14, 2020, the Second Circuit reversed the imposition of leave-to-file sanctions in *Malcolm I*, reasoning that although Malcolm had a concerning "history of duplicative and harassing litigation," *Malcolm I* had been the first of the instant lawsuits against this particular group of defendants, and as such, Malcolm "was entitled to an opportunity to be heard before a sanction was imposed." *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147 F.3d 207, 209 (2d Cir. 1998)).[2] *See also Viola v. United States*, 481 Fed. Appx. 30, 31 (2d Cir. 2012)(unpublished opinion).

---

[1] *Malcolm I* was the not the first occasion in which this Court determined that the imposition of sanctions against plaintiff was appropriate. On September 14, 2010, the Court issued identical sanctions related to plaintiff's flurry of duplicative federal and state litigation against a different former employer, the Honeoye Falls-Lima Central School District. *See Malcolm v. Bd. of Educ. of the Honeoye Falls-Lima Central Sch. Dist.*, 737 F. Supp. 2d 117 (W.D.N.Y. 2010), *aff'd*, 506 Fed. Appx. 65 (2d Cir. 2012).

[2] In point of fact, the complaint in *Malcolm I* was filed on December 20, 2017, one day after the complaint in

SPA-54

The Court notes that Malcolm is and has been explicitly notified that the pursuit of frivolous and repetitive litigation can and will result in leave-to-file sanctions. The Court, then, turns to consideration of the most effective manner in which plaintiff can respond. The Court observes that Malcolm's prior in-person and telephonic interactions with the Court and its staff members have been marked by abusive and disrespectful conduct and verbiage by plaintiff, and concludes that an in-person hearing is therefore unlikely to be productive or helpful to plaintiff or to the Court. The Court accordingly directs plaintiff to file a sworn affidavit stating why she believes the imposition of leave-to-file sanctions is not appropriate at this juncture, after no less than four lawsuits have been filed against the instant defendants, three of which involved the same conduct.

In so doing, the Court reminds plaintiff of the factors the Court must consider in determining whether such sanctions are appropriate, which plaintiff may wish to speak to in her affidavit. These include: (1) the plaintiff's history of litigation; in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the plaintiff's motive in pursuing the litigation, e.g., does the plaintiff have an objective good faith expectation of prevailing?; (3) whether the plaintiff is represented by counsel; (4) whether the plaintiff has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties. *See Safir v. United States Lines, Inc.*, 792 F.2d 19, 23 (2d Cir. 1986).

After the Court has reviewed plaintiff's submissions, the Court will determine whether the re-imposition of leave-to-file sanctions is appropriate. Ultimately, the question the Court must

---

*Malcolm II*. The Court notes that at the time it issued its July 11, 2019 Decision and Order assessing sanctions (*Malcolm I*, 17-CV-6878 at Dkt. #28), Malcolm's count of duplicative actions against the District and related defendants had grown to three. This Court's decisions dismissing all three cases were filed on the same day.

4



answer is whether plaintiff is likely to continue to abuse the judicial process and harass the parties in question. *Id.*

## II.   Leave to Amend

The Second Circuit determined that insofar as she relies upon events occurring *after the filing of the Malcolm I and Malcolm II complaints*, plaintiff might potentially assert facts sufficient to state or cure the following claims: (1) Title VII, ADEA and NYSHRL claims against the District and ASAR, including retaliatory termination claims against the District; and (2) Section 1983 and NYSHRL equal protection claims against all defendants. *See Curry-Malcolm v. Rochester City School District et al.*, 2020 U.S. App. LEXIS 35730 at *5 fn.5 (2d Cir. 2020)(affirming in part and remanding in part *Malcolm I*); *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 (2d Cir. 2020)(affirming and remanding *Malcolm III*).

The Court accordingly grants plaintiff leave to file an Amended Complaint with respect to these matters, against any appropriate defendants, in the manner and to the extent set forth below.

## CONCLUSION

For the reasons set forth above, the Court's imposition of leave-to-file sanctions in *Malcolm I* is reversed for reconsideration. Plaintiff is directed to file, within thirty (30) days of entry of this Decision and Order, an affidavit demonstrating why the Court should not reissue leave-to-file sanctions requiring plaintiff to obtain leave of Court before initiating future litigation against the Rochester City School District and related entities. Within fifteen (15) days of plaintiff's filing, defendants may file a response as to why they believe the sanction is appropriate.



Plaintiff is also granted leave to file, within thirty (30) days of entry of this Decision and Order, a single Amended Complaint which consolidates her claims in the above-referenced actions for which leave to amend has been granted, as set forth above in Section II.

Should plaintiff opt to file an Amended Complaint, she shall not attempt to reassert any of the claims for which dismissal with prejudice was affirmed by the Second Circuit. While plaintiff may opt to retain or amend certain factual allegations related to those claims for background purposes, they shall not be deemed to state (or to re-state) any causes of action inconsistent with the Second Circuit's affirmances in *Malcolm I*, *Malcolm II* and/or *Malcolm III*. Plaintiff is further granted leave to assert new and previously-unadjudicated claims (if any) against the defendants or related parties, for which right-to-sue letters were issued subsequent to the commencement of *Malcolm IV*.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       December 30, 2020.

6

SPA-57

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

BERNICE MALCOLM,

                         Plaintiff,

          v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                         Defendants.
_____

BERNICE CURRY-MALCOLM,

                         Plaintiff,

          v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                         Defendants.
_____

DECISION AND ORDER

17-CV-6878L
18-CV-6450L

Plaintiff Bernice Curry-Malcolm ("plaintiff") was employed by the Rochester City School District (the "District"), beginning in 2015 and continuing through the end of the 2016-17 school year. She has previously brought several lawsuits against various District entities and employees, as well as against the Association of Supervisors and Administrators of Rochester ("ASAR") and

SPA- 58

two of its employees, arising out of that period of employment. Her claims include race-based and age-based discrimination and retaliation in violation of state and federal anti-discrimination statutes, as well as miscellaneous labor-related claims and claims sounding in contract. All of these were initially dismissed by this Court. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 (dismissed at 388 F. Supp. 3d 242 (W.D.N.Y. 2019)); *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 (dismissed, Dkt. #14); *Curry-Malcolm v. Rochester City Sch. Dist. et al.*, ("*Malcolm III*"), 18-CV-6450 (dismissed at 389 F.Supp.3d 189 (W.D.N.Y. 2019)); *In re Curry-Malcolm* ("*Malcolm IV*"), 20-CV-6537 (dismissed at 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020)).

Plaintiff appealed this Court's decisions in *Malcolm I, II, III*, and *IV*. On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III*, but reversed and remanded portions of *Malcolm I* and *III*, for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. (17-CV-6878, Dkt. #32, #33). The plaintiff's appeal in *Malcolm IV* remains pending.

The Court consolidated *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand. On December 30, 2020, the Court issued a Decision and Order which, inter alia, granted plaintiff leave to file an Amended Complaint to restate some of her previously dismissed claims, and to assert any new related claims. (17-CV-6878, Dkt. #34). Plaintiff thereafter filed an Amended Complaint (Dkt. #39). The Court dismissed the Amended Complaint, without prejudice, for failure to comply with the pleading requirements of Fed. R. Civ. Proc. 8, and granted plaintiff leave to file a Second Amended Complaint. (17-CV-6878, Dkt. #41).

Plaintiff filed a Second Amended Complaint on April 26, 2021. (17-CV-6878, Dkt. #43). The defendants now move to dismiss the Second Amended Complaint pursuant to Fed. R. Civ.

2

SPA-59

Proc. 8, 10, 11, 12(b)(1), (2), (3), and (6), and/or for failure to comply with this Court's prior orders. (17-CV-6878, Dkt. #44, #46). For the reasons that follow, the defendants' motions are granted, and the Second Amended Complaint is dismissed.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education ("CASE"). Plaintiff claims that she was thereafter subjected, inter alia, to age-based and/or race-based discrimination, in the form of a hostile work environment, disparate treatment and/or retaliation by the District, ASAR, and certain District and ASAR employees, culminating in the termination of her employment on or about July 1, 2017. Plaintiff was placed on a preferred eligibility list, and was ultimately rehired by the District less than five months later, on or about November 20, 2017. (18-CV-6450, Dkt. #14 at 2).

This Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34), in conformity with the Second Circuit's directives, permitted plaintiff to file an Amended Complaint to reassert, e.g.,: (1) discrimination and retaliation claims against the District pursuant to Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. ("ADEA") and, to the extent such claims were not already determined to be barred by plaintiff's election of remedies, the New York Human Rights Law, N.Y. Exec. Law §290 et seq. ("NYHRL"); (2) equal protection claims under 42 U.S.C. §1983; and (3) any additional claims for which right-to-sue letters were issued after the commencement of *Malcolm IV* on or about July 22, 2020. The Court reiterated these holdings in its April 6, 2021 Decision and Order dismissing plaintiff's first Amended Complaint. (17-CV-6878, Dkt. #41).

SPA-60

## DISCUSSION

### I.     Fed. R. Civ. Proc. 8

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). Dismissal of a complaint for failure to comply with Rule 8 is generally reserved for those cases in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). This standard should be applied with special lenience to pro se pleadings. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).

Plaintiff's initial Amended Complaint – which the Court dismissed based on its failure to comply with Rule 8 – was 132 pages and 592 paragraphs in length, along with exhibits comprised of an additional 234 pages. It described fifteen causes of action, a number of which were not properly asserted, because they were untimely, unexhausted, or had previously been dismissed with prejudice, with such dismissal affirmed by the Second Circuit.

Unfortunately, some of the same defects persist in plaintiff's Second Amended Complaint. The Second Amended Complaint is 76 pages and 500 paragraphs long, and asserts a total of twenty-two causes of action, several of which were previously dismissed by this Court with prejudice, and the dismissal of which was affirmed by the Second Circuit. Plaintiff appears to have disregarded the Second Circuit's orders, and this Court's admonitions, in attempting to reassert those claims.[1] Moreover, the Second Amended Complaint continues to include extraneous material, including factual allegations and claims against another, unrelated school district by

---

[1] Although defendants urge the Court to dismiss the Second Amended Complaint on the basis of its noncompliance with Court orders pursuant to Fed. R. Civ. Proc. 11, the Court declines to do so, in deference to plaintiff's pro se status, and in the well-settled interest of resolving the instant disputes on their merits.

4

GPA-61

whom plaintiff was employed prior to the events underlying this action. (17-CV-6878, Dkt. #43 at ¶¶223, 225, 226, 487).

While the Second Amended Complaint is not a model of clarity and, on its face, fails to comply with the prior orders of this Court, I find that when viewed with the favorable inferences owed to a pro se pleading, the Second Amended Complaint is narrowly sufficient to give defendants fair notice of the plaintiff's claims. I therefore decline to dismiss it for failure to satisfy the requirements of Rule 8. (17-CV-6878, Dkt. #43 at ¶¶315-465).

## II.     Motions to Dismiss Pursuant to Fed. R. Civ. Proc. 12(b)(6)

### A.     Rule 12(b)(6) Standard

In deciding whether a complaint should be dismissed for failure to state a claim pursuant to Fed. Civ. Proc. 12(b)(6), a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citing *Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987)). However, "a plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

While this standard applies no less to pro se pleadings, the Court is mindful that a "pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008). Nevertheless, all pleadings, pro se or otherwise, must contain enough factual allegations to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*

SPA-62

### B. Reasserted Title VII Claims Against the District (Counts I and IV)

#### i. Disparate Treatment

As in her initial and Amended Complaints, plaintiff alleges that the District subjected her to race-based discrimination and retaliation during her employment as a probationary CASE.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Stating a claim of discrimination in violation of Title VII requires the plaintiff to allege two elements: "(1) [that] the employer took adverse employment action against [the plaintiff]; and (2) [that plaintiff's] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)(emphasizing that at the pleadings stage of an employment discrimination case, a plaintiff has the "minimal burden" of alleging facts "suggesting an inference of discriminatory motivation")(quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

An adverse employment action occurs when an employee "endures a materially adverse change in the terms and conditions of employment." *Vega*, 801 F.3d 72 at 85 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Galabya*, 202 F.3d 636 at 640, and includes (but is not limited to) such acts as discharge or demotion, denial of a promotion, assignment of additional responsibilities, involuntary transfer to an inferior position, and denial of benefits. *See Little v. NBC*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).

Plaintiff alleges that she suffered from the following adverse employment actions as a probationary CASE: (1) the District, allegedly in violation of its own policies, failed to adequately investigate her internal complaints of discrimination; (2) plaintiff was "transferred" in February 2017 without her consent; (3) the District made errors in its record-keeping and reporting to the teacher's union concerning plaintiff's married name and Social Security number; and (4) plaintiff was given a performance rating of "developing" in an annual evaluation. (17-CV-6878 at ¶¶256, 273-76).

Granting plaintiff every favorable inference, none of the complained-of acts, singly or in combination, arise to the level of an adverse employment action, or are sufficient to raise an inference of discriminatory animus.

With respect to plaintiff's claim that the District failed to adequately investigate her internal complaints of discrimination, courts in this Circuit have consistently concluded that an employer's failure to investigate a plaintiff's complaint of discrimination does not constitute an adverse employment action for purposes of a disparate treatment claim. *See Bianchi v. Rochester City Sch. Dist.*, 2019 U.S. Dist. LEXIS 168991 at *23 (W.D.N.Y. 2019); *Day v. City of New York*, 2015 U.S. Dist. LEXIS 161206 at *24 (S.D.N.Y. 2015)(collecting cases).

I find no basis to disturb this precedent, particularly given that plaintiff makes no claim that the District's allegedly insufficient investigations altered the terms and conditions of her employment in any way. Similarly, although plaintiff alleges that she was involuntarily "transferred" in February 2017, she does not describe the particulars of the transfer, and makes no claim that she was transferred to an inferior position, or that her terms and conditions of employment were changed. As such, neither action plausibly arises to the level of an adverse employment action.

SPA-64

Turning to plaintiff's allegation that her supervisor's assignment of a "developing" rating in a performance evaluation was adverse, it is well settled that "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019). Plaintiff has not alleged that the "developing" rating resulted in any form of discipline, or that it otherwise altered her compensation, benefits, job title, or any other terms and conditions of her employment. As such, plaintiff has failed to plausibly state that the performance evaluation was adverse.

Finally, plaintiff's allegations that the District purposely made mistakes in its records or its communications to the union concerning plaintiff's married surname and/or Social Security number are insufficient to raise an inference of discriminatory animus. Plaintiff makes no claim that the District was less prone to recordkeeping errors for employees who are not part of a protected class, and does not allege that these errors had any negative repercussions with respect to the terms and conditions of her employment, or to her receipt of union-related services.

Plaintiff's Title VII discrimination and retaliation claims are accordingly insufficiently stated, and are dismissed.

## ii. Hostile Work Environment

Plaintiff's Second Amended Complaint also refers to her having experienced a hostile work environment.

"An employer violates Title VII when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . so long as there is a basis for imputing the conduct that created the hostile environment to the employer.'" *Rasmy v.*

*Marriott Int'l Inc.*, 952 F.3d 379, 387 (2d Cir. 2020) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010)).

"To plead a hostile work environment claim, a plaintiff must plead facts that describe conduct which: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Maines v. Last Chance Funding, Inc.*, 2018 U.S. Dist. LEXIS 162073 at *26 (E.D.N.Y. 2018) (quoting *Placide-Eugene v. Visiting Nurse Serv. of New York*, 2013 U.S. Dist. LEXIS 76240 at *34 (E.D.N.Y. 2013)). Furthermore, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations and internal quotation marks omitted).

Here, plaintiff claims in vague and conclusory fashion that she was subjected to ongoing race-based harassment by her supervisor, and by a coworker. She describes their conduct toward her as "hostile," a "relentless unwarranted attack," "harassing and discriminatory," "horrible," and designed to "provoke" plaintiff. (17-CV-6878, Dkt. #43 at ¶¶249-50, 266-68). However, plaintiff does not describe any specific comments or actions by either woman.

These allegations do not plausibly describe a hostile work environment. Plaintiff does not identify any offensive, disparaging or insulting words or actions, let alone a continuous or pervasive pattern of such incidents, motivated by or relating to plaintiff's race (or, more broadly, related to her membership in any protected class). She makes no allegation that any of the conduct to which she refers, whatever it might have been, is attributable to the District.

SPA - 66

While plaintiff does allege, as discussed above, that her supervisor gave her an unfair performance review, and that the District failed to properly investigate plaintiff's internal complaints, such allegations are "insufficient as a matter of law to state a hostile work environment claim." *Haggood v. Rubin & Rothman, LLC*, 2014 U.S. Dist. LEXIS 161674 at *48 (E.D.N.Y. 2014) (claims that employer reprimanded plaintiffs, failed to investigate their discrimination complaints, and engaged in excessive scrutiny, even if adequate to demonstrate disparate treatment, are insufficient to state a hostile work environment claim).

In short, plaintiff's hostile work environment claim is comprised solely of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are insufficient to state a claim. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). That claim is accordingly dismissed.

### iii.    Retaliation

Plaintiff alleges that the District retaliated against her for complaining about discrimination by terminating her employment in 2017, and by no longer paying plaintiff's union dues and "retirement loan" thereafter.

In order to state a claim of retaliation in violation of Title VII, a plaintiff must "give plausible support to the reduced prima facie requirements" of: (1) participation in protected activity; (2) the employer's awareness of that activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Febrianti v. Starwood Worldwide*, 2016 U.S. Dist. LEXIS 15285 at *9 (S.D.N.Y. 2016). *See also Ninying v. N.Y. City Fire Dep't*, 2020 U.S. App. LEXIS 12232 at *5 (2d Cir. 2020) (unpublished opinion).

With respect to her retaliation claims, plaintiff has failed to allege facts sufficient to suggest any causal connection between her protected activity and the District's actions. As this Court has

10

SPA-67


previously observed, the elimination of the probationary CASE positions resulted in the layoff of some twenty-two employees, none of whom are alleged to have engaged in protected activity except for plaintiff. All of those employees – plaintiff included – were re-employed by the District within four months, with plaintiff having declined the District's initial offer of a full-time teaching position, and then having accepted its second offer, for the same compensation and benefits she had previously received.[2] Nor does the fact that the District ceased paying plaintiff's union dues or "retirement loan" during the period when she was not employed by the District have any plausible connection with plaintiff's protected activity, particularly as plaintiff makes no allegation that the District otherwise had a policy or practice of continuing to provide such benefits to other former employees.

As such, plaintiff's Title VII claims against the District defendants are once again dismissed for failure to state a claim, for the reasons set forth herein, as well as in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

---

[2] It is well-settled that at the pleading stage, temporal proximity can sometimes be sufficient to establish a causal connection between protected activity and retaliatory actions. However, as the Court previously observed in dismissing the complaint in *Malcolm IV*, while "'temporal proximity, without more,' may be sufficient to suggest an inference of discrimination for purposes of a claim for retaliatory termination, 'temporal proximity, with less' – that is, vague allegations of potential temporal proximity, eroded by a plaintiff's own factual allegations that suggest coincidental timing, describe an adverse employment action which equally affected dozens of employees who didn't engage in protected activity, and indicate that plaintiff's employer subsequently made multiple attempts to reemploy her, and ultimately did re-hire her in a position with equal pay and [benefits] – is insufficient to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (20-CV-6537, Dkt. #3 at 13-14) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *See also Febrianti*, 2016 U.S. Dist. LEXIS 15285 at *15-*17 (dismissing retaliation claim as wholly conclusory where plaintiff points to no circumstantial evidence of retaliation such as disparate treatment of employees who didn't engage in protected conduct, relies solely on temporal proximity, and sets forth "uniformly vague allegations about the events surrounding [her protected activity and the adverse employment action that followed] which] in no way suggest that the temporal proximity . . . is anything but coincidence").

11

SPA-68

## C. Reasserted ADEA Discrimination and Retaliation Claims Against the District (Counts II and V)

Plaintiff's allegations of age-based discrimination are based on the same facts that underlie her Title VII claims: plaintiff claims that the District's actions toward her were motivated, if not by race-based discriminatory and retaliatory animus, then by age-based factors.

In order to state a prima facie claim of age-based discrimination in violation of the ADEA, a plaintiff must allege that: (1) she is a member of a protected class (e.g., over the age of forty); (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination based on age. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997).

As with her Title VII claims, plaintiff has failed to plausibly allege that she was subjected to an adverse employment action under circumstances permitting an inference of discrimination. Plaintiff describes no age-based comments or disparate treatment in the terms and conditions of her employment. Although plaintiff claims to have been the oldest person among the class of CASEs whose employment was terminated, the group included a number of persons under the age of forty, thus undermining any inference that the layoffs were motivated by age. To the extent plaintiff contends that the District retaliated against her for complaining about age-based discrimination, she again fails to allege facts sufficient to suggest a causal connection between her protected activity and the elimination of the CASE positions, or the District's payment of union dues or other benefits.

Plaintiff's ADEA discrimination and retaliation claims are therefore dismissed, for the reasons set forth herein, as well as in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### D.    Reasserted Breach of Contract Claim Against the District (Count VII)

Plaintiff's breach of contract claim was previously dismissed, and such dismissal was affirmed by the Second Circuit, on the grounds that plaintiff had failed to identify any contract with the District, or any provision thereof, that was allegedly breached.

Plaintiff's Second Amended Complaint refers to a collective bargaining agreement and generally alleges that she has been "denied her rights" pursuant to it (17-CV-6878, Dkt. #43 at ¶205), but fails to identify any valid contractual provision that was allegedly breached by the District. Plaintiff's breach of contract claim is accordingly dismissed as insufficiently stated, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### E.    Reasserted ADEA Claims Against ASAR (Count IX)

Plaintiff's Second Amended Complaint broadly alleges that ASAR discriminated against plaintiff due to her age, and that it "allowed" the District to do so.

The ADEA prohibits labor organizations such as ASAR from excluding, expelling, or segregating persons due to their age, or from depriving them of employment opportunities or causing or attempting to cause an employer to discriminate against them in violation of the Act. *See* 29 U.S.C.A. §623(d).

As with her initial Complaint, plaintiff's Second Amended Complaint "lacks sufficient detail to support her allegations." (17-CV-6878, Dkt. #32 at 4). The Second Amended Complaint fails to set forth any facts that plausibly suggest that ASAR or any of its officers treated plaintiff differently because of her age, or that ASAR engaged in any conduct that caused, or attempted to cause, the District to do so.


SPA-70

Plaintiff's ADEA claims are accordingly dismissed, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### F. Reasserted Title VII Claims of Discrimination Against ASAR (Count VIII)

Plaintiff claims that ASAR unlawfully subjected her to race-based and/or gender-based discrimination, retaliation, and disparate treatment, in violation of Title VII, through ASAR's "neglect of duty, breach of contract and breach of a fair duty."

As before, plaintiff has failed to support her claims with factual allegations sufficient to render them plausible. Plaintiff makes no claim that ASAR denied her of any privilege of membership, or engaged in any specific overt act or omission that comprised discrimination against her, or that facilitated or supported discrimination by her employer.

For these reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders, plaintiff's Title VII discrimination claims against ASAR are dismissed. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### G. Reasserted Equal Protection Claims (Count XI)

Plaintiff asserts that the defendants violated her Constitutional right to equal protection, in violation of 42 U.S.C. §1983. Plaintiff's equal protection claims were initially dismissed, because ASAR was not a government actor, and because plaintiff had failed to allege any facts sufficient to raise an inference of discrimination against the District.

With respect to the ASAR defendants, it is well settled that labor unions and their employees are not state actors for purposes of Section 1983. This claim was previously dismissed for that reason, and the dismissal was affirmed by the Second Circuit. Plaintiff has asserted no

14


SPA-71

facts suggesting that ASAR or any of its employees are state actors, and as such, that claim must be dismissed.

With respect to the District defendants, plaintiff has supplemented her initial pleadings by alleging certain "direct actions" by individual defendant Superintendent Deane-Williams. *See generally Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)(liability under Section 1983 requires proof that the defendant was directly involved in the unconstitutional conduct, by participating in it, directing it or authorizing it).

Specifically, plaintiff alleges that Deane-Williams "knew that [plaintiff's supervisor] had rated Plaintiff as highly effective," "knew that [the District] had changed the Plaintiff's name [in its internal records] in February 2017," "knew that Plaintiff was not affected as a probationary CASE administrator regarding the 2017-2018 budgetary process," "targeted" the probationary CASE employee group for layoffs, "entered into a memorandum of understanding" with the union to protect tenured CASEs from termination, and "was aware" that plaintiff's supervisor had changed her assessment of plaintiff's skills to "developing" in plaintiff's final performance evaluation. (Dkt. #43 at ¶¶367-86).

As before, these allegations suggest only that Deane-Williams was aware of certain facts – such as the impending layoff of the persons in plaintiff's position, and the contents of plaintiff's performance evaluations – and failed to intervene. None of them describe any direct involvement by Deane-Williams in altering plaintiff's terms and conditions of employment in a manner that "raise[s] a plausible inference of discrimination." (17-CV-6878, Dkt. #32 at 6).

In any event, plaintiff's equal protection claims are duplicative of her Title VII claims. It is well settled in this Circuit that "the analytical framework of a workplace equal protection claim parallels that of a discrimination claim under Title VII." *Cunningham v. N.Y. State DOL*, 326



F. App'x 617, 620 (2d Cir. 2009) (unpublished opinion). Thus where, as here, they are asserted together, "the two must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).

Plaintiff's equal protection claims are accordingly dismissed, for the above-stated reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### H. Improperly Reasserted Claims

#### i. NYHRL Discrimination and Retaliation Claims (Counts III, VI and X)

Plaintiff's NYHRL claims were previously dismissed as barred by plaintiff's election of remedies before the NYSDHR. Their dismissal was affirmed by the Second Circuit, and plaintiff was explicitly directed that she was collaterally estopped from reasserting them. *See York v. Ass'n of the Bar*, 286 F.3d 122, 127 (2d Cir. 2002)("NYHRL . . . claims, once brought before the NYSDHR, may not be brought again as a plenary action in another court").

Those claims are accordingly dismissed, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

#### ii. Claims Against the Individual Defendants

Plaintiff's Title VII and ADEA claims against the individual defendants were previously dismissed as a matter of law, as "individual liability is not possible under either Title VII or the ADEA." *Leach v. Univ. at Buffalo Pediatric Assocs.*, 2021 U.S. Dist. LEXIS 83457 at *20 (W.D.N.Y. 2021)(citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) and *Cherry v.*


SPA-73

*Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002)). Their dismissal was affirmed by the Second Circuit, and plaintiff was explicitly directed that she was estopped from reasserting them.

Those claims are accordingly dismissed, for the above-stated reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### I.  New Individual Defendants

Plaintiff's Second Amended Complaint seeks to add a number of individual defendants who were not previously named in plaintiff's four lawsuits arising out of her employment with the District. These include several District employees and an attorney. Plaintiff makes no factual assertions demonstrating that her administrative remedies have been exhausted with respect to any of these parties, and in any event, her discrimination and retaliation claims against these individual defendants fail as a matter of law for the same reasons discussed above. Her request to add them as parties to the instant lawsuit(s) is accordingly denied.

### J.  New Claims

Plaintiff's Second Amended Complaint also sets forth eleven new claims, which are alleged to have arisen after her rehire in November 2017. (17-CV-6878, Dkt. #43 at ¶459 et seq.).

Initially, the bulk of plaintiff's new claims are nothing more than boilerplate recitations of the elements of a cause of action, with no supporting facts that are alleged to have taken place during the relevant time period. These include: (1) race-based discrimination claims against the District and ASAR under Title VII and the NYSDHR; (2) age-based discrimination claims against the District and ASAR under the ADEA and NYSDHR; (3) breach of contract claims against the

17

SPA-74

District; and (4) retaliation claims under Title VII, the ADEA and the NYDHR, against ASAR. Because these claims lack a sufficient factual basis to be plausible, they are dismissed.

Plaintiff does allege that after she was rehired by the District in November 2017, the District placed her on paid administrative leave from December 8, 2017 through April 23, 2018, and then terminated her employment once again, as a result of race-related or age-related discrimination, and/or in retaliation for her prior complaints about discrimination. (17-CV-6878, Dkt. #43 at ¶¶309, 473-78). However, the Second Amended Complaint fails to indicate whether these new discrimination/retaliatory termination claims – or any of plaintiff's other new claims, for that matter – have been administratively exhausted, or are entitled to be excused from the exhaustion requirement. Indeed, the latest administrative charge plaintiff claims to have filed was submitted in August 2017, prior to plaintiff's rehire, placement on paid leave, and subsequent termination. "Right to Sue" letters were issued by the NYSDHR and EEOC regarding that charge on February 14, 2018, and March 20, 2018, respectively – weeks before plaintiff's April 23, 2018 termination – and it is unclear what matters, if any, either agency investigated or determined with respect to plaintiff's second period of employment with the District, in and after November 2017. (17-CV-6878, Dkt. #43 at ¶¶135-38).

Because plaintiff's new claims arising in and after November 2017 are unaccompanied by any allegations that plaintiff's administrative remedies have been exhausted, and are not otherwise sufficiently stated, they are hereby dismissed, without prejudice.

The Court has reviewed plaintiff's pleading to determine whether it states some other claim not already enumerated by plaintiff, and has determined that it does not.

SPA-75

## CONCLUSION

For the reasons set forth above, plaintiff's Second Amended Complaint fails to state a plausible cause of action. The defendants' motions to dismiss (17-CV-6878, Dkt. #44, #46) are hereby granted, and the Second Amended Complaint (17-CV-6878, Dkt. #43) is dismissed in its entirety.

Plaintiff's causes of action arising out of her initial employment with the District, which ended in or about July 2017, are dismissed in their entirety, with prejudice.

Plaintiff's claims that are alleged to have arisen after her rehire by the District, in and after November 2017, are dismissed without prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
       October 19, 2021.

19

SPA-76

Intentionally Blank

Judgment in a Civil Case

United States District Court
WESTERN DISTRICT OF NEW YORK

**JUDGMENT IN A CIVIL CASE**

BERNICE MALCOLM                           CASE NUMBER: 17-cv-6878
      v.
                                CASE NUMBER 18-CV-6450

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,
Defendants.

BERNICE CURRY-MALCOLM,
Plaintiff,
      v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,
Defendants

☐ **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that judgment is entered in favor of all defendants, and the cases are dismissed.

Date: October 25, 2021                    MARY C. LOEWENGUTH
                                       CLERK OF COURT

                                       By: Lisa M. Duque
                                          Deputy Clerk

S PA-77

Intentionally Blank

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BERNICE MALCOLM,                                          DECISION AND ORDER

                                    Plaintiff,            17-CV-6878L
                                                          18-CV-6450L

            v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                                    Defendants.

_____

BERNICE CURRY-MALCOLM,

                                    Plaintiff,

            v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                                    Defendants.

_____

            Plaintiff Bernice Curry-Malcolm ("plaintiff") was employed by the Rochester City School

District (the "District"), beginning in 2015 and continuing through the end of the 2016-17 school

year. She has previously brought several lawsuits against various District entities and employees,

as well as against the Association of Supervisors and Administrators of Rochester ("ASAR") and

6PA-78

two of its employees, arising out of that period of employment. Her claims include race-based and age-based discrimination and retaliation in violation of state and federal anti-discrimination statutes, as well as miscellaneous labor-related claims and claims sounding in contract. All of these were initially dismissed by this Court. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 (dismissed at 388 F. Supp. 3d 242 (W.D.N.Y. 2019)); *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 (dismissed, Dkt. #14); *Curry-Malcolm v. Rochester City Sch. Dist. et al.*, ("*Malcolm III*"), 18-CV-6450 (dismissed at 389 F.Supp.3d 189 (W.D.N.Y. 2019)); *In re Curry-Malcolm* ("*Malcolm IV*"), 20-CV-6537 (dismissed at 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020)).

Plaintiff appealed this Court's decisions in *Malcolm I, II, III,* and *IV*. On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III*, but reversed and remanded portions of *Malcolm I* and *III*, for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. (17-CV-6878, Dkt. #32, #33). The plaintiff's appeal in *Malcolm IV* remains pending.

The Court consolidated *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand. On December 30, 2020, the Court issued a Decision and Order which, inter alia, granted plaintiff leave to file an Amended Complaint to restate some of her previously dismissed claims, and to assert any new related claims. (17-CV-6878, Dkt. #34). Plaintiff thereafter filed an Amended Complaint (Dkt. #39). The Court dismissed the Amended Complaint, without prejudice, for failure to comply with the pleading requirements of Fed. R. Civ. Proc. 8, and granted plaintiff leave to file a Second Amended Complaint. (17-CV-6878, Dkt. #41).

Plaintiff filed a Second Amended Complaint on April 26, 2021. (17-CV-6878, Dkt. #43). The defendants now move to dismiss the Second Amended Complaint pursuant to Fed. R. Civ.

Proc. 8, 10, 11, 12(b)(1), (2), (3), and (6), and/or for failure to comply with this Court's prior orders. (17-CV-6878, Dkt. #44, #46). For the reasons that follow, the defendants' motions are granted, and the Second Amended Complaint is dismissed.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education ("CASE"). Plaintiff claims that she was thereafter subjected, inter alia, to age-based and/or race-based discrimination, in the form of a hostile work environment, disparate treatment and/or retaliation by the District, ASAR, and certain District and ASAR employees, culminating in the termination of her employment on or about July 1, 2017. Plaintiff was placed on a preferred eligibility list, and was ultimately rehired by the District less than five months later, on or about November 20, 2017. (18-CV-6450, Dkt. #14 at 2).

This Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34), in conformity with the Second Circuit's directives, permitted plaintiff to file an Amended Complaint to reassert, e.g.,: (1) discrimination and retaliation claims against the District pursuant to Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. ("ADEA") and, to the extent such claims were not already determined to be barred by plaintiff's election of remedies, the New York Human Rights Law, N.Y. Exec. Law §290 et seq. ("NYHRL"); (2) equal protection claims under 42 U.S.C. §1983; and (3) any additional claims for which right-to-sue letters were issued after the commencement of *Malcolm IV* on or about July 22, 2020. The Court reiterated these holdings in its April 6, 2021 Decision and Order dismissing plaintiff's first Amended Complaint. (17-CV-6878, Dkt. #41).

# DISCUSSION

## I.    Fed. R. Civ. Proc. 8

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). Dismissal of a complaint for failure to comply with Rule 8 is generally reserved for those cases in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). This standard should be applied with special lenience to pro se pleadings. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).

Plaintiff's initial Amended Complaint – which the Court dismissed based on its failure to comply with Rule 8 – was 132 pages and 592 paragraphs in length, along with exhibits comprised of an additional 234 pages. It described fifteen causes of action, a number of which were not properly asserted, because they were untimely, unexhausted, or had previously been dismissed with prejudice, with such dismissal affirmed by the Second Circuit.

Unfortunately, some of the same defects persist in plaintiff's Second Amended Complaint. The Second Amended Complaint is 76 pages and 500 paragraphs long, and asserts a total of twenty-two causes of action, several of which were previously dismissed by this Court with prejudice, and the dismissal of which was affirmed by the Second Circuit. Plaintiff appears to have disregarded the Second Circuit's orders, and this Court's admonitions, in attempting to reassert those claims.[1] Moreover, the Second Amended Complaint continues to include extraneous material, including factual allegations and claims against another, unrelated school district by

---

[1] Although defendants urge the Court to dismiss the Second Amended Complaint on the basis of its noncompliance with Court orders pursuant to Fed. R. Civ. Proc. 11, the Court declines to do so, in deference to plaintiff's pro se status, and in the well-settled interest of resolving the instant disputes on their merits.

SPA- 81

whom plaintiff was employed prior to the events underlying this action. (17-CV-6878, Dkt. #43 at ¶¶223, 225, 226, 487).

While the Second Amended Complaint is not a model of clarity and, on its face, fails to comply with the prior orders of this Court, I find that when viewed with the favorable inferences owed to a pro se pleading, the Second Amended Complaint is narrowly sufficient to give defendants fair notice of the plaintiff's claims. I therefore decline to dismiss it for failure to satisfy the requirements of Rule 8. (17-CV-6878, Dkt. #43 at ¶¶315-465).

## II.  Motions to Dismiss Pursuant to Fed. R. Civ. Proc. 12(b)(6)

### A.  Rule 12(b)(6) Standard

In deciding whether a complaint should be dismissed for failure to state a claim pursuant to Fed. R. Civ. Proc. 12(b)(6), a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant. *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994) (citing *Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987)). However, "a plaintiff's obligation . . . requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

While this standard applies no less to pro se pleadings, the Court is mindful that a "pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008). Nevertheless, all pleadings, pro se or otherwise, must contain enough factual allegations to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*

SPA- 82

### B. Reasserted Title VII Claims Against the District (Counts I and IV)

#### i. Disparate Treatment

As in her initial and Amended Complaints, plaintiff alleges that the District subjected her to race-based discrimination and retaliation during her employment as a probationary CASE.

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1). Stating a claim of discrimination in violation of Title VII requires the plaintiff to allege two elements: "(1) [that] the employer took adverse employment action against [the plaintiff]; and (2) [that plaintiff's] race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)(emphasizing that at the pleadings stage of an employment discrimination case, a plaintiff has the "minimal burden" of alleging facts "suggesting an inference of discriminatory motivation")(quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

An adverse employment action occurs when an employee "endures a materially adverse change in the terms and conditions of employment." *Vega*, 801 F.3d 72 at 85 (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). An adverse employment action is "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Galabya*, 202 F.3d 636 at 640, and includes (but is not limited to) such acts as discharge or demotion, denial of a promotion, assignment of additional responsibilities, involuntary transfer to an inferior position, and denial of benefits. *See Little v. NBC*, 210 F. Supp. 2d 330, 377 (S.D.N.Y. 2002).

Plaintiff alleges that she suffered from the following adverse employment actions as a probationary CASE: (1) the District, allegedly in violation of its own policies, failed to adequately investigate her internal complaints of discrimination; (2) plaintiff was "transferred" in February 2017 without her consent; (3) the District made errors in its record-keeping and reporting to the teacher's union concerning plaintiff's married name and Social Security number; and (4) plaintiff was given a performance rating of "developing" in an annual evaluation. (17-CV-6878 at ¶¶256, 273-76).

Granting plaintiff every favorable inference, none of the complained-of acts, singly or in combination, arise to the level of an adverse employment action, or are sufficient to raise an inference of discriminatory animus.

With respect to plaintiff's claim that the District failed to adequately investigate her internal complaints of discrimination, courts in this Circuit have consistently concluded that an employer's failure to investigate a plaintiff's complaint of discrimination does not constitute an adverse employment action for purposes of a disparate treatment claim. *See Bianchi v. Rochester City Sch. Dist.*, 2019 U.S. Dist. LEXIS 168991 at *23 (W.D.N.Y. 2019); *Day v. City of New York*, 2015 U.S. Dist. LEXIS 161206 at *24 (S.D.N.Y. 2015)(collecting cases).

I find no basis to disturb this precedent, particularly given that plaintiff makes no claim that the District's allegedly insufficient investigations altered the terms and conditions of her employment in any way. Similarly, although plaintiff alleges that she was involuntarily "transferred" in February 2017, she does not describe the particulars of the transfer, and makes no claim that she was transferred to an inferior position, or that her terms and conditions of employment were changed. As such, neither action plausibly arises to the level of an adverse employment action.

SPA-84

Turning to plaintiff's allegation that her supervisor's assignment of a "developing" rating in a performance evaluation was adverse, it is well settled that "a negative performance review, without any showing of a negative ramification, cannot constitute an adverse employment action." *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019). Plaintiff has not alleged that the "developing" rating resulted in any form of discipline, or that it otherwise altered her compensation, benefits, job title, or any other terms and conditions of her employment. As such, plaintiff has failed to plausibly state that the performance evaluation was adverse.

Finally, plaintiff's allegations that the District purposely made mistakes in its records or its communications to the union concerning plaintiff's married surname and/or Social Security number are insufficient to raise an inference of discriminatory animus. Plaintiff makes no claim that the District was less prone to recordkeeping errors for employees who are not part of a protected class, and does not allege that these errors had any negative repercussions with respect to the terms and conditions of her employment, or to her receipt of union-related services.

Plaintiff's Title VII discrimination and retaliation claims are accordingly insufficiently stated, and are dismissed.

### ii. Hostile Work Environment

Plaintiff's Second Amended Complaint also refers to her having experienced a hostile work environment.

"An employer violates Title VII when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . so long as there is a basis for imputing the conduct that created the hostile environment to the employer.'" *Rasmy v.*

8


SPA-85

*Marriott Int'l Inc.*, 952 F.3d 379, 387 (2d Cir. 2020) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010)).

"To plead a hostile work environment claim, a plaintiff must plead facts that describe conduct which: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's protected characteristic." *Maines v. Last Chance Funding, Inc.*, 2018 U.S. Dist. LEXIS 162073 at *26 (E.D.N.Y. 2018) (quoting *Placide-Eugene v. Visiting Nurse Serv. of New York*, 2013 U.S. Dist. LEXIS 76240 at *34 (E.D.N.Y. 2013)). Furthermore, "[a]s a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citations and internal quotation marks omitted).

Here, plaintiff claims in vague and conclusory fashion that she was subjected to ongoing race-based harassment by her supervisor, and by a coworker. She describes their conduct toward her as "hostile," a "relentless unwarranted attack," "harassing and discriminatory," "horrible," and designed to "provoke" plaintiff. (17-CV-6878, Dkt. #43 at ¶¶249-50, 266-68). However, plaintiff does not describe any specific comments or actions by either woman.

These allegations do not plausibly describe a hostile work environment. Plaintiff does not identify any offensive, disparaging or insulting words or actions, let alone a continuous or pervasive pattern of such incidents, motivated by or relating to plaintiff's race (or, more broadly, related to her membership in any protected class). She makes no allegation that any of the conduct to which she refers, whatever it might have been, is attributable to the District.

9

SPA-86

While plaintiff does allege, as discussed above, that her supervisor gave her an unfair performance review, and that the District failed to properly investigate plaintiff's internal complaints, such allegations are "insufficient as a matter of law to state a hostile work environment claim." *Haggood v. Rubin & Rothman, LLC*, 2014 U.S. Dist. LEXIS 161674 at *48 (E.D.N.Y. 2014) (claims that employer reprimanded plaintiffs, failed to investigate their discrimination complaints, and engaged in excessive scrutiny, even if adequate to demonstrate disparate treatment, are insufficient to state a hostile work environment claim).

In short, plaintiff's hostile work environment claim is comprised solely of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," which are insufficient to state a claim. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). That claim is accordingly dismissed.

### iii. Retaliation

Plaintiff alleges that the District retaliated against her for complaining about discrimination by terminating her employment in 2017, and by no longer paying plaintiff's union dues and "retirement loan" thereafter.

In order to state a claim of retaliation in violation of Title VII, a plaintiff must "give plausible support to the reduced prima facie requirements" of: (1) participation in protected activity; (2) the employer's awareness of that activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Febrianti v. Starwood Worldwide*, 2016 U.S. Dist. LEXIS 15285 at *9 (S.D.N.Y. 2016). *See also Ninying v. N.Y. City Fire Dep't*, 2020 U.S. App. LEXIS 12232 at *5 (2d Cir.2020) (unpublished opinion).

With respect to her retaliation claims, plaintiff has failed to allege facts sufficient to suggest any causal connection between her protected activity and the District's actions. As this Court has

previously observed, the elimination of the probationary CASE positions resulted in the layoff of some twenty-two employees, none of whom are alleged to have engaged in protected activity except for plaintiff. All of those employees – plaintiff included – were re-employed by the District within four months, with plaintiff having declined the District's initial offer of a full-time teaching position, and then having accepted its second offer, for the same compensation and benefits she had previously received.[2] Nor does the fact that the District ceased paying plaintiff's union dues or "retirement loan" during the period when she was not employed by the District have any plausible connection with plaintiff's protected activity, particularly as plaintiff makes no allegation that the District otherwise had a policy or practice of continuing to provide such benefits to other former employees.

As such, plaintiff's Title VII claims against the District defendants are once again dismissed for failure to state a claim, for the reasons set forth herein, as well as in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

---

[2] It is well-settled that at the pleading stage, temporal proximity can sometimes be sufficient to establish a causal connection between protected activity and retaliatory actions. However, as the Court previously observed in dismissing the complaint in *Malcolm IV*, while "'temporal proximity, without more,' may be sufficient to suggest an inference of discrimination for purposes of a claim for retaliatory termination, 'temporal proximity, with less' – that is, vague allegations of potential temporal proximity, eroded by a plaintiff's own factual allegations that suggest coincidental timing, describe an adverse employment action which equally affected dozens of employees who didn't engage in protected activity, and indicate that plaintiff's employer subsequently made multiple attempts to reemploy her, and ultimately did re-hire her in a position with equal pay and [benefits] – is insufficient to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (20-CV-6537, Dkt. #3 at 13-14) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *See also Febrianti*, 2016 U.S. Dist. LEXIS 15285 at *15-*17 (dismissing retaliation claim as wholly conclusory where plaintiff points to no circumstantial evidence of retaliation such as disparate treatment of employees who didn't engage in protected conduct, relies solely on temporal proximity, and sets forth "uniformly vague allegations about the events surrounding [her protected activity and the adverse employment action that followed, which] in no way suggest that the temporal proximity . . . is anything but coincidence").

11

SPA-88

**C.    Reasserted ADEA Discrimination and Retaliation Claims Against the District (Counts II and V)**

Plaintiff's allegations of age-based discrimination are based on the same facts that underlie her Title VII claims: plaintiff claims that the District's actions toward her were motivated, if not by race-based discriminatory and retaliatory animus, then by age-based factors.

In order to state a prima facie claim of age-based discrimination in violation of the ADEA, a plaintiff must allege that: (1) she is a member of a protected class (e.g., over the age of forty); (2) her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) the circumstances surrounding that action permit an inference of discrimination based on age. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir. 1997).

As with her Title VII claims, plaintiff has failed to plausibly allege that she was subjected to an adverse employment action under circumstances permitting an inference of discrimination. Plaintiff describes no age-based comments or disparate treatment in the terms and conditions of her employment. Although plaintiff claims to have been the oldest person among the class of CASEs whose employment was terminated, the group included a number of persons under the age of forty, thus undermining any inference that the layoffs were motivated by age. To the extent plaintiff contends that the District retaliated against her for complaining about age-based discrimination, she again fails to allege facts sufficient to suggest a causal connection between her protected activity and the elimination of the CASE positions, or the District's payment of union dues or other benefits.

Plaintiff's ADEA discrimination and retaliation claims are therefore dismissed, for the reasons set forth herein, as well as in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).



**D.      Reasserted Breach of Contract Claim Against the District (Count VII)**

Plaintiff's breach of contract claim was previously dismissed, and such dismissal was affirmed by the Second Circuit, on the grounds that plaintiff had failed to identify any contract with the District, or any provision thereof, that was allegedly breached.

Plaintiff's Second Amended Complaint refers to a collective bargaining agreement and generally alleges that she has been "denied her rights" pursuant to it (17-CV-6878, Dkt. #43 at ¶205), but fails to identify any valid contractual provision that was allegedly breached by the District. Plaintiff's breach of contract claim is accordingly dismissed as insufficiently stated, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

**E.      Reasserted ADEA Claims Against ASAR (Count IX)**

Plaintiff's Second Amended Complaint broadly alleges that ASAR discriminated against plaintiff due to her age, and that it "allowed" the District to do so.

The ADEA prohibits labor organizations such as ASAR from excluding, expelling, or segregating persons due to their age, or from depriving them of employment opportunities or causing or attempting to cause an employer to discriminate against them in violation of the Act. *See* 29 U.S.C.A. §623(d).

As with her initial Complaint, plaintiff's Second Amended Complaint "lacks sufficient detail to support her allegations." (17-CV-6878, Dkt. #32 at 4). The Second Amended Complaint fails to set forth any facts that plausibly suggest that ASAR or any of its officers treated plaintiff differently because of her age, or that ASAR engaged in any conduct that caused, or attempted to cause, the District to do so.

13


SPA-90

Plaintiff's ADEA claims are accordingly dismissed, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### F.   Reasserted Title VII Claims of Discrimination Against ASAR (Count VIII)

Plaintiff claims that ASAR unlawfully subjected her to race-based and/or gender-based discrimination, retaliation, and disparate treatment, in violation of Title VII, through ASAR's "neglect of duty, breach of contract and breach of a fair duty."

As before, plaintiff has failed to support her claims with factual allegations sufficient to render them plausible. Plaintiff makes no claim that ASAR denied her of any privilege of membership, or engaged in any specific overt act or omission that comprised discrimination against her, or that facilitated or supported discrimination by her employer.

For these reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders, plaintiff's Title VII discrimination claims against ASAR are dismissed. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### G.   Reasserted Equal Protection Claims (Count XI)

Plaintiff asserts that the defendants violated her Constitutional right to equal protection, in violation of 42 U.S.C. §1983. Plaintiff's equal protection claims were initially dismissed, because ASAR was not a government actor, and because plaintiff had failed to allege any facts sufficient to raise an inference of discrimination against the District.

With respect to the ASAR defendants, it is well settled that labor unions and their employees are not state actors for purposes of Section 1983. This claim was previously dismissed for that reason, and the dismissal was affirmed by the Second Circuit. Plaintiff has asserted no



facts suggesting that ASAR or any of its employees are state actors, and as such, that claim must be dismissed.

With respect to the District defendants, plaintiff has supplemented her initial pleadings by alleging certain "direct actions" by individual defendant Superintendent Deane-Williams. *See generally Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)(liability under Section 1983 requires proof that the defendant was directly involved in the unconstitutional conduct, by participating in it, directing it or authorizing it).

Specifically, plaintiff alleges that Deane-Williams "knew that [plaintiff's supervisor] had rated Plaintiff as highly effective," "knew that [the District] had changed the Plaintiff's name [in its internal records] in February 2017," "knew that Plaintiff was not affected as a probationary CASE administrator regarding the 2017-2018 budgetary process," "targeted" the probationary CASE employee group for layoffs, "entered into a memorandum of understanding" with the union to protect tenured CASEs from termination, and "was aware" that plaintiff's supervisor had changed her assessment of plaintiff's skills to "developing" in plaintiff's final performance evaluation. (Dkt. #43 at ¶¶367-86).

As before, these allegations suggest only that Deane-Williams was aware of certain facts – such as the impending layoff of the persons in plaintiff's position, and the contents of plaintiff's performance evaluations – and failed to intervene. None of them describe any direct involvement by Deane-Williams in altering plaintiff's terms and conditions of employment in a manner that "raise[s] a plausible inference of discrimination." (17-CV-6878, Dkt. #32 at 6).

In any event, plaintiff's equal protection claims are duplicative of her Title VII claims. It is well settled in this Circuit that "the analytical framework of a workplace equal protection claim parallels that of a discrimination claim under Title VII." *Cunningham v. N.Y. State DOL*, 326



F. App'x 617, 620 (2d Cir. 2009) (unpublished opinion). Thus where, as here, they are asserted together, "the two must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).

Plaintiff's equal protection claims are accordingly dismissed, for the above-stated reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### H.    Improperly Reasserted Claims

#### i.    NYHRL Discrimination and Retaliation Claims (Counts III, VI and X)

Plaintiff's NYHRL claims were previously dismissed as barred by plaintiff's election of remedies before the NYSDHR. Their dismissal was affirmed by the Second Circuit, and plaintiff was explicitly directed that she was collaterally estopped from reasserting them. *See York v. Ass'n of the Bar*, 286 F.3d 122, 127 (2d Cir. 2002)("NYHRL . . . claims, once brought before the NYSDHR, may not be brought again as a plenary action in another court").

Those claims are accordingly dismissed, for the reasons set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

#### ii.    Claims Against the Individual Defendants

Plaintiff's Title VII and ADEA claims against the individual defendants were previously dismissed as a matter of law, as "individual liability is not possible under either Title VII or the ADEA." *Leach v. Univ. at Buffalo Pediatric Assocs.*, 2021 U.S. Dist. LEXIS 83457 at *20 (W.D.N.Y. 2021)(citing *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) and *Cherry v.*

*Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002)). Their dismissal was affirmed by the Second Circuit, and plaintiff was explicitly directed that she was estopped from reasserting them.

Those claims are accordingly dismissed, for the above-stated reasons, as well as those set forth in this Court's July 11, 2019 Decisions and Orders, and in the Second Circuit's October 14, 2020 and November 12, 2020 Summary Orders. (18-CV-6450, Dkt. #14; 17-CV-6878, Dkt. #28, #32, #33).

### I. New Individual Defendants

Plaintiff's Second Amended Complaint seeks to add a number of individual defendants who were not previously named in plaintiff's four lawsuits arising out of her employment with the District. These include several District employees and an attorney. Plaintiff makes no factual assertions demonstrating that her administrative remedies have been exhausted with respect to any of these parties, and in any event, her discrimination and retaliation claims against these individual defendants fail as a matter of law for the same reasons discussed above. Her request to add them as parties to the instant lawsuit(s) is accordingly denied.

### J. New Claims

Plaintiff's Second Amended Complaint also sets forth eleven new claims, which are alleged to have arisen after her rehire in November 2017. (17-CV-6878, Dkt. #43 at ¶459 et seq.).

Initially, the bulk of plaintiff's new claims are nothing more than boilerplate recitations of the elements of a cause of action, with no supporting facts that are alleged to have taken place during the relevant time period. These include: (1) race-based discrimination claims against the District and ASAR under Title VII and the NYSDHR; (2) age-based discrimination claims against the District and ASAR under the ADEA and NYSDHR; (3) breach of contract claims against the

District; and (4) retaliation claims under Title VII, the ADEA and the NYDHR, against ASAR. Because these claims lack a sufficient factual basis to be plausible, they are dismissed.

Plaintiff does allege that after she was rehired by the District in November 2017, the District placed her on paid administrative leave from December 8, 2017 through April 23, 2018, and then terminated her employment once again, as a result of race-related or age-related discrimination, and/or in retaliation for her prior complaints about discrimination. (17-CV-6878, Dkt. #43 at ¶¶309, 473-78). However, the Second Amended Complaint fails to indicate whether these new discrimination/retaliatory termination claims – or any of plaintiff's other new claims, for that matter – have been administratively exhausted, or are entitled to be excused from the exhaustion requirement. Indeed, the latest administrative charge plaintiff claims to have filed was submitted in August 2017, prior to plaintiff's rehire, placement on paid leave, and subsequent termination. "Right to Sue" letters were issued by the NYSDHR and EEOC regarding that charge on February 14, 2018, and March 20, 2018, respectively – weeks before plaintiff's April 23, 2018 termination – and it is unclear what matters, if any, either agency investigated or determined with respect to plaintiff's second period of employment with the District, in and after November 2017. (17-CV-6878, Dkt. #43 at ¶¶135-38).

Because plaintiff's new claims arising in and after November 2017 are unaccompanied by any allegations that plaintiff's administrative remedies have been exhausted, and are not otherwise sufficiently stated, they are hereby dismissed, without prejudice.

The Court has reviewed plaintiff's pleading to determine whether it states some other claim not already enumerated by plaintiff, and has determined that it does not.

SPA-95

## CONCLUSION

For the reasons set forth above, plaintiff's Second Amended Complaint fails to state a plausible cause of action. The defendants' motions to dismiss (17-CV-6878, Dkt. #44, #46) are hereby granted, and the Second Amended Complaint (17-CV-6878, Dkt. #43) is dismissed in its entirety.

Plaintiff's causes of action arising out of her initial employment with the District, which ended in or about July 2017, are dismissed in their entirety, with prejudice.

Plaintiff's claims that are alleged to have arisen after her rehire by the District, in and after November 2017, are dismissed without prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
October 19, 2021.

SPA-96

Intentionally Blank

United States District Court
WESTERN DISTRICT OF NEW YORK

**JUDGMENT IN A CIVIL CASE**

BERNICE MALCOLM

v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,
Defendants.

CASE NUMBER: 17-cv-6878

CASE NUMBER 18-CV-6450

BERNICE CURRY-MALCOLM,
Plaintiff,

v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,
Defendants

☐ **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that judgment is entered in favor of all defendants, and the cases are dismissed.

Date: October 25, 2021

MARY C. LOEWENGUTH
CLERK OF COURT

By: Lisa M. Duque
Deputy Clerk

SPA-97

Intentionally Blank


**ORIGINAL**

# UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BERNICE CURRY- MALCOLM

Plaintiff,

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER, ("ASAR")
DR. TIMOTHY CLIBY, PRESIDENT and Individually,
JOHN ROWE, VICE PRESIDENT and Individually,
ROCHESTER CITY SCHOOL DISTRICT,
BARBARA DEANE-WILLIAMS,
SUPERINTENDENT OF SCHOOLS and Individually,
SANDRA SIMPSON, CHIEF OF SPECIALIZED
SERVICES AND FORMER INTERIM EXECUTIVE
DIRECTOR OF SPECIALIZED SERVICES and Individually,
MARY PAULY, EXECUTIVE DIRECTOR OF SPECIALIZED
SERVICES and Individually, TERESA ROOT, ZONE DIRECTOR
OF SPECIALIZED SERVICES and Individually, RCSD
UNKNOWN ATTORNEY FOR HUMAN CAPITAL INITIATIVES
("HCI") and individually, KARIANN KITTELBERGER, COORDINATING
ADMINISTRATOR OF SPECIAL EDUCATION and individually,
HARRY KENNEDY, CHIEF OF HUMAN CAPITAL INITIATIVES ("HCI")
and Individually, KELLY SANSON, ZONE DIRECTOR OF
SPECIALIZED SERVICES and Individually, SANDRA JORDAN,
ADMINISTRATOR ON ASSIGNMENT and Individually,

Defendants.

**NOTICE OF MOTION FOR
RECUSAL OF HONORABLE
DAVID G. LARIMER**
**Civ. No.: 17-cv-6878 (Hon. DGL)**
**U.S.C.A. Appeal No.: 19-2412cv**

**Civ. No.: 17-cv-6450 (Hon. DGL)**
**U.S.C.A. Appeal No.: 19-2416cv**

**JURY TRIAL DEMANDED**

---

## NOTICE OF MOTION FOR RECUSAL OR REMOVAL OF
## HONORABLE DAVID G. LARIMER

**PLEASE TAKE NOTICE,** Mrs. Bernice Curry-Malcolm, plaintiff will move this court

on a return date set by the Court or on or about April 12, 2021 for an order of the recusal or

removal of Honorable David G. Larimer in the above captioned combined cases, i.e., 17-cv-6878

and 18-cv-6450 and including any matters before the Court regarding the pro se Plaintiff,

including any remands from the United States Court of Appeals for the Second Circuit. In

1

SPA-98

support of this motion, the plaintiff files the attached Declaration/Affidavit of Bernice Curry-

Malcolm, which describes fully the grounds for the plaintiff's respectful request for the recusal

of Honorable David G. Larimer, United States District Court, Western District of New York.

Dated:  March 30, 2021
        West Henrietta, New York
        Monroe County, New York

RESPECTFULLY SUBMITTED BY:

Bernice Curry-Malcolm

*Pro se Plaintiff*

## Sworn Declaration Pursuant to 28 U.S.C.§1746

I, Bernice Curry-Malcolm, *pro se* Plaintiff declares and certify under penalty of perjury that the

foregoing is true and correct to the best of my knowledge and recall based on my personal

knowledge and experience. Executed on March 30, 2021.

Bernice Curry-Malcolm
*Pro se Plaintiff*

2

SPA-99

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

BERNICE CURRY- MALCOLM

                Plaintiff,

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER, ("ASAR")
DR. TIMOTHY CLIBY, PRESIDENT and Individually,
JOHN ROWE, VICE PRESIDENT and Individually,
ROCHESTER CITY SCHOOL DISTRICT,
BARBARA DEANE-WILLIAMS,
SUPERINTENDENT OF SCHOOLS and Individually,
SANDRA SIMPSON, CHIEF OF SPECIALIZED
SERVICES AND FORMER INTERIM EXECUTIVE
DIRECTOR OF SPECIALIZED SERVICES and Individually,
MARY PAULY, EXECUTIVE DIRECTOR OF SPECIALIZED
SERVICES and Individually, TERESA ROOT, ZONE DIRECTOR
OF SPECIALIZED SERVICES and Individually, RCSD
UNKNOWN ATTORNEY FOR HUMAN CAPITAL INITIATIVES
("HCI") and individually, KARIANN KITTELBERGER, COORDINATING
ADMINISTRATOR OF SPECIAL EDUCATION and individually,
HARRY KENNEDY, CHIEF OF HUMAN CAPITAL INITIATIVES ("HCI")
and Individually, KELLY SANSON, ZONE DIRECTOR OF
SPECIALIZED SERVICES and Individually, SANDRA JORDAN,
ADMINISTRATOR ON ASSIGNMENT and Individually,

                Defendants.

**CERTIFICATE OF SERVICE**
**Civ. No.: 17-cv-6878 (Hon. DGL)**
**U.S.C.A. Appeal No.: 19-2412cv**

**Civ. No.: 17-cv-6450 (Hon. DGL)**
**U.S.C.A. Appeal No.: 19-2416cv**

**JURY TRIAL DEMANDED**

---

### CERTIFICATE OF SERVICE

I, Mrs. Bernice Curry-Malcolm, hereby certify under the penalty of perjury that on the

30th day of March 2021, that I handed-delivered the Original and a copy of the Notice of Motion

for the recusal or removal of Honorable David G. Larimer, United States District Court, Western

District of New York upon the Office of the Clerk, United States District Court, Western District

of New York located at United States District Court, 2120 U.S., Courthouse, 100 State Street,

3


SPA - 100

Rochester, New York 14614 and that I served the same by postal mail upon the Defendants.

The United States Postal Service worker is over the age of 18 years and is not a party to these

proceedings and that I served by United States Postal Service Priority Mail copies of the Notice

of Motion on the following as follows:

Rochester City School District, Superintendent of Schools
Board of Education
Attorney for Defendants-Respondents' Rochester City School District, Alison K. L. Moyer, Esq.
Email: alison.moyer@rcsdk12.org
Telephone: (585) 262-8550
131 West Broad Street
Rochester, New York 14614
Telephone (585) 262-8100

School Administrators Association of New York State ("SAANYS") for
Association of Supervisors and Administrators of Rochester (ASAR)
Timothy Cliby, President, John Rowe, Vice President
Attorney for Defendants-Respondents' Association of Supervisors and Administrators of
Rochester ("ASAR"), Arthur Scheuermann, Esq., and Jennifer L. Carlson, Esq., Deputy Counsel
Email: ascheuermann@saanys.org
Email: JCarlson@saanys.org
8 Airport Park Boulevard
Latham, New York 12110
Telephone: (518) 782-0600

Dated: March 30, 2021
West Henrietta, New York
Monroe County, New York

## DECLARATION

Plaintiff declares pursuant to 28 U.S.C. Code § 1746 under penalty of perjury that the foregoing

is true and correct to the best of her knowledge and/or recall. Plaintiff reserves the right to

correct and/or amend as necessary and/or where applicable.

Bernice Curry-Malcolm
*Pro se Plaintiff*

SPA-101

Case 21-2683, Document 54, 03/28/2022, 3324938, Page193 of 468

 **ORIGINAL**

**UNITED STATES DISTRICT COURT**
WESTERN DISTRICT OF NEW YORK

---

BERNICE CURRY- MALCOLM

Plaintiff,

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER, ("ASAR")
DR. TIMOTHY CLIBY, PRESIDENT and Individually,
JOHN ROWE, VICE PRESIDENT and Individually,
ROCHESTER CITY SCHOOL DISTRICT,
BARBARA DEANE-WILLIAMS,
SUPERINTENDENT OF SCHOOLS and Individually,
SANDRA SIMPSON, CHIEF OF SPECIALIZED
SERVICES AND FORMER INTERIM EXECUTIVE
DIRECTOR OF SPECIALIZED SERVICES and Individually,
MARY PAULY, EXECUTIVE DIRECTOR OF SPECIALIZED
SERVICES and Individually, TERESA ROOT, ZONE DIRECTOR
OF SPECIALIZED SERVICES and Individually, RCSD
UNKNOWN ATTORNEY FOR HUMAN CAPITAL INITIATIVES
("HCI") and individually, KARIANN KITTELBERGER, COORDINATING
ADMINISTRATOR OF SPECIAL EDUCATION and individually,
HARRY KENNEDY, CHIEF OF HUMAN CAPITAL INITIATIVES ("HCI")
and Individually, KELLY SANSON, ZONE DIRECTOR OF
SPECIALIZED SERVICES and Individually, SANDRA JORDAN,
ADMINISTRATOR ON ASSIGNMENT and Individually,

Defendants.

**PLAINTIFF'S AFFIDAVIT**
Civ. No.: 17-cv-6878 (Hon. DGL)
U.S.C.A. Appeal No.: 19-2412cv

Civ. No.: 17-cv-6450 (Hon. DGL)
U.S.C.A. Appeal No.: 19-2416cv

**JURY TRIAL DEMANDED**

---

**PLAINTIFF'S AFFIDAVIT**

STATE OF NEW YORK

COUNTY OF MONROE ss:

1. I, <u>Bernice Curry-Malcolm</u>, being duly sworn, deposes and says: that I am the plaintiff,

   proceeding *pro se* in the above captioned matter and that I certify and affirm pursuant to

   28 U.S.C. Code § 1746 under penalty of perjury that:

2. That I am the plaintiff and that I submit this affidavit in support of my motion for the

   recusal or removal of Honorable David G. Larimer.



3.  I, <u>Bernice Curry-Malcolm</u> ("Plaintiff" or Curry-Malcolm") has not ever filed any
    frivolous lawsuits against anyone. They have done exactly what I said that they did,
    including the stuff that I am just learning of and have no knowledge of. If they had not
    done what I said that they did then I would not have said it. I don't play people games
    and I don't make up stories for the sake of making them up. That is not who I am or
    aspire to be.

4.  I have just been unwarrantedly and unwantedly been labeled as a frivolous and/or
    vexatious litigant and that has been truly unfortunate and a throne in myside. It is hard to
    fight against wrong and evil where there is no good balance in a system to stop and/or
    deter it. For me, trying to make me look as if I am not credible only testifies to the truth
    of my creditability.

5.  I have only filed because in honest and good faith I believe that I was and have been
    discriminated and retaliated against.

6.  I am not abusive, and I am offended at the implications. I have not abused the Court; I
    have only exercised the fundamental rights under state and federal law and the United
    States Constitution that I am afforded.  Neither have I harassed the defendants and/or any
    other defendants.

7.  I have only filed my lawsuits because the defendants relentlessly and continuously with
    depraved indifference discriminated and retaliated against me. They would not stop and
    have not stopped because why should they when they have a judge and others in high
    power positions that are doing their bidding for them, together with covering up
    everything they do with their pen to paper mentality.

2


SPA - 103

8. Judge Larimer's December 30, 2020 Decision and Order is just another testament to the same. This was done in rebuke of the Second Circuit Mandates and all because he did not want to provide me with a full and fair opportunity to be heard as a matter of record where the defendants would also have to testify as a matter of record. Judge Larimer has extended a long arm of protection to defendants as far back as 2008.

9. The Court should not be defined by the actions of a corrupt judge. One bad apple can spoil the whole bunch. I was not abusive and/or disrespectful to the Court's employees and/or staff. I never have and never intend to be. I did not do that. Shame on him! That is not who I am, not matter how much the pen to paper of others is trying to make me out to be.

10. It is hard trying to stay true to yourself and trying to maintain your good moral values and ethics while the world around you prefers to be abusive, hateful, criminal minded, together with no filter or thought of their egregious actions and/or conduct. Here Judge Larimer's conduct is grossly wrong and egregious.

11. He knows better but because he is a judge, he knows that he has an advantage over me as a little *pro se* litigant trying to right a wrong. Judge Larimer is intentionally and deliberately ___ me against the entire Court, its employees, and staff. He's like a bully on the playground that doesn't play fair in the sandbox. That is the definition of abuse of power. He knows that I do not have any control over his misconduct. He's a judge of course some of them will lie for him. I just hope not.

12. I should have never been sanctioned in the first place. Christina A. Agola, LLC Attorneys at Law were retained as my attorney and represented me and when I complained about her, Judge Larimer reversed his ruling in federal case 6557 referring the case to a

3

magistrate judge and dismissed my case, together with dismissal following in all other lawsuits that I filed, including the lawsuit against the unions, including New York State United Teachers and Association of Administrators of Rochester.

13. No matter the substantial evidence I submitted that materially and factually disputed the defendants it never mattered. The defendants have never had to defend themselves.

14. A person knows when a judge is not going to judge fairly, but I never thought in a million years that he would flat out lie on me to this magnitude where he involved Court staff and employees to rebuke the second circuit's mandate granting me the opportunity to be heard. To lie in such a vivid and colorful manner is unheard of by a darn federal judge no less.

15. I knew Judge Larimer did not like me and I knew that he would never give me a fair, honest, and good faith opportunity to be heard . I just hoped he would find his way back to his decency and the oath that he took to uphold the law, but I see now where I am concerned that was wishful thinking.

16. As an example,  In his December 30, 2020 Decision and Order in relevant part, he wrote, "The Court observes that Malcolm's prior in-person and telephonic interactions with the Court and its staff members have been marked by abusive and disrespectful conduct and verbiage by the plaintiff, and concludes that an in-person hearing is therefore unlikely to be productive or helpful to plaintiff or the Court".

17. In all due respect just because the Honorable David G. Larimer he should recuse himself and/or be removed from any matters that pertains to me. This is beyond abuse of power and discretion. I should not have to have to endure this kind of abuse of power. Neither should I have to be subjected to it. I ask him to recuse himself, but he denied my request.

SPA- 105

18. Judge Larimer is lying on me and it does not matter whether I submit in an affidavit or not, nothing is going to change and that is very evident by the lies he spews against me in his December 30, 2020 Decision and Order. I am just disgusted by his purposeful lies against me. That's not right. This is so wrong on so many levels.

19. I filed lawsuits against the defendants not to fight with a judge that clearly does not care for me and as such does not care about providing me with a full and fair opportunity to be heard and/or to litigate and defend my lawsuits. He lied on me because he does not want me to be heard and is still trying to paint a horrible picture of me to prejudice this Court and others as he has done in the past.

20. I am so sick and tired of being lied on. So sick and tired on having to defend the truth when everyone already knows what the truth is and is simply choosing to ignore it, stand silent and look the other way. I am so glad to know God and have Him in my life and a part of my lie. My faith is what keeps and sustains me because no one should have to endure and/or be subjected to this kind abuse of power, unrelenting, unsurmountable, and intolerable actions the years by the defendants' school districts and/or unions, but now a sitting federal judge. That is awful to know and to have to contend with. My heart aches when I think on it and I weep. It's too much!

21. At this juncture, Judge Larimer has really gone off the deep end signifying no filter, no morals, no ethics, no boundaries, no resembles of ever being a fair and impartial judge where I am concerned. He has chosen rather to write lies about me to protect those who have wronged me.

22. Instead of doing his civic duty by allowing me equal access to and opportunity to a hearing so that I could be heard, Judge Larimer has intentional and abusively attack me

SPA-106

for no good reason and no good cause with his lies and personal and prejudice attacks and insults. No Judge should do that! How sickening and horrible!

23. Judge Larimer should have long ago recused himself, but now and surely, he must without any doubt recuse himself in all matter pertaining to me. have not at any time that she recalls as Judge Larimer in relevant part wrote, "The Court observes that Malcolm's prior in-person and telephonic interactions with the Court and its staff members have been marked by abusive and disrespectful conduct and verbiage by the plaintiff, and concludes that an in-person hearing is therefore unlikely to be productive or helpful to plaintiff or the Court".

24. Judge David G. Larimer is a liar and should be ashamed of himself and any of the Court's employees and staff that goes along with these personal attacks and lies against me are in the wrong profession. Who does that to another human being, knowing full well it's a lie before they write such a thing? I am saddened and horrified and it pains me to even have to respond to such lies that is written by a sitting judge who is supposed to protect me, but instead has shown to spew harmful, poisonous, irreparable, hateful, bias, and evil lies that he knows is not true. As I write and respond to this attack I cannot stop crying because it is so hurtful, wrong, and painful.

25. Specifically, the Court is equipped with audio and cameras. It is a federal courthouse. Please provide me with the sworn affidavits of the Court's employees and staffs' sworn affidavits that is willing to promote such lies by Judge Larimer.

26. I have never been abusive and/or disrespectful to the employees and/or staff members at the courthouse. Neither have I been abusive and/or disrespectful the times that I have spoke with them over the telephone. Telephonic calls to be Court are recorded. I would

SPA - 107

like to know the date and time of the conversation (s) in which I was supposedly abusive and disrespectful to a court employee or staff member, who that court employee or staff was, and what was said.

27. When interacting with Court employees or staff members whether in-person or telephonic, I do not scream or shout. I do not curse or abuse or disrespect them. For the most part, I try not to say much at all beyond the basic case stuff.

28. Mostly, I have only dealt with John, Barbara Keenan, and James Bock. We all are pretty familiar with each other because they are usually at the counter to accept the filings and as far as I can recall, we all have only treated each other with dignity and respect. Other than that, I have not had many interactions with that many Court employees or staff member in-person or telephonic. There are cameras with audio in the Clerk's Office. And telephonic calls into the Clerk's Office or Court are recorded.

29. And aside from John, Barb and James, and a few others whom I was also respectful to, the only other court employees or staff that I am aware of would be the guys in the blue coats when entering the courthouse. I am respectful to them and they have been respectful to me for the most part.

30. I have never ever been abusive, disrespectful or any other of those kinds of negative adjectives that Judge Larimer is describing in his Decision and Order dated December 30, 2020.

31. I have prayed for him. It is my hope he is never ever allowed to do anyone else, including me like this. His ruling is a personal, bias, prejudice, unconscionable and downright mean. Judge Larimer needs to recuse himself.

SPA- 108

32. Oh! My God! This is treacherous and a dangerous precedent that the Judge is trying to set.

33. Neither have I been abusive and disrespectful to any other of the Court's employees or staff members.

34. What verbiage is the judge speaking of? Is he trying to imply that I cursed court employees and/or staff members out? All black people do not act a fool and all black people don't just curse people out. Is this his attempted implication to go along with his lies and tone of falsity of my being abusive and disrespectful to the courts' employees and staff members? I don't know, but upon information and belief, it appears as such.

35. I am ashamed of him. I had given him beyond the benefit of the doubt and am sadden that he has done this. He has falsely accused me of serious misconduct that I have not displayed, and I am truly hurt and offended by it and his false actions against me are harmful and unfounded.

36. I should not have to be made to speak to this lie levied against me in an affidavit or by any other means. Judge Larimer's false allegations against me are a travesty and distorted representation of the truth. I have tried to respect him and still will even though he has told a tremendous number of bald-faced lies on me. I take my Christianity very seriously and I try hard to live up to the goodness and faith that my ancestors, great-great grandparents, great-grandparents, grandparents, and parents instilled in us, "Never stoop to another man's level, if you can't bring him up to yours, kick the dust off your feet". That is my culture and my creed that I try to live by. They also taught us that if we were wronged never takes matters into our own hands, but rather to follow truth and justice and the law and to seek justice the right way.

37. How does one set laws before you then ask you your motive for seeking justice within the confinement of the court system or any other agency that was created for that very purpose? If I had not filed my lawsuit then it would be said that were not timely or were barred due to some type of statute of limitations. My filing history is as long as the unlawful harassment, discrimination and retaliation was as it was relentless, continuous, and ongoing. None of my lawsuits entailed vexatious, harassing, or duplicate lawsuits as far as I am concerned because the defendants' actions may have been the same or similar, but were separate actions occurring in different intervals, days, months, and years. They were separate distinct acts of unlawful harassment, discrimination, and retaliation.

38. I do not like lawsuits, and I do not have a motive in pursuing lawsuits. As a matter of fact, I hate lawsuits and I equally detested them now, but the defendants did not leave me with any other options than to pursue my fundamental civil rights options through the avenue afforded to me by New York Human Rights Law and the United States Constitution.

39. Any Plaintiff, including me should have an objective good faith expectation of prevailing in a fair, equal and balance just system that is objective, fair, and impartial and in one that is without bias, prejudice and its own self-serving interest. As here, with Judge Larimer, he can't be bothered and he has no intentions of being fair, equal, balance or impartial and that is most unfortunate. Any judge that will flat out lie to protect underserving employers or unions is not going to judge fairly and Judge Larimer has proven that.

40. At one time, I was represented by counsel in cases 08-cv-6300, 08-cv-6551, 08-cv-6577, 09-cv-6421. Christina A. Agola and her firm was retained y me to represent me. Agola

9

SPA- 110

withdrew sometime in 2010, abruptly leaving me to have to fend for myself in an arena that I am at a disadvantage in.

41. I tried to retain other counsel to no avail. I did not ever want to be pro se and still don't, but I was left with no choice. The attorneys that I have had in the past all sold me out and left me to fend for myself and I am still trying to do that. I proceed in these matters a *pro se* plaintiff. I have not had the good fortunate of finding a lawyer or a union that I was a member of with lawyers that put my self-interest ahead of their own.

42. I have not posed any unnecessary burden on this court, its personnel and/or any other for that matter. The law teaches us that we have fair and equal access to the doors of justice, but the court has treated me unfairly and without looking at me through the lens of a person that has been wrong and is coming to the doors of justice in which is supposedly to be equal in its care and treatment no matter the party.

43. I have not caused needless expenses on any of the parties they represent with free taxpayers' dollars, including mines and/or my union dues. The defendants have caused me needless expenses, out-of-pocket expenses, economic hardships, and irreparable harm to me. I am defending my lawsuits out of my own pocket and that has not been cheap.

44. This sanction was not adequate, fair, or truthful. Had the Court, i.e., Judge Larimer not got in the way and just judge fairly this would have never happened. When Agola was my attorney I was on my way to a foreseeably different outcome, i.e., winning my federal cases against the defendants, but the minute I became what Judge Larimer looked at as a "nobody" *pro se*, the writing was on the wall and in his case pen to paper dismissing them all.

10

SPA-111

45. I have not abused the judicial process. It is a process with several parts. I did not make the laws or the rules. Why don't we just set fire to the Constitution if it does not mean a darn thing. Let's just do away with all these feel-good policies, laws and procedures regarding unlawful harassment, discrimination, and retaliation. I don't mean that literally, but rather to make a point on how absurd when state and federal anti-discrimination laws and anti-retaliation statutes and the United States Constitution provide free, equal, and fair access to justice and prohibits unlawful discrimination and retaliation by employers and labor unions. If I cannot have free and equal access to justice which the courts are supposed to provide and/or administer, then what?

46. If the Second Circuit had not intervened, I would not have had this opportunity to amend my complaint (s) and still Judge Larimer is trying to sabotage that before I can even submit.

47. I make respectful request that Judge David G. Larimer recuse himself and be removed from any and all actions and/or cases pertaining to me. He is bias and prejudiced against me and after the huge lies her just told on me, I do not see him being fair and I am saddened about that. I thought judges were supposed to be able to be fair, objective, morally ethical with good moral character, and impartial and sound and reasonable minded. Judges are not supposed to care who the parties are they are just supposed to treat you fairly. That is not the case of Judge Larimer when it comes to me.

48. With a fair, objective, unbiased, and impartial judge or judges that lacks prejudice and that judges fairly, I have more than a good chance of prevailing. And had Judge Larimer not interfered and used his judicial power in a biased and prejudice manner this would have long been over because the defendants would have known that they need to what

my parents would say, "Have some stopping sense and go somewhere and sit your ass down".

49. Judge Larimer's actions have caused me great sorrow and is now causing me pain and suffering that I would not have had to endure because the defendants would have done right because they would have known that they could not receive any favors. I have had people say to me if done right, it would have been over. And it would and should have long been over had Judge Larimer not engaged in and participated in this continuous wrong.

50. As an example, refusing to set a hearing date to allow me to be heard, but rather instead lied on me to keep from having to set a hearing date so that I could be heard. So, he did not want to set an in-person hearing for me, but he did not have to lie on me so that he did not have to schedule an in-person.

51. I have not abused, mistreated and/or disrespect the court, its employees, personnel, or staff members. Ruling against me is one thing, but flat out bald-faced lying on me is a whole horse of another color. This so wrong!!!!  How I supposed to expect that I am going to objectivity and impartiality from a judge that has outright lied one me?

52. I am sorry and hurt that Judge Larimer felt the need to lie on me and I am equally hurt that he felt the needs to involve others, but I have no control in this situation where he is concerned. I pray that he recuse himself. If I know he has gone too far, he knows he has gone too far. As hard as it has been for me with the defendants' constant, manipulative and relentless depraved indifference towards me, this combined with that is off the charts. This is what corruption and obstruction of justice looks like. My heart aches!

53. Judge Larimer has flat out lied on me and that is wrong on so many levels of an equal and

SPA-113

fair justice system. Judge Larimer should be removed by this Court from any further matters regarding me, including, but not limited to the pending motion for an extension of time to amend her complaint in accordance with this Court's remand in district court cases 17-cv-6878 and 18-cv-6450. In re *Curry-Malcolm ("Malcolm IV")*, 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020).

54. Recusal pursuant to 28 U.S.C. § 455(a) ("section 455(a)"), which provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Canon 3C(1) of the Code of Conduct for United States Judges provides, in relevant part, that recusal is appropriate "in a proceeding in which the judge's impartiality might reasonably be questioned," including but not limited to several specific instances listed in subsections (a) through (e). Further and specifically, the district court decision and order dated December 30, 2020 appears to abuse discretion and inherent powers to take back jurisdiction over 20-cv-6537 which is on appeal with this court as 20-2808. ); In re *Curry-Malcolm ("Malcolm IV")*, 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020).

55. Judge judicial Larimer's extra accusations of a personal and professional nature made against me are unwanted, unwarranted, offensive, troubling, scandalous, defamatory, stigmatizing and are based on lies and are being made with the sole and exclusive intent to continue to prejudice these proceedings as has been done in the past by the district court. See *Malcolm v. Bd. of Educ. Of the Honeoye Falls-Lima Cent. Sch. Dist.*, 737 F. Supp. 2d 117, 120-21 (W.D.N.Y. 2010). In fact, plaintiff sought such relief which was denied by this Court on two occasions. *Malcolm v. Honeoye Falls-Lima Cent. Sch. Dist.*, 278 F. Supp. 3d 677, 678 (W.D.N.Y. 2017); *Malcolm v. Honeoye Falls-Lima Cent. Sch.*

SPA - 114

*Dist.*, No. 11-CV-6509, 2011 WL 13128613, at *1-2 (W.D.N.Y. Oct. 27, 2011), aff'd 517

F. App'x 11 (2d Cir. 2013), *Malcolm v. Honeoye Falls-Lima Educ.* Ass'n, 08-CV-6551,

2015 WL 1507830 (W.D.N.Y. Mar. 31, 2015) (complaint dismissed), aff'd, 684 F. App'x

87 (2d Cir. 2017), cert. denied, 138 S. Ct. 365 (2017), See *Malcolm v. Ass'n of*

*Supervisors & Adm'rs of Rochester (ASAR), Rochester City School District, et al.*,

*("Malcolm I"),* 17-CV-6878 at Dkt. #28; *Malcolm v. Rochester City Sch. Dist. et al.*

("Malcolm II"), 17-CV-6873 at Dkt. #14; *Curry-Malcolm v. Rochester City Sch. Dist. et*

*al.*, ("Malcolm III"), 389 F.Supp.3d 189 (W.D.N.Y. 2019); In re *Curry-Malcolm*

*("Malcolm IV")*, 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020).

56. I wish that things were different but does not see from any angle that the pie is sliced that

Honorable David G. Larimer is going to be objective, impartial and/or unbiased towards

her.

57. Judge Larimer's attitude towards me is disturbing and has caused great harm to my

character, professional reputation, honor and integrity. He has impugned my reputation

and its just not right or fair.

Dated: March 30, 2021
West Henrietta, New York
Monroe County, New York

BERNICE CURRY-MALCOLM
Proceeding, *pro se*

SWORN TO BEFORE ME
THIS 30th DAY OF MARCH 2021

NOTARY PUBLIC

REBECCA B. WIESNER
NOTARY PUBLIC, State of New York
Monroe County, No. 01WI6268295
Commission Expires 9/04/2024

14

SPA- 115

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

BERNICE MALCOLM,

                        Plaintiff,

                  v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                        Defendants.

_____

BERNICE CURRY-MALCOLM,

                        Plaintiff,

                  v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                        Defendants.

_____

DECISION AND ORDER

17-CV-6878L

18-CV-6450L

Plaintiff Bernice Curry-Malcolm ("plaintiff") was employed by the Rochester City School

District (the "District"), beginning in 2015 and continuing through the end of the 2016-17 school

year. She has previously brought several lawsuits against various District entities and employees,

SPA – 116

as well as against the Association of Supervisors and Administrators of Rochester ("ASAR") and its employees, arising out of that employment. Her claims include race-based and age-based discrimination and retaliation in violation of state and federal anti-discrimination statutes, as well as miscellaneous labor-related claims and claims sounding in contract. All of these matters were initially dismissed by this Court, and the Court presumes the reader's familiarity therewith. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 (dismissed, Dkt. #28); *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 (dismissed, Dkt. #14); *Curry-Malcolm v. Rochester City Sch. Dist. et al.,* ("*Malcolm III*"), 18-CV-6450 (dismissed at 389 F.Supp.3d 189 (W.D.N.Y. 2019)); *In re Curry-Malcolm* ("*Malcolm IV*"), 20-CV-6537 (dismissed at 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020)).

Plaintiff appealed this Court's decisions in *Malcolm I, II, III,* and *IV*. On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III,* but reversed the Court's imposition of sanctions in *Malcolm I* in order to permit plaintiff an opportunity to be heard on the issue, and remanded *Malcolm I* and *III* solely for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. The plaintiff's appeal in *Malcolm IV* remains pending.

The Court consolidated *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand. On December 30, 2020, the Court issued a Decision and Order which: (1) granted plaintiff an opportunity to show cause why leave-to-file sanctions should not be imposed; and (2) granted plaintiff leave to file an Amended Complaint with respect to certain of her previously-dismissed claims. (17-CV-6878, Dkt. #34).

In response to that Decision and Order, plaintiff has filed an Amended Complaint (Dkt. #39), and a motion asking the Court to recuse itself (Dkt. #40). For the reasons that follow, the

Amended Complaint (Dkt. #39) is hereby dismissed without prejudice, and plaintiff is granted leave to file a Second Amended Complaint to the extent set forth below. The motion seeking recusal (Dkt. #40) is denied. Further, as plaintiff has failed to respond to the Court's directive to show cause why leave-to-file sanctions should not imposed, the Court concludes that such sanctions are appropriate.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education. Plaintiff claims that she was thereafter subjected, inter alia, to age-based and/or race-based discriminatory hostile work environment, harassment, disparate treatment and/or retaliation by the District, her union, and numerous District and union employees, culminating in the termination of her employment on or about July 1, 2017.

This Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34), in conformity with the Second Circuit's directives, permitted plaintiff to file an Amended Complaint which: (1) reasserted retaliatory termination claims against the District pursuant to Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. ("ADEA") and the New York Human Rights Law ("NYHRL"); (2) reasserted 42 U.S.C. §1983 and equal protection claims against all defendants; and (3) asserted any additional claims for which right-to-sue letters had been issued after the commencement of *Malcolm IV* on or about July 22, 2020.

3

SPA - 118

# DISCUSSION

## I.      Motion Seeking Recusal

Plaintiff has requested that the Court recuse itself (Dkt. #40), accusing the Court of "bullying" plaintiff through its previous imposition of sanctions, and through rulings and findings that were not in plaintiff's favor.

The relevant standard for evaluating a motion for recusal is set forth in 28 U.S.C. §455(a), which provides that, "[a] judge is required to recuse in any proceeding in which his impartiality might reasonably be questioned, and the test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts." *In re International Bus. Mach. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) (internal quotations and citations omitted). "Consideration of a motion for recusal is committed to the sound discretion of the district court, *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988), and there is a substantial burden on the moving party to show that the judge is not impartial." *United States v. Lamorte*, 940 F. Supp. 572, 576 (S.D.N.Y. 1996). "A judge should not recuse himself on unsupported, irrational or highly tenuous speculation, and has as much of an obligation not to recuse himself when it is not called for as he is obliged to when it is." *Id.*, 940 F. Supp. 572 at 576-77 (internal quotations and citations omitted). *See also Zavalidroga v. Cote*, 395 Fed. Appx. 737, 2010 U.S. App. LEXIS 20591 at 3-*4 (2d Cir. 2010) ("we have a duty to . . . the Court at large, and the public not to casually recuse ourselves when a party makes general and unsupported allegations about our impartiality").

Here, plaintiff's claims that the Court is prejudiced against her are wholly speculative. Plaintiff alleges no facts that would call the Court's impartiality into question. Rather, plaintiff complains that the Court has issued rulings that were not in her favor, attacks the Court's integrity

SPA-119

without basis, and generally accuses the Court of misconstruing plaintiff's actions and motives. None of these is a proper basis for recusal. Plaintiff's recusal motion (Dkt. #40) is therefore denied.

## II.    Leave-To-File Sanction

Plaintiff's pursuit of multiple, repetitive lawsuits is a tactic already familiar to this Court, which has previously imposed narrowly-tailored leave-to-file sanctions against plaintiff relative to another of plaintiff's former employers, the Honeoye Falls-Lima Central School District. *See Malcolm v. Bd. of Educ. of the Honeoye Falls-Lima Central Sch. Dist.*, 737 F. Supp. 2d 117 (W.D.N.Y. 2010), *aff'd*, 506 Fed. App'x 65 (2d Cir. 2012).

Plaintiff has now filed four largely duplicative lawsuits against defendants arising out of her employment with the Rochester City School District. The Second Circuit, in reversing this Court's initial imposition of leave-to-file sanctions in *Malcolm I*, reasoned that although plaintiff had a concerning "history of duplicative and harassing litigation," *Malcolm I* had been the first of the instant lawsuits against this particular defendant group, and as such, plaintiff "was entitled to an opportunity to be heard before a sanction was imposed." *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147 F.3d 207, 209 (2d Cir. 1998)). [1] *See also Viola v. United States*, 481 Fed. App'x. 30, 31 (2d Cir. 2012)(unpublished opinion).

The Court accordingly vacated the imposition of sanctions, and directed plaintiff to file, within thirty days of that Decision and Order, "an affidavit demonstrating why the Court should not reissue leave-to-file sanctions" in light of the relevant factors, including but not limited to the plaintiff's history of litigation, whether the plaintiff had a good faith expectation of prevailing,

---

[1] While *Malcolm I* was one of the first two actions commenced by plaintiff against the present defendant group, at the time this Court issued its July 11, 2019 Decision and Order imposing sanctions (*Malcolm I*, 17-CV-6878 at Dkt. #28), it had before it a total of three lawsuits filed by plaintiff against the defendants arising out of her employment with the District.

5


SPA-120

whether plaintiff was represented by counsel, whether plaintiff had caused needless expense or posed an unnecessary burden on the courts, and whether lesser sanctions would be appropriate. (17-CV-6878, Dkt. #34 at 4-5).

Plaintiff subsequently requested two extensions of time to respond to the December 30, 2020 Decision and Order (Dkt. #35, #37), both of which were granted (Dkt. #36, #38). The deadline for plaintiff's response has now passed, and plaintiff has failed to request an additional extension of time, to file an affidavit as directed, or otherwise to express any opposition or reaction to the potential reinstatement of leave-to-file sanctions.

Plaintiff has been notified, explicitly and repeatedly, that the pursuit of frivolous and duplicative litigation can and will result in leave-to-file sanctions. Plaintiff was granted an opportunity to be heard concerning whether they should be imposed relative to the instant defendants, and the Court, in its December 30, 2020 Decision and Order, listed the factors it was required to consider, so that plaintiff might tailor her response to be of maximum helpfulness to the Court and to her own interests. Despite multiple extensions of time, she has failed to do so, and has ignored the portion of the Court's order of December 30, 2020 relating to sanctions.

The Court, then, must assess whether leave-to-file sanctions are still appropriate. I conclude, for the reasons set forth in *Malcolm I*, and in light of plaintiff's continued attempts to pursue frivolous, already-dismissed claims by restating them in the instant action in violation of this Court's instructions, leave-to-file sanctions are merited here.

"A district court, may, in its discretion, impose sanctions against litigants who abuse the judicial process." *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir.1996) (citation and quotation marks omitted). A demonstrated history of frivolous and vexatious litigation is required in order for a court to prevent a litigant from filing pleadings, motions or appeals. *See Richardson*

6

SPA-121

*Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987). Pre-filing injunctions are a permissible exercise of the court's discretion to deter abusive litigation, once a pattern of such litigation has emerged. *See In re Hartford Textile Corp.*, 681 F.2d 895, 897-98 (2d Cir. 1982).

Plaintiff is presently engaged in a pattern of frivolous and repetitive litigation arising out of her employment with the District and her dealings with ASAR relative to that employment. Despite multiple warnings and the dismissal-with-prejudice of a number of claims, plaintiff continues to attempt to prosecute the same causes of action against the same defendants. In so doing, plaintiff has abused the time and resources of the Court, defendants and their counsel, and multiple administrative agencies. Plaintiff was afforded the opportunity to be heard and show cause why sanctions should not be imposed, but has declined to offer any objection, or any explanation for her course of conduct.

Plaintiff is therefore permanently enjoined from commencing any further pro se actions in federal court, without prior leave of court, against: (1) the District and/or any District agents or employees, which arises out of her employment with the District; or (2) the ASAR, or any ASAR representatives or members, which arises out of her employment with the District.

Leave of court shall be obtained by filing with the proposed complaint a motion captioned, "Motion Pursuant to Court Order Seeking Leave to File." Plaintiff must attach to that motion, as Exhibit 1, a true and correct copy of this Decision and Order. As Exhibit 2 to that motion, plaintiff must attach either a declaration prepared pursuant to 28 U.S.C. §1746 or a sworn affidavit certifying that the claims she wishes to present are meritorious and made in good faith. As Exhibit 3 to that motion, plaintiff must include a list of every suit previously filed by her or on her behalf in any federal court against each and every defendant to the suit she wishes to file, including the title and index number of each such case. As Exhibit 4 et seq. to that motion, plaintiff must provide

SPA-122

a copy of each such complaint and a statement describing the matter's disposition. Finally, plaintiff must serve a copy of this Decision and Order upon each defendant if and when leave to serve the complaint in the new case is granted.

Failure to comply with the terms of this Decision and Order may be sufficient grounds for a court to deny any motion for leave to file made by plaintiff. Further, plaintiff's failure to advise a federal court in which she has filed a complaint of this Decision and Order and/or her failure to otherwise comply with this Decision and Order may be considered by such court as good and sufficient cause to dismiss such a lawsuit, and further may be considered sufficient grounds upon which to levy additional sanctions, including but not limited to fines, imprisonment, and/or an award to defendants in the amount of their reasonable costs and attorneys' fees in defending the action.

However, nothing in this Decision and Order shall be construed as having any effect on plaintiff's ability to initiate or continue actions in state court and/or appeals before the United States Courts of Appeals, or her power to prosecute or defend any other action or appeal that is presently pending, brought by her in any federal court prior to the date of entry of this Decision and Order.

### III.   Plaintiff's Amended Complaint

The Second Circuit found that although plaintiff had not asserted sufficient facts to state several of her claims, she might potentially be able to cure their deficiencies if she were granted leave to do so. Those claims consisted of: (1) Title VII, ADEA and NYSHRL claims against the District and ASAR, including retaliatory termination claims against the District; and (2) Section 1983 and NYSHRL equal protection claims against all defendants. *See Curry-Malcolm v. Rochester City School District et al.*, 2020 U.S. App. LEXIS 35730 at *5 n.5 (2d Cir.

SPA - 123

2020)(affirming in part and remanding in part *Malcolm I*); *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 (2d Cir. 2020)(affirming and remanding *Malcolm III*).

In its decision applying the Second Circuit's holdings, this Court also extended plaintiff leave to assert any new and previously-unadjudicated claims against the defendants or related parties for which right-to-sue letters had been issued subsequent to the commencement of *Malcolm IV*. However, the Court specifically warned plaintiff that the Amended Complaint should "*not* attempt to reassert any of the claims for which dismissal with prejudice was affirmed by the Second Circuit." (17-CV-6878, Dkt. #34 at 6)(emphasis added).

In response, plaintiff has now filed an Amended Complaint that is 132 pages and 592 paragraphs in length, along with exhibits comprised of an additional 234 pages. The Amended Complaint purports to assert fifteen causes of action, a number of which (e.g., labor-related claims against ASAR defendants) improperly seek to resurrect claims which were dismissed with prejudice and for which dismissal was affirmed, and others of which (e.g., conspiracy, denial of due process) appear to be thinly-veiled attempts to recast already-dismissed claims, or to assert new claims that are either untimely or unexhausted.

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). The statement must be concise, "because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (internal quotation marks omitted).

SPA - 124

Dismissal of a complaint for failure to comply with Rule 8 is generally reserved for those cases in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* This standard should be applied with special lenience to pro se pleadings. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).

Plaintiff's Amended Complaint, construed liberally and granting plaintiff every favorable inference, simply does not satisfy Rule 8's requirement of a "short and plain statement." The Amended Complaint consists of several hundred paragraphs which meander back and forth in anachronic, stream-of-consciousness fashion over events and conversations alleged to have taken place over a period of several years. As such, it is not "sufficient to give the defendants fair notice of what the plaintiff's claim[s are] and the grounds upon which [they] rest[]," *Jones v. Nat'l Communications and Surveillance Networks*, 226 Fed. App'x 31, 32 (2d Cir. 2008), and sifting through it to glean the relevant facts places an "unjustified burden" on the Court and counsel. *Salahuddin*, 861 F.2d 40 at 42.

The Amended Complaint vacillates between providing voluminous extraneous details of little apparent relevance to plaintiff's claims, and engaging in sweeping legal conclusions that do not identify which parties, incidents and policies are being discussed, or suggest a cogent timeline of the salient events. To paraphrase Shakespeare, it presents a prosaic blunderbuss "full of sound and fury," but so encumbered with repetition, confusing timeline jumps, tangential factual minutia and legal argument that it "signif[ies] nothing" to a sympathetic reader.

The Court also observes that by virtue of its attempt to resurrect already-dismissed claims for which the Second Circuit affirmed dismissal, plaintiff's Amended Complaint does not comply with this Court's December 30, 2020 Decision and Order. Fed. R. Civ. Proc. 41(b) authorizes a district court to "dismiss a complaint for failure to comply with a court order, treating the

SPA - 125

noncompliance as a failure to prosecute," although leniency is still required in analyzing a pro se party's submissions. *Simmons*, 49 F.3d 83 at 87. *See also Shabtai v. Levande*, 38 Fed. App'x 684 (2d Cir. 2002)(affirming dismissal of pro se plaintiff's complaint for failure to comply with Fed. R. Civ. Proc. 8, and with a court order).

In sum, plaintiff's Amended Complaint does not comply with the requirements of Rule 8, or with this Court's prior order specifying the claims that plaintiff could – and could not – properly assert in her amended pleading.

However, in deference to plaintiff's pro se status, in light of the *sua sponte* nature of the Court's consideration of Rule 8 factors, and in the overarching interests of justice, plaintiff will be granted leave to amend her complaint a second time, as set forth below.

## CONCLUSION

For the reasons set forth above, plaintiff's motion seeking recusal (17-CV-6878, Dkt. #40) is denied.

Further, the Court finds that the leave-to-file sanctions imposed in *Malcolm I* should be reinstated, in the manner and to the extent set forth above.

The Amended Complaint (17-CV-6878, Dkt. #39; 18-CV-6450, Dkt. #22) is dismissed in its entirety, without prejudice. Plaintiff is granted leave to file, within twenty (20) days of entry of this Decision and Order and without the need to seek further leave of Court, a Second Amended Complaint in this consolidated action, which sets forth the relevant facts and claims in a clear and concise manner, in conformity with Fed. R. Civ. Proc. 8.

Plaintiff is once again warned that she may *not* attempt to reassert – and should not include in her Second Amended Complaint – any of the causes of action for which dismissal with prejudice

11

SPA- 126

was affirmed by the Second Circuit, nor may she raise any new claims that have been found

untimely, or for which administrative remedies have not been exhausted. Such actions would be

in violation of this Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34;

18-CV-6450, Dkt. #18). Plaintiff is warned that if the Second Amended Complaint fails to comply

with Fed. R. Civ. Proc. 8, and/or with the prior orders of this Court, it shall be subject to dismissal,

with prejudice.

      IT IS SO ORDERED.


                                _____

                                    DAVID G. LARIMER
                                 United States District Judge

Dated: Rochester, New York
      April 6, 2021.

SPA - 127

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

BERNICE MALCOLM,

                            Plaintiff,

                v.

ASSOCIATION OF SUPERVISORS AND
ADMINISTRATORS OF ROCHESTER (ASAR),
TIMOTHY CLIBY, President and Individually,
JOHN ROWE, Vice President and Individually,
ROCHESTER CITY SCHOOL DISTRICT, and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually,

                         Defendants.

BERNICE CURRY-MALCOLM,

                            Plaintiff,

                v.

ROCHESTER CITY SCHOOL DISTRICT and
BARBARA DEANE-WILLIAMS, Superintendent
of Schools, Individually and Collectively,

                         Defendants.

DECISION AND ORDER

17-CV-6878L

18-CV-6450L

      Plaintiff Bernice Curry-Malcolm ("plaintiff") was employed by the Rochester City School

District (the "District"), beginning in 2015 and continuing through the end of the 2016-17 school

year. She has previously brought several lawsuits against various District entities and employees,

SPA-128

as well as against the Association of Supervisors and Administrators of Rochester ("ASAR") and its employees, arising out of that employment. Her claims include race-based and age-based discrimination and retaliation in violation of state and federal anti-discrimination statutes, as well as miscellaneous labor-related claims and claims sounding in contract. All of these matters were initially dismissed by this Court, and the Court presumes the reader's familiarity therewith. *See Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester (ASAR)* ("*Malcolm I*"), 17-CV-6878 (dismissed, Dkt. #28); *Malcolm v. Rochester City Sch. Dist. et al.* ("*Malcolm II*"), 17-CV-6873 (dismissed, Dkt. #14); *Curry-Malcolm v. Rochester City Sch. Dist. et al.,* ("*Malcolm III*"), 18-CV-6450 (dismissed at 389 F.Supp.3d 189 (W.D.N.Y. 2019)); *In re Curry-Malcolm* ("*Malcolm IV*"), 20-CV-6537 (dismissed at 2020 U.S. Dist. LEXIS 131548 (W.D.N.Y. 2020)).

Plaintiff appealed this Court's decisions in *Malcolm I, II, III,* and *IV.* On October 14, 2020 and November 12, 2020, the Second Circuit Court of Appeals affirmed this Court's dismissals of *Malcolm I, II* and *III,* but reversed the Court's imposition of sanctions in *Malcolm I* in order to permit plaintiff an opportunity to be heard on the issue, and remanded *Malcolm I* and *III* solely for consideration of whether plaintiff should be granted leave to amend certain of her dismissed claims. The plaintiff's appeal in *Malcolm IV* remains pending.

The Court consolidated *Malcolm I* and *Malcolm III* for purposes of determining the issues on remand. On December 30, 2020, the Court issued a Decision and Order which: (1) granted plaintiff an opportunity to show cause why leave-to-file sanctions should not be imposed; and (2) granted plaintiff leave to file an Amended Complaint with respect to certain of her previously-dismissed claims. (17-CV-6878, Dkt. #34).

In response to that Decision and Order, plaintiff has filed an Amended Complaint (Dkt. #39), and a motion asking the Court to recuse itself (Dkt. #40). For the reasons that follow, the

SPA - 129

Amended Complaint (Dkt. #39) is hereby dismissed without prejudice, and plaintiff is granted leave to file a Second Amended Complaint to the extent set forth below. The motion seeking recusal (Dkt. #40) is denied. Further, as plaintiff has failed to respond to the Court's directive to show cause why leave-to-file sanctions should not imposed, the Court concludes that such sanctions are appropriate.

## FACTUAL BACKGROUND

Beginning in 2015, plaintiff was employed by the District as a full-time probationary Case Administrator for Special Education. Plaintiff claims that she was thereafter subjected, inter alia, to age-based and/or race-based discriminatory hostile work environment, harassment, disparate treatment and/or retaliation by the District, her union, and numerous District and union employees, culminating in the termination of her employment on or about July 1, 2017.

This Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34), in conformity with the Second Circuit's directives, permitted plaintiff to file an Amended Complaint which: (1) reasserted retaliatory termination claims against the District pursuant to Title VII of Civil Rights Act of 1964, 42 U.S.C. §2000e ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. §621 et seq. ("ADEA") and the New York Human Rights Law ("NYHRL"); (2) reasserted 42 U.S.C. §1983 and equal protection claims against all defendants; and (3) asserted any additional claims for which right-to-sue letters had been issued after the commencement of *Malcolm IV* on or about July 22, 2020.

SPA-130

# DISCUSSION

## I.     Motion Seeking Recusal

Plaintiff has requested that the Court recuse itself (Dkt. #40), accusing the Court of "bullying" plaintiff through its previous imposition of sanctions, and through rulings and findings that were not in plaintiff's favor.

The relevant standard for evaluating a motion for recusal is set forth in 28 U.S.C. §455(a), which provides that, "[a] judge is required to recuse in any proceeding in which his impartiality might reasonably be questioned, and the test to be applied is an objective one which assumes that a reasonable person knows and understands all the relevant facts." *In re International Bus. Mach. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995) (internal quotations and citations omitted). "Consideration of a motion for recusal is committed to the sound discretion of the district court, *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988), and there is a substantial burden on the moving party to show that the judge is not impartial." *United States v. Lamorte*, 940 F. Supp. 572, 576 (S.D.N.Y. 1996). "A judge should not recuse himself on unsupported, irrational or highly tenuous speculation, and has as much of an obligation not to recuse himself when it is not called for as he is obliged to when it is." *Id.*, 940 F. Supp. 572 at 576-77 (internal quotations and citations omitted). *See also Zavalidroga v. Cote*, 395 Fed. Appx. 737, 2010 U.S. App. LEXIS 20591 at 3-*4 (2d Cir. 2010) ("we have a duty to . . . the Court at large, and the public not to casually recuse ourselves when a party makes general and unsupported allegations about our impartiality").

Here, plaintiff's claims that the Court is prejudiced against her are wholly speculative. Plaintiff alleges no facts that would call the Court's impartiality into question. Rather, plaintiff complains that the Court has issued rulings that were not in her favor, attacks the Court's integrity

SPA-131

without basis, and generally accuses the Court of misconstruing plaintiff's actions and motives. None of these is a proper basis for recusal. Plaintiff's recusal motion (Dkt. #40) is therefore denied.

## II.    Leave-To-File Sanction

Plaintiff's pursuit of multiple, repetitive lawsuits is a tactic already familiar to this Court, which has previously imposed narrowly-tailored leave-to-file sanctions against plaintiff relative to another of plaintiff's former employers, the Honeoye Falls-Lima Central School District. *See Malcolm v. Bd. of Educ. of the Honeoye Falls-Lima Central Sch. Dist.*, 737 F. Supp. 2d 117 (W.D.N.Y. 2010), *aff'd*, 506 Fed. App'x 65 (2d Cir. 2012).

Plaintiff has now filed four largely duplicative lawsuits against defendants arising out of her employment with the Rochester City School District. The Second Circuit, in reversing this Court's initial imposition of leave-to-file sanctions in *Malcolm I*, reasoned that although plaintiff had a concerning "history of duplicative and harassing litigation," *Malcolm I* had been the first of the instant lawsuits against this particular defendant group, and as such, plaintiff "was entitled to an opportunity to be heard before a sanction was imposed." *Malcolm v. Ass'n of Supervisors & Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 at *8 (citing *Moates v. Barkley*, 147 F.3d 207, 209 (2d Cir. 1998)).[1] *See also Viola v. United States*, 481 Fed. App'x. 30, 31 (2d Cir. 2012)(unpublished opinion).

The Court accordingly vacated the imposition of sanctions, and directed plaintiff to file, within thirty days of that Decision and Order, "an affidavit demonstrating why the Court should not reissue leave-to-file sanctions" in light of the relevant factors, including but not limited to the plaintiff's history of litigation, whether the plaintiff had a good faith expectation of prevailing,

---

[1] While *Malcolm I* was one of the first two actions commenced by plaintiff against the present defendant group, at the time this Court issued its July 11, 2019 Decision and Order imposing sanctions (*Malcolm I*, 17-CV-6878 at Dkt. #28), it had before it a total of three lawsuits filed by plaintiff against the defendants arising out of her employment with the District.

SPA-132

whether plaintiff was represented by counsel, whether plaintiff had caused needless expense or posed an unnecessary burden on the courts, and whether lesser sanctions would be appropriate. (17-CV-6878, Dkt. #34 at 4-5).

Plaintiff subsequently requested two extensions of time to respond to the December 30, 2020 Decision and Order (Dkt. #35, #37), both of which were granted (Dkt. #36, #38). The deadline for plaintiff's response has now passed, and plaintiff has failed to request an additional extension of time, to file an affidavit as directed, or otherwise to express any opposition or reaction to the potential reinstatement of leave-to-file sanctions.

Plaintiff has been notified, explicitly and repeatedly, that the pursuit of frivolous and duplicative litigation can and will result in leave-to-file sanctions. Plaintiff was granted an opportunity to be heard concerning whether they should be imposed relative to the instant defendants, and the Court, in its December 30, 2020 Decision and Order, listed the factors it was required to consider, so that plaintiff might tailor her response to be of maximum helpfulness to the Court and to her own interests. Despite multiple extensions of time, she has failed to do so, and has ignored the portion of the Court's order of December 30, 2020 relating to sanctions.

The Court, then, must assess whether leave-to-file sanctions are still appropriate. I conclude, for the reasons set forth in *Malcolm I,* and in light of plaintiff's continued attempts to pursue frivolous, already-dismissed claims by restating them in the instant action in violation of this Court's instructions, leave-to-file sanctions are merited here.

"A district court, may, in its discretion, impose sanctions against litigants who abuse the judicial process." *Shafii v. British Airways, PLC,* 83 F.3d 566, 571 (2d Cir.1996) (citation and quotation marks omitted). A demonstrated history of frivolous and vexatious litigation is required in order for a court to prevent a litigant from filing pleadings, motions or appeals. *See Richardson*

*Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987). Pre-filing injunctions are a permissible exercise of the court's discretion to deter abusive litigation, once a pattern of such litigation has emerged. *See In re Hartford Textile Corp.*, 681 F.2d 895, 897-98 (2d Cir. 1982).

Plaintiff is presently engaged in a pattern of frivolous and repetitive litigation arising out of her employment with the District and her dealings with ASAR relative to that employment. Despite multiple warnings and the dismissal-with-prejudice of a number of claims, plaintiff continues to attempt to prosecute the same causes of action against the same defendants. In so doing, plaintiff has abused the time and resources of the Court, defendants and their counsel, and multiple administrative agencies. Plaintiff was afforded the opportunity to be heard and show cause why sanctions should not be imposed, but has declined to offer any objection, or any explanation for her course of conduct.

Plaintiff is therefore permanently enjoined from commencing any further pro se actions in federal court, without prior leave of court, against: (1) the District and/or any District agents or employees, which arises out of her employment with the District; or (2) the ASAR, or any ASAR representatives or members, which arises out of her employment with the District.

Leave of court shall be obtained by filing with the proposed complaint a motion captioned, "Motion Pursuant to Court Order Seeking Leave to File." Plaintiff must attach to that motion, as Exhibit 1, a true and correct copy of this Decision and Order. As Exhibit 2 to that motion, plaintiff must attach either a declaration prepared pursuant to 28 U.S.C. §1746 or a sworn affidavit certifying that the claims she wishes to present are meritorious and made in good faith. As Exhibit 3 to that motion, plaintiff must include a list of every suit previously filed by her or on her behalf in any federal court against each and every defendant to the suit she wishes to file, including the title and index number of each such case. As Exhibit 4 et seq. to that motion, plaintiff must provide

7

SPA- 134

a copy of each such complaint and a statement describing the matter's disposition. Finally, plaintiff must serve a copy of this Decision and Order upon each defendant if and when leave to serve the complaint in the new case is granted.

Failure to comply with the terms of this Decision and Order may be sufficient grounds for a court to deny any motion for leave to file made by plaintiff. Further, plaintiff's failure to advise a federal court in which she has filed a complaint of this Decision and Order and/or her failure to otherwise comply with this Decision and Order may be considered by such court as good and sufficient cause to dismiss such a lawsuit, and further may be considered sufficient grounds upon which to levy additional sanctions, including but not limited to fines, imprisonment, and/or an award to defendants in the amount of their reasonable costs and attorneys' fees in defending the action.

However, nothing in this Decision and Order shall be construed as having any effect on plaintiff's ability to initiate or continue actions in state court and/or appeals before the United States Courts of Appeals, or her power to prosecute or defend any other action or appeal that is presently pending, brought by her in any federal court prior to the date of entry of this Decision and Order.

### III.    Plaintiff's Amended Complaint

The Second Circuit found that although plaintiff had not asserted sufficient facts to state several of her claims, she might potentially be able to cure their deficiencies if she were granted leave to do so. Those claims consisted of: (1) Title VII, ADEA and NYSHRL claims against the District and ASAR, including retaliatory termination claims against the District; and (2) Section 1983 and NYSHRL equal protection claims against all defendants. *See Curry-Malcolm v. Rochester City School District et al.*, 2020 U.S. App. LEXIS 35730 at *5 n.5 (2d Cir.

2020)(affirming in part and remanding in part *Malcolm I*); *Malcolm v. Ass'n of Supervisors &
Adm'rs of Rochester*, 2020 U.S. App. LEXIS 32404 (2d Cir. 2020)(affirming and remanding
*Malcolm III*).

In its decision applying the Second Circuit's holdings, this Court also extended plaintiff
leave to assert any new and previously-unadjudicated claims against the defendants or related
parties for which right-to-sue letters had been issued subsequent to the commencement of *Malcolm
IV*. However, the Court specifically warned plaintiff that the Amended Complaint should "*not
attempt to reassert any of the claims for which dismissal with prejudice was affirmed by the Second
Circuit.*" (17-CV-6878, Dkt. #34 at 6)(emphasis added).

In response, plaintiff has now filed an Amended Complaint that is 132 pages and 592
paragraphs in length, along with exhibits comprised of an additional 234 pages. The Amended
Complaint purports to assert fifteen causes of action, a number of which (e.g., labor-related claims
against ASAR defendants) improperly seek to resurrect claims which were dismissed with
prejudice and for which dismissal was affirmed, and others of which (e.g., conspiracy, denial of
due process) appear to be thinly-veiled attempts to recast already-dismissed claims, or to assert
new claims that are either untimely or unexhausted.

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain "a short
and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc.
8(a)(2). The statement must be concise, "because unnecessary prolixity in a pleading places an
unjustified burden on the court and the party who must respond to it because they are forced to
select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d
Cir. 1988) (internal quotation marks omitted).

SPA-134

Dismissal of a complaint for failure to comply with Rule 8 is generally reserved for those cases in which the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* This standard should be applied with special lenience to pro se pleadings. *See Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995).

Plaintiff's Amended Complaint, construed liberally and granting plaintiff every favorable inference, simply does not satisfy Rule 8's requirement of a "short and plain statement." The Amended Complaint consists of several hundred paragraphs which meander back and forth in anachronic, stream-of-consciousness fashion over events and conversations alleged to have taken place over a period of several years. As such, it is not "sufficient to give the defendants fair notice of what the plaintiff's claim[s are] and the grounds upon which [they] rest[]," *Jones v. Nat'l Communications and Surveillance Networks*, 226 Fed. App'x 31, 32 (2d Cir. 2008), and sifting through it to glean the relevant facts places an "unjustified burden" on the Court and counsel. *Salahuddin*, 861 F.2d 40 at 42.

The Amended Complaint vacillates between providing voluminous extraneous details of little apparent relevance to plaintiff's claims, and engaging in sweeping legal conclusions that do not identify which parties, incidents and policies are being discussed, or suggest a cogent timeline of the salient events. To paraphrase Shakespeare, it presents a prosaic blunderbuss "full of sound and fury," but so encumbered with repetition, confusing timeline jumps, tangential factual minutia and legal argument that it "signif[ies] nothing" to a sympathetic reader.

The Court also observes that by virtue of its attempt to resurrect already-dismissed claims for which the Second Circuit affirmed dismissal, plaintiff's Amended Complaint does not comply with this Court's December 30, 2020 Decision and Order. Fed. R. Civ. Proc. 41(b) authorizes a district court to "dismiss a complaint for failure to comply with a court order, treating the

10


SPA - 137

noncompliance as a failure to prosecute," although leniency is still required in analyzing a pro se

party's submissions. *Simmons*, 49 F.3d 83 at 87. *See also Shabtai v. Levande*, 38 Fed. App'x 684

(2d Cir. 2002)(affirming dismissal of pro se plaintiff's complaint for failure to comply with Fed.

R. Civ. Proc. 8, and with a court order).

     In sum, plaintiff's Amended Complaint does not comply with the requirements of Rule 8,

or with this Court's prior order specifying the claims that plaintiff could – and could not – properly

assert in her amended pleading.

     However, in deference to plaintiff's pro se status, in light of the *sua sponte* nature of the

Court's consideration of Rule 8 factors, and in the overarching interests of justice, plaintiff will be

granted leave to amend her complaint a second time, as set forth below.


## CONCLUSION

     For the reasons set forth above, plaintiff's motion seeking recusal (17-CV-6878, Dkt. #40)

is denied.

     Further, the Court finds that the leave-to-file sanctions imposed in *Malcolm I* should be

reinstated, in the manner and to the extent set forth above.

     The Amended Complaint (17-CV-6878, Dkt. #39; 18-CV-6450, Dkt. #22) is dismissed in

its entirety, without prejudice. Plaintiff is granted leave to file, within twenty (20) days of entry of

this Decision and Order and without the need to seek further leave of Court, a Second Amended

Complaint in this consolidated action, which sets forth the relevant facts and claims in a clear and

concise manner, in conformity with Fed. R. Civ. Proc. 8.

     Plaintiff is once again warned that she may *not* attempt to reassert – and should not include

in her Second Amended Complaint – any of the causes of action for which dismissal with prejudice

SPA-138

was affirmed by the Second Circuit, nor may she raise any new claims that have been found untimely, or for which administrative remedies have not been exhausted. Such actions would be in violation of this Court's December 30, 2020 Decision and Order (17-CV-6878, Dkt. #34; 18-CV-6450, Dkt. #18). Plaintiff is warned that if the Second Amended Complaint fails to comply with Fed. R. Civ. Proc. 8, and/or with the prior orders of this Court, it shall be subject to dismissal, with prejudice.

IT IS SO ORDERED.

DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
April 6, 2021.

12

SPA-139



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

BERNICE CURRY-MALCOLM,

                        Complainant,

         v.

ROCHESTER CITY SCHOOL DISTRICT,

                      Respondent.

DETERMINATION AFTER
INVESTIGATION

Case No.
10186902

---

Federal Charge No. 16GB701939

    On 3/16/2017, Bernice Curry-Malcolm filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of age, opposed discrimination/retaliation; race/color, sex in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

    After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

    Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated:      AUG 2 9 2017
       Syracuse, New York

                          STATE DIVISION OF HUMAN RIGHTS

            By:    _Julia B. Day_
                       Julia B. Day
                       Regional Director

SPA-140

EEOC Form 161 (11/16)

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Bernice Curry-Malcolm
6 Gingerwood Way
West Henrietta, NY 14586

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2017-01939 | Holly M. Shabazz,
State & Local Program Manager | (929) 506-5316 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act: This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Equal Pay Act (EPA): EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

December 4, 2019
(Date Mailed)

Enclosure(s)

cc:
Attn: Samantha J. Crane,
ROCHESTER CITY SCHOOL DISTRICT
Department of Law
131 West Broad Street
Rochester, NY 14614

SPA - 141

**NEW YORK STATE DIVISION OF HUMAND RIGHTS AND COPY: EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

STATE OF NEW YORK WESTERN DISTRICT

---

Bernice Malcolm
6 Gingerwood Way
West Henrietta, New York 14586

                 Charging Party               EEOC CHARGE NO:

v.

Rochester City School District,
131 W Board Street
Rochester, New York 14614

                          Respondents.

---

COUNTY OF MONROE) ss:

1. I am Bernice Malcolm, with date of birth of ████████ I am an African American/Black female over 40 years of age. My address is 6 Gingerwood Way, West Henrietta, New York 14586. My telephone number is ████████ The discriminatory and retaliatory acts against me occurred in the New York Western District of Monroe County, State of New York.

2. I believe that I have been discriminated against based on my race, color, and gender and based on disparate treatment and disparate impact. Their actions were in violation pursuant to Title VII of the Civil Rights Act of 1964; the New York Executive Law §290 *et seq.*, race and age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq.*, and the New York State Human Rights Law ("Human Rights Law"), discrimination and retaliation, and disability discrimination, pursuant to Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000 et. seq.),

1


SPA-142

42 U.S.C. §1981, 42 U.S.C. §1983, and the New York State Human Rights Laws; breach of contract, age and race discrimination and retaliation, with respect to harassment, termination and other terms and conditions of employment, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 1981, the Age Discrimination in Employment Act of 1967, and the New York State Human Rights Laws, Equal Protection Clause of the Constitution, enforceable through Section 1983, and conspiracy under 42 U.S.C. Section 1985 (c) , Disparate treatment and Disparate impact pursuant to Title VII of the Civil Rights Act of 1964, defamation, employment discrimination.

## COMPLAINTANT

3.        COMPLAINTANT, Bernice Malcolm is a citizen of the United States and a resident of Rochester, New York, Western District, in Monroe County. COMPLAINTANT is a 58 years old African American/Black female.

## RESPONDENTS

4.  The Respondent Rochester City School District is a public school district located in Monroe County, New York, doing business located at 131 W Board Street, Rochester, New York 14614, and organized and existing pursuant to the laws of the State of New York. At all times relevant, the school district has been COMPLAINTANT's employer.

5.        The Respondent Board of Education of the Rochester City School District, is located in Monroe County, New York, and is a board of education organized and existing under the laws of the State of New York, having all the powers, duties, and responsibilities of a board of education under the laws of the State of New York, and is subject to the provisions of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 1981, Equal Protection Clause of the

Constitution, enforceable through Section 1983 and procedural due process under the 14th Amendment of the United States Constitution, and the Human Rights Law.

6. Teresa Root ("Root"), is a supervisory employee for the Rochester City School District and in the position of a Zone Director. I filed discriminatory and harassment charges against Root attached and marked as *Exhibit A*.

7. The District refused to investigate and the district's legal counsel closed my complaint attached and marked as *Exhibit B*.

8. At all times relevant, COMPLAINTANT was employed by the Rochester City School District (hereinafter "the District") as a Coordinating Administrator of Special Education ("CASE)".

9. At all times relevant, COMPLAINTANT was a member of the Association of Supervisors and Administrators ("ASAR"), which is the sole bargaining unit for unit members

10. I complained of and opposed my employer's unlawful employment and discriminatory practices and discriminatory actions against me by my direct and immediate supervisor, Teresa Root, Zone Director. The discriminatory and retaliatory actions occurred in Rochester, New York of Monroe County, State of New York. I believe that I have been discriminated against based on my race, age, retaliation and disparate treatment. I complained of my immediate supervisor, Teresa Root's abuse of power, harassment, and disparate treatment, discriminatory and retaliatory actions against me. I also complained about the hostile and harassing behavior of a colleague, Kariann Kittelberger. My employer unlawfully violated its own policies and procedure in regard to investing my complaint without an appropriate and proper investigation and without interviewing me.

The District policies and procedures in regard to Alleged Harassment is attached and marked as *Exhibit C*.

I have exhausted my administrative remedies attached and marked as *Exhibit D*.

Respectfully,

*/s/Bernice Malcolm*
Bernice Malcolm

Dated: March 15, 2017

SPA-145

## NOTARIZATION OF THE COMPLAINT

Based on the information contained in this form, I charge the above-named Respondent with an unlawful discriminatory practice, in violation of the New York State Human Rights Law.

By filing this complaint, I understand that I am also filing my employment complaint with the United States Equal Employment Opportunity Commission under the Americans With Disabilities Act (covers disability related to employment), Title VII of the Civil Rights Act of 1964, as amended (covers race, color, religion, national origin, sex relating to employment), and/or the Age Discrimination in Employment Act, as amended (covers ages 40 years of age or older in employment), or filing my housing/credit complaint with HUD under Title VIII of the Federal Fair Housing Act, as amended (covers acts of discrimination in housing),as applicable. This complaint will protect your rights under Federal Law!

I hereby authorize the New York State Division of Human Rights to accept this complaint on behalf of the U.S. Equal Employment Opportunity Commission, subject to the statutory limitations contained in the aforementioned law and/or to accept this complaint on behalf of the U.S. Department of Housing and Urban Development for review and additional filing by them, subject to the statutory limitations contained the in aforementioned law.

I have not filed any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

I swear under penalty of perjury that I am the complainant herein; that I have read (or have had read to me) the foregoing complaint and know the contents of this complaint; and that the foregoing is true and correct, based on my current knowledge, information, and belief.

_Bernice CMalcon_
Sign your full legal name

**WANDA STARKES**
Commissioner Of Deeds
Monroe County, New York State
My Commission Expires April 14, 2009 27

Subscribed and sworn before me
This 16 day of March, 20 17

_Wanda Starkes_
Signature of Notary Public

County:                              Commission expires:

*Please note: Once this form is notarized and returned to the Division, it becomes a legal document and an official complaint with the Division of Human rights. After the Division accepts your complaint, this form will be sent to the company or person(s) whom you are accusing of discrimination.*

.9

SPA-146



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of | **DETERMINATION AFTER INVESTIGATION** |
| BERNICE MALCOLM, Complainant, | |
| v. | Case No. 10187117 |
| ROCHESTER CITY SCHOOL DISTRICT, Respondent. | |

Federal Charge No. 16GB702093

On 3/30/2017, Bernice Malcolm filed a verified complaint with the New York State Division of Human Rights ("Division"), charging the above-named Respondent with an unlawful discriminatory practice relating to employment because of age, sex, race/color, opposed discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

After investigation, the Division has determined that it has jurisdiction in this matter and that PROBABLE CAUSE exists to believe that the Respondent has engaged in or is engaging in the unlawful discriminatory practice complained of.

Pursuant to the Human Rights Law, this matter is recommended for public hearing. The parties will be advised of further proceedings.

Dated: AUG 2 9 2017
Syracuse, New York

STATE DIVISION OF HUMAN RIGHTS

By: _____
Julia B. Day
Regional Director

SPA-147

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# DISMISSAL AND NOTICE OF RIGHTS

| To: Bernice Curry-Malcolm<br>6 Gingerwood Way<br>West Henrietta, NY 14586 | From: New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative<br>Holly M. Shabazz,<br>State & Local Program Manager | Telephone No.<br>(929) 506-5316 |
|---|---|---|
| 16G-2017-01939 | | |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

---

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____                    December 4, 2019
Kevin J. Berry,                                    *(Date Mailed)*
District Director

Enclosure(s)

cc:
Attn: Samantha J. Crane,
**ROCHESTER CITY SCHOOL DISTRICT**
Department of Law
131 West Broad Street
Rochester, NY 14614

SPA-148



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

BERNICE MALCOLM,

                                  Complainant,

                    v.

ASSOCIATION OF SUPERVISOR &
ADMINISTRATORS OF ROCHESTER (ASAR),

                                  Respondent.

**DETERMINATION AND
ORDER AFTER
INVESTIGATION**

Case No.
10187122

---

Federal Charge No. 16GB702096

    On 3/30/2017, Bernice Malcolm filed a verified complaint with the New York State
Division of Human Rights ("Division") charging the above-named respondent with an unlawful
discriminatory practice relating to employment because of age, sex, race/color, opposed
discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

    After investigation, and following opportunity for review of related information and
evidence by the named parties, the Division has determined that there is NO PROBABLE
CAUSE to believe that the respondent has engaged in or is engaging in the unlawful
discriminatory practice complained of. This determination is based on the following:

There is insufficient evidence to support the allegations of unlawful discrimination contained in
the complaint. The investigation has not revealed that Complainant was subjected to
discrimination on the basis of her age, race/color, and/or opposition to discrimination at the
hands of Respondent. In fact, Respondent informed Complainant of the internal complaint
process for bringing claims of discrimination within the Rochester City School District when
Complainant brought these concerns to union. Moreover, many of the members Complainant
alleges were treated more favorably by the union shared some of the same protected
characteristics (race/color and/or age) as Complainant; therefore, there is no indication that
Complainant was targeted by the union due to her age and/or race/color. Instead, the record
suggests that the union looked into concerns brought by Complainant. Although the parties
dispute what actions were grievable or not, these disputes are not enough to suggest that
Respondent aided and abetted discriminatory practices by the Respondent. Any allegation

*SPA-149*

related to breach of fair duty of representation on Respondent's part, absent discriminatory motive, can be brought before the New York Public Employment Relations Board; issues of fair representation, absent evidence of unlawful discrimination based on protected categories under the New York State Human Rights Law, are beyond the purview of the New York State Division of Human Rights. Therefore, there is no probable cause to support the allegations in the complaint.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Your charge was also filed under the Age Discrimination in Employment Act (ADEA). Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

Dated:    AUG 2 9 2017
        Syracuse, New York

STATE DIVISION OF HUMAN RIGHTS

By: *Julia B. Day*
    Julia B. Day
    Regional Director

SPA-150

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: Bernice Malcolm
6 Gingerwood Way
West Henrietta, NY 14586

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16G-2017-02096 | Holly M. Woodyard, State & Local Program Manager | (212) 336-3643 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

September 22, 2017
(Date Mailed)

Enclosures(s)

cc:

Attn: Director of Human Resources
ASSOCIATION OF SUPERVISORS &
ADMINISTRATORS OF ROCHESTER
25 N. Washington Street
Rochester, NY 14614

SPA-151

NEW YORK STATE DIVISION OF HUMAND RIGHTS AND COPY: EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION

STATE OF NEW YORK WESTERN DISTRICT

MAR 3 0 2017

Bernice Malcolm
6 Gingerwood Way
West Henrietta, New York 14586

                      Charging Party              NYSDHR CHARGE NO:

v.

Rochester City School District,
131 W Board Street
Rochester, New York 14614
585-262-8100

Association of Supervisor & Administrators (ASAR) of Rochester
25 North Washington Street
Rochester, New York 14614
585-262-2130

                      Respondents.

COUNTY OF MONROE) ss:

   1.  I am Bernice Malcolm, with date of birth of ████████. I am an African
American/Black female over 40 years of age. My address is ████████████████,
████████ My telephone number is ████████. The retaliatory acts against me
occurred in the New York Western District of Monroe County, State of New York.

     I believe that I have been retaliated against for engaging in a protective activity and for
filing a complaint of discrimination in violation of Title VII of the Civil Rights Act of 1964,
New York State Human Rights Law ("Human Rights Law"), discrimination and retaliation, in
violation of retaliation statutes and breach of contract and the collective bargaining agreement.

1

SPA-152

Correction: From my March 15, 2017 charge of discrimination to EEOC, dually filed with the NYSHR on March 16, 2017 (Case Number 10186902), the words "disability discrimination" and termination from that complaint was a mistakenly misprint.

## COMPLAINT OF RETALIATION

### COMPLAINTANT

2.        COMPLAINTANT, Bernice Malcolm is a citizen of the United States and a resident of Rochester, New York, Western District, in Monroe County. COMPLAINTANT is a 58 years old African American/Black female.

### RESPONDENTS

3.   The Respondent Rochester City School District is a public school district located in Monroe County, New York, doing business located at 131 W Board Street, Rochester, New York 14614, and organized and existing pursuant to the laws of the State of New York. At all times relevant, the school district has been COMPLAINTANT's employer.

4.        The Respondent Board of Education of the Rochester City School District, is located in Monroe County, New York, and is a board of education organized and existing under the laws of the State of New York, having all the powers, duties, and responsibilities of a board of education under the laws of the State of New York, and is subject to the provisions of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 1,981, Equal Protection Clause of the Constitution, enforceable through Section 1983 and procedural due process under the 14th Amendment of the United States Constitution, and the Human Rights Law.

5.  Association of Supervisor & Administrators (ASAR) is the local labor bargaining agents for administrators in the District, including me with it principal place of business located at 25 North Washington Street, Rochester New York 14614.

2


SPA-153

6. I believe that I have been retaliated against based on race and age, for engaging in a protective activity after filing a complaint of discrimination; Case Number 10186902 and EEOC Charge Number 16GB701939.

7. I filed this complaint in good faith, believing that I have been retaliated against.

8. In December 2016, I filed a discrimination charge against Teresa Root, my then direct and immediate supervisor.

9. The Rochester City School District has an internal investigation process. I was told that my complaint would be investigated in accordance with the Rochester City School District's Superintendent's Regulation 0100-R.

10. My complaint was never properly and adequately investigated, but rather taken over by the District's legal counsel and dismissed.

11. Pursuant to the Superintendent's Regulation 0100-R, retaliation is prohibited.

12. On or about February 17, 2017, the Rochester City School District placed Kariann Kittelberger ("Kittelberger", as the Interim Alternative Director of North STAR Educational Program. The District, its officers, employees, directors, Chiefs, Superintendent of Schools (who lived and is in association with Honeoye Falls, New York), officers and /or agents, full well knew that Kariann Kittelberger was hostile towards me and that she has a vendetta against me.

13. Kittelberger made it well known that she dislikes me and that she was hostile towards me. In April 2016, Kittelberger told two supervisors in front of me that she was hostile towards me. The supervisors were Teresa Root and Joe Capezzuto.

14. The District removed me from North STAR as the CASE for no good reason and without good cause.

15. The District also removed me from another program, All City without good reason and

3



without good cause,

16.  It was reported to me that Kittelberger told the District that she would only become the Director for North STAR if the district allowed Rosemary Lane, school psychologist to go with her and only if they removed me.

17.  Kittelberger, until being placed in the position of Interim Director, was also a CASE in the same Bracket.

18.  I was demoted and assigned the work of three school programs instead of the two that I had served. I was stripped of my administrative duties of teacher evaluations and have been assigned to an Elementary School and two Charter Schools.

19. Teresa Root was one of the decision makers in getting me ousted from North STAR Educational Program.

20.  This move impacted hundreds of students with disabilities and the district, which was out of compliance before I commenced employment is still out of compliance.

21.  I made the District aware that I would move up in the position of Director for North STAR Educational Program, but in retaliated the Board of Education on March 16, 2017 voted to place Kittelberger in the position. Kittelberger is a white younger female.

22.  On or about March 19, 2017, Teresa Root completed my last year performance evaluation.

23. On or about March 21, 2017, Superintendent Deane-Williams presented her proposed 2017-2018 budget to the Rochester City School District Board of Education.

24. On or about March 24, 2017, Root again completed my performance evaluation  She also acknowledged and completed the performance evaluation. A developing rating is a barrier to receiving tenure. It is my belief that this is retaliatory and discriminatory.

4


SPA- 155

25. It is my belief that the District is continuing allow Root to harass and discriminated against me. None of the Administrators in Root's Bracket are being affected. Root continues to harass and discriminate against me.

26. On or about March 22, 2017, I learned from the media that that Barbara Deane-Williams, Superintendent of Schools was proposing to cut/abolish 22 probationary CASE positions. Even though the Superintendent and the district is making claim that this is just a draft budget in the public behind the scenes, I feel that I am being forced by district administration to enter into the RTA teacher's contract. This is against public policy, unconstitutional and in violation of Human Rights Laws and Retaliation statutes.

27. It is my belief that this cut/job abolishment was in retaliation to my filing a charge of Discrimination. The proposed positions were only probationary position. I am a probationary administrator, who is in my second year with the district as an administrator.

28. It is my belief that these administrators were targeted as a way to ultimately terminate my position.

29. It is my belief that these 22 probationary Coordinating Administrators of Special Education, are being targeted by association. No Tenured CASES' position are being abolished/cut only the probationary CASES.

30. Upon information and belief and through word of mouth from other CASES; ASAR met with the tenured CASES and mediated with the district, but the probationary CASES were not a part of this meeting. I did not get an invite. From what I was told, out of this mediation between ASAR, the District and the tenured CASES, an agreement was reached and a Memorandum of Understanding was signed that no matter what happened, the tenured CASES' jobs would not be cut and/or abolish and neither would their salaries been touched.

5

SPA – 156

31. On or about March 22, 2017, the probationary CASES affected were sent an email from Tim Cliby, ASAR President. In the email Cliby laid out the District's plan.

32. On or about March 28, 2017, ASAR and the District meet with the probationary CASES affected and once again laid out the District plans to abolish our jobs even though the district has not abolished the tenured tracked CASE position of Bracket IV, but only proposing abolishment of the probationary CASES in that Bracket. It is my belief that this is unlawful discrimination based on probationary status as an administrator in the Bracket IV position as no tenured CASE was affected.

33. The 22 probationary CASES affected are Faith Hart, whom we were told was the last hired in her absence; Yajara Walker, Diana Radley, Brandon Jones, Marissa Nicholson, Kathleen Foster, Mark Ferraro, Amy Mastowski, Lakisha Wilson, Emily Lathers, Stacey Aliasso, Bonnie Ellsi, Kristina Shambo, Davina Mclean-Randal, Melinda Hyde, Rosa Bellone, Christina Ricther, Collen Muller, Megan Bonacci and myself.

34. It is my honest belief that the Superintendent's proposed budget is a mere disguise to demote me as a probationary administrator and to try to force me into signing a teacher contract with the ultimate goal of terminating my employment at some future date. This teacher's contract that is being presented is also a demotion in pay.

35. It is my belief that this is discriminatory animus and a pretext to discrimination and done for intentional and deliberate reasons.

36. We were told that the reason was budgetary, however at the meeting of March 28, 2017 and in reference to ASAR email, as well as Gwen Thompson's email review of the tenured CASES' conversation with SAANYS deputy attorney, Jennifer Carlson that this was a re-organization.



37. At the meeting on March 28, 2017, we were told that there was really no budget crisis and that the proposed abolishment and/or cutting of our jobs were really insignificant.

38. Of the 22 CASES, there are eight (8) up for tenure. A couple of people were granted their tenure and/or moved into a higher level position ahead of this so that they were not affected.

39. At the meeting the other 8 probationary CASES referred within were told that the District would grant them their tenure by June 30, 2017, so should that occur, those eight probationary CASES would join the ranks of the other tenured CASES and would not be affected. This is discriminatory and retaliatory.

40. Even though, it is said that this is just a draft budget, it is not been treated as one. As we are bring called to meeting after meeting. We are also being told that this is going to happen and that we are moving from our administrators' contract to a RTA teacher's contract.

41. On or about March 29, 2017, we received an email from John Rowe, ASAR Vice President, informing us that the RTA would be negotiating our salary.

42. Even though the Board of Education has not voted on the abolishment of the probationary CASES' jobs as administrators, we are being told by ASAR, SAANYS and the District, including Sandy Simpson, who stated to us that she represented the District that this is happening as plans are being set into motion to ensure that it happens.

43. It is my belief that we are being manipulated, coerced and forced into a RTA teachers' contract. The District and the Union is trying to force us out of our administrative contracts. It is my honest belief that this is in retaliation to my filing a discrimination complaint and has nothing to do with budgetary reasons and/or re-organization.

44. I feel that my salary is being dangled in front of me and/or the potential loss thereof and that the District and Union are not operating in good faith, but rather bad faith.

45. It is my belief that the Union, ASAR and SAANYS are aiding and abetting the District in its retaliation and discrimination against me.

46. We were given a job description of that of an Elementary TCOSE, which is not in the same Bracket of as a CASE and neither the same salary or tenure area.

47. It was stated that at least we have jobs and that we could not have a job at all. I should not have to be forced into a teachers' contract with lower pay and the threat of no pay over the summer.

48. The District has threaten not to pay us over the summer and it has been stated that at least we have a job. A job supposedly, but for how long after being forced into negotiating a new contract, new teacher area and with less pay. The outrageous and unconscionable actions by the District and Union are shocking to the sense and the bullying to forge ahead nature of trying to use the fear of job loss in trying to force the entry into a teacher's contract is not lawful. The District and Union is trying to use the loss and/or deduction in my salary to bend me into entering a different contract.

49. It is my belief that this is an attempt to circumvent and avoid liability because of filed a charge of discrimination and that the district is intentionally targeting this particular group of administrators and a Bracket that I just happen to part of and just happen to be probationary.

50. In these meetings that the District and Union are having with us, I feel that I am being Pressured, coerced, bullied and forced into a teacher's contract under the RTA so much so that the Union has abandon its fair duty of representation and the Board has not even voted and is forcing a teacher's contract and now telling us to allow the RTA to negotiate for me when I am an administrator under an administrator's contract.

51. Aiding and abetting in discrimination/retaliation is unlawful and in violation of New

8



York State Human Rights Laws.

I have exhausted my administrative remedies.

/s/Bernice Malcolm    *Bernice Malcolm*

Bernice Malcolm

Dated: March 30, 2017

**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

BERNICE CURRY-MALCOLM,

                                 Complainant,

                    v.

ROCHESTER CITY SCHOOL DISTRICT,

                                 Respondent.

DETERMINATION AND
ORDER AFTER
INVESTIGATION

Case No.
10187620

Federal Charge No. 16GB702468

---

On 4/25/2017, Bernice Curry-Malcolm filed a verified complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of opposed discrimination/retaliation, race/color, age, sex in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and evidence by the named parties, the Division has determined that there is NO PROBABLE CAUSE to believe that the respondent has engaged in or is engaging in the unlawful discriminatory practice complained of. This determination is based on the following:

Complainant filed a series of internal and external discrimination complaints against the respondent since December 2016.

She maintains that she received a letter, that she never received before, which indicated that her name was changed, although Complainant has not changed her name since 1997. There seems to be indication that Complainant has or does use "Malcolm" and "Curry-Malcolm" interchangeably, however, Complainant maintains that she never received the alleged letter until after she filed her complaints of discrimination. Respondent denied that the letter had anything to do with Complainant's discrimination complaints, as it followed the same process that it has followed with all of its monthly reporting. There is no evidence that the complainant experienced an adverse employment action in connection with the letter regarding the name change.

SPA- 161

While looking into the letter regarding the name change, sometime in early/mid- April 2017, Complainant maintains that she learned that Respondent has stopped paying her loan payments and had terminated her employment with an effective date of June 30, 2017. Complainant was, indeed, terminated with an effective date of June 30, 2017 sometime later; however, the issue of the complainant's termination has been fully addressed in a prior case filed with the New York State Division of Human Rights, upon which a determination has been issued. The Division does not have jurisdiction to investigate and issue a finding on the same issue as has previously been processed by the agency; therefore, this determination in the instant case does not cover the issue of the complainant's termination. Regarding the issue of the loan payments, the evidence indicates that the respondent made late payments on Complainant's loan, and on the respective loans of other similarly situated employees. The evidence does not show that the respondent's failure to make timely payments on the complainant's loan constitutes unlawful discrimination based on the complainant's protected categories nor unlawful retaliation for filing prior complaints.

There is insufficient evidence to support a conclusion that the respondent unlawfully discriminated against the complainant in connection with the jurisdictional issues of the instant case.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Your charge was also filed under the Age Discrimination in Employment Act (ADEA). Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

SPA - 162

Dated:      AUG 3 0 2017
            Rochester, New York

STATE DIVISION OF HUMAN RIGHTS

By:   _Julia B Day_____
      Julia B. Day
      Regional Director

- 3 -

SPA-163

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Bernice Curry-Malcolm | From: New York District Office |
|---|---|
| 6 Gingerwood Way | 33 Whitehall Street |
| West Henrietta, NY 14586 | 5th Floor |
| | New York, NY 10004 |

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | Holly M. Woodyard, | |
| 16G-2017-02468 | State & Local Program Manager | (212) 336-3643 |

THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

On behalf of the Commission

| | | |
|---|---|---|
| Enclosure(s) | Kevin J. Berry,<br>District Director | September 22, 2017<br>(Date Mailed) |

cc:

Attn: Director of Human Resources
ROCHESTER CITY SCHOOL DISTRICT
Department of Law
131 West Broad Street
Rochester, NY 14614

6PA-164

NEW YORK STATE DIVISION OF HUMAND RIGHTS AND COPY: EQUAL
EMPLOYMENT OPPORTUNITY COMMISSION

STATE OF NEW YORK WESTERN DISTRICT

Bernice Malcolm
6 Gingerwood Way
West Henrietta, New York 14586

Charging Party                           NYSDHR CHARGE NO:

v.

Rochester City School District,
131 W Board Street
Rochester, New York 14614
585-262-8100

Respondents.

COUNTY OF MONROE) ss:

1. I am Bernice Malcolm, with date of birth of 0▮▮▮▮▮▮. I am an African

American/Black female over 40 years of age. My address is ▮▮▮▮▮▮▮▮▮▮▮▮,

▮▮▮▮▮▮▮. My telephone number, ▮▮▮▮▮▮▮. The retaliatory acts against me

occurred in the New York Western District of Monroe County, State of New York.

I believe that I have been retaliated against for engaging in a protective activity and for

filing a complaint of discrimination in violation of Title VII of the Civil Rights Act of 1964;

New York State Human Rights Law ("Human Rights Law"), discrimination and retaliation, in

violation of retaliation statutes and breach of contract and the collective bargaining agreement.

SPA-165

# 2nd COMPLAINT OF RETALIATION

## COMPLAINTANT

2.      COMPLAINTANT, Bernice Malcolm is a citizen of the United States and a resident of Rochester, New York, Western District, in Monroe County. COMPLAINTANT is a 58 years old African American/Black female.

## RESPONDENTS

3.  The Respondent Rochester City School District is a public school district located in Monroe County, New York, doing business located at 131 W Board Street, Rochester, New York 14614, and organized and existing pursuant to the laws of the State of New York. At all times relevant, the school district has been COMPLAINTANT's employer.

4.      The Respondent Board of Education of the Rochester City School District, is located in Monroe County, New York, and is a board of education organized and existing under the laws of the State of New York, having all the powers, duties, and responsibilities of a board of education under the laws of the State of New York, and is subject to the provisions of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 1981, Equal Protection Clause of the Constitution, enforceable through Section 1983 and procedural due process under the 14th Amendment of the United States Constitution, and the Human Rights Law.

5.  I believe that I am being continuingly retaliated against based on race and age, for engaging in a protective activity after filing a complaint of discrimination; Case Number 10186902 and EEOC Charge Number 16GB701939.

6.  The RCSD continues to violate retaliation statues and breach my contract. I filed this complaint in good faith, believing that I have been retaliated against.

7.  In the Respondents Rochester City School District response dated April 5, 2017 by and

2

GPA-166

through its counsel, Samantha J. Crane, stated that "the District" the employer in case number 101877117 submits its response to the charge of discrimination filed by Bernice Malcolm, a/k/a Bernice Curry-Malcolm.

8. On or about April 18, 2017, I received written communication dated April 12, 2017 from the New York State Teacher Retirement System (NYSTRS) Loan Unit by and through Deborah Burns that the Rochester City School District Respondents ("RCSD" or "District") informed their system that I had changed my name. It is my belief that the District submitted this ludicrous claim in hear proximity to its response of April 5, 2017.

9. I believe that was what was meant by "the District" the employer in case number 101877117 submits its' response to the charge of discrimination filed by Bernice Malcolm, a/k/a Bernice Curry-Malcolm. The RCSD Respondents are making false claims to the NYSTRS that I had changed my name. This was done in retaliation.

10. I did not know at the time that the District had also terminated my employment so when I made correction in the March 30, 2017 charge and stated that word termination was mistaken misprint I had no idea that the District had actually terminated my employment and reported to the NYSTRS that it had paid me $.61, 920.54 as of 6/30/2017, which was about 4 and ½ months and a month or so prior to the announcement of cutting 22 CASES. The RCSD actions were discriminatory animus and a pretext to discrimination.

11. The District had already cut my job and terminated me through the NYSTRS without my knowledge and/or consent and without any notice to me.

12. I would also discover that the Respondents Rochester City School District terminated my employment as of 2/13/2017 and reported to the teacher retirement system that I was credited two years of service and that I was paid 61,920.54 as of June 30, 2017.

SPA-167

13. The Respondent Rochester City School District also withheld money in the amount of $180.50 from my March 17, 2017, March 31, 2017 and April 14, 2017 payrolls and refused and did not pay my loan. After learning that the District had not paid my loan, I had to pay it myself.

14. I have not changed my name. The District is now claim that I have changed my name is in retaliation, abuse of power, bullying and show depraved indifference.

15. It is my belief, through written communication from the NYSTRS, observation and documentation that the District is now making claim that I have changed my name to circumvent their unlawful discriminatory, retaliatory and adverse actions against me and because they can no longer transfer monies and/or payments to the NYSTRS because they reported to the system on February 13, 2017 that my employment had ended.

16. So, their malicious, willful attempt now is to pretend that I have changed my name so that the District can illegally transfer money. I believe the District's actions are unlawful, fraudulent and in retaliation to my filing a complaint of discrimination, Case No. 10186902 and retaliation, Case Nos. 10187117 and 10187122.

17. The NYSTRS communicated to me on or about April 19, 2017, that the District changed my name to Bernice Malcolm in its system. The NYSTRS also communicated to me that this was done in March 2017.

18. By and through its counsel, Samantha J Clane, Esq., makes that same claim in her response of April 5, 2017, Bernice Malcolm a/k/a Bernice Curry-Malcolm. As an officer of the Court her claim is misrepresentation and done in bad faith as she herself, makes reference to herself as Samantha J. Crane, a/k/a Samantha Crane, a/k/a Samantha Jean Crane, a/k/a SJC/SC etc.

19. It is also my honest belief that the District has also already made me a probationary

4

SPA-168

teacher without my knowledge/consent and because probationary has also set into motion to terminate my employment as a probationary teacher as well. This is based on the fact that the RCSD as of 2/13/2017 reported to the NYSTRS only two years of credit and also is now falsely claiming that I have changed my name without any notice to me that they had changed my name in the NYSTRS.

20. The District terminated my employment, closed out my service credit as of February 13, 2017 and has reported that it has paid me through June 30, 2017 as of February 2013. It is my honest belief that this was done with the ultimate goal to terminate my employment and that it has nothing to do with the District's false claim of the budget and/or re-organization of special education.

21. The 21 CASES, as well as, myself are not high level administrators. There are also at least 17 CASES that still have their jobs as administrators, all of them are tenured, but yet in the same Bracket IV as the 22 probationary CASES, including myself. Bracket IV is a tenure bearing Bracket and has not been abolished and/or done away with.

22. The District's adverse actions against me was done in retaliation to my filing an internal discriminatory and/or harassment complaint with the District in December 2016. The District refused to investigate the complaint and violated its own policies and procedures and then dismissed the complaint with an adequate and/or proper investigation in accordance with the Superintendent's Regulations R0100.

23. It is also my honest belief that the District is making this false claim that I have changed my name because the District knows that it would have to give me service credit and have to grant me tenure as a teacher because I was granted tenure in another NYS School District. My service credit would count towards my tenure.

SPA – 169

24. It continues to be my honest belief that the Superintendent's proposed budget was a mere disguise to demote me as a probationary administrator and to try to force me into signing a teacher contract with the ultimate goal of terminating my employment at some future date. And as you can see from the reference above my employment was terminated in February 2017 without any notice to me as required by law. It is my belief that this is discriminatory animus and a pretext to discrimination and done for intentional and deliberate reasons.

25. It is my honest belief that the RCSD's now false claim that I have changed my name is in retaliation and is in violation of not only Human Rights Laws, but also state and federal laws. Their actions against me are shocking and shock the conscious.

26. Other changes made to the NYSTRS includes making changes to my teacher retirement account to show that I was working for the Rochester City School District and the Honeoye Lima Central School District, during the same years, e.g., 2001, 2004, etc.

27. I have no way of knowing where the money that are being withheld from my salary is being routed and/or transferred to. I do know that the money being withheld for my NYSTRS Loan has not been paid since February 13, 2017. Had I not received the letter from the NYSTRS alerting me that the District had changed my name, I wouldn't have known that the District had also terminated my employment and was now claiming that I had changed my name and/or that they were not paying my loan even though it was being withheld from my salary.

28. It is my honest belief that the District was trying to ensure that my loan went into default. And had the NYSTRS had not alerted me it would have as I thought that it was being paid since the District was withholding it from my pay.

29. These adverse actions by the RCSD against me are discriminatory and in retaliation

because I complained of its unlawful practices, policies and procedures against me and because I opposed its unlawful discriminatory and retaliatory actions against me based on race, age and/or sex/gender.

30. I have exhausted my administrative remedies.

*/s/Bernice Malcolm*

Bernice Malcolm

Dated: April 24, 2017

SPA-171

## NOTARIZATION OF THE COMPLAINT

Based on the information contained in this form, I charge the above-named Respondent with an unlawful discriminatory practice, in violation of the New York State Human Rights Law.

By filing this complaint, I understand that I am also filing my employment complaint with the United States Equal Employment Opportunity Commission under the Americans With Disabilities Act (covers disability related to employment), Title VII of the Civil Rights Act of 1964, as amended (covers race, color, religion, national origin, sex relating to employment), and/or the Age Discrimination in Employment Act, as amended (covers ages 40 years of age or older in employment), or filing my housing/credit complaint with HUD under Title VIII of the Federal Fair Housing Act, as amended (covers acts of discrimination in housing), as applicable. This complaint will protect your rights under Federal Law.

I hereby authorize the New York State Division of Human Rights to accept this complaint on behalf of the U.S. Equal Employment Opportunity Commission, subject to the statutory limitations contained in the aforementioned law and/or to accept this complaint on behalf of the U.S. Department of Housing and Urban Development for review and additional filing by them, subject to the statutory limitations contained the in aforementioned law.

I have not filed any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

I swear under penalty of perjury that I am the complainant herein; that I have read (or have had read to me) the foregoing complaint and know the contents of this complaint; and that the foregoing is true and correct, based on my current knowledge, information, and belief.

_____
Sign your full legal name

Subscribed and sworn before me
This ___ day of April, 20 17

_____
Signature of Notary Public

IRWIN H. HARRIS
Notary Public, State of New York
Qualified in Monroe County
My Commission expires _____  3-2-1-18

County:
Monroe

Commission expires:
3-2-1-18

**Please note: Once this form is notarized and returned to the Division, it becomes a legal document and an official complaint with the Division of Human rights. After the Division accepts your complaint, this form will be sent to the company or person(s) whom you are accusing of discrimination**

9

SPA-172



Division of
Human Rights

RECEIVED ON

FEB 18 201___

ROCHESTER CITY SCHOOL DISTRICT
DEPARTMENT OF LAW

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

BERNICE MALCOLM,

Complainant,

v.

ROCHESTER CITY SCHOOL DISTRICT,

Respondent.

---

DETERMINATION AND
ORDER AFTER
INVESTIGATION

Case No.
10189668

Federal Charge No. 16GB704037

On 8/24/2017, Bernice Malcolm filed a verified complaint with the New York State
Division of Human Rights ("Division") charging the above-named respondent with an unlawful
discriminatory practice relating to employment because of age, race/color, sex, opposed
discrimination/retaliation in violation of N.Y. Exec. Law, art. 15 (Human Rights Law).

After investigation, and following opportunity for review of related information and
evidence by the named parties, the Division has determined that there is NO PROBABLE
CAUSE to believe that the respondent has engaged in or is engaging in the unlawful
discriminatory practice complained of. This determination is based on the following:

Investigation did not reveal sufficient evidence to support the allegations of unlawful
discrimination that are contained in the complaint. Evidence did not indicate that Complainant
was retaliated against for opposing discrimination. Investigation showed Complainant filed
series of discrimination complaints against Respondent since 2016, and her allegations of
discrimination on the basis of age, sex, race/color and retaliation were addressed in these
complaints. Investigation did not show any act of discrimination on the basis of Complainant's
sex, age, race/color in the present complaint. Although Complainant alleged she was retaliated
against and laid off because she filed discrimination complaints, evidence indicates Respondent
laid off Complainant and some employees who had seniority over Complainant, due to budgetary
reasons. Evidence showed Respondent relied on a bargaining stipulation of the union contract in
making its decision. Evidence further revealed that Respondent recalled Complainant and some
employees laid off, based on the stipulations of the union contract. Investigation did not show
that Respondent's failure to allow Complainant to participate in the interview process of new

SPA-173

hires was in retaliation for filing prior complaint. There is insufficient evidence to support a conclusion that Respondent unlawfully discriminated against Complainant in connection with the jurisdictional issues of the instant case. Therefore, there is no probable cause to support the allegations of the complaint.

The complaint is therefore ordered dismissed and the file is closed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition within sixty (60) days after service of this Determination. A copy of this Notice and Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Your charge was also filed under the Age Discrimination in Employment Act (ADEA). Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC). You have the right to request a review by EEOC of this action. To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112. Otherwise, EEOC will generally adopt our action in your case.

Dated:      FEB 1 4 2018
        Rochester, New York

STATE DIVISION OF HUMAN RIGHTS

By:      *Julia B. Day*
        Julia B. Day
        Regional Director

- 2 -

SPA ÷ 174

# DISMISSAL AND NOTICE OF RIGHTS

| To: | Bernice Malcolm<br>6 Gingerwood Way<br>West Henrietta, NY 14586 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

☐ On behalf of person(s) aggrieved whose identity is
*CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative, | Telephone No. |
|---|---|---|
| 16G-2017-04037 | Holly M. Shabazz,<br>State & Local Program Manager | (212) 336-3643 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry,
District Director

March 20, 2018
*(Date Mailed)*

Enclosures(s)

cc:  Attn: Director of Human Resources
ROCHESTER CITY SCHOOL DISTRICT
Department of Law
131 West Broad Street
Rochester, NY 14614

SPA-175



### Division of Human Rights

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of BERNICE CURRY-MALCOLM, Complainant, v. ROCHESTER CITY SCHOOL DISTRICT, Respondent. | NOTICE AND FINAL ORDER Case No. 10186902 |

Federal Charge No. 16GB701939

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS on the Complaint of BERNICE MALCOLM, Complainant, v. ROCHESTER CITY SCHOOL DISTRICT, Respondent. | Case No. 10187117 |

Federal Charge No. 16GB702093

**PLEASE TAKE NOTICE** that the attached is a true copy of the Recommended Findings of Fact, Opinion and Decision, and Order ("Recommended Order"), issued on June 10, 2019, by Michael T. Groben, an Administrative Law Judge of the New York State Division of Human Rights ("Division"). An opportunity was given to all parties to object to the

SPA-176

Recommended Order, and all Objections received have been reviewed.

**PLEASE BE ADVISED THAT, UPON REVIEW, THE RECOMMENDED ORDER IS HEREBY ADOPTED AND ISSUED BY THE HONORABLE ANGELA FERNANDEZ, COMMISSIONER, AS THE FINAL ORDER OF THE NEW YORK STATE DIVISION OF HUMAN RIGHTS ("ORDER").** In accordance with the Division's Rules of Practice, a copy of this Order has been filed in the offices maintained by the Division at One Fordham Plaza, 4th Floor, Bronx, New York 10458. The Order may be inspected by any member of the public during the regular office hours of the Division.

**PLEASE TAKE FURTHER NOTICE** that any party to this proceeding may appeal this Order to the Supreme Court in the County wherein the unlawful discriminatory practice that is the subject of the Order occurred, or wherein any person required in the Order to cease and desist from an unlawful discriminatory practice, or to take other affirmative action, resides or transacts business, by filing with such Supreme Court of the State a Petition and Notice of Petition, <u>within sixty (60) days after service of this Order</u>. A copy of the Petition and Notice of Petition must also be served on all parties, including the General Counsel, New York State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458. <u>Please do not file the original Notice or Petition with the Division.</u>

**ADOPTED, ISSUED, AND ORDERED.**

DATED:  **OCT 0 3 2019**
Bronx, New York

ANGELA FERNANDEZ
COMMISSIONER

- 2 -

GPA-177

TO:

<u>Complainant</u>
Bernice Curry-Malcolm
6 Gingerwood Way
West Henrietta, NY 14586

<u>Respondent</u>
Rochester City School District
Attn: Samantha J. Crane, Associate Counsel
Department of Law
131 West Broad Street
Rochester, NY 14614

Hon. Letitia James, Attorney General
Attn: Civil Rights Bureau
28 Liberty Street
New York, New York 10005

<u>State Division of Human Rights</u>
Robert Goldstein, Director of Prosecutions
Richard J. Van Coevering, Senior Attorney
Lilliana Estrella-Castillo, Chief Administrative Law Judge
Michael T. Groben, Administrative Law Judge
Michael Swirsky, Litigation and Appeals
Caroline J. Downey, General Counsel
Melissa Franco, Deputy Commissioner for Enforcement
Peter G. Buchenholz, Adjudication Counsel
Matthew Menes, Adjudication Counsel

SPA-178



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS<br>on the Complaint of<br><br>BERNICE CURRY-MALCOLM,<br>Complainant,<br><br>v.<br><br>ROCHESTER CITY SCHOOL DISTRICT,<br>Respondent. | **RECOMMENDED FINDINGS OF FACT, OPINION AND DECISION, AND ORDER**<br><br>Case No. 10186902 |

Federal Charge No. 16GB701939

| | |
|---|---|
| NEW YORK STATE DIVISION OF HUMAN RIGHTS<br>on the Complaint of<br><br>BERNICE MALCOLM,<br>Complainant,<br><br>v.<br><br>ROCHESTER CITY SCHOOL DISTRICT,<br>Respondent. | Case No. 10187117 |

Federal Charge No. 16GB702093

## SUMMARY

Complainant alleges that Respondent unlawfully discriminated against her because of her

race, age and sex when it dismissed an internal complaint of discrimination she had made against

two of Respondent's employees. Complainant also alleges that Respondent discriminated against

GPA-179

her because of her age and race when it promoted a younger, white person instead of her, harassed her, gave her an unfavorable job evaluation, and dismissed her second internal complaint of discrimination without proper investigation. Complainant further alleges that Respondent retaliated against her when she filed Division complaint 10186902, by arranging to lay off a number of employees in Complainant's job title, including Complainant. Complainant has failed to sustain her burden of proof, and the complaints are dismissed.

## PROCEEDINGS IN THE CASE

On March 16, 2017, Complainant filed verified complaint 10186902 with the New York State Division of Human Rights ("Division"), charging Respondent with unlawful discriminatory practices relating to employment in violation of N.Y. Exec. Law, art. 15 ("Human Rights Law").

On March 30, 2017, Complainant filed verified complaint 10187117 with the Division, charging Respondent with unlawful discriminatory practices relating to employment in violation of the Human Rights Law.

After investigation, the Division found that it had jurisdiction over both complaints and that probable cause existed to believe that Respondent had engaged in unlawful discriminatory practices. The Division thereupon referred the cases to public hearing.

After due notice, the cases came on for public hearing before Michael T. Groben, an Administrative Law Judge ("ALJ") of the Division. The public hearing was held on November 14-15, 2018.

Complainant and Respondent appeared for the hearing. The Division was represented by Senior Attorney Richard J. Van Ceevering, Esq. Respondent was represented by Rochester City

School District Department of Law General Counsel·Karl W. Kristoff, Esq. (Alison Moyer, Esq., of counsel).

## FINDINGS OF FACT

1. Complainant was born on May 20, 1958. She is an African American female. (Tr. 32-33; ALJ Exhibits 2, 3, 5, and 6)

2. Respondent is a public school district in Rochester, New York. (ALJ Exhibits 2, 3, 5, and 6)

3. Complainant first worked for Respondent in 1998. Complainant began her relevant employment with Respondent in 2015. (Tr. 12-13)

4. Complainant's title was coordinating administrator of special education ("CASE") within Respondent's special education department (also known as the department of specialized services). (Tr. 13, 162; ALJ Exhibits 2, 3, 5, and 6; Respondent's Exhibit 34)

5. Complainant was a member of a union of Respondent's administrative personnel, known as the Association of Supervisors and Administrators of Rochester (the "union"). (ALJ Exhibits 2, 3)

6. Each CASE is assigned a number of special education students. The duties of a CASE include serving as the local education agency ("LEA") representative on Respondent's various committee on special education ("CSE") meetings for the students to which the CASE is assigned, and conducting said meetings. CASEs supervise special education teachers, psychologists, and therapists working with the students. A CASE is also responsible for ensuring that documentation required for the CSE meetings is timely produced and filed, as required by federal and state law and regulations. Required documentation includes periodic evaluations of

- 3 -


SPA-191

the students and notice to the students' parents of developments in the students' educational

program. (Tr. 15, 276-80, 323, 327; Respondent's Exhibit 34)

7.   Theresa Root ("Root") has worked for Respondents since 1999. After working under

various titles, Root was appointed as a zone director in July 2015. (Tr. 263-68) I observed Root

to be a white female.

8.   Root's duties as zone director include supervising a group of CASEs assigned to her.

Zone directors are responsible for making sure that the CASEs timely completed their work

assignments regarding CSE meetings, student evaluations, and other tasks. (Tr. 276-79, 281,

347-48; Respondent's Exhibit 34, p. 3)

9.   Root is also responsible for conducting performance evaluations of the CASEs under

her supervision. (Tr. 281)

10.   During the 2015/2016 school year, Complainant was one of the CASEs under Root's

supervision. (Tr. 22, 268-73; Respondent's Exhibit 45)

11.   Respondent's programs included "NorthSTAR," a program for mentally or behaviorally

challenged students with disabilities, the "Lynox Academy," a program for students on long-term

suspension, and "Youth & Justice." (Tr. 13-14)

12.   Complainant's assignments during the 2015/2016 school year included NorthSTAR,

Youth & Justice, and the Lynox Academy. (Tr. 109-10, 295; Respondent's Exhibit 45)

13.   Chris Suriano ("Suriano") was executive director of specialized services, and Root's

supervisor at that time. (Tr. 50, 269; Respondents Exhibit 45)

14.   Kari Ann Kittelberger ("Kittelberger") has been employed by Respondent under various

titles since 1997. She has been employed as a CASE for approximately 10 years. (Tr. 318, 320-

21)

- 4 -

Case 21-2683, Document 54, 05/26/2022, 3324938, Page274 of 468

15. Kittelberger is white; at the time of the public hearing she was 49 years old. (Tr. 338)

16. Kittelberger's assignments during the 2015/2016 school year included the home instruction program. (Tr. 295, 329)

17. Kittelberger's supervisor during the 2015/2016 school year was zone director Joseph Cappezzuti ("Cappezzuti"). Cappezzuti is white; at the time of the public hearing he was 53 years old. (Tr. 333, 346-47, 350)

18. Complainant's NorthSTAR assignment and Kittelberger's home instruction program assignment required that the two work together. Initially, their relationship was cordial, and the two often conferred. (Tr. 328-29, 339)

19. When Complainant recommended that one of her NorthSTAR students be transferred to the home instruction program, she would have to complete certain paperwork to permit Kittelberger to accept the student into the program. (Tr. 296, 332)

20. During the 2015/2016 school year, Complainant fell behind with the required documentation, and her relationship with Kittelberger became strained. The two stopped conferring in person and worked by exchanging emails. (Tr. 294-96, 328-33, 339-40, 348-49; Respondent's Exhibit 31)

21. Although Root met regularly with Complainant regarding her difficulties with timely completing required documentation for Kittelberger, Complainant's difficulties with this task continued. Root concluded that Complainant did not fully understand her responsibilities and was thus unable to satisfactorily perform them. (Tr. 296-98; Respondent's Exhibit 31, p. 26 et seq.)

22. During the 2015/2016 school year, Cappezzuti took over as Complainant's supervisor. (Tr. 348, 350)


GPA-183

23. In or about December 2015, Complainant, Kittelberger, Root and Cappezzuti met to try to resolve the problems between Complainant and Kittelberger. The meeting was not successful, and Kittelberger was directed by Cappezzuti to apologize to Complainant and to state that her criticisms of Complainant were "not personal." (Tr. 333-38)

24. Complainant continued to have difficulty producing documents on time. (Tr. 351-52; Respondent's Exhibit 31, pp. 1-2)

### *Complainant's 2015/2016 School Year Evaluation*

25. Respondent requires that its personnel receive performance evaluations each year. (Tr. 193-94; Respondent's Exhibit 15)

26. In September or October 2015, Root met with her CASEs, including Complainant, to establish performance goals for the school year. She then monitored their performance during the year. (Tr. 289-91, 293)

27. In July 2016, the end of the school year, each CASE drew up a self-evaluation of their performance during the year. (Tr. 291)

28. Respondent evaluates employee performance as "ineffective" (the lowest rating), "developing," "effective," and "highly effective" (the highest rating). (Tr. 287-89)

29. In July 2016, Root reviewed Complainant's self-evaluation, and completed her own evaluation of Complainant's performance. Because of Complainant's continued difficulties during the 2015/2016 school year in working cooperatively with her fellow employees and in performing her work tasks on time, Root rated Complainant's performance as "developing." (Tr. 291-93, 299-303; Respondent's Exhibits 25 and 26)

30. Root conducted evaluations of a total of nine CASEs under her supervision in the 2015/2016 school year. Of these, one African-American CASE, age 42, received a rating of

SPA-184

"ineffective," another African-American CASE, age 36, was rated "effective," and Complainant received a rating of "developing." Of the white CASEs, two, ages 41 and 42, were rated as "developing," and four others, ages 49, 42, 48 and 63, were rated "effective." (Tr. 285-88; Respondent's Exhibit 24)

31. Contrary to Complainant's testimony at the public hearing, Root did not change the rating of Bonnie Ellis, a white CASE, from "developing" to "effective." (Tr. 34-35, 310-11)

32. In her dealings with Complainant, Root never made any reference to Complainant's age or race. (Tr. 32-33)

33. Contrary to Complainant's claim at the public hearing, she did not receive any counseling or discipline as a result of the evaluation. In that evaluation, Root recommended that Complainant be retained as an employee and receive additional training. (Tr. 21-22, 24-25, 99, 304-05; Respondent's Exhibit 25)

34. On July 27, 2016, Root met with Complainant to discuss the evaluation. (Tr. 303-04; Respondent's Exhibit 25, p. 9)

35. Complainant disagreed with the evaluation and produced a written rebuttal, which was attached to the evaluation. Complainant told Root that she wanted certain documents removed from the evaluation. (Tr. 305-06; Respondent's Exhibit 25)

36. Harry Kennedy ("Kennedy") is Respondent's chief of Human Capital Initiatives, Respondent's human resources department. Kennedy is African American; at the time of the hearing he was 63 years old. (Tr. 356-57)

37. In September 2016, because Root believed that she was unable to resolve her ongoing problems with Complainant, the two had several meetings with Suriano. (Tr. 305-06, 312-13)

38. Those meetings were not productive, and Complainant and Root then met with Kennedy and interim Executive Director Terry Wood. Once again, Complainant and Root were unable to resolve their differences, and Kennedy advised them of their right to file internal complaints. (Tr. 305-06, 312-13, 392-93)

39. Because Root believed that Complainant had threatened her when Complainant stated at one of the meetings "I will damage you," and because she felt intimidated by Complainant's continuing efforts to get her to change Complainant's 2015/2016 school year evaluation, Root filed an internal discrimination complaint against Complainant on December 22, 2016. (Tr. 306-07, 312-13; Respondent's Exhibit 19)

### *Internal Discrimination Complaint*

40. On December 22, 2016, Complainant filed an internal discrimination complaint against Root, charging her with harassment, retaliation and discrimination based on race, sex, color and age. Complainant also charged that Root had harassed white CASEs who were younger than Complainant. (Tr. 57-62, 64, 66, 100-04; Respondent's Exhibit 16)

41. Respondent maintains policies which, *inter alia*, guarantee equal employment opportunity and prohibit discrimination or harassment of employees on the basis of race, color, age and sex. (Tr. 183-84; Respondent's Exhibits 14 and 44)

42. Respondent's policy for reporting complaints of discrimination or harassment sets forth reporting procedures, and states that at any stage of investigation, Respondent may conclude that unlawful discrimination or harassment did not occur. If the complaint is deemed "founded," Respondent will proceed with an investigation. (Tr. 184-88; Respondent's Exhibit 9)

43. Daniel Betancourt ("Betancourt") is Respondent's supervisor of safety and security, and also the acting director of safety and security. Betancourt's duties as acting director include

- 8 -

SPA - 186

responsibility for supervising Respondent's investigations of discrimination complaints. (Tr. 244-46)

44. Betancourt is of Puerto Rican descent. At the time of the public hearing, he was 56 years old. (Tr. 245)

45. Per Respondent's procedure, Kennedy received Complainant's December 22, 2016, complaint and forwarded it to Respondent's legal counsel for review. (Tr. 205-06, 246, 388-89)

46. Karl Kristoff ("Kristoff") is Respondent's general counsel. Kristoff is white. At the time of the public hearing he was 76 years old. (Tr. 181-82)

47. Steven Carling ("Carling"), Respondent's deputy general counsel, reviewed and analyzed Complainant's December 22, 2016 complaint. By memorandum dated January 13, 2017, Carling concluded that because the complaint did not set forth any comments made by Root about Complainant's race, age, or gender, or overt acts indicating racial animus, and because the complaint alleged that Root displayed exactly the same behavior towards younger, white employees (both male and female) as she did towards Complainant, the complaint should be dismissed without further investigation. (Tr. 195-99, 204-06; Respondent's Exhibits 16 and 17)

48. By letter dated January 17, 2017, Kennedy advised Complainant that the investigation of her December 22, 2016, complaint was closed. (Tr. 70, 199-200, 390; Respondent's Exhibit 18)

49. Carling reached a similar conclusion regarding Root's complaint against Complainant, and by letter dated January 17, 2017, Kennedy advised Root that her complaint was also dismissed. (Tr. 200-03, 206-07, 308, 390-92; Respondent's Exhibit 19, pp. 3-4)

50. For the 2016/2017 school year, Complainant was placed under the supervision of zone director Stephanie Thompson. (Tr. 112-13, 273-75, 283; Respondent's Exhibit 45, p. 2; Respondent's Exhibit 36, p. 2)

51. For the 2016/2017 school year, Root no longer supervised Complainant, and she did not determine any of Complainant's assignments. (Tr. 284-85)

52. Complainant's assignments for the 2016/2017 school year included the "University Preparatory" ("UPREP") and "Renaissance" programs. (Tr. 110-12, 283; Respondent's Exhibit 36, p. 2)

53. During the 2016/2017 school year, the director of Respondent's NorthSTAR program was scheduled to take a leave of absence. (Tr. 324-25)

54. Kittelberger was well-qualified for this position because of her extensive experience with the type of students in the NorthSTAR program. (Tr. 341-43)

55. In or about January 2017, Kittelberger was notified that she had been selected by principal Sandy Jordan and executive director Sandy Simpson ("Simpson") to serve as acting director of NorthSTAR during the director's leave of absence. (Tr. 325)

56. Between March 1 and the end of June 2017, Kittelberger served as acting director of the NorthSTAR program, with a temporary increase in salary. She then returned to her duties as a CASE. (Tr. 129-30, 321, 326, 341)

*Complainant's Second Internal Discrimination Complaint*

57. Neil O'Brien ("O'Brien") was employed by Respondent as an internal investigator from January 2013 through June 2017. O'Brien's duties included investigation of discrimination cases. (Tr. 213)

58. O'Brien is white. At the time of the public hearing he was 58 years old. (Tr. 214)

-10-

59.  Upon receiving and reviewing a complaint, O'Brien's procedure was to interview the complainant to receive additional information and documents, and following the investigation, to produce an investigation report. (Tr. 213-16)

60.  On March 3, 2017, Complainant filed a second internal complaint of discrimination, this time against Root, Kittelberger, and Simpson. This complaint was investigated by O'Brien. (Tr. 75, 216-17, 393; Respondent's Exhibit 20, pp. 44-45)

61.  Upon receiving and reviewing the complaint, O'Brien determined that it focused on alleged discrimination based on age, color, race, and sex due to continuing "hostility" from Root and Kittelberger, and Root's July 2016 evaluation of Complainant. Complainant further charged that Kittelberger had been named director of NorthSTAR in preference to Complainant, because Kittelberger was white and younger than Complainant. Complainant also charged that Respondent retaliated against her when it transferred her from NorthSTAR. (Tr. 218; Respondent's Exhibit 20, p. 1)

62.  Complainant had never applied for the position of NorthSTAR director. (Tr. 129)

63.  At the public hearing, Complainant testified that her second internal complaint dealt with Respondent failing to deduct from her paycheck loan payments due from a loan Complainant had taken out from the New York State Teachers' Retirement System. (Tr. 71-74; Respondent's Exhibit 20, pp. 44-53) The complaint does not include such an allegation.

64.  O'Brien determined that he needed to interview Complainant in order to get further information to support her claims of discrimination. On March 7, 2017, O'Brien emailed Complainant, and they scheduled the meeting at a local public library for 2:00 p.m. on April 5, 2017. (Tr. 218-19; Respondent's Exhibit 20, p. 2)

SPA-189

65. On April 5, 2017, prior to the appointed time, O'Brien entered the public library and sat at a table, visible from the entrance. Although he had met Complainant before, O'Brien also displayed his identification tag so that he could be sure that Complainant would recognize him. (Tr. 219-21)

66. O'Brien waited for Complainant until 2:45 p.m. When she did not appear, he left the library. (Tr. 221)

67. O'Brien then emailed Complainant, who claimed via email response that she had been at the library. (Tr. 221)

68. O'Brien and Complainant then agreed to meet at the library on April 11, 2017. Complainant canceled that appointment. (Tr. 77, 222)

69. On April 27, 2017, O'Brien and Complainant met. Complainant advised O'Brien that she did not want to discuss her complaint because she needed more time to prepare. Complainant then left. (Tr. 221-24)

70. Complainant and O'Brien then arranged to meet at 10:00 a.m. on May 15, 2017, at a local bookstore. (Tr. 224-25)

71. O'Brien went to the bookstore and sat in a location where he could observe the entrance. Complainant never appeared. Approximately an hour later, she emailed O'Brien and claimed that she had been there but that he had not appeared. (Tr. 224-27)

72. On May 24, 2017, O'Brien concluded that Complainant did not want to meet with him, and that because her complaint did not contain sufficient information to support her charges of discrimination, further investigation was not warranted. O'Brien then closed the investigation. (Tr. 227-28; Respondent's Exhibit 20, pp. 12-13)

- 12 -

SPA- 190

73. On May 24, 2017, O'Brien reached the same conclusion regarding Complainant's discrimination charges against Kittelberger and Simpson. (Tr. 229; Respondent's Exhibit 21, pp. 12-13, and Respondent's Exhibit 22, pp. 12-13)

### *Respondent's 2017/2018 Budget*

74. Everton Sewell ("Sewell") has been employed in Respondent's finance department since 2010. His current title is chief financial officer. (Tr. 153-54)

75. Sewell is African American. At the time of the public hearing, he was 53 years old. (Tr. 154-55)

76. Respondent's fiscal year begins on July 1. Respondent promulgates a budget for each upcoming school year, which then must be adopted by Respondent's Board of Education and approved by the Rochester City Council. (Tr. 155-58, 160-61; Respondent's Exhibit 1)

77. Respondent began its budget planning process for the 2017/2018 school year budget in October 2016. (Tr. 158, 172)

78. Respondent's budget process for the 2017/2018 school year included consultation with affected departments, various meetings with the community and with unions (including Complainant's union), and public deliberations by Respondent's Board of Education. (Tr. 158-60)

79. Because Respondent expected a budget shortfall for the 2017/2018 school year, it promulgated a draft budget in which CASEs would be laid off, and each would be eligible for employment as a teacher coordinator of special education ("TCOSE"). Respondent expected to thereby save approximately $1.4 million. (Tr. 161-69, 172-75; Respondent's Exhibit 2, pp. 2-10, 18; Respondent's Exhibit 3, pp. 15, 26; Respondent's Exhibit 4, p. 4; Respondent's Exhibit 5)

80.  Between October 2016 and February 2017, the Board received a presentation from its consultant recommending the layoff of CASEs. (Tr. 172-73; Respondent's Exhibit 2)

81.  The proposed budget dealt with categories of jobs affected by the budget and did not specify or target individual employees. (Tr. 167, 174-75)

82.  The 2017/2018 budget was approved by Respondent's Board of Education in May 2017 and by the city of Rochester in June 2017. (Tr. 170-71, 176-77; Respondent's Exhibits 6 and 7)

83.  Using a list of CASEs ranked by seniority, Kennedy compiled a list of those who were subject to layoff under the 2017/2018 budget and held meetings with those employees and their union in an effort to find new positions for them. (Tr. 368-72, 375; Respondent's Exhibits 37, 38 and 39)

84.  In March 2017, Complainant became aware that CASE positions were to be eliminated in the 2017/2018 school year. (Tr. 141)

85.  The CASEs whose jobs were to be eliminated were either white or African American, and of various ages. A number of the affected CASEs either resigned or applied for and received different positions with Respondent. Faith Hart, an African American, applied for and received a position as assistant principal. (Tr. 372-74; Respondent's Exhibit 37)

86.  Kennedy emailed Complainant to encourage her to apply for a TCOSE or assistant principal position. Complainant did not respond. (Tr. 141-43, 374-75)

87.  Complainant did not file any union grievance against Respondent for its treatment of her throughout her career. (Tr. 94-95, 137-40)

88.  During the time relevant to the Division complaints, Complainant was never issued any discipline or counseling memoranda, nor was she ever placed on administrative leave for disciplinary reasons. (Tr. 143-45)

SPA-192

89. By letters dated June 19, June 27, and July 11, 2017, Kennedy informed Complainant that, as the least senior person in her tenure area, Complainant was laid off from her position effective July 1, 2017, and that she would then be placed on a preferred eligible list, to be recalled in order of seniority. (Tr. 79, 82-83, 362-63; Respondent's Exhibit 28)

90. Complainant did not respond to Kennedy's letters of June 19, June 27, and July 11, 2017, and she did not apply for any position with Respondent. Complainant was laid off from her position effective July 1, 2017. (Tr. 129, 142, 377-78; Respondent's Exhibit 28)

91. By Respondent's Board of Education resolution of November 16, 2017, Complainant, along with other CASEs, was recalled to her position effective November 20, 2017. (Tr. 118, 379; Respondent's Exhibit 27)

92. By Board of Education resolution of March 20, 2018, Complainant's employment, and that of certain other employees, was terminated. (Tr. 118, 379-80; Respondent's Exhibit 27)

93. In testimony at the public hearing, Complainant made frequent references to a conspiracy against her and efforts to harass her, sabotage her career and terminate her employment by Root, Kittelberger, and other unnamed persons in Respondent's employ, because of Complainant's age and race. Complainant produced no evidence of this conspiracy other than her own opinion. (Tr. 16, 31-32, 38, 41-43, 68, 88, 145-46)

94. In testimony at the public hearing, Complainant often avoided answering questions directly (Tr. 25-26, 29-32, 35-36, 37-38, 67-68, 70-71, 80, 84-85, 97-98, 101, 103, 109-11, 121-22, 128, 134-35, 142, 147-48); gave answers which were confusing and indicated a poor memory (Tr. 28-29, 56-58, 65-66, 79, 90, 132, 136-37); was unable to support her claims of discrimination by referencing specific facts or events (Tr. 35-36, 42-43, 65-66, 146); and gave contradictory testimony (Tr. 52-55, 75-76, 78-79, 85, 87). Complainant was not a credible

SPA-193

witness. Where Complainant's testimony differed from that of Respondent's witnesses, I credited the testimony of Respondent's witnesses.

## OPINION AND DECISION

Pursuant to N.Y. Exec. Law art. 15 (the "Human Rights Law") § 296.1 (a) it is an unlawful discriminatory practice "for an employer... because of an individual's age, race...color [or] sex... to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

To make out a prima facie case of unlawful discrimination under the Human Rights Law, a complainant must show (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of unlawful discrimination. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305, 786 N.Y.S.2d 382, 390 (2004).

If a complainant makes out a prima facie case of unlawful discrimination, the burden shifts to the respondent to present a legitimate, non-discriminatory reason for its actions. *Id.* If the respondent does so, the complainant must show that the reasons presented were merely a pretext for unlawful discrimination by demonstrating both that the respondent's stated reasons were false and that the real reason was unlawful discrimination. *Id.* at 305, 786 N.Y.S.2d at 391. The ultimate burden of proof always remains with the complainant. *See Stephenson v. Hotel Employees and Rest. Employees Union Local 100 of the AFL-CIO*, 6 N.Y.3d 265, 271, 811 N.Y.S.2d 633, 636 (2006).

Complainant is an African American female over 60 years old and she is thus a member

SPA- 194

of several protected classes. Complainant was qualified for her position as a CASE based on her performance of that position.

Complainant alleges in her Division complaint 10186902 that Respondent discriminated against her because of her race and age when it dismissed her first internal complaint without investigation. Complainant failed to demonstrate that this dismissal constituted an adverse employment action. An adverse employment action requires a materially adverse change in the terms and conditions of employment. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 307, 786 N.Y.S.2d 382, 392 (2004). Under the circumstances presented herein, the mere dismissal of Complainant's first internal complaint was not an adverse employment action. Complainant also failed to demonstrate that the dismissal occurred under circumstances giving rise to an inference of unlawful discrimination. Complainant has failed to present a prima facie case of discrimination.

Assuming, *arguendo*, that Complainant had presented a prima facie case, Respondent presented credible evidence that the first internal complaint was not dismissed for discriminatory reasons, but because it failed to present facts supporting a claim of discrimination. This complaint is dismissed.

Complainant alleges in her Division complaint 10187117 that Respondent discriminated against her because of her age and race when it promoted Kittelberger, a younger white person, to the position of acting director instead of Complainant, harassed Complainant, and gave her an unfavorable job evaluation.

Because of Complainant's experience in the NorthSTAR program, she appears to have been qualified to hold the acting director position. The position included a temporary increase in pay, and thus Respondent's failure to promote Complainant to the acting director position could

- 17 -


SPA-195

constitute an adverse job action. Although Complainant never applied for the position, it does not appear that such application was necessary. Kittelberger was selected for the position without application. Complainant has established a prima facie case of race and age discrimination.

In response, Respondent provided evidence that Kittelberger was more qualified for the position, a legitimate, non-discriminatory reason for its selection of Kittelberger. Complainant did not rebut Respondent's proof. This claim is dismissed.

Complainant also alleges that Respondent gave her an unfavorable "developing" rating in her performance evaluation because of her age and race, and that it raised the performance rating of a younger white colleague for discriminatory reasons. With regard to the latter, Complainant presented no reliable evidence that this ever occurred, and her supervisor credibly denied the allegation. With respect to Complainant's own performance evaluation, she failed to demonstrate that the "developing" rating constituted an adverse job action. Complainant was not disciplined, counseled, or otherwise adversely impacted by the rating, and her supervisor recommended her for continued employment in said evaluation. These claims are dismissed.

Complainant also alleged that her supervisor and fellow employees created a hostile work environment by displaying hostility towards her and denigrating her work performance, and that her supervisor and a fellow employee continually conspired against her to sabotage her career. Hostile work environment has been recognized as a form of discrimination which is actionable under the Human Rights Law. To establish a prima facie case of hostile work environment, a complainant must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 310, 786 N.Y.S.2d 382 (2004), quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21

(1993). Whether an environment is hostile or abusive can be determined only by looking at all of

the circumstances, including the "frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive utterance; and whether it

unreasonably interferes with an employee's work performance. The effect on the employee's

psychological well-being is, of course, relevant to determining whether the plaintiff actually

found the environment abusive." *Harris*, at 23. Moreover, the conduct must both have altered the

conditions of the victim's employment by being subjectively perceived as abusive by the

employee, and have created an objectively hostile or abusive environment--one that a reasonable

person would find to be so. *See id.* at 21.

However, Complainant failed to present any credible evidence of that Respondent created

a hostile work environment, and this claim is dismissed.

With respect to Complainant's claim that Respondent discriminated against her because

of her age and race when it dismissed her second internal complaint without proper investigation,

Complainant failed to demonstrate that this dismissal constituted an adverse job action.

Complainant has failed to state a prima facie case of race and age discrimination with regard to

the dismissal of her second internal complaint.

Assuming, *arguendo*, that Complainant had presented a prima facie case of race and age

discrimination, Respondent presented credible evidence that the second internal complaint was

dismissed because Complainant refused to cooperate in Respondent's efforts to determine

whether there were facts or documents which would support the complaint. Respondent

presented a legitimate, non-discriminatory reason for its dismissal of the complaint. Complainant

did not rebut Respondent's proof. This claim is dismissed.

Pursuant to Human Rights Law § 296.7, it is an unlawful discriminatory practice for an

6PA - 197

employer to retaliate against an employee because she has opposed any practices forbidden under the Human Rights Law or because she has filed a complaint, testified or assisted in any proceeding under the Human Rights Law.

In order to establish a prima facie case of retaliation, a complainant must show that (1) she engaged in activity protected by the Human Rights Law; (2) respondent was aware that she participated in the protected activity; (3) she suffered an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action. *Pace v. Ogden Servs. Corporation*, 257 A.D.2d 101, 104, 692 N.Y.S. 220, 223-24 (3d Dept. 1999). In a retaliation case, "an adverse employment action is one which 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Mejia v. Roosevelt Island Med. Associates*, 31 Misc.3d 1206(A), 927 N.Y.S.2d 817 (Table) (N.Y. Sup. Ct. 2011) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 63, 68 (2006)), *aff'd*, 95 A.D.3d 570, 944 N.Y.S.2d 521 (1st Dept. 2012), *lv. to appeal dismissed*, 20 N.Y.3d 1045, 961 N.Y.S.2d 374 (2013).

Once a complainant has met this burden, the respondent has the burden of coming forward with legitimate, nondiscriminatory reasons in support of its actions. *Pace* at 104, 692 N.Y.S.2d at 224. If the respondent meets this burden, the complainant must then show that the reasons presented are a pretext for unlawful retaliation. *Id.*

Complainant alleges that she participated in protected activity when she filed her Division complaint 10186902 on March 16, 2017. Respondent would have been aware of said filing shortly thereafter, upon service of the complaint. Complainant suffered an adverse job action a few months later, when she was laid off from her position as a CASE. Complainant's burden in presenting a prima facie case has been described as *de minimis*. *Schwaller v. Squire*

Case 21-2683, Document 54, 05/26/2022, 3324938, Page290 of 468

*Sanders & Dempsey*, 249 A.D.2d 195, 671 N.Y.S.2d 759 (1st Dept. 1998). Complainant has presented a prima facie case of retaliation.

Respondent presented legitimate, non-discriminatory reasons for its termination of Complainant's position. Respondent presented evidence that the layoff of CASE employees was being considered by Respondent's Board of Education well before Complainant filed complaint number 10186902, and that the layoff was done for legitimate budgetary reasons and was not targeted at any particular employee. Respondent attempted to reach out to Complainant in an effort to have her apply for another position, which would allow it to retain Complainant as an employee. Complainant ignored this opportunity and did not respond. Complainant failed to demonstrate that Respondent's reasons for its actions are a pretext for unlawful retaliation. This claim is dismissed.

## ORDER

On the basis of the foregoing Findings of Fact, Opinion and Decision, and pursuant to the provisions of the Human Rights Law and the Division's Rules of Practice, it is hereby

ORDERED, that the complaints be, and hereby are, dismissed.

DATED:   June 10, 2019
            Bronx, New York

Michael T. Groben
Administrative Law Judge

6PA - 199

*The*

*Contractual Agreement*

*Between the*

*The City School District*

*of*

*Rochester, New York*

*and*

*The Association of Supervisors and*

*Administrators of Rochester*

*July 1, 2009- June 30, 2014*

SPA - 200

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| 1 | RECOGNITION | 1 |
| 2 | NEGOTIATIONS PROCEDURES | 1 |
| 3 | DUES DEDUCTION | 3 |
| 4 | ASSOCIATION RIGHTS | 4 |
| 5 | SALARY:  CERTIFICATED SALARY | 5 |
| 6 | SALARY:  CIVIL SERVICE STAFF | 10 |
| 7 | GENERAL ADMINISTRATIVE AND SUPERVISORY POSITIONS | 12 |
| 8 | INSURANCES | 13 |
| 9 | TAX SHELTERED ANNUITIES | 15 |
| 10 | PAID HOLIDAYS | 15 |
| 11 | GENERAL ABSENCE PROVISIONS – CERTIFICATED STAFF | 16 |
| 12 | GENERAL ABSENCE PROVISIONS – CIVIL SERVICE STAFF | 25 |
| 13 | LEAVES OF ABSENCE – CERTIFICATED STAFF | 31 |
| 14 | MISCELLANEOUS FRINGE BENEFITS | 35 |
| 15 | DISCIPLINE AND DISCHARGE - NON TENURED CERTIFICATED STAFF | 37 |
| 16 | DISCIPLINE AND DISCHARGE - TENURED CERTIFICATED STAFF ONLY | 38 |
| 17 | DISCIPLINE AND DISCHARGE – CIVIL SERVICE STAFF ONLY | 39 |
| 18 | ACTING ADMINISTRATIVE ASSIGNMENTS | 40 |
| 19 | ALLOCATION OF BUILDING STAFF | 40 |
| 20 | PROTECTION OF ADMINISTRATORS | 41 |
| 21 | PERSONAL INJURY BENEFITS | 42 |
| 22 | VACANCY AND TRANSFER | 42 |
| 23 | OBSERVATION AND EVALUATION | 44 |
| 24 | GRIEVANCE PROCEDURE | 46 |
| 25 | JOB SECURITY | 49 |
| 26 | MAINTENANCE OF STANDARDS | 49 |
| 27 | MANAGEMENT RIGHTS | 49 |

SPA-201

# TABLE OF CONTENTS

**(continued)**

| Article | Title | Page |
|---|---|---|
| 28 | CONTRACT REPRODUCTION AND DISTRIBUTION | 51 |
| 29 | LEGISLATIVE APPROVAL | 51 |
| '30 | NO STRIKE | 51 |
| 31 | SAVINGS CLAUSE | 51 |
| 32 | JOINT COMMITTEE | 51 |
| 33 | PERFORMANCE APPRAISAL FOR CERTIFICATED ADMINISTRATORS | 53 |
| 34 | PROFESSIONAL ATTIRE | 54 |
| 35 | LIVING CONTRACT COMMITTEE | 55 |
| 36 | DURATION | 55 |
| | APPENDIX A | 57 |
| | APPENDIX B | 59 |
| | APPENDIX C | 60 |
| | INDEX | 62 |

SPA - 202

# ARTICLE 1
## RECOGNITION

The Board agrees to recognize the Association (hereinafter "ASAR") as the exclusive bargaining representative for the negotiating unit described as follows.

The term "administrator", and "administrative personnel" for the purpose of this document shall include all certificated employees in the administrative salary brackets, with the exception of the Superintendent and employees designated by the Board of Education as members of the Superintendent's Employee Group. It also includes Civil Service employees formerly represented by the Middle Level Managers and Supervisor's Association, as defined in Appendix C.

# ARTICLE 2
## NEGOTIATIONS PROCEDURES

1.  Meetings of the negotiating committees may be initiated at the written request of either party. All subject matter to be negotiated should be submitted by the first Friday in March when school is in session. The parties shall arrange for a mutually satisfactory time and place for an initial meeting within a reasonable time thereafter.

2.  Agreements reached by the negotiating committees shall be submitted in writing to the Board of Education and the Association for ratification.

    Upon ratification the agreement shall be signed by the Superintendent of Schools, and the President of ASAR.

3.  If the Superintendent and the ASAR negotiating committee are unable to reach agreement, the parties shall each select a representative and the two representatives shall elect a third person mutually acceptable to them to act as chairman of an ad hoc committee. This committee shall take whatever steps it deems necessary in order to assist the parties to resolve their differences.

4.  The costs of the services of the ad hoc committee, including per diem fees, if any, and actual and necessary travel and subsistence expenses, shall be shared equally by the District and ASAR.

5.  The District agrees to furnish to the negotiating committee in accordance with reasonable requests, all available information concerning financial resources of the District, tentative budgetary requirements and allocations, and such other information as will assist the negotiating committee in developing intelligent, accurate, and constructive programs.

SPA-203

1

6. **If joint meetings of the negotiating committees are scheduled during the work day,** members of the committees shall be released from their regular duties without loss of pay and with substitutes provided when requested.

7. In the event the District is considering a change in policy which would come within the scope of this Agreement, or is considering any change in district wide educational policy which has an impact on the terms and conditions of work, the Superintendent of Schools shall so notify the President of the Association. The Association shall, within ten (10) days, notify the Superintendent if the Association will exercise its right to negotiate these matters. The Superintendent and the Association shall also negotiate on any appropriation of unanticipated additional sources of public revenue, which are not specifically earmarked.

   The Association shall also have the opportunity to present its views to the Superintendent or designee at a mutually convenient time, on other revisions of educational policy which the Association may deem desirable.

8. The District recognizes that ASAR Unit members are organized in "councils" for the purpose of conducting ASAR business and for informational purposes.

   A. At the end of any monthly meeting of a council scheduled by the District, the ASAR Unit members who are members of that council will be permitted to meet in "executive session" for 30 minutes for the purpose of conducting ASAR business.

   B. The right to meet for ASAR business for 30 minutes will not begin past 3:30 p.m. In this case, the council meeting would be suspended for 30 minutes at 3:30 p.m. for ASAR business.

   C. The District recognizes the following groups as councils:

      1. Secondary School Principals

      2. Elementary Principals

      3. Executive Directors

      4. Program Administrators

      5. Directors/Instructional Directors Certificated

      6. Directors Civil Service

      7. Elementary Assistant Principals

      8. Secondary Assistant Principals

      9. RCESL - Rochester Council of Elementary and Secondary Leadership

      10. Coordinators of Special Education

      11. Coordinators of Physical Education, Health and Athletics

      12. Central Office certificated non directors

2

SPA-204

Case 21-2683, Document 54, 05/26/2022, 3324938, Page296 of 468

13. Senior Information Services Business Analysts

14. Data Management Specialist

15. Civil Service unit members formerly represented by Middle Level Managers and Supervisors

D.  Once every month, certificated unit members housed at Central Office and Civil Service unit members are permitted to meet for 30 minutes during work hours to conduct ASAR business.

9.  The contract may not be modified in whole or in part by the parties except by an instrument in writing duly executed by both parties, and no departure from any provision of this Contract by either party or by members of the negotiating committee shall be construed to constitute a continuing waiver of the right to enforce such provision.

10. This Contract shall supersede any rules, regulations, or practices of the Board of Education which shall be contrary or inconsistent therewith.

# ARTICLE 3
# DUES DEDUCTION

1.  The District agrees to deduct from the salaries of the administrators who are members of ASAR the dues levied as said administrator individually and voluntarily authorizes the District to deduct and to transmit the monies promptly to ASAR.

2.  ASAR shall certify to the District the current rate of membership dues to the associations which are named in paragraph 1 above, and shall notify the District of any changes in the rates of membership.

3.  Dues deductions authorized by individual administrators shall be continuous unless revoked in writing. Any administrator desiring to have the District discontinue deductions previously authorized must notify ASAR by September 15 of each year, in writing, and ASAR shall notify the District in writing of said revocation.

4.  Deductions shall commence and be consistent with the procedures developed jointly by the City School District and ASAR.

5.  It is specifically agreed that the City School District and the Board of Education assume no obligations, financial or otherwise, arising out of the provisions of this Section, and ASAR agrees that it will indemnify and hold the District and Board harmless from any and all claims, actions, demands, suits or proceedings, by any employee or any other party arising from deductions made by the District or Board and remittance to ASAR of dues and any other fees under this Section.

SPA - 205

Once the funds are remitted to ASAR, their disposition thereafter shall be the sole and exclusive obligation and responsibility of ASAR.

6. Effective July 1, 1983, the Rochester City School District shall deduct from the wage or salary of employees in the bargaining unit who are not members of the ASAR the amount equivalent to the dues levied by the ASAR and transmit the same so deducted to the ASAR, in accordance with Chapters 677 and 678 of the laws of 1977 of the State of New York.

ASAR affirms that it has adopted such procedure for refund of agency fee deduction as required in Section 3 of Chapters 677 and 678 of the laws of 1977 of the State of New York. This provision for agency shop deduction shall continue in effect so long as the ASAR maintains such procedure.

The agency fee deduction shall be made following the same procedures as applicable as set forth earlier in this Section.

## ARTICLE 4
## ASSOCIATION RIGHTS

1. The City School District's daily courier service shall be extended to ASAR's use.

2. Duly authorized representatives of ASAR, certificated to the District, shall have the right to transact official organization business on school property. Upon arrival, such authorized representatives shall report their presence to the principal or designee. The principal or designee shall then confer with the duly authorized representatives in order to facilitate the purpose of the visit provided such visit shall not interrupt normal school operations and is approved by the principal or designee.

3. When it is necessary for representatives of ASAR to engage in Association activities directly relating to the Association duties which cannot be performed other than during school hours, upon the approval of the Superintendent or designated representative within a reasonable time in advance, they shall be given such time, without loss of pay, as is necessary to perform any such activities. ASAR recognizes and agrees that this privilege should not be abused

4. The President of ASAR shall be released from duties on a full-time basis to conduct Association business. The president of ASAR will, after consulting with the superintendent, designate one additional ASAR member to be released full time to conduct association business. At the end of their assignments, the president of ASAR and the additional ASAR member who were on full time release are entitled to return to his/her prior position. He/she will accrue seniority in his/her tenure area during the time served on full time release.

5. ASAR shall have the right to use bulletin boards or other communication media, and to use building facilities for the purpose of meetings concerned with the exercise of the rights established in this Agreement.

SPA- 206

4

## ARTICLE 5
## SALARY: CERTIFICATED STAFF

1. Effective July 1, 2006, the following salary brackets shall be established for certificated staff:

| | |
|---|---|
| Bracket I | $85,000 to $130,000 |
| Bracket II | $75,000-$95,000 |
| Bracket III | $70,000-$90,000 |
| Bracket IV | $65,000-$85,000 |

2. Effective July 1, 2004, the administrative title of record for each bracket will be as follows:

| | |
|---|---|
| Bracket I | School Principal, Supervising Director, Executive Director and Coordinating Director of an individual area of responsibility and tenure area |
| Bracket II | Individual titles established by the District with specific job descriptions |
| Bracket III | Assistant School Principal |
| Bracket IV | Administrator |

Unit members in Brackets I and II earn tenure and seniority within job title. Unit members in Brackets III and IV earn tenure and seniority within the bracket.

Tenure and seniority that has been accrued by unit members in Bracket II will be subsumed in their placement in an individual title effective July 1, 2004, and there will be no lay-off of unit members who are in Bracket II titles and in Bracket I Supervising Director and Coordinating Director Titles for the life of this agreement. Except for Bracket II members and Bracket I Supervising Directors and Coordinating Directors, if any unit member is assigned to another administrative function within their salary bracket, they shall retain their tenure and seniority. See Appendix A for a definition of each bracket.

3. A joint committee of the District and Association with equal membership will determine the placement of each title in accordance with definitions contained within the contract and will determine the application of the terms and conditions of this contract when a bracket reclassification is made.

4. All certificated staff who do not work a twelve month work year shall move to a twelve month work year effective July 1, 2010 and receive $2,000 added to their base salary prior to the application of the general salary increase. They will earn vacation days according to the contract, including the ability to cash in unlimited number of earned, unused days calculated at the rate of 1/260 of salary.

   A. Effective July 1, 2009 the base salary of all unit members shall be increased 3.5 % except as indicated in 5, below.

GPA-207

5

B. Effective July 1, 2010 the base salary of all unit members shall be increased 3.5 % except as indicated in 5, below.

C. Effective July 1, 2011 the base salary of all unit members shall be increased 3.0% except as indicated in 5, below.

D. Effective July 1, 2012 the base salary of all unit members shall be increased 3.0% except as indicated in 5, below.

E. Effective July 1, 2013 the base salary of all unit members shall be increased 3.0% except as indicated in 5, below.

F. After June 30, 2011, ASAR shall have the right to reopen the contract for the purpose of salary negotiations.

5. Performance-Based Compensation

A. A joint District/ASAR task force will be established to research performance-based compensation plans for unit members and make recommendations to the Superintendent and the ASAR president by July 1, 2007.

B. Beginning school year 2006-07, tenured principals who are working in the role of a school principal have the option to elect performance-based compensation.

C. Option Number 1: Receive the negotiated contractual increase that is provided to all members of ASAR, or

D. Option Number 2: Enroll in the performance-based salary increase plan. Under this plan, the principal and his/her supervisor will agree at the beginning of the school year on three (3) measurable performance objectives to be attained by the principal in the year ahead. At the end of the school year, the principal will be evaluated on progress toward meeting the performance objectives and he/she will be eligible for a salary increase within a percentage range. For the following year, the percentage range will be 2.5% to 7% for the life of this contract.

E. Superintendent may recommend administrators or teams of administrators for a one-time merit payment of up to $15,000.

F. Decisions made under the performance-based salary plan are not subject to grievance.

6. Persons appointed or promoted to an administrative position must be placed within the appropriate salary range as defined in Article 5. The District may place the appointment anywhere within the salary range. Members who are promoted will receive a minimum salary increase of 5% for each bracket they move up in the schedule.

SPA-208

6

7. Summer Work Schedule for Principals

   A. Principals will be notified by April 1 of required work days for the following July and August.

   B. The workdays in July and August are to be used to carry out the duties and responsibilities of the primary job title and assignment of the Principal.

   C. The Principal shall not be assigned to other roles or tasks during the work days in July and August without his or her consent.

   D. The District may call Principals to District-wide in services, workshops, and meetings up to five (5) workdays in July and August.  No more than two (2) work days will be scheduled in the 2 weeks immediately before school opens.

8. Summer School

   The District and ASAR shall form a joint committee to study operational concerns relative to the administration of summer school.  The committee shall have equal representation, and each side will choose its own representatives.  The committee's charge is to determine how the administration of summer schools shall work.  The committee's finding shall be reduced to an agreement which shall become incorporated into the CBA.

9. Coordinating Administrators in Special Education shall receive an annual stipend based on the number of students with IEPs they oversee according to the October BEDS report, as follows:

   | Up to 200 students | $750 |
   | 201 to 300 students | $1,000 |
   | 301 to 400 students | $1,500 |
   | 401+ students | $2,000 |

   The stipend will be paid in the first November paycheck.

10. School Coordinators of Health, Physical Education, and Athletics (Department Heads) shall be assigned to secondary schools upon the recommendation of the Superintendent of Schools. In addition to their regular duties, they shall supervise intramural and interscholastic athletics.  Coordinators of Health, Physical Education and Athletics are not eligible to apply for or hold any coaching positions with the District unless qualified candidates are not available and the coordinator obtains approval from the school principal.  They shall receive an annual stipend based on the number of interscholastic teams in their school as follows:

    | Up to 19 interscholastic teams | $4,000 |
    | 20 to 39 | $5,000 |

7

SPA - 209

40+                    $6,000

The minimum stipend of $4,000 will be distributed throughout the normal paychecks. An adjustment paying additional amounts above $4,000 will be added to the final paycheck based on the number of teams fielded for the school year as verified by the Director of Health/Physical Education and Athletics.

11. <u>Temporary Assignment in Higher Bracket Position.</u> When an administrator is assigned by the Superintendent of Schools to the responsibilities of a higher bracket administrative position for 15 or more school days within the same school year, he shall receive the same pay for all days served as if regularly appointed in that position.

12. <u>Adjust in Salaries.</u> A salary is subject to audit and immediate correction at any time for error and/or adjustment of incorrect payment.

13. <u>Salary Payments.</u> Unit members shall be paid by direct deposit over twenty-six (26) two-week pay periods. Salary adjustments consistent with this Contract shall begin on the first day of the first full pay period of the District's fiscal year.

14. <u>Additional Time Worked</u>

A. Building-based unit members shall for compensation purposes work a normal workday that extends ninety (90) minutes beyond the daily dismissal of students and also extends to and includes supervision of building events and activities such as plays, social/athletic events, open houses and curriculum nights. They are not eligible for additional compensation during the normal workday as described in this paragraph.

B. Building-based unit members shall be paid at the daily rate of their base salary for comparable work of a professional nature beyond the normal work day and on days they are not normally scheduled to work (1/260 for certificated unit members). They will be paid at the rate of $33 per hour for all other work of a professional nature that is assigned beyond the normal work day and on days they are not normally scheduled to work. All unit members who are required to attend professional development beyond their normal workday and on days they are not normally scheduled to work will be paid $40 per hour.

C. Twelve month unit members assigned to Central Office shall work a minimum of 8 hours per day, excluding lunch. Deviation from the length and time may be made when the work of the department so requires it. They are not eligible for additional compensation during the normal workday as described in this paragraph. They shall be paid at the rate of 1/260 of base salary for comparable work of a professional nature on days they are not normally scheduled to work. Twelve month unit members who are required to attend professional development on days they are not normally scheduled to work

SPA—210

will be paid $40 per hour, and for CSE Chairs, this will also apply to hours beyond their normal workday.

15. Attendance Incentive

A. To be eligible, a staff member must have worked 15 consecutive years as a District employee beginning at the effective date of appointment contained in the Board Resolution approving the appointment. If no effective date is contained in the Board Resolution, the date of Board Resolution shall be used. Unit members as of June 30, 2006, may choose either Option I or II. Unit members as of July 1, 2006, or later, will receive Option I.

B. Option I Plan

1. If the Unit member has used no more than 20 total-sick days in the 5 out of 7 years immediately preceding retirement, he or she is eligible for the incentive.

2. The incentive of $15,000 shall be payable in cash, deferral into a tax-sheltered plan or into an account to be administered by the District for the member's use in retirement to enhance standard health and dental benefits, or any combination thereof, until the credit is exhausted.

C. Option II Plan

If the Unit member, when eligible to retire or anytime thereafter has used no more than two (2) sick days each of 12 years out of the last 15 years, he or she is eligible for the incentive.

1. When eligible for the incentive under the Option II Plan, the Unit member shall receive a credit of $10,000 in an account to be administered by the District for the member's use in retirement to enhance standard health and dental benefits until the credit is exhausted.

2. Each year worked beyond the year of retirement eligibility, if the unit member uses no more than two (2) sick days during the year, the amount of the credit is increased by $2,000 for up to five (5) years.

3. The Option II Plan in Article 5, section 15, paragraph C shall sunset at the conclusion of this CBA due to expire June 30, 2014.

D. This paragraph D is applicable to either of the Option I plan or the Option II found in Article 5, paragraph 15 (B) and (C) respectively.

SPA-211

9

1. **If the Unit member becomes deceased, a surviving spouse will have** access to the remaining credit for health and dental benefits until the credit is exhausted.

2. An Appeals Committee, with three members appointed by the Superintendent and two members appointed by the ASAR President shall review and act upon any appeal from a Unit member that the 15 year requirement in Article 17c has been substantially met.

16. Principal's Stipends. Effective July 1, 2001, Principals shall be paid an annual stipend based on the student enrollment of their school. The October BEDS Report shall be used to determine student enrollment for this purpose. The stipends shall be as follows:

| Student Enrollment | Stipend |
|---|---|
| 600-999 | $1,000 |
| 1000-1399 | $2,000 |
| 1400-1599 | $3,000 |
| 1600 + | $4,500 |

The stipend shall be paid beginning with the first paycheck in November. This benefit shall remain in effect for those who were principals on or before December 31, 2009 and shall not apply to those becoming principals on or after January 1, 2010.

### ARTICLE 6
### SALARY: CIVIL SERVICE STAFF

1. Base Salary

A. Effective July 1, 2009 the base salary for bargaining unit employees shall be increased 3.5%.

B. Effective July 1, 2010 the base salary for bargaining unit employees shall be increased 3.5%.

C. Effective July 1, 2011 the base salary for bargaining unit employees shall be increased 3.00%.

D. Effective July 1, 2012 the base salary for bargaining unit employees shall be increased 3.00%.

E. Effective July 1, 2013 the base salary for bargaining unit employees shall be increased 3.00%

10

GPA-212

2. Effective July 1, 2004 all unit members will work on a 12 month basis, 8 hours per day, exclusive of lunch. Deviation from the length and time may be made when the work of the department so requires it.

3. Unit members shall be paid by direct deposit over 26 bi-weekly pay periods. Salary adjustments consistent with this contract shall begin the first day of the fiscal year.

4. Longevity Increments: All full time employees with a regular assignment (i.e. not substitute or temporary employees) shall be eligible for longevity payments as follows:

5. After completing 10 years of service, the member will receive a lump sum payment of $2,000.

   After completing 15 years of service, the member will receive a lump sum payment of $2,500.

   After completing 20 years of service, the member will receive a lump sum payment of $3,000.

   After completing 25 years of service and at 5 year intervals thereafter, the member will receive a lump sum payment of $3,500.

   If the employee is less than full-time, such increment shall be pro-rated.

5. <u>Out-of-Title Work</u>: Out-of-Title Work is defined as work that may periodically develop in any job title because of illness, vacation, or leave of absence and for which a determination is made by the City School District that the vacancy created by the temporary absence must be filled. In such instances an employee covered by this Article may be assigned to fill such a position on a temporary basis provided the employee can meet the qualifications for said position. Employees who are assigned or reassigned to work out-of-title shall receive for the duration for such out-of-title work the rate of pay they would receive if regularly appointed to that title, provided, however that out-of-title pay shall only be extended where such work is for a period of time of more than fifteen (15) working days or eight (8) consecutive working days.

   Out-of-Title assignments shall not be made so as to avoid compensation for out-of-title assignments.

6. The District and ASAR agree to form a committee to review Civil Service titles, study the bracket placement of those Civil Service titles, study the nature of the hours worked by Civil Service members of the bargaining unit and consider the feasibility of the utilization of flex time options and/or overtime to address periods of peak work demands, if appropriate.

7. A ten (10%) percent premium shall be paid to the Supervisor of Plant Security for regularly assigned work beyond the end of the normal work day (i.e., 5:00 p.m.). Such premium shall be prorated to reflect only that period worked beyond the end of the normal work day.

11

SPA-213

# ARTICLE 7
## GENERAL ADMINISTRATIVE AND SUPERVISORY POSITIONS

1. <u>General Provisions.</u>

   A. Before any new position has been established, the bracket placement of said position shall be negotiated with the ASAR negotiating committee.

2. <u>Temporary Assignment</u>

   A. The Superintendent may designate a Unit member to serve temporarily in a Unit position. Such a designation shall not exceed a period of twelve (12) months from its effective date. At the conclusion of service in the designation, the Unit member shall have the absolute right to the position and location in which he or she was serving at the time the designation was made. Such a designation shall not be considered a transfer.

   B. The Superintendent's designation may be involuntary, provided the Superintendent shall not make an involuntary designation without first having consulted with ASAR and the Unit member to be so designated about the member's interests, credentials, and expertise.

   C. A Unit member designated to serve in a temporary assignment shall suffer no decrease in salary, shall continue to accrue credit toward seniority and tenure in the position to which the member is currently assigned, and if the designated position is in a salary bracket higher than that to which the member is currently assigned, the member shall receive out-of-title pay as determined by the Superintendent.

   D. If, during or within six months after the temporary assignment, the Unit member is appointed on a probationary or permanent basis to the position covered by the temporary assignment, the period of time served in the temporary assignment shall be credited towards seniority and tenure in the position.

   E. This provision applies only to Unit members and positions represented by ASAR.

   F. Qualified and certificated non-bargaining-unit members, as well as Unit members, may be appointed by the Superintendent to positions represented by ASAR on an acting basis for up to one year.

GPA-214

# ARTICLE 8
## INSURANCES

1. HEALTH INSURANCE

   A. All regularly Board-appointed administrators assigned full-time or full-schedule for the type of assignment involved shall be entitled to health and hospitalization, major medical and dental benefits presently in effect.

      1. A new administrator must submit to the Benefits Office within thirty (30) days of the first day of employment a Declaration of Intent to Enroll.

      2. After thirty (30) days of employment, an administrator may apply for coverage by submitting to the Benefits Office a Declaration of Intent to Enroll, and by conforming to the rules for admittance to the plan desired.

      3. Effective July 1, 1992, all new hires to the City School District shall contribute fifteen percent (15%) of health insurance premium costs for health and hospitalization, major medical and dental benefits.

      4. Effective January 1, 1997, the District will provide and administer a pre-tax premium plan for all administrators contributing towards the Health Insurance premium.

      5. Effective July 1, 1992, each married employee whose spouse or domestic partner is also employed by the District shall be entitled to benefits under only one family contract.

   B. Our insurance carriers require that:

      1. Addition of spouse or domestic partner must be made within thirty (30) days of the date of marriage through the Benefits Office.

      2. Change in marital status or death of a spouse or domestic partner must be reported to the Benefits Office so that the insurance carriers may be notified and the necessary adjustment in plan may be made.

   C. Full premium amounts will be paid by the City School District to the insurance carrier or carriers involved.

   D. The administrator is entitled to health insurance coverage through the last month of active employment.

   E. When accumulated illness allowance of an insured administrator is exhausted, premiums will be paid by the City School District for such time, not to exceed ten (10) weeks, as may be necessary for the insured administrator to arrange coverage.

   F. 1. The active employee who becomes eligible for Medicare, or whose spouse or domestic partner becomes Medicare-eligible, either due to reaching age

13

SPA-215

65 or due to disability, must notify the Benefits Office sixty (60 days) in advance so that the health insurance may be coordinated under the provision of Federal Law.

2. The retired employee who becomes eligible for Medicare, or whose spouse or domestic partner becomes Medicare-eligible, either due to reaching age 65 or due to disability, must enroll in Medicare and then notify the Benefits Office(60) days in advance so that the health insurance may be converted under the provision of Federal Law.

G. Provided the administrator has been employed with the City School District for at least ten (10) continuous years prior to the date of retirement, the administrator shall be allowed, upon retirement, to transfer to the retired employees' group by requesting the transfer through the Human Capital Initiatives Department. If the unit member contributes a portion of the cost while employed, the contribution level will continue into retirement.

1. For January 1, 2010 through December 31, 2012 the district shall pay the full cost of the traditional indemnity plan for post 65 retirees. If the post 65 retiree selects an alternative plan, the District shall contribute the cost of the traditional indemnity plan towards the alternative plan.

2. For January 1, 2010 through December 31, 2012, pre 65 retirees will be offered the same health plan as active employees.

H. Full health insurance premiums will be paid by the City School District for the months of July and August. However, if an administrator resigns between the closing day of school in June and the opening day of school in September, the full premiums for July and August must be refunded to the City School District.

I. The administrator assumes full premium costs while on leave without pay.

J. The parties agree that ASAR will be a full participant in any health, dental or benefit committee established by the district.

2. DENTAL INSURANCE

A. All regularly appointed administrators assigned full-time or full-schedule for the type of assignment involved will be eligible to enroll within 30 days in the District's Dental Insurance Program.

B. If an employee's spouse or domestic partner is also a District employee, one employee may enroll in a dental plan which covers dependents.

C. Effective July 1, 1992, all new hires to the City School District shall contribute fifteen percent (15%) of health insurance premium costs for health and hospitalization, major medical and dental benefits.

SPA-216

D. Effective January 1, 1997, the District will provide and administer a pre-tax premium plan for all administrators contributing towards the Dental Insurance premium.

3. Any increase in health and dental insurance benefits to other professional employees of the District shall accrue to members of ASAR. A joint committee of all parties will be established with a goal to identify all possible health/dental benefits economies and cost savings practices, effective as soon as is practicable.

4. Cafeteria Plan

A. The District and ASAR shall design and implement a 125 Benefits Plan (Cafeteria Plan) to become effective July 1, 2001, that will provide members with a variety of benefit choices regarding benefits.

B. The dollar amount available to a Unit member to spend will be dependent upon the Unit members hire date with the District and the Unit member's marital/family status consistent with current policies.

C. The District may at any time become self-insured for health and dental benefits provided that benefits to Unit members under the plan are not reduced or eliminated.

## ARTICLE 9
## TAX SHELTERED ANNUITIES

The Board shall provide the opportunity for employees to participate in tax sheltered annuity programs.

## ARTICLE 10
## PAID HOLIDAYS

The following are recognized paid holidays for 12 month certificated members and all civil service members:

| | |
|---|---|
| Independence Day | Day before or after Christmas |
| Labor Day | Christmas Day |
| Columbus Day | New Year's Day |
| Veterans' Day | Martin Luther King Day |
| Thanksgiving Day | Washington's Birthday |
| Day after Thanksgiving | Good Friday |
| | Memorial Day |

SPA-217

15

Pay shall be granted for the above days provided they fall within a period of time when an employee is normally scheduled to work or be paid. Pay for those days will only be granted if the employee works the last scheduled work day before and the first scheduled work day after the holiday or is on approved absence.

An unauthorized absence on the last scheduled work day prior to or the first scheduled work day following any paid holiday will result in loss of pay for the holiday. It is understood that authorized absences shall only include the following:

A. Personal illness (where the employee has submitted a Certificate of Personal illness signed by a licensed physician or Christian Science Practitioner)

B. Paid vacation

C. Paid leaves of absence as enumerated in the Agreement

D. Approved absence whether paid or unpaid as determined by the department head.

## ARTICLE 11
## GENERAL ABSENCE PROVISIONS – CERTIFICATED STAFF

1. Rate of Salary Deduction

   A. No Deduction - Self Explanatory

   B. Regular Deduction - Regular deduction for administrators shall be at the daily rate of 1/260th of annual salary

   C. Full Deduction - Full deduction for administrator shall be at the daily rate of 1/260th of annual salary.

2. Determining Full or Part-time

   A. Full-Time shall be interpreted to mean a full schedule at full annual salary.

   B. Part-Time shall be considered as cases where a partial schedule is involved. Such part-time may be a partial schedule every day or a full schedule on certain days only. Part-time will be prorated for purposes of salary, service credit or benefits.

3. Salary Deductions

   The following absence classifications, conditions and exceptions governing all salary deductions pertain to all full-time administrators assigned on a school year or 12 month basis and to regular substitute administrators assigned for one (1) year, but shall not apply to temporary substitutes and regular substitutes assigned for less than five (5) months or one (1) semester, or assigned on a part-time basis.

4. Class A Absences (Accumulation)

SPA - 218

16

No deductions shall be made for personal illness, including pregnancy related medical disability, or certain injuries under the following specified conditions with the exceptions outlined. Such absences shall be limited to the number of illness available for use as defined in paragraph D3 for unit members hired prior to Sept. 1984 or paragraph E1 for unit members hired on or after Sept. 7, 1984.

5. Regulations Governing Class A Absences at No Deduction

   A. All certificated members of the bargaining unit will receive an annual accrual of illness days equivalent to the number of months worked during the school year.

   B. Annual accruals will be awarded on July 1st.

   C. In the event that a unit member is hired or transfers in to the unit after July 1st, or terminates, retires, transfers or goes on leave prior to June 30th of the following year, the Annual Accrual shall be prorated as follows:  The unit member will be awarded 1 illness day for each full month worked.  For each partial month worked the percentage of the month work will be calculated and rounded to the nearest half month.  Additional time will be awarded as follows:

   | Percentage of month worked | Additional Accrual |
   | --- | --- |
   | Less than 25% | 0 |
   | Between 25% and 74.99% | ½ day |
   | 75% or more | 1 day |

   D. For unit members hired prior to Sept. 7, 1984:

1. Illness accrual days will be accumulated from year to year by adding each new annual accrual to the prior years' accumulated accruals.

2. Accumulated illness accruals may not exceed a total of 220 days.

3. In any one (1) year, the number of illness days available for use shall be the total accumulated illness accruals minus the sum of all illness days used in the previous three years.

4. Should a unit member use all available days (as defined above) in any one (1) year, the accumulated accruals shall be reset to 0 for the following year, and the unit member will restart the accumulation process with the appropriate annual accrual award.

E. For unit members hired on or after September 7, 1984:

1. Illness accrual days will be added to the prior year's unused illness balance.  The amount represents the available days for the year.

2. The sum of the available illness days may not exceed 220 days.

SPA-219

17

3. Unit Members resigning before the close of the school year who have used illness days beyond the appropriate prorated number of illness days (see paragraph 2C) will have their last paycheck adjusted for the overpaid days.

6. Procedures: Personal Illness

A. Request for Sick Pay (RSP) shall be filed for all absences due to illness.

1. State the nature and extent of the illness.

2. Submit to immediate supervisor for signature and forward to the Human Resources Department.

B. Certificate of Personal Illness (CPI) stating the nature and extent of illness signed by a duly registered physician, a licensed chiropractor, or a Christian Science practitioner may be required at the Superintendent's discretion at any time, for any reason, and under any circumstances.

C. Consistent with the procedures of this subsection, unit members may use illness time for family illness absence for care of a spouse, parent or child. The number of illness days used for this purpose may not exceed the current annual accrual in any one year.

7. Class A - Personal Illness at Full Deduction. Full deduction for personal illness days will be taken under the following circumstances:

A. For the full period of absence when a CPI (with doctor's certification) is not filed following an illness of more than three (3) consecutive days and/or in conjunction with other leaves.

B. For surgery for the relief of a chronic disorder, unless medical reasons require that the surgery is performed during the school year.

C. For illness or bodily injury caused outside the school by another individual where damages are successfully collected.

D. For newly assigned or probationary administrators who have not had their pre-employment physical examination and whose report of that examination is not on file in the Department of Human Capital Initiatives.

8. Workers Compensation

The following rules relate to Workers Compensation covering injuries sustained during the course of employment with the City School District. These rules apply to full and part-time administrators.

A. Full salary shall be paid for an absence due to an injury for as many days as the injured employee has accumulated illness allowance. Only the first five (5) days will be deducted from illness allowance. The balance of the time is available to be used for regular illness, but not for the injury.

GPA-220

18

B.     When full salary in lieu of the compensation rate as prescribed by law has been paid for the number of days representing accumulated illness allowance, the injured employee shall then be paid the compensation rate for the balance of the disability until the physician has declared the injured employee ready to resume usual work.

C.     If an employee is still disabled in September, full salary shall be paid in lieu of the compensation rate for the first ten (10) days of the new year after which the compensation rate shall be resumed.

D.     The City School District will pay all medical bills arising from compensation injuries. All compensation matters are handled by the Human Resources Department.

E.     All reports of injuries must be forwarded to the Human Resources Department within thirty (30) days from the date of injury.

9.   Class B Absences

No deduction shall be made for absences not to exceed a total of eight (8) days in any one year, under the conditions specified below, including individual limitations for each incident as outlined. Exceptions to increase individual incident limitation or the total eight days in one year limitation, for situations considered abnormal or unusual, may be made only when approved by the Superintendent of Schools.

For the purposes of determining eligibility for the following provisions, "immediate family" is defined as spouse or domestic partner, parent, child, or grandchild, brother, sister, grandparent, by blood, marriage, or legal adoption, but excluding uncles, aunts, nephews, and nieces who are blood relatives unless they are living in the same house.

A.   Conditions No Deductions

1.     Death in the immediate family not to exceed five (5) consecutive days per incident including either the day of the death or the day of the funeral.

2.     Death of blood relatives living in the same household (uncles, aunts, nieces, nephews, cousins) not to exceed three (3) days as requested.

Death of blood relatives not living in the same household (uncles, aunts, nieces, nephews, cousins) not to exceed one (1) day as requested.

3.     Absence not to exceed two (2) days if necessitated by educational examinations conducted by the State of New York, the Board of Education, or by an institution of collegiate grade, or for the attendance thereafter as a recipient of a degree.

4.     Absence not to exceed two (2) days for each incident due to summons by a Selective Service Board or other military organization having the power of direction necessitating absence due to military obligation or national security. Administrators in reserve military units will be fully paid for the

19

SPA-221

two (2) weeks of active duty. A copy of the military order must accompany the Request for Absence form.

5. Absence of one (1) day, including travel time, for the recipient of an earned degree by an administrator, spouse or domestic partner, or child of an administrator.

6. Absence for two (2) days to the father for the birth, or either parent for the legal adoption of infant children.

B. <u>Class B Regular Deduction</u>

For additional days needed beyond those allowed for death in the family under Class B Absences.

10. <u>Class C Absences</u>

No deductions shall be made for absences due to circumstances and for period of time beyond the individual's control.

A. <u>Conditions No Deductions Personal Leave</u>

1. The absence results from compliance with the requirements of a court if the administrator attends a court under subpoena. In such cases, an administrator is required to submit photostatic copies of court orders, or written proof of specific days spent in court.

2. Absence caused by quarantine established by the Health Department, in all such cases the nature of the quarantine served by the Health Department must be submitted with the application for exemption, and satisfactory proof of the beginning and the close of the quarantine period must be furnished. This exemption does not apply to personal quarantine which shall be considered a personal illness and which will be covered by a Class A Absence.

3. Absence because of jury duty (excluding time off for taking an examination to become a juror) for the actual days reporting and paid for rendering such duty as indicated by the Commissioner of Juror's fee paid slip. The Commissioner of Jurors will arrange an after school qualifying examination. All compensation received for services performed as a juror while on required and/or approved jury duty shall be refunded to the City School District. Said refund need not include authorized transportation and/or parking fees for which funds are or are not provided.

4. Absence for the attendance as a duly elected delegate or alternate to the:

a) Annual convention of the New York State Teachers Retirement System.

20

SPA-222

b) Annual convention of affiliated state and national organizations.

5. Absences resulting from visiting days as approved by the Superintendent of Schools.

6. Absences for conventions or conferences which contribute to the effectiveness of the instructional program as authorized by the Superintendent of Schools.

7. Absences resulting from travel for professional business in the interest of a professional organization of teachers or administrators within and considered a part of the City School District of Rochester, if the absence is authorized in advance by the Superintendent of Schools.

8. Three (3) personal leave days may be taken singly or together in any one year for personal business, religious observances or family illness not covered in other Sections of this Agreement and which require absence during the school hours (Personal leave days increased to three (3) days effective July 1, 1989).

Up to a total of five (5) days (three personal days and two illness days) of leave for religious observance may be taken in any given year from an employee's accumulated illness allowance. Personal days are to be applied before using accumulated illness days.

Application for personal leave shall be made three (3) days before taking such leave (except in case of emergencies). The applicant must state "Personal Leave" as the reason for taking such leave.

Personal leave shall not be granted:

a) the day before or after paid holidays.

b) the day before or after scheduled recesses.

c) the day before or after teacher conference days.

In the event that any administrator's days of personal leave are not used, such days shall be in addition to sick leave awarded in Article 11 and shall be excluded from any illness cap applied to accumulated illness days.

It is understood that any administrator who by willful misrepresentation violates the personal leave policy shall forfeit all accumulations and any other further rights to compensated absences under Article 11 until reinstated in good standing by the Board on the recommendation of the Superintendent.

B. <u>Class C - Regular Deduction</u>

6PA-223

21

1. **Absence due to illness in the immediate family excluding uncles, aunts,** nephews, and nieces who are blood relatives unless they are living in the same house, not otherwise provided herein, is basis for regular deduction and will be so treated for a total of three (3) days within any one (1) year.

2. For absences not to exceed five (5) days (3 personal days and 2 illness days) beyond the five (5) days, taken for religious holidays provided the absences are scheduled for and approved by the Superintendent of Schools prior to the time the absences occur.

C. Class C - Full Deduction

   9. For failure to supply, when requested, photostatic copies of written proof of court orders and specific days spent in court for any excusable reason.

   10. For failure to file proper absence request forms in sufficient time to allow the Superintendent to rule on the request.

11. Class D Absences

   A. Full deduction shall be made for all unexcused absences or absences in excess of allowances specified under Classes A, B, and C. For unexcused absences which occur during all or any part of the day before or after a paid day when school is not in session, the deduction shall include the paid day(s) when school is not in session. When the personal illness allowance specified under Class A has been exhausted, the deduction shall include paid day(s) when school is not in session except when the administrator returns to work the first day school is in session after the holiday and a C.P.I. covering the period prior to the holiday is filed. The administrator must work either the day before or the day after the paid day when school is not in session.

   B. It is understood that excessive and/or repeated unexcused absences may result in disciplinary action.

12. Hardship - Unforeseen Circumstances

   Deviation from any of the regularly specified conditions and exceptions covered by this Section and necessary because of extreme hardship or unforeseen circumstances shall be made only upon the recommendation and approval of the Principal and/or Central Office Department Head and the final approval of the Superintendent.

13. Return to Service

   A. Following a Disability Retirement.

   An administrator may not be reinstated following a disability retirement except upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, and in addition, satisfactorily passing a physical examination by a physician representing the Board of Education.

   B. Following a Long Illness

22

SPA -224

An administrator who has been absent because of illness, and whose illness certificate has not been approved for return by the physician representing the Board of Education may resume employment only after examination and certification by a physician representing the Board of Education and the approval of the Superintendent of Schools.

14. <u>Catastrophic Illness Leave</u>

A. Upon complete exhaustion of the paid illness allowance, personal leave, and vacation provisions of this Agreement, a unit member with a minimum of one (1) year of continuous employment may request from the Superintendent of Schools a catastrophic illness leave. The Superintendent shall convene a joint committee with ASAR representation, chaired by the Chief Human Resources Officer, to review the request. If the joint committee recommends and the Superintendent approves, a unit member may receive up to ninety-five (95) paid illness days.

B. Upon exhaustion of such paid catastrophic illness leave, the unit member may reapply for an additional paid illness leave of up to ninety-five (95) days. The granting of such additional leave is discretionary on the part of the Superintendent and is contingent upon the unit member applying for a disability retirement at the time of their application for an additional ninety-five (95) paid illness days and their resigning from employment with the City School District at the end of such leave. No seniority shall accrue during catastrophic illness leave.

15. <u>Emergency Closings</u>

A. If the Superintendent determines to close all schools because of an emergency, then members of the Unit shall not report to work and shall be paid their regular salaries for the day(s) on which schools are closed. When schools are thus closed, the Superintendent or his/her designee(s) may require specific members of the Unit to report to work at any District location for the whole or part of the day; in such case the reporting members shall each be credited with an additional personal day. Members of the Unit required to report to work but unable to do so by virtue of the emergency shall not be penalized.

B. If the Superintendent determines to close one or more, but not all, schools because of an emergency, the foregoing terms and conditions shall govern only the members of the Unit assigned to the schools affected by the determination.

C. If the Superintendent determines to close one, some, or all schools because of an emergency, he or she shall have the absolute right, after consultation with the President of ASAR, to direct the day(s) on which missed classes shall be made up, provided that such directive shall be consistent with the Education Law and the Regulations of the Commissioner of Education.

23

SPA-225

D. If a countywide "State of Emergency" is declared which prohibits travel and a Unit member has already reported to work, the Unit member will be immediately released provided that no students are under the Unit member's care. If a countywide "State of Emergency" is declared which prohibits travel before a Unit member reports to work, the Unit member will not be required to report to work.

16. <u>Vacation</u>

A. All certificated bargaining unit members who were members of the unit as of June 30, 2010 will receive 30 vacation days effective July 1, 2010. All members hired into the unit on or after July 1, 2010 will receive 25 vacation days for the first five consecutive years of employment. On July 1, following the five year anniversary date the annual vacation accrual award will be increased to 30 days.

B. For Unit members hired or transferred in after July 1 or who terminate, retire, go on unpaid leave or transfer to a non vacation eligible position, the annual vacation accrual will be prorated as follows:

1. For an annual accrual of 25 days, two days will be awarded for each full month worked.

2. For an annual accrual of 30 days, 2.5 days will be awarded for each full month worked.

3. For each partial month worked, the percentage for the month worked shall be calculated as follows:

- If less than 50% one day will be awarded

- If 50% or greater, the full monthly accrual will be awarded.

4. If a member terminates or transfers, and, after applying the above proration calculation:

- Has used vacation days beyond the allowable amount, the value of the vacation days exceeding the prorated amount shall be deducted from the next paycheck.

- Has vacation days remaining, he/she will be paid for the unused vacation days.

C. A unit member may carry over unused vacation days to a maximum of forty (40). Unused vacation days beyond this maximum are lost on June 30th.

D. Request for vacation days must be submitted twenty (20) days in advance and must be approved by the unit member's immediate supervisor which shall not be unreasonably denied. If not approved, the unit member may appeal the supervisor's decision to the superintendent whose decision is final and is not subject to the grievance procedure. If vacation requests are not approved, the supervisor must approve the required number of days at the end of the work year so as to avoid the

24

SPA-226

unit member's loss of vacation days. Building-based administrators may use vacation days with prior supervisory approval except during the last two weeks in June, the last two weeks in August and the first two weeks in September unless extraordinary circumstances are shown.

E. In the year in which a unit member severs employment with the District or takes a ten or eleven month position, the member shall be paid for unused vacation days on a prorated basis.

F. Unit members may cash-in an unlimited number of vacation days annually at the rate of 1/260th of the base salary for the pay period the cash in is made.

G. Unit members shall cash-in accumulated unused vacation days upon separation from the District at the rate of 1/260 of their base salary for the pay period in which the cash in is made.


# ARTICLE 12
## GENERAL ABSENCE PROVISIONS – CIVIL SERVICE STAFF

1. <u>Illness Allowance</u>

   A. All full-time employees covered by this Agreement shall receive and accrue illness allowance at the rate of one (1) day per month. For the purpose of computing accruals, employees who work less than twelve (12) month assignments will accrue illness days only during the months of their employment. Proration will be made in accordance with Article 11, section 2 (C) above.

   B. An employee may use up to ten (10) days per year for family illness absence for care of a spouse or domestic partner, parent or child.

   C. Accumulated illness allowance, including reserve illness allowance previously granted, may be used in any amount consistent with the procedures outlined in Section 2 below.

   D. Unit members who retire after completing 15 consecutive years of service in the district immediately preceding retirement are eligible to receive an attendance incentive if they have used no more than 15 total sick days in the 5 years immediately preceding retirement. The incentive of $10,000 will be paid to the member, deferral into a tax-sheltered plan, or placed into an account to be administered by the District for the member's use in retirement to enhance standard health and dental benefits until the credit is exhausted.

2. <u>Absence Procedures for Illness</u>

   A. For absences of one (1) through three (3) days of illness, a payroll scanner sheet must be submitted stating "illness" as the reason for absence.

25

SPA-227

B. **For absences of more than three (3) consecutive days of illness, a Certificate of** Personal Illness (C.P.I.) must be filed with the employee's supervisor upon their return to work:

1. Stating the nature and extent of the illness

2. Part II of the Certificate of Personal Illness must be completed by a duly registered physician, licensed chiropractor, or Christian Science Practitioner for each payroll period for all days taken regardless of the number.

3. A Certificate of Personal Illness, completed as in Part II above, must be submitted if requested by the Superintendent of Schools or his/her designee:

   a) before or after holidays, and/or paid local recess days
   b) before or after paid scheduled recesses
   c) first and last day school is in session
   d) at any time requested by the Superintendent of Schools or his/her designee

3   <u>Extended Illness or Injury Leave</u>

An employee who is ill for a prolonged period and has used all sick leave allowance included under this Agreement shall be granted a leave of absence due to illness or injury as follows:

A. Extended Leave at One-Half Pay shall be authorized after sick leave accruals, unused vacation days, and personal leave days have been exhausted, with the approval of the Chief Human Resources Officer. Such leave shall be granted only on the basis of a doctor's certificate, clearly stating the nature and expected length of disability. Said doctor's certificate is to be filed with the Chief Human Resources Officer within seven (7) calendar days of the employee exhausting all full pay accruals. The Extended Sick Leave will be retroactive to the date of eligibility.

B. Eligibility: Extended Sick Leave at One-Half Pay shall be granted to employees with a minimum of one (1) year of continuous service. This benefit can only be used once every twelve (12) months no matter how short the duration of One Half Pay is used.

C. Initial Allowances: Based upon years of service to the City School District, employees will have the following allowances of Extended Sick Leave at One Half Pay for each of the service time periods indicated:

   One full year but less than three years – 30 working days;

   Three full years but less than six years – 60 working days;

   Six full years or more – 90 working days.

26

SPA- 228

Service time must be continuous years of service with the City School District of Rochester.

D. Additional Allowance: If an employee utilizes any amount of Extended Sick Leave at One-Half Pay, he/she will begin re-accumulating the allowance according to the schedule in Paragraph "C" as if a new employee. However, an employee will retain any unused Extended One-Half Sick Pay allowance previously accumulated. Retained allowances and additional allowance provided in this Section shall not be cumulative and in no event shall the total allowance exceed the maximum allowance set forth in Paragraph "C" of this section. An employee's eligibility for additional allowance will be calculated from the day the employee resumes working after having last used Extended Sick Leave at One-Half Pay.

E. Employees shall receive the following fringe benefits while on One-Half Pay Sick Leave: Pension, Blue Cross/Blue Shield, Medical and Hospital benefits, Dental benefits, and Life Insurance. There shall be no accrual of vacation, sick or personal leave while on One-Half Pay Sick Leave.

F. An employee who is on an Extended Sick Leave at One-Half Pay shall not be eligible for Catastrophic Illness Leave, as described in Section 4. Employees diagnosed with an illness or injury of a catastrophic nature while on Extended Illness Leave at One-Half Pay, may also apply for Catastrophic Illness Leave retroactive to the date of the diagnosis.

G. Additional leave without pay may be granted upon the recommendation of the Chief Human Resources Officer and approval of the Superintendent of Schools.

4. Catastrophic Illness

A. Upon complete exhaustion of paid illness allowance, personal leave, and vacation provisions of this Agreement, a unit member with a minimum of one (1) year continuous employment may request from the Superintendent of Schools a catastrophic illness leave. The Superintendent shall convene a joint committee chaired by the Chief Human Resources Officer to review the request. If the joint committee recommends and the Superintendent approves, a unit member may receive up to ninety-five (95) paid illness days.

B. Upon exhaustion of such paid catastrophic illness leave, the employee may reapply for an additional paid illness leave of up to ninety-five (95) days. The granting of such additional leave is discretionary on the part of the Superintendent and is contingent upon the unit member applying for a disability retirement at the time of their application for an additional ninety-five (95) paid illness days and their resigning from employment with the City School District at the end of such leave if their disability retirement has been approved. No seniority shall accrue during catastrophic illness leave.

27

SPA-229

## 5. Personal Leave Days

A. All full-time employees covered by this Agreement shall receive three (3) personal leave days per year.

B. Personal leave days may be taken for personal business, religious observances, or family illness not covered in other sections of this Agreement and which require absence during work hours.

C. Application for personal leave shall be made at least three (3) working days in advance of taking such leave (except in the case of emergencies). The applicant shall state "Personal Leave" as the reason for taking such leave.

D. Personal leave shall not be granted under the following conditions:

1. The day before or after a paid holiday or local recess day, except in matters of an emergency nature as shall be approved by the Superintendent of Schools or his/her designee.

2. The first two (2) weeks or the last two (2) weeks school is in session except for religious holidays or in matters of an emergency nature as approved by the Superintendent of Schools or his/her designee.

3. Time taken for personal business not included in or in excess of the amount allowed may not be made up, either prior to or subsequent to the absence, and shall result in salary loss.

4. Personal leave days not taken will be carried over into the next school year as accumulated sick leave. Such accumulations shall be in addition to regularly accumulated sick leave.

## 6. Miscellaneous Paid Absences

No deduction shall be made for absences not to exceed a total of eight (8) days in any one school year, under the conditions specified below including individual limitations for each incident at outlined. Exceptions to increase either the individual incident limitation or the total eight-days-in-one-year limitation, for situations considered abnormal or unusual, may be made only when approved by the Superintendent of Schools or his/her designee.

A. Absences due to death in the immediate family[1], maximum of five (5) consecutive working days per incident including either the day of the death or the day of the funeral.

B. Death of blood relatives (aunts, uncles, nieces, nephews, cousins) not to exceed one (1) day as requested with notice of death. If such blood relative was living in the employee's household, then three (3) days may be used.

---

[1] Immediate family: spouse or domestic partner, parent, sister, brother, child, grandparent or grandchild, by blood, marriage or legal adoption — excluding aunts, uncles, nieces and nephews who are blood relatives unless they were living in the same house.

SPA-230

28

C.   Jury Duty – As required and approved.

    1.   All compensation received for services preformed as a juror while on required and/or approved jury duty shall be refunded to the City School District by check made out to the City School District and forwarded to the Personnel Department.   Said refund need not include authorized transportation and/or parking fees for which funds are or are not provided.

D.   Military – Personnel in reserve military units will be paid as required by law. Copy of the military order must accompany the Request for Absence form.

E.   Quarantine – By Health Bureau action, as needed.

F.   Subpoena – If not interested party, as required and approved.

G.   Moving Day – One (1) day per year.

H.   Absence for two (2) days to the father for birth or parent for legal adoption of children.

I.   Absence not to exceed two (2) days per year if necessitated by educational examinations conducted by New York State, Board of Education, or by an institution of collegiate grade, or for the attendance thereafter as a recipient of a degree or a diploma.

    Absence of one (1) day (including travel time) to attend the presentation of an earned degree or diploma by an employee's spouse or child from a college or other post-secondary school, accredited institution, or high school graduation over one hundred (100) miles away or conflicting with the employee's scheduled work hours.

J.   Miscellaneous Unpaid Absences – Personnel (Regular Deduction)

    1.   Absence due to illness in the immediate family[2] is basis for Regular Deduction and will be so treated for a total of ten (10) days in any one (1) school year.

7.   <u>Other Leaves of Absence</u>

A.   Leaves of absence for purposes of Maternity, Education, or ACTION Leave may be granted to employees covered by this Agreement consistent with the procedure established for the granting of such leaves for other District non-certificated personnel.

B.   The Superintendent of Schools may recommend to the Board of Education for approval, other leaves of absence for employees covered by this Agreement. Such leaves if granted shall be upon such terms and conditions as the Board of Education may approve.

---

[2]  Immediate family:  spouse or domestic partner, parent, sister, brother, child, grandparent or grandchild, by blood, marriage or legal adoption – excluding aunts, uncles, nieces and nephews who are blood relatives unless they were living in the same house.

SPA-231

29

## 8. Vacation Days

A.  Civil Service members shall receive 15 vacation days upon hire into the unit. On July 1, following the third anniversary of date of hire the vacation days shall increase to 20 days. On July 1, following the 7th anniversary date of hire the vacation days shall increase to 25 days. For those members who completed their third anniversary date prior to July 1, 2009, they shall move to 20 vacation days after ratification of this agreement. Any members who are presently receiving 20 or more vacation days shall not be impacted by this language.

B.  The amount of vacation days which can be carried over will be limited to forty (40) days.

C.  Unit employees will have the option of "cashing in" any number of their accumulated vacation days at anytime at their current daily rate of compensation. Cash in rate is 1/260 of current salary.

D.  Those non-certificated employees leaving the employ of the City School District of Rochester after July 1st of any year and having given written two (2) weeks notice to the Human Resources Department shall have their total pay adjusted to include annual vacation allowance computed on the basis of one twenty-sixth (1/26th) of their total annual vacation allowance for each full pay period worked or major portion thereof in addition to all previously accrued and unused vacation days. In the case of death, such payment shall be made to the employee's estate or beneficiary. Paid legal holidays occurring in accrued vacation time after the last day of work shall not be included.

E.  On a one-time only basis, Civil Service employees in the unit as of July 1, 2004, have the opportunity to elect conversion to the vacation benefit for certificated 12-month members as specified in Article 11, Section 16. This written election shall be effective on July 1, 2004.

## 9. Emergency Closings

A.  Unit members may be required to work when the Superintendent declares schools closed due to weather or other emergency conditions. If the unit member is required to report in such cases and does, the unit member will be granted an additional personal leave day for the year in which the closing occurred.

B.  Unit members not required to work during emergency closings will not be granted personal leave for days worked during emergency closings.

C.  If a countywide "State of Emergency" is declared which prohibits travel and a Unit member has already reported to work, the Unit member will be immediately released. (Provided that no students are under the Unit Member's care.) If a countrywide "State of Emergency" is declared which prohibits

SPA -232

travel before a Unit member reports to work, the Unit member will not be required to report to work.

# ARTICLE 13
## LEAVES OF ABSENCE – CERTIFICATED STAFF

1. <u>Return After Leave: Tenure Status</u>

   A tenured administrator returning from a leave shall retain tenured status.

2. <u>Parental Leave</u>

   A. Any administrator on permanent appointment or on probationary status is eligible for parental leave without pay.

   B. Where possible, not less than thirty calendar days prior to the commencement of the requested leave, a request for leave shall be made in writing to the Human Resources Department indicating the dates of the leave. A physician's statement or a statement from an adoption agency must accompany the request for leave.

   C. The administrator must agree to write the Chief Human Resources Officer not later than November 1 in the fall semester or March 1 in the spring semester before the expiration of the leave, concerning plans for the next school term. Unless an extension is requested and granted, the administrator shall either return to service no later than the beginning of the 3rd full semester from the date such leave is granted, or the Board shall terminate services. Return to service shall be at the beginning of a school semester.

   D. In the event an administrator exercises the right to return at the end of the leave, the administrator shall be entitled to receive all benefits accumulated prior to the time of the leave.

   E. Where an employee has used her illness allowance due to a pregnancy related disability, upon termination of that pregnancy related disability, the employee must return to work or must request a parental leave in accordance with the provisions of this Article.

   F. Leaves of absence without pay shall be granted for the purposes of parenting.

   G. If the parental leave of absence is granted before the expiration of a probationary period, the administrator must complete the unexpired portion of the probationary period satisfactorily upon return from leave before tenure appointment is granted.

6PA-233

31

H. All administrators returning from leaves of absence under this section shall be restored to equivalent positions.

3. Exchange Administrator Leave

A. Upon the recommendation of the Superintendent of Schools, leave for exchange administrative positions under either national or international programs may be granted by the Board to administrators who have successfully completed their entire probationary period in the City School District.

B. The Board shall compensate any administrator granted exchange administrator leave on the basis of said administrator's regular salary status. Any period served as an exchange administrator shall be applied to the salary schedule annexed hereto as if such period had been served by the administrator in the City School District.

4. Action Leave

A. Leave of Absence without pay will be granted up to two (2) years to any administrator who joins the Peace Corps or V.I.S.T.A. as a full-time participant in such program.

B. During any period so served, the unit member's salary shall be increased in accordance with all provisions of this contract.

5. Sabbatical Leave for Accredited Study

Regularly appointed administrators who have served for five (5) years in the City School District and who have been granted tenure in his/her current position may, upon the recommendation of the Superintendent of Schools and with the approval of the Board, be granted leave of absence for accredited study upon the following conditions:

A. Applicants must file with the Superintendent of Schools a statement of the definite purpose for which such leave of absence is desired. This statement must include the institution at which the individual is to study and courses to be pursued.

B. Any change in the approved plans must be submitted in writing in advance to the Superintendent of Schools and the Board of Education for approval. Sabbatical leave pay will not be paid for change in plans not so approved.

C. The Unit member's immediate supervisor and Cabinet level supervisor shall be asked to make their recommendations to the selection committee regarding the Unit member's application for a sabbatical leave.

D. The CIAS Panel will review and make recommendations to the Superintendent regarding sabbatical applications for ASAR members.

SPA-234

E.   At the discretion of the CIAS Panel, sabbaticals may also be awarded for reasons other than accredited university study.  Such leave applications must be directly connected/related to one of the following:

1.   The District's five (5) design tasks:

   a,   Dimensions of leadership

   b.   Knowledge of teaching and learning,

   c,   Effective organizational management.

   d.   Public engagement and collaboration with others.

   e.   High performance management professional development reflective practice.

2.   The school's three-year improvement plan.

3.   The District's benchmarks.

F.   Persons granted sabbatical leave of absence are required to report once each semester to the Superintendent of Schools during such absence, indicating the nature of the courses taken at a university and the application of these to the work of the individual. Those on sabbatical leave for travel shall submit a report of their travel,

G.   Applicants must file with the Board a written agreement to remain in the service of the Board for three (3) years after the expiration of such leave. If an administrator resigns from the service of the Board within the three (3) year period, the administrator shall refund to the City School District such proportion of the salary paid during the leave of said period. If, upon return from sabbatical, the services of the administrator are terminated through job abolition at any time during the three (3) year period, and if the administrator is no longer employed by the City School District, the administrator shall not be required to pay any prorated refund. Any refund owed to the City School District shall be repaid in equal monthly installments, as a minimum, so that the total amount owed to the City School District will be paid in full not later than five (5) years following the expiration date of the paid sabbatical leave.

H.   Such leave shall not be granted for less than one (1) full semester nor more than one (1) year. Administrators taking leave shall not be eligible for such leave until five (5) years have expired after return.

I.   An administrator on sabbatical leave will receive 60% of base salary for the length of the leave.

J.   At any time at least one (1%) percent but not more than two (2%) percent of the total number of administrators shall be eligible for sabbatical leave, i.e., those who have served for five (5) years shall be eligible for a leave of absence. In case the number of applications shall exceed one (1%) percent,

33

GPA-235

selection shall be made based primarily on length of service as an administrator or supervisor in accordance with the following principles:

1.  Preference being given to those longest in service.

2.  Distribution by schools, care being taken that the number from any school shall not be comparatively excessive.

3.  Nature of service, provision being made that the benefits of such leave of absence shall be distributed as fairly as possible among all positions covered by this Agreement.

K.  Regular annual salary increases shall be given for the time of leave the same as for regular service in the school.

L.  Applications for such leave of absence for any school year shall be acted on by the Board of Education not later than its first regular meeting in April of the preceding year.

M.  If any applicant notifies the Board on or before March 30 of the inability to take the sabbatical, the Board shall extend the sabbatical to the next eligible administrator on the list.

N.  Deviations from the above may be recommended by the Superintendent.

In each school year, the District shall grant enough sabbatical leaves to total 1% but not more than 2% of the eligible administrators.

6.  Other Approved Leaves

A.  Leave Without Pay

Permanently appointed administrators who are members of the bargaining unit may, upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, be granted leave of absence without pay.

B.  Salary Determination/Full-Time Study

Permanently appointed administrators may, upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, be given their regular salary increase for full-time approved study at an accredited institution of higher learning. For purposes of complying with this Section, it is understood that full-time study shall be defined as a minimum of ten (10) semester hours of approved study each semester.

C.  Deviations from the above may be recommended by the Superintendent.

7.  Return After Leave of Absence

A.  Administrators who have been granted leaves of absence shall notify the Superintendent of Schools in writing on or before the first day of November or March preceding the opening of the semester following the expiration of the

SPA-236

34

leave of their intention to resume work at the beginning of the ensuing school semester.

B.   All administrators returning from leaves of absence shall, upon request, be restored at the same or equivalent positions they held at the time the leave was granted.

# ARTICLE 14
## MISCELLANEOUS FRINGE BENEFITS

1.   Allowance for Transportation

A.   Administrators required to use their own automobile on official business or on an irregular basis shall be reimbursed at the highest minimum rate per mile in effect in the District at the time of such use.   Approved parking expenses incurred in such travel shall also be reimbursed.

B.   Other administrators not covered in "a" above shall receive a monthly transportation allowance based upon a schedule of allowances prepared by the Finance Department and approved by the Superintendent of Schools and shall be included in the regular salary check each pay period.

C.   Outside of District Travel.  Each administrator shall be allotted a base sum of $600 per year effective July 1, 2009, for approved conferences and out of district travel.  Additional allowance for administrators may be provided in the budget with the approval of the appropriate division head.

D.   Travel Funds not disbursed by the Association in a given school year shall be retained by the Association and shall "roll over" into the following year for the same purpose.

E.   Travel funds shall be paid in total to ASAR in July of the school year based on the ASAR membership at that time.  In October, additional monies shall be paid to ASAR for any membership increase since July.  The October payment shall be the final payment for the school year.

F.   In July of each year, ASAR will provide the District's Chief Financial Officer documentation of disbursements from the travel funds for the previous school year in the form and substance required by the Chief Financial Officer after consulting with the Executive Director of ASAR.

G.   The immediate supervisor of each Unit member shall approve or deny the Unit member's Request for Absence.  Travel forms shall be approved and processed by ASAR.   Requests for Absence for travel must be submitted to the

35

SPA-237

immediate supervisor 30 calendar days prior to the absence unless there are extenuating circumstances.

2. <u>Medical Examination</u>. All medical examinations and tests related to application requirements for new administrators shall be paid for by the City School District provided that with the approval of the Board of Education, an administrator may be examined by a doctor of his own choice with the administrator paying the difference between the cost of that examination and the District provided examination.

3. <u>Standard Immunization</u>. Standard immunization, if required by the Board of Education, shall be provided for all administrators.

4. <u>Professional Development Funds.</u>

    A. Effective July 1, 2009, the District shall allocate annually to the Association $200 per member for a professional development fund to be managed and administered by ASAR. The purpose of this fund is to reimburse Unit members for advanced academic studies that are not designed or intended to lead to an advance degree or certificate. Effective upon the ratification of the 2001-2003 Agreement, professional development funds may be used to pay registration fees at conferences, seminars and training classes.

    B. Professional development monies not disbursed by the Association in a given school year shall be retained by the Association and "rolled over" into the following year for the same purpose.

    C. Professional development monies shall be paid in total to ASAR in July of the school year based on the ASAR membership at that time. In October, additional monies shall be paid to ASAR for any membership increase since July. The October payment shall be the final calculation for the school year.

    D. In July, ASAR will provide to the District's chief Financial Officer documentation of disbursements from this fund for the previous year in the form and substance required by the Chief Financial Officer after consulting with ASAR's Executive Director.

    E. Centralized professional development sponsored by ASAR, will be done in collaboration with District leadership development team and/or HCI.

## ARTICLE 15
## DISCIPLINE AND DISCHARGE
## <u>NONTENURED CERTIFICATED STAFF</u>

1. Discipline and Discharge Probationary Administrators

    A. <u>Eligibility</u>

    The provisions of this clause shall apply only to probationary administrators.

    B. <u>Discipline</u>

GPA-238

36

1.  No eligible administrator within the bargaining unit shall be disciplined without good and sufficient cause.

2.  Disciplinary action or measures may include but not be limited to the following:

    a.  Oral reprimand

    b.  Written reprimand

    c.  Suspension (with or without pay)

    d.  Discharge

Any disciplinary action or measure imposed may be subject to the grievance procedure up to and including Level Three, except that in the case of such action against a non-tenured administrator which is based on the results of a regular evaluation, the provisions of this Section shall not apply.

3.  Whenever an administrator is required to give a statement that involves potential disciplinary action he or she shall have present a representative of ASAR to act on his or her behalf.

C.  Discharge

The discharge of a probationary administrator which is based upon the result of a regular evaluation shall be governed by Section 3031 of the Education Law except that nothing in this clause shall be construed to deny said probationary administrator the opportunity to discuss the dismissal with any appropriate supervisory personnel.

## ARTICLE 16
## DISCIPLINE AND DISCHARGE
## TENURED CERTIFICATED STAFF ONLY

1.  Eligibility

The provisions of this Article shall apply only to tenured administrators.

2.  Discipline and Discharge

A.  No eligible administrator within the bargaining unit shall be disciplined without good and sufficient cause.

B.  Disciplinary action or measures may include, but not limited to the following:

    1)  Oral reprimand

    2)  Written reprimand

SPA - 239

37

3) **Suspension (with or without pay)**

4) **Salary withhold and/or performance incentive withhold**

5) **Discharge**

C. Except as specified elsewhere in this Section, any disciplinary action imposed upon any eligible administrator may be processed as a grievance through the regular grievance and arbitration procedure.

D. Whenever an administrator is required to give a statement that involves potential disciplinary action he or she shall have present a representative of the ASAR to act on his or her behalf.

E. No eligible administrator within the bargaining unit shall be suspended without pay or discharged without good and sufficient cause. If the City School District determines that there is good and sufficient cause for discharge, the administrator and the Association shall be notified in writing. Notification shall also include whether or not the administrator has been suspended pending an investigation and recommendation by the Superintendent to the Board of Education. Within seven (7) days of the initial notice, the Superintendent of Schools shall file with the clerk of the Board of Education a written statement of charges. Upon receipt of said charges, the clerk of the Board shall immediately notify the Board. Within five (5) days after receipt of the charges, the Board shall meet in executive session to determine, by a majority vote of the Board of Education, whether probable cause exists to pursue the recommended discharge. If the Board determines that probable cause does exist, a written statement specifying the charges in detail, and outlining the options available under this Agreement and under Section 3020-a of the Education Law shall be immediately forwarded to the administrator by certified mail. Such notice shall include whether the administrator is suspended pending determination of the charges. Within ten (10) days of receipt of the statement of charges, the employee shall notify the City School District whether he/she desires to pursue one of the following procedures:

1. No hearing

2. Panel hearing - 3020-a procedure

3. Arbitration - contractual procedure

F. Failure of the employee to notify the clerk of his desire for a hearing within ten (10) days of the receipt of charges shall be deemed a waiver of rights to a hearing or arbitration.

G. If the employee waives his right to the procedures provided in this Agreement, the Board of Education shall proceed within fifteen (15) days, by a majority

GPA-240

38

vote of all members of the Board to determine the case and fix the penalty or punishment.

H.   It is understood that once the employee chooses one of the above procedures he/she shall be bound by the procedure chosen and shall not be permitted to pursue more than one procedure.

I.   If the administrator chooses to pursue the statutory procedure, all applicable provisions of Section 3020-a shall apply.

J.   If the administrator chooses to pursue the arbitration procedure, all applicable provisions of the arbitration section of this Agreement and the provisions of Article 75 of the Civil Practice Law and Rules shall apply.

# ARTICLE 17
## DISCIPLINE AND DISCHARGE
## CIVIL SERVICE STAFF ONLY

Civil Service unit members who have completed a one year probationary period in their job title are entitled to due process under the contract, including binding arbitration and joint selection of the hearing officer. ASAR and the District will share the costs of the hearing officer. ASAR will provide representation to the unit member. In the event that any unit member elects to be represented by any party other than ASAR, or its affiliate SAANYS, such unit member shall be individually responsible for all expenses which are incurred in connection with the disciplinary proceeding. Mutual discovery shall be permitted to the same extent as it is provided to tenured certificated employees. The District can suspend a member without pay for a maximum of 30 days. Members may be disciplined for acts that occurred up to 3 years earlier.

# ARTICLE 18
## ACTING ADMINISTRATIVE ASSIGNMENTS

1.   Acting positions shall not be for a period of more than one (1) year from the date of appointment. Unit members serving in acting positions shall have absolute right of return to their former positions.

2.   Appointments to acting positions shall be governed by Article 7 herein, unless the vacancy is created by an emergency.

SPA-241

39

# ARTICLE 19
## ALLOCATION OF BUILDING STAFF

1.  By June 1, a joint committee appointed by the Chief of Human Resources and the President of ASAR will meet to review the proposed administrative structure and responsibilities in secondary schools for the next school year.

2.  Appropriate building administrators shall be directly involved in the selection of teachers, paraprofessionals and administrators to be assigned to their building.

3.  During the first week in June, the District will meet with a five (5) member committee of ASAR for assistant principal allocation.

    Tentative Assistant Principal assignments will be recommended during the first week of June. The assignments will be reviewed at the end of the first attendance period in October. Mutually agreed upon revisions in assignments will be made based upon the latest data.

    The City School District has worked toward, and will continue to work toward the full assignment of Elementary School Assistant Principals to single administrator elementary schools. We believe this is the means through which the greatest amount of concentrated instructional support can be provided to schools.

4.  Appendix B sets forth an agreed upon formula to determine assistant principal allocations. The calculations under this formula will be used by the district in constructing the Annual District Budget.

# ARTICLE 20
## PROTECTION OF ADMINISTRATORS

1.  <u>Assault and Battery Cases</u>.

    A.  The Board shall maintain a policy of public support of prosecution of offenders in all cases of assault and/or battery upon administrators who are engaged in the performance of their duty.

    B.  Administrators shall be required to immediately report in writing all cases of assault and/or battery suffered by them in connection with their employment to the Superintendent of Schools or his designee, and the Association. This report will be forwarded immediately to the Superintendent who in turn shall report the information to the Board.

    C.  The Superintendent and representative or Counsel shall inform the administrator immediately upon receipt of the report of assault and/or battery

SPA-242

of his/her rights under the law and shall provide such information in a written document.

2. <u>In Other Than Assault and Battery Cases.</u>

A.  The Board shall provide Counsel and pay court costs and judgments related to any administrative or judicial proceeding or suit involving an administrator who has acted in the discharge of duties within the scope of his employment. The administrator must, however, deliver copies of any legal papers served upon him/her to the office of the Board's Counsel not later than five (5) days after service. Disciplinary proceedings under the education law involving administrators shall be excluded from the provisions of this Section.

B.  Pursuant to Section 3023 of the Education Law... "It shall be the duty of each Board of Education...in any school district having a population of less than one million...to save harmless and protect all teachers, practice and cadet teachers, and members of the supervisory and administrative staff, or employees from financial loss arising out of any claim, demand, suit or judgment by reason of alleged negligence or other acts resulting in accidental bodily injury to any person or accidental damage to the property of any person within or without the school building, provided such teacher, practice or cadet teacher, or member of the supervisory or administrative staff, or employee at the time of the accident was acting in the discharge of his duties within the scope of his employment and/or under the direction of said Board of Education..."

C.  If a complaint against an administrator is not sustained, the administrator shall be reinstated with full reimbursement of all compensation lost.

D.  When an administrator acting in the discharge of duties within the scope of employment is involved in an administrative or judicial proceeding that requires meeting during the school day, the administrator shall be released with full pay and the time shall not be charged against sick leave or personal leave time.

E.  The Board shall provide counsel and pay court costs and judgments related to any administrative or judicial proceeding or suit involving a unit member who has acted in the discharge of duties within the scope of his employment. In instances when the interest of the District and the unit member may conflict the District shall so notify the unit member and shall reimburse the unit member for his representation and any damages and court costs in an administrative or judicial proceeding or suit involving the administrator who has acted in the discharge of duties within the scope of his/her employment.

SPA-243

41

# ARTICLE 21
## PERSONAL INJURY BENEFITS

1.  Coverage. All administrators are covered by Workers Compensation insurance which protects them in case of accidents while on duty. In the event of such an accident, the administrator shall immediately notify the Superintendent of Schools or his designee that the proper forms can be executed by the school authorities and attending physician.

2.  Procedure. Should an assault on a unit member occur, and if it results in loss of time, the unit member shall be paid in full for a period of six (6) months; this period may be renewed for successive six (6) month periods upon certification of the continuance of the disability by a District physician. Such paid absence shall not be deducted from any sick leave to which such administrator is entitled under this Agreement.

3.  Reimbursement. The City School District shall reimburse administrators for the replacement cost of any clothing, dentures, eyeglasses, hearing aids, or other similar items which are damaged or destroyed while they were acting in the discharge of their duties, within the scope of their employment, provided that such replacement cost does not result in double reimbursement.

# ARTICLE 22
## VACANCY AND TRANSFER

1.  For the purposes of this section, a bona fide vacancy is defined as occurring once a bargaining unit position becomes open to be filled with a probationary appointment.

2.  When a vacancy exists, the District shall inform the President of ASAR in writing and post the vacancy in the district's weekly electronic bulletin.

3.  All vacancies for bargaining unit positions including assignments to summer school positions shall be posted for five (5) business days unless the position will be filled with an acting assignment. The intent to fill the position on an acting basis shall be communicated to the President of ASAR by the Superintendent or his/her designee in advance of making the acting assignment.

4.  Applications for unit positions shall be screened by the Department of Human Resources to establish if the applicant meets minimum qualifications contained in the posting. Applications of qualified candidates will then be sent to the appropriate supervisor for additional screening and interviewing.

5.  To be considered for a lateral transfer to a posted vacancy, a Unit member must indicate his or her interest, in writing, to the Chief Human Resources Officer by 4:00 p.m. of the fifth business day of the week that the vacancy was posted.

SPA-244

6. During the period between July 1 and the first day of the April recess, any Unit member may submit a promotional application for a specific position at any location, an identified number of locations, or a specific location.

7. The District will announce annually that it is accepting promotional applications for titles when openings occur through the year.

8. Paragraphs 6 and 7 do not restrict the District from advertising for a particular position or title at any time. All Unit members are eligible to apply as a result of such advertising.

9. When a principal has given written notice to terminate employment with the District, or the District has created a new principalship, or the District has taken action to create an opening in a principalship, all principals in that level (elementary or secondary) shall be informed of the opening and be given an opportunity to request a transfer. The principals will be given five working days from the time the notice is mailed to respond in writing to the Superintendent. The transfer request is confidential and shall not be discussed beyond the Superintendent and his or her direct reports, unless the Superintendent decides to approve the transfer request.

10. Section 9 is not activated if the leaving principal requests that his or her departure be kept confidential for a reasonable period of time. If that request is made and honored by the District, Section 9 is activated after the period of confidentiality.

11. Administrators shall be notified at least thirty (30) days in advance of any change in assignment, unless an emergency situation exists.

12. The superintendent of the District may pre-select up to three individuals per year for permanent positions, without having to post those positions. Any pre-selections without posting beyond the three must be mutually agreed upon by the District and ASAR.

## ARTICLE 23
## OBSERVATION AND EVALUATION

Tenured and Non Tenured Certificated Staff

1. A Unit member shall be evaluated annually by his or her immediate supervisor.

2. The evaluation process and form shall contain a level of performance described as "Exceeds District Standards."

3. Effective July 1, 2000, every two years, a Unit member having tenure shall receive a $1,500 incentive if in that year the Unit member is evaluated by his or her immediate supervisor as "Exceeds District Standards." Effective in the 2006-07 school year, tenured principals are no longer eligible for this incentive.

SPA 245

4. The appropriate Cabinet member may appeal this evaluation to the CIAS Panel, which will review and may reverse the evaluation by a majority of the full panel.

5. All observations and evaluations of non-tenured administrators will be conducted in accordance with the present form or a new form developed and approved by the CIAS Panel. CIAS timeframes are guidelines only.

6. All observation of work performance of non-tenured administrators shall be conducted openly, with full knowledge of the administrator.

7. A non-tenured administrator shall be given a copy of his/her final evaluation prepared by the supervisor upon request.

8. No reports shall be submitted to central administration or the CIAS Panel, placed in any administrator's file or otherwise acted upon without prior review with the administrator. An administrator will be entitled to have a representative of ASAR present at the conference.

9. All observation and evaluation forms for non-tenured administrators shall require the signature of the evaluator or observer and the administrator. These standard forms shall contain the statement "I have read and (do/do not) agree with the above," followed by space for the administrator's signature.

10. The administrator shall also have the right to submit a written reply to such material and attach it to the file copy.

11. No material derogatory to an administrator's conduct, service, character, or personality shall be placed in a personnel file unless the administrator has received such material indicating he has had the opportunity to review it. This clause shall not apply to:

   A. Reference information supplied by former employers.

   B. Reference information supplied by colleges and universities.

   C. Reference information as required by the local promotional procedures.

   The administrator shall also have the right to submit a written reply to such material and have it attached to the file copy.

12. No observation or evaluation forms of any kind shall become part of an administrator's personnel file unless it has met the above conditions.

13. A. An administrator shall have the right upon request and by appointment to review the contents of that administrator's personnel and CIAS file except information supplied by reference sources. An administrator will be entitled to have a representative of ASAR present during such review.

   B. No agency or group or ASAR representative shall have access to an administrator's personnel or CIAS file without prior consent of the administrator.

GPA-246

44

C. The District shall maintain a list which shall become part of the personnel file of all personnel who review the administrator's personnel or CIAS file, which list shall contain the name of the individual and the date reviewed. An individual not known to the custodian of the file shall be required to identify themselves prior to gaining access to the file. No access except as provided herein to an administrator's personnel or CIAS file shall be permitted.

14. A non-tenured administrator may request an observation or evaluation be made by an appropriate Central Office staff member at any time during the school year.

## Civil Service Staff

1. Civil Service members will receive an annual evaluation according to the process and using the instrument developed by the District and the Association.

2. Any member rated as "exceeds expectation" overall will receive an off-base bonus of $1,000 payable during July or August of the following school year.

3. Any member rated as "unsatisfactory" overall will be subject to a salary increase withhold (the amount of which may be recoverable as a bonus with the approval of the Superintendent (or his/her designee) in the subsequent year, depending on performance.

4. Any member who has any portion of salary increase withheld by the Superintendent (or his/her designee) may contest this action through the grievance procedure.

5. The District will provide substantive training for evaluators as needed.

## ARTICLE 24
## GRIEVANCE PROCEDURE

1. Grievance.

   A grievance is a claim by one or more bargaining unit members, based on the occurrence of an actual event involving the member(s), that one or more specific provisions of this collective bargaining agreement, mutually recognized past practice, or policy adopted by the Board of Education have been violated by the District.

2. Level 1.

   A. A bargaining unit member shall submit his or her grievance to his or her principal or if the member does not work in a school or is a principal to his or

45

SPA-247

her immediate supervisor. The grievance shall be submitted on a standard form and contain substantially all the information required by the form. The grievance shall be submitted so as to be received by the principal or immediate supervisor within ten (10) work days of the date on which the member knew or should have known of the grievance. The member shall provide ASAR with a copy of the grievance.

B.    The grievance shall be addressed by the principal or immediate supervisor within ten (10) work days of its receipt. Addressing the grievance may include one or more conversations between the member and the principal or immediate supervisor, and on such occasions the member shall be entitled to have an ASAR representative present and participate in the conversation(s).

C.    If the grievance is not resolved to the satisfaction of the member by the conclusion of the tenth work day, the principal or immediate supervisor shall reduce his or her decision to writing and provide it to the member within five (5) further work days.

3.  Level 2.

A.    If the grievance has not been resolved to the satisfaction of the member and ASAR at Level 1, the member and ASAR may submit the grievance to the Superintendent or his/her designee. The contents of the submission shall be a copy of the grievance submitted at Level 1, the written decision of the principal or immediate supervisor at that level, and a concise statement by ASAR of its position on the grievance. The grievance shall be submitted so as to be received by the Superintendent or his/her designee within five (5) work days of the date of the decision of the principal or immediate supervisor at Level 1.

B.    The grievance shall be addressed by the Superintendent or his/her designee within fifteen (15) work days of its receipt. Addressing the grievance shall include reviewing the decision of the principal or immediate supervisor at Level 1, and may including providing ASAR an opportunity to meet and discuss the grievance.

4.  Arbitration.

If the grievance has not been resolved to the satisfaction of ASAR at Level 2 ASAR may submit the grievance to arbitration by filing a Demand for Arbitration with the Public Employment Relations Board (PERB) on the form and in the manner prescribed by PERB. If such a Demand is to be filed, it shall be filed by ASAR within fifteen (15) work days of ASAR's receipt of the decision of the Superintendent or his or her designee at Level 2. The Chief Human Resources Officer shall be provided a copy of the Demand when it is filed. Thereafter, arbitration shall proceed in accordance with the rules of PERB and the Article 75 of the Civil Practice Law and Rules. The arbitrator shall have no authority or power to

46

SPA-248

make any decision which requires the commission of an act prohibited by law, or which adds to, deletes from, or in any way changes, alters or modifies the terms of this Agreement. The decision of the arbitrator shall be final and binding upon all parties. The cost of the services of the arbitrator shall be borne equally by the District and ASAR.

5. Employer Arbitration.

If the Superintendent or his or her designee believes that ASAR has violated one or more specific provisions of this collective bargaining agreement, he or she may file with PERB a Demand for Arbitration on the form and in the manner prescribed by PERB. If such a Demand is to be filed, it shall be filed by the Superintendent or his or her designee within thirty (30) work days of the date on which the Superintendent or his or her designee knew or should have known of the alleged violation. The President of ASAR shall be provided a copy of the Demand when it is filed. Thereafter, arbitration shall proceed in accordance with the rules of PERB and Article 75 of the Civil Practice Law and Rules.

6. Miscellaneous.

A. The member filing the grievance shall have the right and responsibility to appear at each meeting involving the grievance, unless the member, ASAR, and the District waive his or her appearance.

B. All meetings at Level 1 or 2 involving a grievance and the member filing the grievance shall be held during unassigned time during the school day or after school hours.

C. During the pendency of a grievance, all proceedings and records shall be confidential until a decision is made that becomes final. The final written decision on a grievance shall be public record.

D. All records dealing with a grievance shall be filed separately from the personnel file of the member filing the grievance.

E. A standard form for the submission of the grievances shall be prepared and distributed by the Superintendent or his or her designee. The design and content of the form shall be approved by the President of ASAR.

F. During the pendency of a grievance, ASAR shall take all steps necessary and appropriate to assure that all Unit members faithfully and fully discharge their job responsibilities.

G. There shall be no reprisals of any kids by non-bargaining unit supervisory or administrative personnel against any ASAR member or representative by reason of their participation in this grievance procedure.

H. One grievance may be submitted on behalf of a group of members, provided the grievance alleges a common violation or set of violations, and the members

47

GPA-249

the highest minimum standards in effect in the system at the time this Contract is signed, provided that such conditions shall be improved for the benefit of the administrators as required by the express condition of this Contract.

## ARTICLE 27
## MANAGEMENT RIGHTS

It is understood and agreed that the Board of Education possesses the sole right to operate the City School District, and that all management rights must be exercised consistent with the provisions of this Agreement.

Nothing contained in this Agreement shall be construed to waive or limit the power of the Board of Education to abolish, create or modify administrative/supervisory positions. It is further understood that the Board of Education has the management right to transfer members of the bargaining unit within their tenure area, to establish policies and procedures concerning promotion into and within the unit, and to establish the criteria for such promotion including the establishment and maintenance of residency within the District as a condition for such promotion and continued employment in that position.

## ARTICLE 28
## CONTRACT REPRODUCTION AND DISTRIBUTION

Copies of this Agreement shall be reproduced and distributed at Board expense and made available to all unit members now employed or hereafter employed by the Board within a reasonable period of time after its ratification or the beginning of such employment if that occurs later. The format of the Contract copy shall be jointly developed by ASAR and the Board.

## ARTICLE 29
## LEGISLATIVE APPROVAL

It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefore, shall not become effective until the appropriate legislative body has given approval.

## ARTICLE 30
## NO STRIKE

The Association in consideration of the terms and conditions of this Agreement, will not engage in, instigate, or condone any strike, work stoppage, or any concerted refusal to perform normal work duties on the part of any member of the bargaining unit covered by

SPA-250

of the group do not have a common supervisor. In such a case, the grievance shall be submitted by the President of ASAR initially at Level 2 utilizing the standard form for grievances.

I.   Failure by the member or ASAR to submit to the next Level within the specified time limits shall terminate the grievance. Failure by the District to decide a grievance and communicate the decision to the member and ASAR within the specified time limits shall permit ASAR to submit the grievance to the next level within the specified time limits from the date of the District's failure. The President of ASAR shall determine who shall represent ASAR and the group in the processing of the grievance.

J.   Nothing in these grievance procedures shall be deemed to prevent the parties from agreement to a mutually acceptable arbitrator without going through the process prescribed by PERB or Article 75 of the CPLR

7.   <u>Grievance Hearings for Another Bargaining Unit.</u>

On occasion ASAR members are required to attend RTA Level 2 Grievances Hearings. RTA Level Grievance Hearings will initially be scheduled at the RTA offices. If an ASAR unit member whose attendance at this hearing is required wishes to object to the location, he or she will make the objection to the District's Hearing Officer. The hearing will then be scheduled for a designated room at a neutral site.



When a certificated m⋯ ⋯⋯ and Supervisory bargaining unit is laid off due to budget con⋯ ⋯⋯ reductions and there is a vacancy in a teaching position for wh⋯ ⋯⋯istrator has certification and where there is no preferred eligible list for tha⋯ ⋯ that administrator shall be offered that position. In the event of job abolition or l⋯ ⋯⋯ of a Civil Service member of the unit, he/she shall be given ninety (90) calendar days written notice. Such job abolition or layoff will be conducted according to statutory procedures and the employee will have reinstatement rights consistent with Civil Service rules and regulations.

### ARTICLE 26
### MAINTENANCE OF STANDARDS

All conditions of employment, including extra compensation for outside regular hours, relief periods, leaves, and general working conditions shall be maintained at not less than

6PA-251

this Agreement, and will undertake to discourage any such acts by any such bargaining unit member.

## ARTICLE 31
## SAVINGS CLAUSE

This Agreement and all provisions herein are subject to all applicable laws. In the event any provision of this Agreement is held to violate such laws, said provision shall not bind either of the parties, but the remainder of the Agreement shall remain in full force and effect as if the invalid provision had not been a part of this Agreement.

## ARTICLE 32
## GROUP ACCOUNTABILITY

Our system of accountability is shared accountability where expectations and standards are clearly defined; assessments are credible, measure true progress and provide information to improve practice; triggers of support, assistance and intervention are defined; and incentives to improve practice exist for individual educators (teachers, administrators, support staff), groups of educators (schools, schools-within-schools, primary unit, intermediate unit, houses, etc.) and others (parents, community, human service agencies, governmental institutions and businesses).

Further, the Rochester City School District and ASAR recognize that schools or groups of educators within schools (schools-within-schools, primary unit, or intermediate unit) are the essential unit of accountability and that student achievement is the essential indicator of progress.
ASAR and RCSD therefore commit to establishing a group or school accountability plan that is based upon four key principles:

A. Student outcomes are the primary indicator of progress. Student growth and meeting learning standards will serve as the fundamental measure of school or school unit accountability.

B. Annual assessment of progress, including public reporting by each school or school unit, will occur.

C. Evidence of how school results have informed and led to changes in the school's improvement plan must be reported annually.

D. Incentives, including a Leadership Development/School Support Fund will be tied to school or school unit progress.

SPA - 252

50

1. STUDENT OUTCOMES AND ANNUAL ASSESSMENT OF PROGRESS

The annual progress reporting on all aspects of school performance would include but not be limited to, the following achievement measures and measures of school quality:

A. Measures in language arts and math (primary and intermediate levels) to be combined, including developmental stages in listening and speaking, writing and reading, and math.

B. Percent of students expected to perform at the next grade level without additional support.

C. Progress/growth of cohort groups over 2-3 year period: primary K-2/3; intermediate, 3-5/4-6; middle, 6-8; and high school, 9-12.

D. Feedback from receiving school.

E. Percent of students who take and, where applicable, pass District, Regents, and national exams, including but not limited to, SAT/ACT and other authentic measures of student performance, e.g., New York State proposed Unitary Regents Examination.

F. Portfolios with evidence of strong accomplishments in writing.

In addition to student achievement measures, ASAR and RCSD recognize the importance of indicators of school quality that must be included in an assessment of progress. Such school quality indicators will include but not be limited to:

A. Parent Involvement, including evidence of parent direct impact on the educational process and evidence of staff connection/outreach to the parent/home.

B. Customer Satisfaction, including evidence of satisfaction with the quality of the educational experience, school environment and school/staff levels of responsiveness.

ASAR and the RCSD also recognize the importance of delivery standards which ensure the opportunity to learn by describing the support appropriate to achieve established District content and performance standards.

2. LINKING RESULTS TO THE SCHOOL IMPROVEMENT PLAN

The annual public reporting by each school or school unit will describe how the school's results have informed the school and led to changes in the school improvement plan.

3. INCENTIVES LINKED TO SCHOOL OR SCHOOL UNIT PROGRESS

SPA-253

A proportionate (per administrator) amount of the funds (total amount not to exceed $85,000) will be made available to the building principal, program principal, teaching principal, or other structure resulting from Article 31. The fund would support efforts that promote effective leadership towards "Principles for Achieving Schools."

A. Schools that have high and rigorous standards for what all students should know and be able to do.

B. Schools that promote active, meaningful and real to life learning that focuses on critical and creative thinking and empower students to take greater responsibility for their learning.

C. Schools that have student learning assessments that are diversified and performance based and school assessments that focus on credible, diversified and fair (equitable) indicators of opportunities for all students.

D. Schools that have knowledge-based teaching that is responsible and responsive to student's needs, ensuring high standards for all students.

E. Schools that are small in size to permit supportive environments, where students are known.

F. Students that have shared decision-making and shared accountability for student success as well as democratic governance.

G. Schools that provide safe and democratic environments for learning.

H. Schools that provide incentives to promote student success and to create opportunities for all students, as well as logical sequences and disincentives for failing to do so.

I. Schools that work closely with students' families and seek to coordinate non-school services for students who need them.

Allocation of the fund to each school will be made by the Superintendent of Schools or his/her designee.

After the initial year of implementation, school administrators will account for the results/benefits from the use of such resources.

Logical consequences must exist for schools or schools-within-schools that are unable to demonstrate progress toward agreed upon standards. The quality review and assessment of progress will identify barriers that must be addressed. A plan of corrective action may include a combination of the following:

A. Necessary support and assistance

B. Changes in procedures, staff and/or school operations

C. Prescribed training

D. Replacement or reconstituting of the school program or portion thereof

52

SPA- 254

E.   School closing

4.   GOVERNANCE

Governance shall be provided by an Executive Committee of the School-Based Planning Committee, comprised of the Superintendent or designee, bargaining unit Presidents or designees, parent representative, and student/representative.

## ARTICLE 33
## PERFORMANCE APPRAISAL FOR CERTIFICATED ADMINISTRATORS

The District and ASAR recognize that administrative leadership is crucial to the success of schools. Therefore, the District and ASAR agree that the performance appraisal of administrators shall be tied directly to critical success factors, utilizing multiple indicators. These indicators shall include the supervision and evaluation of subordinates and the District's five design tasks:

A.   Dimensions of Leadership

B.   Knowledge of teaching and learning effective Organizational Management

C.   Effective Organizational Management

D.   Public Engagement and Collaboration with Others

E.   High Performance Management/Professional Development/Reflective Practice

The District expectations for tenured administrators will be linked to evidence of individual, school and student performance. The CIAS Panel shall be responsible for providing professional development that will be tied directly to the District mission and purpose.

The CIAS Panel shall be responsible for professional expectations and standards. These expectations and standards shall be developed jointly by the CIAS Panel. The panel shall consist of five members appointed by the Superintendent, five members appointed by the ASAR President. The chair will rotate annually between the two parties with a panel year being defined as July 1 - June 30th. The joint governing panel will develop and make program and policy recommendations concerning the implementation of the CIAS Plan to the Superintendent of Schools and the ASAR President. The panel shall be compensated for services consistent with procedures developed by the panel and approved by the ASAR President and the Superintendent of Schools.

SPA-255

53

# ARTICLE 34
## PROFESSIONAL ATTIRE

The Rochester City School District's sole mission is to educate all the children entrusted to our care and custody so that they may become successful citizens of our community, our country, and our world. That mission, and the public nature of our work, requires us to be role models for our children, and also require us to interact effectively with parents, community and government leaders, employees and vendors of other organizations, representatives of the news media, and the general public.

We are all professionals, and the success of our mission depends in part on establishing and maintaining a professional business atmosphere, which is determined not only by professional conduct but also by the image we project. All employees are therefore expected to dress in attire that is neat and clean as well as consistent with the nature of their position and the particular work they perform. What constitutes appropriate attire is initially up to the good judgment of each employee. Employees who are in doubt or have a question about specific attire are to consult with their supervisor[3] and abide by his or her advice. A supervisor's advice regarding attire will not be based merely on taste, and will respect workplace rights relating to bona fide religious observance. Employees, who are inappropriately attired, in the judgment of the supervisor, will be directed to go home and return to work in appropriate attire. Refusal to follow such a directive will constitute insubordination. A subsequent occurrence will be treated as an unpaid leave of absence. Employees are also expected to observe good habits of grooming and personal hygiene at all times.

# ARTICLE 35
## LIVING CONTRACT COMMITTEE

1. The parties agree to establish a joint committee to provide for discussions and decision-making on matters germane to improved union-management relations and more effective overall system operations. The Living Contract Committee shall be co-chaired by the Superintendent of Schools and the President of ASAR.

2. The joint committee shall be authorized to discuss any issue of mutual interest or concern and to reach tentative agreements on issues in a timely manner without delaying action until the expiration and renegotiation of the collective bargaining agreement. The joint committee shall also have the power to amend this Agreement, provided that any substantive amendments shall be subject to internal ratification and approval procedures of the District and Association.

---

[3] For this purpose, supervisors are principals for schools; program administrators for the Family Learning Center; and the Parent Center; the Director of Transportation for the Service Center; and Cabinet members for employees who report to them at Central Office or elsewhere.

54

SPA-256

3.  Each party shall identify at least two (2) representatives and no more than four (4) representatives as permanent committee members

4.  The Living Contract Committee shall meet the third week of October and May of each year. Either party may request additional meetings which shall be scheduled when requested.

## ARTICLE 36
## DURATION

The provisions of each Section attached hereto shall be effective July 1, 2009, unless otherwise noted, and shall continue in full force and effect until June 30, 2014, or until a subsequent Agreement is signed by both parties.

SPA-257

IN WITNESS WHEREOF, the parties hereunto set into their hands and seals.

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT
OF ROCHESTER, NEW YORK

By _____
Jean-Claude Brizard
Superintendent of Schools

By _____
Jacqueline Phipps Polito
Chief Negotiator

ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER

By _____
Vicki M. Gouveia
President

By _____
Deborah Rider
Chief Negotiator

SPA-258

# APPENDIX A
## SCHOOL DEFINITION

The components of a school are as follows:

1. Serves students, kindergarten through grade 12, in any configuration or combination of grade levels.

2. Board approved as a school with a unique school name.

3. School-Based Planning Team with constituencies elected by staff, students, and parents of that school. Principal serves as chair.

4. Staff rights and responsibilities as contained in employee contractual agreements apply as defined in the agreements (i.e., seniority, transfer, representation, etc.) for a school.

5. Separate budget and staffing allocation based on District formulas for schools.

6. Student rights and responsibilities as contained in State Education law and Board policy apply as defined for a school.

## Bracket Definitions

**Bracket I:**

**School Principal:** A unit member administrator who has full authority, responsibility, and accountability for a school as defined in Appendix A. The school may share a campus with another school or schools.

**Executive Director** A unit member who supervises directors as described in Bracket II.

**Bracket II:**

**Director:** A unit member administrator with central management authority, responsibility, and accountability affecting all school sites or all school sites at an identified level such as elementary, middle school, high school, etc.

**Program Administrators:** A unit member administrator with management authority, responsibility, and accountability affecting specific program sites or specific programs in identified levels such as elementary, middle school, high school, etc.

SPA-259

57

# Bracket III:

**Assistant School Principal:** A unit member who directly assists a school principal with school wide authority, responsibility and accountability,

OR

A unit member who, under the supervision of the school principal, has full authority, responsibility, and accountability for at least 200 students and, at minimum, the core academic teachers of those students,

OR

A unit member administrator who, under the supervision of the school principal, has full authority, responsibility, and accountability for at least 200 students and, at minimum, 15 teachers,

OR

Effective July 1, 2010 academy directors will have their titles changed to assistant principal and will be assigned to Bracket III. All academy directors affected by this change shall retain their salary, tenure and seniority.

**Associate Director:** A unit member administrator with central management authority, responsibility, and accountability who reports to a Director affecting all school sites or all school sites at an identified level such as elementary, middle school, high school, etc.

# Bracket IV:

**Administrator:** All other unit member administrators not defined in Brackets I, II, and III.

## Titles

The District, for internal organizational purposes, may utilize different administrative titles and, in collaboration with ASAR, develop and issue job descriptions for those titles. The District must negotiate with ASAR the placement of all titles within a salary bracket. This negotiation must be completed prior to the appointment of any individual to the title.

All ASAR members assigned to salary brackets as of July 1, 2001, shall retain both tenure and seniority in those brackets accruing to them from their previous assignments. If any member is assigned to another administrative title within their salary bracket, they shall retain their tenure and seniority.

GPA-260

58

# APPENDIX B
## ELEMENTARY ASSISTANT PRINCIPAL FORMULA

During the projected budget process, the Division of School Development and Operations identifies each elementary school's weighted Total Aidable Pupil Units (TAPU). Upon completion, the weighted TAPU is used to assign a weighted enrollment for each school. The schools are listed in descending rank order according to that weighting.

Schools that fall within the following ranges will be eligible, if budgeted, for the number of Assistant Principals as indicated:

| Weighted Enrollment | Total Number of APs |
|---|---|
| 700 and higher | 2 |
| 500 - 699 | 1 |

If a school falls below the range, the current allocated AP will be allocated to the next identified eligible school. If reductions in staff are needed, reductions will occur beginning from the bottom of the list. Any allocations of budgeted positions beyond the allocated formula positions are made at the sole discretion of the Superintendent.

SPA- 261

# APPENDIX C
## ASAR –Civil Service Title Salary Ranges

| Bracket A     $60,000 - $100,000 | Bracket D     $45,000 - $80,000 |
|---|---|
| Benefits Administrator | Administrative Analyst |
| Director of School Food Service | Application Supports Specialist |
| Director of Accounting | Assistant Food Service Director |
| Director of Educational Facilities | Assistant Supervising Custodian Engineer |
| Director of Financial Management | Assistant Supervisor of Public Health Nurse |
| Director of Information | Assistant User Support Instructor I |
| Director of M/W BE | Broadcasting Assistant |
| Director of Procurement and Supply | Budget Analyst |
| Director of Security Operations | Community Liaison Specialist |
| Director of Transportation | Contract Administrator |
| Senior Database Administrator | Coordinator of Environmental Safety |
| Supervising Director of District Operations | Data Liaison Specialist |
| Supervisor of Technology Services | Data Management Specialist |
| | Information Services Business Analyst |
| | Maintenance Inspector |
| | Ombudsperson |
| | Plant Engineer |
| | Quality Assurance Coordinator |
| | Senior Audit Specialist |
| | Senior Buyer |
| | Senior Computer Applications Specialist |
| | Senior Technical Director |
| | Supervisor of Plant Security |
| | Supervisor of Print Shop |
| | Supervisor of Safety and Security |
| | Supervisor of Storehouse |
| | Youth Development Coordinator |

| Bracket B     $55,000 - $95,000 | Bracket E     $40,000 - $70,000 |
|---|---|
| Assistant to the Chief Financial Officer | Art Center Director |
| Data Base Administrator | Hearing Officer |
| Educational Facility Planner | Purchasing Assistant |
| Internal Auditor | Senior Communications Assistant |
| Manager, Financial Reporting | Webmaster |
| Principal Management Analyst | |
| Project Architect | |
| Project Director | |
| Senior Programmer Analyst | |
| Senior Systems Analyst | |
| Supervising Accountant | |
| Supervising Custodian Engineer | |
| Supervisor of Plant Maintenance | |
| Supervisor Payrolls | |
| Technical Project Manager | |

GPA- 262

| Bracket C | $50,000 - $90,000 |
| --- | --- |
| Accounts Payable Supervisor | |
| Accounts Payable Supervisor | |
| Associate Architect | |
| Asst. Director of Transportation | |
| Bus Maintenance Supervisor | |
| Bus Operations Supervisor | |
| Bus Systems Analyst II | |
| Coordinator Human Services Systems | |
| Coordinator of Parent Engagement | |
| Data Management Programmer | |
| Director of Parent/Community Involvement | |
| Emergency Management and PD Coordinator | |
| Grant Writer | |
| Manager of Instructional Applications | |
| Operations Manager, MIS | |
| Position Control Specialist | |
| Position Management Specialist | |
| Purchasing Agent | |
| School Health Coordinator | |
| Senior Administrative Analyst | |
| Senior Budget Analyst | |
| Senior Information Services Business Analyst | |
| Senior Management Analyst | |
| Senior Systems Programmer | |

| Bracket F | $35,000 - $60,000 |
| --- | --- |
| Administrative Assistant | |
| Administrative Clerk | |
| Assistant Personnel Analyst | |
| Assistant Personnel Analyst/Bilingual | |
| Parent and School Community Partnership Mgr | |

| Bracket G | $30,000 - $55,000 |
| --- | --- |
| Secretary I | |
| Secretary I/Bilingual | |

SPA-263

**INDEX**

| Title | Page |
|---|---|
| Absence Provisions: Certificated Staff | 16 |
| Absence Provisions: Civil Service Staff | 25 |
| Accumulations of Absence Days: Certificated Staff | 17 |
| Acting Administrative Assignments | 12, 40 |
| ACTION Leave: Certificated Staff | 32 |
| Addition of Spouse to Insurance Plan | 13 |
| Additional Time Worked: Certificated Staff | 8 |
| Administrative and Supervisory Positions: Certificated Staff | 12 |
| Administrative Titles: Certificated Staff | 5, 57 |
| Agency Fees | 4 |
| Allocation of Building Staff | 40 |
| Allowance for Transportation | 20, 35 |
| Assault and Battery Cases | 41, 42 |
| Assistant Principal Allocation - Elementary | 40, 59 |
| Association Release Time | 4 |
| Association Representatives | 4 |
| Association Rights | 4 |
| Attendance Incentive: Certificated Staff | 9 |
| Attendance Incentive: Civil Service Staff | 25 |
| Attire | 54 |
| Birth or Adoption of Child: Civil Service Staff | 29 |
| Birth/Adoption Allowance: Certificated Staff | 20 |
| Bracket Definitions: Certificated Staff | 57 |
| Bracket Placement: Certificated Staff | 12 |
| Cafeteria Plan | 15 |
| Catastrophic Illness Leave: Certificated Staff | 23 |
| Catastrophic Illness: Civil Service Staff | 27 |
| Certificate of Personal Illness Requirement: Certificated Staff | 18 |
| Certificate of Personal Illness Requirement: Civil Service Staff | 26 |
| CIA/S Panel | 33, 44, 54 |
| Contract Reproduction and Distribution | 49 |
| Coordinating Administrator in Special Education Stipend | 7 |
| Council Meeting Times | 2 |
| Councils | 2 |
| Courier Service | 4 |
| Date of Resignation and Medical Insurance | 14 |
| Death in Immediate Family Allowance: Certificated Staff | 19 |
| Death in Immediate Family Allowance: Civil Service Staff | 29 |
| Death of Blood Relative Allowance: Certificated Staff | 19 |
| Death of Blood Relative Allowance: Civil Service Staff | 29 |
| Degree Recipient/Family: Certificated Staff | 20 |
| Degree Recipient/Family: Civil Service Staff | 29 |
| Dental Insurance | 14 |
| Discipline & Discharge: Civil Service Staff | 39 |
| Discipline and Discharge: Non-Tenured Certificated Staff | 37 |
| Discipline and Discharge: Tenured Certificated Staff | 38 |
| Discipline: ASAR Representation | 38, 39 |



# INDEX

### (continued)

District Contribution to Dental Insurance...............................................................15
District Contribution to Health Insurance...............................................................13
Domestic Partner ...............................................................13, 14, 19, 20, 25, 29
Dues Deduction .......................................................................................................3
Duration ................................................................................................................55
Elementary Assistant Principal Formula ................................................................59
Emergency Closings: Certificated Staff .................................................................23
Emergency Closings: Civil Service Staff ................................................................30
Exchange Administrator Leave: Certificated Staff..................................................32
Extended Illness or Injury Leave: Civil Service Staff.............................................26
Family Illness Allowance: Certificated Staff ..........................................................18
Family Illness Allowance: Civil Service Staff ........................................................25
Grievance Hearings ..............................................................................................46
Grievance Procedure.............................................................................................46
Group Accountability ............................................................................................50
Hardship Absences: Certificated Staff...................................................................22
Health Insurance – Retirement Contributions .......................................................14
Health Insurance ..................................................................................................13
Illness Allowance: Civil Service Staff....................................................................25
Immunizations......................................................................................................36
Increase in Health and Dental Benefits ................................................................15
Insurances ...........................................................................................................13
Job Security ..........................................................................................................49
Jury Duty: Certificated Staff.................................................................................20
Jury Duty: Civil Service Staff................................................................................29
Leave Without Pay: Certificated Staff...................................................................34
Leaves of Absence: Certificated Staff ...................................................................31
Legislative Approval .............................................................................................50
Living Contract Committee ...................................................................................55
Longevity Increments: Civil Service Staff .............................................................11
Maintenance of Standards.....................................................................................49
Make-up Days: Certificated Staff..........................................................................24
Management Rights ..............................................................................................49
Medical Examination ............................................................................................36
Merit Payment ......................................................................................................6
Military Leave: Civil Service Staff.........................................................................29
Military Obligation Allowance: Certificated Staff..................................................20
Miscellaneous Fringe Benefits ..............................................................................35
Miscellaneous Paid Absences: Civil Service Staff..................................................28
Moving Day: Civil Service Staff ............................................................................29
Negotiations Procedures .......................................................................................1
Observation and Evaluation..................................................................................44
Observation and Evaluation: Civil Service Staff....................................................45
Observation and Evaluation: Tenured and Non-Tenured Certificated Staff ...........44
Out of Title Work: Civil Service Staff ...................................................................11
Outside of District Travel .................................................................................21, 35


SPA-265

# INDEX

## (continued)

Paid Holidays ........................................................................................... 15
Parental Leave: Certificated Staff ............................................................ 31
Performance Appraisal for Certificated Administrators ........................... 53
Performance Based Compensation – Principals ........................................ 6
Performance Incentive: Certificated Administrators ........................... 6, 44
Performance Incentive: Civil Service Staff ............................................. 45
Personal Injury Benefits .......................................................................... 42
Personal Leave Days: Civil Service Staff ................................................ 28
Personal Leave: Certificated Staff ........................................................... 20
Physical Exams: Certificated Staff .................................................... 18, 23
Policy Changes ........................................................................................... 2
Posting of Positions ................................................................................. 43
President Release ........................................................................................ 4
Pre-Tax Premium Deduction for Dental Insurance ................................. 15
Pre-Tax Premium Deduction for Health Insurance ................................. 13
Principal's Enrollment Stipends .............................................................. 10
Principalship Openings ............................................................................ 43
Professional Development Funds ............................................................. 36
Promotional Applications ........................................................................ 43
Promotional Increases: Certificated Staff ................................................. 6
Protection of Administrators .................................................................... 41
Quarantine: Certificated Staff ................................................................. 20
Quarantine: Civil Service Staff ............................................................... 29
Ratification ................................................................................................. 1
Recognition ................................................................................................ 1
Reimbursement for Personal Items .......................................................... 42
Representation in Other Than Assault and Battery Cases ........................ 41
Retirement Attendance Incentive: Civil Service Staff ............................ 25
Retirement Payment for Insurance .......................................................... 14
Retirement System Delegate: Certificated Staff ..................................... 21
Return After Leave - Notification: Certificated Staff .............................. 35
Return After Leave - Tenure: Certificated Staff ...................................... 31
Return to Service Following Absence: Certificated Staff ........................ 22
RTA Grievance Hearings ......................................................................... 48
Sabbatical Leave: Certificated Staff ....................................................... 32
Salary Adjustments: Certificated Staff ..................................................... 8
Salary Brackets: Certificated Staff .................................................. 5, 8, 57
Salary Increase for Full-Time Study: Certificated Staff ......................... 34
Salary Increases: Certificated Staff ........................................................... 5
Salary Increases: Civil Service Staff ....................................................... 10
Salary Payments: Certificated Staff .......................................................... 8
Salary Payments: Civil Service Staff ....................................................... 11
Salary Ranges and Titles: Civil Service Staff .................................... 11, 60
Salary: Certificated Staff ............................................................................ 5
Salary: Civil Service Staff ....................................................................... 10
Savings Clause ......................................................................................... 50



SPA - 266

# INDEX

### (continued)

School Coordinators of Health, Physical Education, Athletics Stipends .................................. 7
School Definition ................................................................................................................ 57
Seniority: Certificated Staff ................................................................................................. 5
Spouse's Employment and Medical Insurance ..................................................................... 13
Strike ................................................................................................................................. 50
Subpoena: Certificated Staff ............................................................................................... 20
Summer School .................................................................................................................... 7
Summer Work Schedules for Principals ................................................................................ 7
Supervisor of Plant Security Premium .................................................................................. 11
Tax Shelter Annuities .......................................................................................................... 15
Temporary Assignment: Certificated Staff .............................................................. 8, 11, 40
Tenure: Certificated Staff ..................................................................................................... 5
Twelve Month Work Year ...................................................................................................... 5
Unsatisfactory Rating: Civil Service Staff ............................................................................ 45
Vacancies ............................................................................................................................ 43
Vacancy and Transfer .......................................................................................................... 42
Vacation – Exceptional Circumstances ................................................................................ 24
Vacation Day Carry Over: Certificated Staff ........................................................................ 24
Vacation Day Carry Over: Civil Service Staff ...................................................................... 30
Vacation Day Cash In: Certificated Staff ....................................................................... 5, 25
Vacation Days: Civil Service Staff ....................................................................................... 30
Vacation: Certificated Staff ............................................................................................ 5, 25
Work Day: Civil Service Staff .............................................................................................. 11
Work Year: Certificated Staff ................................................................................................ 5
Workers Compensation ........................................................................................................ 42
Workers Compensation: Certificated Staff ..................................................................... 18, 42

SPA-267

*The*

*Contractual Agreement*

*Between the*

*The City School District*

*of*

*Rochester, New York*

*and*

*The Association of Supervisors and*

*Administrators of Rochester*

*July 1, 2014- June 30, 2018*

SPA-268

# TABLE OF CONTENTS

| Article | Title | Page |
|---|---|---|
| 1 | RECOGNITION ............................................ | 1 |
| 2 | NEGOTIATIONS PROCEDURES ...................................... | 1-3 |
| 3 | DUES DEDUCTION ................................... | 3 |
| 4 | ASSOCIATION RIGHTS .................................. | 4 |
| 5 | SALARY:  CERTIFICATED SALARY ............................ | 5 |
| 6 | SALARY:  CIVIL SERVICE STAFF ..................... | 10 |
| 7 | GENERAL ADMINISTRATIVE AND SUPERVISORY POSITIONS ................................................. | 12 |
| 8 | INSURANCES ......................................... | 13 |
| 9 | TAX SHELTERED ANNUITIES ........................... | 17 |
| 10 | PAID HOLIDAYS ......................................... | 17 |
| 11 | GENERAL ABSENCE PROVISIONS – CERTIFICATED STAFF ... | 18 |
| 12 | GENERAL ABSENCE PROVISIONS – CIVIL SERVICE STAFF ... | 28 |
| 13 | LEAVES OF ABSENCE – CERTIFICATED STAFF ................... | 33 |
| 14 | MISCELLANEOUS FRINGE BENEFITS ......................... | 38 |
| 15 | DISCIPLINE AND DISCHARGE – NON TENURED CERTIFICATED STAFF ............................. | 39 |
| 16 | DISCIPLINE AND DISCHARGE - TENURED CERTIFICATED STAFF ONLY ................................. | 40 |
| 17 | DISCIPLINE AND DISCHARGE – CIVIL SERVICE STAFF ONLY ................................... | 42 |
| 18 | ACTING ADMINISTRATIVE ASSIGNMENTS ....................... | 42 |
| 19 | ALLOCATION OF BUILDING STAFF ................................ | 42 |
| 20 | PROTECTION OF UNIT MEMBERS ........................... | 43 |
| 21 | PERSONAL INJURY BENEFITS ............................. | 44 |
| 22 | VACANCY AND TRANSFER ............................ | 45 |
| 23 | OBSERVATION AND EVALUATION ........................... | 46 |

ii

SPA - 269

# TABLE OF CONTENTS

### (continued)

| Article | Title | Page |
|---------|-------|------|
| 24 | GRIEVANCE PROCEDURE .............................................. | 48 |
| 25 | JOB SECURITY ......................................................... | 51 |
| 26 | MAINTENANCE OF STANDARDS ................................... | 51 |
| 27 | MANAGEMENT RIGHTS .............................................. | 52 |
| 28 | CONTRACT REPRODUCTION AND DISTRIBUTION ............. | 52 |
| 29 | LEGISLATIVE APPROVAL ........................................... | 52 |
| 30 | NO STRIKE ............................................................. | 52 |
| 31 | SAVINGS CLAUSE ..................................................... | 53 |
| 32 | GROUP ACCOUNTABILITY .......................................... | 53 |
| 33 | PERFORMANCE APPRAISAL FOR CERTIFICATED UNIT MEMBER ............................................................. | 56 |
| 34 | PROFESSIONAL ATTIRE ............................................. | 57 |
| 35 | LIVING CONTRACT COMMITTEE ................................... | 57 |
| 36 | DURATION ............................................................. | 58 |
|  | APPENDIX A ........................................................... | 60 |
|  | APPENDIX B ........................................................... | 62 |
|  | APPENDIX C ........................................................... | 63 |
|  | INDEX .................................................................. | 65 |

SPA- 270

# ARTICLE 1
## RECOGNITION

The Board agrees to recognize the Association (hereinafter "ASAR") as the exclusive bargaining representative for the negotiating unit described as follows.

The term "administrator", and "administrative personnel" for the purpose of this document shall include all certificated employees in the administrative and supervisory salary schedule, with the exception of the Superintendent and employees designated by the Board of Education as members of the Superintendent's Employee Group. It also includes Civil Service employees formerly represented by the Middle Level Managers and Supervisor's Association, as defined in Appendix C.

# ARTICLE 2
## NEGOTIATIONS PROCEDURES

1.  Meetings of the negotiating committees may be initiated at the written request of either party. All subject matter to be negotiated should be submitted by the first Friday in March when school is in session. The parties shall arrange for a mutually satisfactory time and place for an initial meeting within a reasonable time thereafter.

2.  Agreements reached by the negotiating committees shall be submitted in writing to the Board of Education and the Association for ratification.

    Upon ratification the agreement shall be signed by the Superintendent of Schools, and the President of ASAR.

3.  If the Superintendent and the ASAR negotiating committee are unable to reach agreement, the parties shall each select a representative and the two representatives shall elect a third person mutually acceptable to them to act as chairman of an ad hoc committee. This committee shall take whatever steps it deems necessary in order to assist the parties to resolve their differences.

4.  The costs of the services of the ad hoc committee, including per diem fees, if any, and actual and necessary travel and subsistence expenses, shall be shared equally by the Superintendent and ASAR.

5.  The District agrees to furnish to the negotiating committee in accordance with reasonable requests, all available information concerning financial resources of the District, tentative budgetary requirements and allocations, and such other information as will assist the negotiating committee in developing intelligent, accurate, and constructive programs.

SPA-271

1

6. If joint meetings of the negotiating committees are scheduled during the work day, members of the committees shall be released from their regular duties without loss of pay and with substitutes provided when requested.

7. In the event the District is considering a change in policy which would come within the scope of this Agreement, or is considering any change in district wide educational policy which has an impact on the terms and conditions of work, the Superintendent of Schools shall so notify the President of the Association. The Association shall, within ten (10) days, notify the Superintendent if the Association will exercise its right to negotiate these matters. The Superintendent and the Association shall also negotiate on any appropriation of unanticipated additional sources of public revenue, which are not specifically earmarked.

The Association shall also have the opportunity to present its views to the Superintendent or designee at a mutually convenient time, on other revisions of educational policy which the Association may deem desirable.

8. The District recognizes that ASAR Unit members are organized in "councils" for the purpose of conducting ASAR business and for informational purposes.

   A. At the end of any monthly meeting of a council scheduled by the District, the ASAR Unit members who are members of that council will be permitted to meet in "executive session" for 30 minutes for the purpose of conducting ASAR business.

   B. The right to meet for ASAR business for 30 minutes will not begin past 3:30 p.m. In this case, the council meeting would be suspended for 30 minutes at 3:30 p.m. for ASAR business.

   C. The District recognizes the following groups as councils:

      1. Secondary School Principals
      2. Elementary Principals
      3. Elementary School Administrators
      4. Secondary School Administrators
      5. Special Education Coordinators
      6. Coordinators of Physical Education, Health and Athletics
      7. Coordinators of Instruction
      8. Central Office certificated unit members
      9. Civil Service unit members formerly represented by Middle Level Managers and Supervisors

SPA-272

2

D.   Once every month, certificated unit members housed at Central Office and Civil Service unit members are permitted to meet for 30 minutes during work hours to conduct ASAR business.

9.   The contract may not be modified in whole or in part by the parties except by an instrument in writing duly executed by both parties, and no departure from any provision of this Contract by either party or by members of the negotiating committee shall be construed to constitute a continuing waiver of the right to enforce such provision.

10.   This Contract shall supersede any rules, regulations, or practices of the Board of Education which shall be contrary or inconsistent therewith.

## ARTICLE 3
## DUES DEDUCTION

1.   The District agrees to deduct from the salaries of the Unit members who are members of the ASAR the dues levied by the ASAR as said Unit member individually and voluntarily authorizes the District to deduct and to transmit the monies promptly to ASAR.

2.   ASAR shall certify to the District the current rate of membership dues to the associations which are named in paragraph 1 above, and shall notify the District of any changes in the rates of membership.

3.   Dues deductions authorized by individual Unit members shall be continuous unless revoked in writing. Any Unit member desiring to have the District discontinue deductions previously authorized must notify ASAR by September 15 of each year, in writing, and ASAR shall notify the District in writing of said revocation.

4.   Deductions shall commence and be consistent with the procedures developed jointly by the City School District and ASAR.

5.   It is specifically agreed that the City School District and the Board of Education assume no obligations, financial or otherwise, arising out of the provisions of this Section, and ASAR agrees that it will indemnify and hold the District and Board harmless from any and all claims, actions, demands, suits or proceedings, by any employee or any other party arising from deductions made by the District or Board and remittance to ASAR of dues and any other fees under this Section.

Once the funds are remitted to ASAR, their disposition thereafter shall be the sole and exclusive obligation and responsibility of ASAR.

SPA-273                3

6.    Effective July 1, 1983, the Rochester City School District shall deduct from the wage or salary of employees in the bargaining unit who are not members of the ASAR the amount equivalent to the dues levied by the ASAR and transmit the same so deducted to the ASAR, in accordance with Chapters 677 and 678 of the laws of 1977 of the State of New York.

ASAR affirms that it has adopted such procedure for refund of agency fee deduction as required in Section 3 of Chapters 677 and 678 of the laws of 1977 of the State of New York. This provision for agency shop deduction shall continue in effect so long as the ASAR maintains such procedure.

The agency fee deduction shall be made following the same procedures as applicable as set forth earlier in this Section.

## ARTICLE 4
## ASSOCIATION RIGHTS

1.    The City School District's daily courier service shall be extended to ASAR's use.

2.    Duly authorized representatives of ASAR, certificated to the District, shall have the right to transact official organization business on school property. Upon arrival, such authorized representatives shall report their presence to the principal or designee. The principal or designee shall then confer with the duly authorized representatives in order to facilitate the purpose of the visit provided such visit shall not interrupt normal school operations and is approved by the principal or designee.

3.    When it is necessary for representatives of ASAR to engage in Association activities directly relating to the Association duties which cannot be performed other than during school hours, upon the approval of the Superintendent or designated representative within a reasonable time in advance, they shall be given such time, without loss of pay, as is necessary to perform any such activities. ASAR recognizes and agrees that this privilege should not be abused.

4.    The President of ASAR shall be released from duties on a full-time basis to conduct Association business. The president of ASAR will, after consulting with the superintendent, designate one additional ASAR member to be released full time to conduct association business.  At the end of their assignments, the president of ASAR and the additional ASAR member who were on full time release are entitled to return to his/her prior position. He/she will accrue seniority in his/her tenure area during the time served on full time release.

SPA-274

4

5. ASAR shall have the right to use bulletin boards or other communication media, and to use building facilities for the purpose of meetings concerned with the exercise of the rights established in this Agreement.

## ARTICLE 5
## SALARY: CERTIFICATED STAFF

1. Effective July 1, 2006, the following salary brackets shall be established for certificated staff:

    | | |
    |---|---|
    | Bracket I | $85,000 to $130,000 |
    | Bracket II | $75,000-$95,000 |
    | Bracket III | $70,000-$90,000 |
    | Bracket IV | $65,000-$85,000 |

2. Effective July 1, 2004, the administrative title of record for each bracket will be as follows:

    | | |
    |---|---|
    | Bracket I | School Principal, Supervising Director, Executive Director and Coordinating Director of an individual area of responsibility and tenure area |
    | Bracket II | Individual titles established by the District with specific job descriptions |
    | Bracket III | Assistant School Principal |
    | Bracket IV | Administrator |

    Unit members in Brackets I and II earn tenure and seniority within job title. Unit members in Brackets III and IV earn tenure and seniority within the bracket.

3. A joint committee of the District and Association with equal membership will determine the placement of each title in accordance with definitions contained within the contract and will determine the application of the terms and conditions of this contract when a bracket reclassification is made.

    A. Effective January 1, 2015 the base salary of all unit members shall be increased 3.0%.

    B. Effective July 1, 2015 the base salary of all unit members shall be increased 3.0%.

    C. Effective July 1, 2016 the base salary of all unit members shall be increased 3.0%.

    D. Effective July 1, 2017 the base salary of all unit members shall be increased 3.0%.

6PA-275

5

4. Effective July 1, 2016 the work year for Unit members in Brackets III, IV, and non-tenure bearing grant-funded positions (sometimes referred to as Bracket V) will be the same as the District identifies for teachers. These Unit members will not be eligible for any vacation days or the July 4th holiday, but will continue to accrue illness and personal days as provided in Article 11.

   A. Unit members in Brackets III, IV, and non-tenure bearing grant-funded positions (Bracket V) will be required to work, as part of their annual salary, twenty five (25) days in July and August, or on breaks as provided in paragraph B. The days may be worked as full or half days. Twenty (20) of the twenty five (25) days shall be at the discretion of the Unit member's immediate supervisor. Five (5) days shall be at the discretion of the Unit member. The Unit member's immediate supervisor shall identify the required work days in writing to such Unit members by April 1.

   B. Between September 1 and June 30, Bracket III, IV and non-tenure bearing grant-funded (Bracket V) Unit members shall not be required to report to work on holidays, recess days, and days that schools are closed when teachers are not required to report to work (except for Emergency Closing Days). However, upon mutual consent of the Unit member and the Unit member's immediate supervisor, a Unit member may work during these days and count the days worked toward the twenty five (25) requirement in paragraph A, above.

   C. The current annual salary of Bracket III, IV and non-tenure bearing grant-funded (Bracket V) Unit members will not be adjusted and they will be eligible for any negotiated annual salary increases.

   D. Effective July 1, 2016, the per diem rate for Bracket III, IV, and non-tenure bearing grant-funded (Bracket V) Unit members shall be 1/220th of their annual salaries.

   E. Bracket III, IV and non-tenure bearing grant-funded (Bracket V) Unit members will be eligible to work Summer School. The District has discretion to select Unit members for Summer School. Unit members who are selected to work Summer School will continue to be required to report on days assigned by their immediate supervisors other than the Summer School days. Days worked beyond the twenty-five (25) days in paragraphs A and B, above, will be compensated at the 1/200th per-diem rate.

SPA-276

6

F. Unit members employed as Coordinating Administrators of Special Education may be assigned to work up to an additional ten (10) days beyond the twenty five (25) additional days to cover Committee on Special Education meetings, summer programs, or other duties as decided by the District. The District will make every effort to ensure that Unit members are assigned these duties equitably. Days worked beyond the twenty-five (25) days in paragraphs A and B, above, will be compensated at the 1/200th per-diem rate.

G. Bracket I and II Unit members shall not be required to work Summer School.

H. Any Bracket III, IV, and non-tenure bearing grant-funded (Bracket V) Unit members with unused vacation days or vacation days in reserve from previous years may cash-in all or part of those vacation days at any time during their employment with the District at the per diem rate of 1/260th at the time the days are cashed in. They must be cashed in when the Unit member severs employment with the District including but not limited to retirement, layoff, termination, or resignation. These days may also be converted into 403(B) contributions, at the Unit member's discretion.

5. Persons appointed or promoted to an administrative position must be placed within the appropriate salary range as defined in Article 5. The District may place the appointment anywhere within the salary range. Members who are promoted will receive a minimum salary increase of 5% for each bracket they move up in the schedule.

6. Summer Work Schedule for Principals

A. Principals will be notified by April 1 of required work days for the following July and August.

B. The workdays in July and August are to be used to carry out the duties and responsibilities of the primary job title and assignment of the Principal.

C. The Principal shall not be assigned to other roles or tasks during the work days in July and August without his or her consent.

D. The District may call Principals to District-wide in services, workshops, and meetings up to five (5) workdays in July and August. No more than two (2) work days will be scheduled in the 2 weeks immediately before school opens.

GPA-277

7

7. Coordinating Administrators in Special Education shall receive an annual stipend based on the number of students with IEPs they oversee according to the October BEDS report, as follows:

| | |
|---|---|
| Up to 200 students | $750 |
| 201 to 300 students | $1,000 |
| 301 to 400 students | $1,500 |
| 401+ students | $2,000 |

The stipend will be paid in the first November paycheck.

8. School Coordinators of Health, Physical Education, and Athletics (Department Heads) shall be assigned to secondary schools upon the recommendation of the Superintendent of Schools. In addition to their regular duties, they shall supervise intramural and interscholastic athletics. Coordinators of Health, Physical Education and Athletics are not eligible to apply for or hold any coaching positions with the District unless qualified candidates are not available and the coordinator obtains approval from the school principal. They shall receive an annual stipend based on the number of interscholastic teams in their school as follows:

| | |
|---|---|
| Up to 19 interscholastic teams | $4,000 |
| 20 to 39 | $5,000 |
| 40+ | $6,000 |

The minimum stipend of $4,000 will be distributed throughout the normal paychecks. An adjustment paying additional amounts above $4,000 will be added to the final paycheck based on the number of teams fielded for the school year as verified by the Director of Health/Physical Education and Athletics.

9. Temporary Assignment in Higher Bracket Position. When a Unit member is assigned by the Superintendent of Schools to the responsibilities of a higher bracket administrative position for 15 or more school days within the same school year, he shall receive the same pay for all days served as if regularly appointed in that position.

10. Adjust in Salaries. A salary is subject to audit and immediate correction at any time for error and/or adjustment of incorrect payment.

11. Salary Payments. Unit members shall be paid by direct deposit over twenty-six (26) two-week pay periods. Salary adjustments consistent with this Contract shall begin on the first day of the first full pay period of the District's fiscal year.

8

SPA-278

12.  Additional Time Worked

A. Building-based unit members shall for compensation purposes work a normal workday that extends ninety (90) minutes beyond the daily dismissal of students and also extends to and includes supervision of building events and activities such as plays, social/athletic events, open houses and curriculum nights.  They are not eligible for additional compensation during the normal workday as described in this paragraph.

B. Building-based unit members shall be paid at the daily rate of their base salary for comparable work of a professional nature beyond the normal work day and on days they are not normally scheduled to work (1/260 for Bracket I and II certificated unit members, 1/220th for Bracket III, IV, and non-tenure bearing grant-funded certificated Unit members).  They will be paid at the rate of $33 per hour for all other work of a professional nature that is assigned beyond the normal work day and on days they are not normally scheduled to work.  All unit members who are required to attend professional development beyond their normal workday and on days they are not normally scheduled to work will be paid $40 per hour.

C. Unit members assigned to Central Office shall work a minimum of 8 hours per day, excluding lunch.  Deviation from the length and time may be made when the work of the department so requires it.  They are not eligible for additional compensation during the normal workday as described in this paragraph.  They shall be paid at the rate of 1/260 of base salary for comparable work of a professional nature on days they are not normally scheduled to work.  Twelve month unit members who are required to attend professional development on days they are not normally scheduled to work will be paid $40 per hour, and for CSE Chairs, this will also apply to hours beyond their normal workday.

13.  Attendance Incentive

A. To be eligible, a staff member must have worked 15 consecutive years as a District employee beginning at the effective date of employment contained in the Board Resolution approving the appointment. If no effective date is contained in the Board Resolution, the date of the Board Resolution shall be used.

   1. If the Unit member has used no more than 20 total sick days in the 5 out of 7 years immediately preceding retirement, he or she is eligible for the incentive. For purposes of this section, "retirement" shall mean eligibility to collect a pension under the Unit member's applicable pension system upon reaching age 55 or through a disability

SPA-279

9

retirement. Collecting a pension immediately upon retirement is not a prerequisite to receiving retiree health insurance under this section.

2.  The incentive of $15,000 shall be payable in cash, deferral into a tax sheltered plan or into an account to be administered by the District for the member's use in retirement to enhance standard health and dental benefits, or any combination thereof, until the credit is exhausted.

3.  If the Unit member becomes deceased, a surviving spouse will have access to the remaining credit for health and dental benefits until the credit is exhausted.

4.  An appeals committee, with three member appointed by the Superintendent and two members appointed by the ASAR President shall review and act upon any appeal from a Unit member that the 15 year requirement in this Article has been met.

14.  <u>Principal's Stipends</u>. Effective July 1, 2001, Principals shall be paid an annual stipend based on the student enrollment of their school. The October BEDS Report shall be used to determine student enrollment for this purpose. The stipends shall be as follows:

| Student Enrollment | Stipend |
|---|---|
| 600-999 | $1,000 |
| 1000-1399 | $2,000 |
| 1400-1599 | $3,000 |
| 1600 + | $4,500 |

The stipend shall be paid beginning with the first paycheck in November. This benefit shall remain in effect for those who were principals on or before December 31, 2009 and shall not apply to those becoming principals on or after January 1, 2010.

## ARTICLE 6
## SALARY: CIVIL SERVICE STAFF

1.  <u>Base Salary</u>

A.  Effective January 1, 2015 the base salary for bargaining unit employees shall be increased 3.0%.

B.  Effective July 1, 2015 the base salary for bargaining unit employees shall be increased 3.0%.

6PA-280

10

C. Effective July 1, 2016 the base salary for bargaining unit employees shall be increased 3.0%.

D. Effective July 1, 2017 the base salary for bargaining unit employees shall be increased 3.0%.

2. Effective July 1, 2004 all unit members will work on a 12 month basis, 8 hours per day, exclusive of lunch. Deviation from the length and time may be made when the work of the department so requires it.

3. Unit members shall be paid by direct deposit over 26 bi-weekly pay periods. Salary adjustments consistent with this contract shall begin the first day of the fiscal year.

4. Longevity Increments: All full time employees with a regular assignment (i.e. not substitute or temporary employees) shall be eligible for longevity payments as follows:

5. After completing 10 years of service, the member will receive a lump sum payment of $2,000.

After completing 15 years of service, the member will receive a lump sum payment of $2,500.

After completing 20 years of service, the member will receive a lump sum payment of $3,000.

After completing 25 years of service and at 5 year intervals thereafter, the member will receive a lump sum payment of $3,500.

If the employee is less than full-time, such increment shall be pro-rated.

6. Out-of-Title Work: Out-of-Title Work is defined as work that may periodically develop in any job title because of illness, vacation, or leave of absence and for which a determination is made by the City School District that the vacancy created by the temporary absence must be filled. In such instances an employee covered by this Article may be assigned to fill such a position on a temporary basis provided the employee can meet the qualifications for said position. Employees who are assigned or reassigned to work out-of-title shall receive for the duration for such out-of-title work the rate of pay they would receive if regularly appointed to that title, provided, however that out-of-title pay shall only be extended where such work is for a period of time of more than fifteen (15) working days.

7. Out-of-Title pay shall be extended where such work is for a period of time more than eight (8) consecutive days. Out-of-Title assignments shall not be made so as to avoid compensation for out-of-title assignments.

SPA -281

11

p. 282-287

Intentionally Blank

8. The District and ASAR agreed to form a committee to review Civil Service titles, study the bracket placement of those Civil Service titles, study the nature of the hours worked by Civil Service members of the bargaining unit and consider the feasibility of the utilization of flex time options and/or overtime to address periods of peak work demands, if appropriate.

9. A ten (10%) percent premium shall be paid to the Supervisor of Plant Security for regularly assigned work beyond the end of the normal work day (i.e., 5:00 p.m.). Such premium shall be prorated to reflect only that period worked beyond the end of the normal work day.

## ARTICLE 7
## GENERAL ADMINISTRATIVE AND SUPERVISORY POSITIONS

1. General Provisions.

   A. Before any new position has been established, the bracket placement of said position shall be negotiated with the ASAR negotiating committee.

2. Temporary Assignment

   A. The Superintendent may designate a Unit member to serve temporarily in a Unit position. Such a designation shall not exceed a period of twelve (12) months from its effective date. At the conclusion of service in the designation, the Unit member shall have the absolute right to the position and location in which he or she was serving at the time the designation was made. Such a designation shall not be considered a transfer.

   B. The Superintendent's designation may be involuntary, provided the Superintendent shall not make an involuntary designation without first having consulted with ASAR and the Unit member to be so designated about the member's interests, credentials, and expertise.

   C. A Unit member designated to serve in a temporary assignment shall suffer no decrease in salary, shall continue to accrue credit toward seniority and tenure in the position to which the member is currently assigned, and if the designated position is in a salary bracket higher than that to which the member is currently assigned, the member shall receive out-of-title pay as determined by the Superintendent.

   D. If, during or within six months after the temporary assignment, the Unit member is appointed on a probationary or permanent basis to the position covered by the temporary assignment, the period of time served in the temporary assignment shall be credited towards seniority and tenure in the position.

SPA-288

12

E. This provision applies only to Unit members and positions represented by ASAR.

F. Qualified and certificated non-bargaining-unit members, as well as Unit members, may be appointed by the Superintendent to positions represented by ASAR on an acting basis for up to one year.

## ARTICLE 8
## INSURANCES

1. HEALTH INSURANCE

   A. All regularly Board-appointed Unit members assigned full-time or full-schedule for the type of assignment involved shall be entitled to health and hospitalization, major medical and dental benefits presently in effect.

      1. A new Unit member must submit to the Benefits Office within thirty (30) days of the first day of employment a Declaration of Intent to Enroll.

      2. After thirty (30) days of employment, an Unit member may apply for coverage by submitting to the Benefits Office a Declaration of Intent to Enroll, and by conforming to the rules for admittance to the plan desired.

      3. Effective July 1, 1992, all new hires to the City School District shall contribute fifteen percent (15%) of health insurance premium costs for health and hospitalization, major medical and dental benefits.

      4. Effective January 1, 1997, the District will provide and administer a pre-tax premium plan for all Unit members contributing towards the Health Insurance premium.

      5. Effective July 1, 1992, each married employee whose spouse is also employed by the District shall be entitled to benefits under only one family contract.

   B. Our insurance carriers require that:

      1. Addition of spouse must be made within thirty (30) days of the date of marriage through the Benefits Office.

      2. Change in marital status or death of a spouse must be reported to the Benefits Office so that the insurance carriers may be notified and the necessary adjustment in plan may be made.

SPA-289

13

C. Full premium amounts will be paid by the City School District to the insurance carrier or carriers involved.

D. The Unit member is entitled to health insurance coverage through the last month of active employment.

E. When accumulated illness allowance of an insured Unit member is exhausted, premiums will be paid by the City School District for such time, not to exceed ten (10) weeks, as may be necessary for the insured Unit member to arrange coverage.

F. 1. The active employee who becomes eligible for Medicare, or whose spouse or domestic partner becomes Medicare-eligible, either due to reaching age 65 or due to disability, must notify the Benefits Office sixty (60) days in advance so that the health insurance may be coordinated under the provision of Federal Law.

   2. The retired employee who becomes eligible for Medicare, or whose spouse or domestic partner becomes Medicare-eligible, either due to reaching age 65 or due to disability, must enroll in Medicare and then notify the Benefits Office(60) days in advance so that the health insurance may be converted under the provision of Federal Law.

G. Provided the Unit member has been employed with the City School District for at least ten (10) continuous years prior to the date of retirement, the Unit member shall be allowed, upon retirement, to transfer to the retired employees' group by requesting the transfer through the Human Capital Initiatives Department. If the unit member contributes a portion of the cost while employed, the contribution level will continue into retirement. For purposes of this section, "retirement" shall mean eligibility to collect a pension under the Unit member's applicable pension system upon reaching age 55 or through a disability retirement. Collecting a pension immediately upon retirement is not a prerequisite to receiving retiree health insurance under this section.

   1. For January 1, 2010 through December 31, 2012 the district shall pay the full cost of the traditional indemnity plan for post 65 retirees. If the post 65 retiree selects an alternative plan, the District shall contribute the cost of the tradition indemnity plan towards the alternative plan.

   2. For January 1, 2010 through December 31, 2012, pre 65 retirees will be offered the same health plan as active employees.

I. Full health insurance premiums will be paid by the City School District for the months of July and August. However, if a Unit member resigns between the closing day of school in June and the opening day of school in September, the full premiums for July and August must be refunded to the City School District.

14

SPA - 290

J.  The Unit member assumes full premium costs while on leave without pay.

K.  The parties that agree that ASAR will be a full participant in any health, dental or benefit committee established by the district.

2.  **DENTAL INSURANCE**

A.  All regularly appointed Unit members assigned full-time will be eligible to enroll within 30 days in the District's Dental Insurance Program .

B.  If an employee's spouse or domestic partner is also a District employee, one employee may enroll in a dental plan which covers dependents.

C.  Effective July 1, 1992, all new hires to the City School District shall contribute fifteen percent (15%) of health insurance premium costs for health and hospitalization, major medical and dental benefits.

D.  Effective January 1, 1997, the District will provide and administer a pre-tax premium plan for all Unit members contributing towards the Dental Insurance premium.

3.  **ALTERNATIVE HEALTH CARE PLANS**

HEALTH MAINTENANCE ORGANIZATIONS

The Board shall additionally provide opportunity to members of the bargaining unit to enroll in a Health Maintenance Organization (hereinafter referred to as "HMO") available in the area under the following provisions:

Effective January 1, 1997, the employer agrees that each employee covered by this Agreement shall have the privilege of subscribing to an HMO (consistent with "Blue Choice Select" and "Preferred Care Community" - with Chiropractic, vision and eye care riders) and that such an employee's option be in lieu of the group health insurance plan for hospital, medical, surgical and related services provided by this Agreement. The employer agrees that if the employee elects such option, the employer will contribute monthly for each covered employee the entire premiums or subscription charges for the selected HMO coverage[1].  However, the employer's contribution toward such HMO coverage shall not be greater than the amount which the employer would have paid or contributed had the employee not elected such HMO coverage in order to pay for the group health insurance plan for hospital, medical, surgical and related services provided by this Agreement.  If the premium or subscription charges required for the employee's participation in the HMO plan is greater than the amount the employer is liable to contribute under this Section, the employer agrees to check off from the employee's pay, upon receipt of a written authorization for such purpose from the employee, the additional amount required for full payment of the premium or subscription charge.

---

[1] Subject to employee contributions as per Article 8, Section 1.A.3. above.

15

GPA-291

Enrollments in and cancellations of HMO's can only be made once each year and are limited to the District's annual March 1 anniversary date. Notification of intent to enroll and/or cancel must be received in the District's Benefits Office no later than thirty (30) days prior to the March 1 effective date.

4.    Any increase in health and dental insurance benefits to other professional employees of the District shall accrue to members of ASAR. A joint committee of all parties will be established with a goal to identify all possible health/dental benefits economies and cost savings practices, effective as soon as is practicable.

5.    <u>Cafeteria Plan</u>

A. The District and ASAR shall design and implement a 125 Benefits Plan (Cafeteria Plan) to become effective July 1, 2001, that will provide members with a variety of benefit choices regarding benefits.

B. The dollar amount available to a Unit member to spend will be dependent upon the Unit members hire date with the District and the Unit member's marital/family status consistent with current policies.

C. The dollar amount available to a Unit member to spend will be adjusted annually to cover the increase in the cost of maintaining the same level of benefits.

D. The District and ASAR shall appoint a design and implementation team that shall be convened by the respective chief negotiators no later than 30 days after the signing of this Agreement. There shall be co-chairs representing the District and ASAR, and each party shall appoint no more than three members to the team not including the co-chairs.

The team shall make decisions by majority vote of all the members of the team. Co-chairs are voting members. In the event that a majority cannot be reached on a particular issue, the chief negotiators shall meet to decide the issue.

The team shall report to the District's Chief Financial Officer and the ASAR President every 60 calendar days after its first meeting. By the first Monday after February 1, 2001, the team shall report to the Chief Financial Officer and ASAR President an implementation plan for July 1, 2001.

Anytime thereafter, the Superintendent and the ASAR President shall approve the final plan.

E. The plan shall contain opportunities for both the District and the Unit members to realize savings as a result of Unit members voluntarily choosing options that result in lower expenditures for health and dental benefits.

16

SPA-292

F. The District may at any time become self-insured for health and dental benefits provided that benefits to Unit members under the plan are not reduced or eliminated.

G. The cost to the District of the benefits under the plan shall not exceed the District's cost of implementing the current benefits package for ASAR members projected at the time that the new plan is implemented, taking into account annual cost increases in providing the same level of benefits.

H. The administrative costs of implementing the plan in 2001-2002 shall be borne equally by the parties.

## ARTICLE 9
## TAX SHELTERED ANNUITIES

The Board shall provide the opportunity for employees to participate in tax sheltered annuity programs.

## ARTICLE 10
## PAID HOLIDAYS

The following are recognized paid holidays for 12 month certificated members and all civil service members:

| | |
|---|---|
| Independence Day | Day before or after Christmas |
| Labor Day | Christmas Day |
| Columbus Day | New Year's Day |
| Veterans' Day | Martin Luther King Day |
| Thanksgiving Day | Washington's Birthday |
| Day after Thanksgiving | Good Friday |
| | Memorial Day |

Pay shall be granted for the above days provided they fall within a period of time when an employee is normally scheduled to work or be paid. Pay for those days will only be granted if the employee works the last scheduled work day before and the first scheduled work day after the holiday or is on approved absence.

An unauthorized absence on the last scheduled work day prior to or the first scheduled work day following any paid holiday will result in loss of pay for the holiday. It is understood that authorized absences shall only include the following:

A. Personal illness (where the employee has submitted a Certificate of Personal illness signed by a licensed physician or Christian Science Practitioner)

B. Paid vacation

SPA-293

17

C. Paid leaves of absence as enumerated in the Agreement

D. Approved absence whether paid or unpaid as determined by the department head.

## ARTICLE 11
## GENERAL ABSENCE PROVISIONS – CERTIFICATED STAFF

1. Rate of Salary Deduction

   A. No Deduction - Self Explanatory.

   B. Regular Deduction - Regular deduction for Unit members shall be at the daily rate: 1/260th of annual salary for Brackets I and II, and 1/220th of annual salary for Brackets III, IV, and V.

   C. Full Deduction - Full deduction for Unit member shall be at the daily rate: 1/260th of annual salary for Brackets I and II, and 1/220th of annual salary for Brackets III, IV, and V.

2. Determining Full or Part-time

   A. Full-Time shall be interpreted to mean a full schedule at full annual salary.

   B. Part-Time shall be considered as cases where a partial schedule is involved. Such part-time may be a partial schedule every day or a full schedule on certain days only. Part-time will be prorated for purposes of salary, service credit or benefits.

3. Salary Deductions

   The following absence classifications, conditions and exceptions governing all salary deductions pertain to all full-time Unit members assigned on a school year or 12 month basis and to regular substitute Unit members assigned for one (1) year, but shall not apply to temporary substitutes and regular substitutes assigned for less than five (5) months or one (1) semester, or assigned on a part-time basis.

4. Class A Absences (Accumulation)

   No deductions shall be made for personal illness, including pregnancy related medical disability, or certain injuries under the following specified conditions with the exceptions outlined. Such absences shall be limited to the number of illness available for use as defined in paragraph D3 for unit members hired prior to Sept. 1984 or paragraph E1 for unit members hired on or after Sept. 7, 1984.

5. Regulations Governing Class A Absences at No Deduction

18

SPA-294

A. All certified members of the bargaining unit will receive an annual accrual of illness days equivalent to the number of months worked during the school year.

B. Annual accruals will be awarded on July 1st.

C. In the event that a unit member is hired or transfers in to the unit after July 1st, or terminates, retires, transfers or goes on leave prior to June 30th of the following year, the Annual Accrual shall be prorated as follows: The unit member will be awarded 1 illness day for each full month worked. For each partial month worked the percentage of the month work will be calculated and rounded to the nearest half month. Additional time will be awarded as follows:

| Percentage of month worked | Additional Accrual |
| --- | --- |
| Less than 25% | 0 |
| Between 25% and 74.99% | ½ day |
| 75% or more | 1 day |

D. For unit members hired prior to Sept. 7, 1984:

1. Illness accrual days will be accumulated from year to year by adding each new annual accrual to the prior years' accumulated accruals.

2. Accumulated illness accruals may not exceed a total of 220 days.

3. In any one (1) year, the number of illness days available for use shall be the total accumulated illness accruals minus the sum of all illness days used in the previous three years.

4. Should a unit member use all available days (as defined above) in any one (1) year, the accumulated accruals shall be reset to 0 for the following year, and the unit member will restart the accumulation process with the appropriate annual accrual award.

E. For unit members hired on or after September 7, 1984:

1. Illness accrual days will be added to the prior year's unused illness balance. The amount represents the available days for the year.

2. The sum of the available illness days may not exceed 220 days.

3. Probationary Unit members resigning before the close of the school year who have used illness days beyond the appropriate prorated number of illness days (see paragraph 2C) will have their last paycheck adjusted for the overpaid days.

6. Procedures: Personal Illness

SPA - 295

A. Request for Sick Pay (RSP) shall be filed for all absences due to illness.

    1. State the nature and extent of the illness.

    2. Submit to immediate supervisor for signature and forward to the Human Capital Initiatives Department.

B. Certificate of Personal Illness (CPI) stating the nature and extent of illness signed by a duly registered physician, a licensed chiropractor, or a Christian Science practitioner may be required at the Superintendent's discretion at any time, for any reason, and under any circumstances.

C. Consistent with the procedures of this subsection, unit members may use illness time for family illness absence for care of a spouse, parent or child. The number of illness days used for this purpose may not exceed the current annual accrual in any one year.

7. <u>Class A - Personal Illness at Full Deduction.</u> Full deduction for personal illness days will be taken under the following circumstances:

A. For the full period of absence when a CPI (with doctor's certification) is not filed following an illness of more than three (3) consecutive days and/or in conjunction with other leaves.

B. For surgery for the relief of a chronic disorder, unless medical reasons require that the surgery be performed during the school year.

C. For illness or bodily injury caused outside the school by another individual where damages are successfully collected.

D. For newly assigned or probationary Unit members who have not had their pre-employment physical examination and whose report of that examination is not on file in the Department of Human Capital Initiatives.

8. <u>Workers Compensation</u>

The following rules relate to Workers Compensation covering injuries sustained during the course of employment with the City School District. These rules apply to full and part-time Unit members.

A. Full salary shall be paid for an absence due to an injury for as many days as the injured employee has accumulated illness allowance. Only the first five (5) days will be deducted from illness allowance. The balance of the time is available to be used for regular illness, but not for the injury.

B. When full salary in lieu of the compensation rate as prescribed by law has been paid for the number of days representing accumulated illness allowance, the injured employee shall then be paid the compensation rate for the balance of the disability until the physician has declared the injured employee ready to resume usual work. This compensation payment covers summer months and unpaid school vacation periods.

20

SPA- 296

C. If an employee is still disabled in September, full salary shall be paid in lieu of the compensation rate for the first ten (10) days of the new year after which the compensation rate shall be resumed.

D. The City School District will pay all medical bills arising from compensation injuries. All compensation matters are handled by the Human Capital Initiatives Department.

E. All reports of injuries must be forwarded to the Human Capital Initiatives Department within thirty (30) days from the date of injury.

9. Class B Absences

No deduction shall be made for absences not to exceed a total of eight (8) days in any one year, under the conditions specified below, including individual limitations for each incident as outlined. Exceptions to increase individual incident limitation or the total eight days in one year limitation, for situations considered abnormal or unusual, may be made only when approved by the Superintendent of Schools.

For the purposes of determining eligibility for the following provisions, "immediate family" is defined as spouse or domestic partner, parent, child, or grandchild, brother, sister, grandparent, by blood, marriage, or legal adoption, but excluding uncles, aunts, nephews, and nieces who are blood relatives unless they are living in the same house.

A. Conditions No Deductions

1. Death in the immediate family not to exceed five (5) consecutive days per incident including either the day of the death or the day of the funeral.

2. Death of blood relatives living in the same household (uncles, aunts, nieces, nephews, cousins) not to exceed three (3) days as requested.

   Death of blood relatives not living in the same household (uncles, aunts, nieces, nephews, cousins) not to exceed one (1) day as requested.

3. Absence not to exceed two (2) days if necessitated by educational examinations conducted by the State of New York, the Board of Education, or by an institution of collegiate grade, or for the attendance thereafter as a recipient of a degree.

4. Absence not to exceed two (2) days for each incident due to summons by a Selective Service Board or other military organization having the power of direction necessitating absence due to military obligation or national security. Unit members in reserve military units will be fully paid for the two (2) weeks of active duty. A copy of the military order must accompany the Request for Absence form.

6PA-297

21

5. Absence of one (1) day, including travel time, for the recipient of an earned degree by an Unit member, spouse or domestic partner, or child of an Unit member.

6. Absence for two (2) days to the father for the birth, or either parent for the legal adoption of infant children.

B. Class B  Regular Deduction

For additional days needed beyond those allowed for death in the family under Class B Absences.

10. Class C Absences

No deductions shall be made for absences due to circumstances and for period of time beyond the individual's control.

A. Conditions  No Deductions  Personal Leave

1. The absence results from compliance with the requirements of a court if the Unit member attends a court under subpoena. In such cases, an Unit member is required to submit photostatic copies of court orders, or written proof of specific days spent in court.

2. Absence caused by quarantine established by the Health Department, in all such cases the nature of the quarantine served by the Health Department must be submitted with the application for exemption, and satisfactory proof of the beginning and the close of the quarantine period must be furnished. This exemption does not apply to personal quarantine which shall be considered a personal illness and which will be covered by a Class A Absence.

3. Absence because of jury duty (excluding time off for taking an examination to become a juror) for the actual days reporting and paid for rendering such duty as indicated by the Commissioner of Juror's fee paid slip. The Commissioner of Jurors will arrange an after school qualifying examination. All compensation received for services performed as a juror while on required and/or approved jury duty shall be refunded to the City School District. Said refund need not include authorized transportation and/or parking fees for which funds are or are not provided.

4. Absence for the attendance as a duly elected delegate or alternate to the:

a) Annual convention of the New York State Teachers Retirement System.

22

SPA-298

b) Annual convention of affiliated state and national organizations.

5. Absences resulting from visiting days as approved by the Superintendent of Schools.

6. Absences for conventions or conferences which contribute to the effectiveness of the instructional program as authorized by the Superintendent of Schools.

7. Absences resulting from travel for professional business in the interest of a professional organization of teachers or Unit members within and considered a part of the City School District of Rochester, if the absence is authorized in advance by the Superintendent of Schools.

8. Three (3) personal leave days may be taken singly or together in any one year for personal business, religious observances or family illness not covered in other Sections of this Agreement and which require absence during the school hours (Personal leave days increased to three (3) days effective July 1, 1989).

Up to a total of five (5) days (three personal days and two illness days) of leave for religious observance may be taken in any given year from an employee's accumulated illness allowance. Personal days are to be applied before using accumulated illness days.

Application for personal leave shall be made three (3) days before taking such leave (except in case of emergencies). The applicant must state "Personal Leave" as the reason for taking such leave.

Personal leave shall not be granted:

a) the day before or after paid holidays.

b) the day before or after scheduled recesses.

c) the day before or after teacher conference days.

In the event that any Unit member's days of personal leave are not used, such days shall be in addition to sick leave awarded in Article 11 and shall be excluded from any illness cap applied to accumulated illness days.

It is understood that any Unit member who by willful misrepresentation violates the personal leave policy shall forfeit all accumulations and any other further rights to compensated absences under Article 11 until reinstated in good standing by the Board on the recommendation of the Superintendent.

B. Class C - Regular Deduction

1. Absence due to illness in the immediate family excluding uncles, aunts, nephews, and nieces who are blood relatives unless they are living in the same house, not otherwise provided herein, is basis for

SPA-299

regular deduction and will be so treated for a total of three (3) days within any one (1) year.

2. For absences not to exceed five (5) days (3 personal days and 2 illness days) beyond the five (5) days, taken for religious holidays provided the absences are scheduled for and approved by the Superintendent of Schools prior to the time the absences occur.

C. Class C - Full Deduction

1. For failure to supply, when requested, photostatic copies of written proof of court orders and specific days spent in court for any excusable reason.

2. For failure to file proper absence request forms in sufficient time to allow the Superintendent to rule on the request.

11. Class D Absences

A. Full deduction shall be made for all unexcused absences or absences in excess of allowances specified under Classes A, B, and C. For unexcused absences which occur during all or any part of the day before or after a paid day when school is not in session, the deduction shall include the paid day(s) when school is not in session. When the personal illness allowance specified under Class A has been exhausted, the deduction shall include paid day(s) when school is not in session except when the Unit member returns to work the first day school is in session after the holiday and a C.P.I. covering the period prior to the holiday is filed. The Unit member must work either the day before or the day after the paid day when school is not in session.

B. It is understood that excessive and/or repeated unexcused absences may result in disciplinary action.

12. Hardship - Unforeseen Circumstances

Deviation from any of the regularly specified conditions and exceptions covered by this Section and necessary because of extreme hardship or unforeseen circumstances shall be made only upon the recommendation and approval of the Principal and/or Central Office Department Head and the final approval of the Superintendent.

13. Return to Service

A. Following a Disability Retirement.

An Unit member may not be reinstated following a disability retirement except upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, and in addition, satisfactorily

24

SPA-300

passing a physical examination by a physician representing the Board of Education.

B. Following a Long Illness

An Unit member who has been absent because of illness, and whose illness certificate has not been approved for return by the physician representing the Board of Education may resume employment only after examination and certification by a physician representing the Board of Education and the approval of the Superintendent of Schools.

14. Catastrophic Illness Leave

A. Upon complete exhaustion of the paid illness allowance, personal leave, and vacation provisions of this Agreement, a unit member with a minimum of one (1) year of continuous employment may request from the Superintendent of Schools a catastrophic illness leave. The Superintendent shall convene a joint committee with ASAR representation, chaired by the Chief of Human Capital Initiatives, to review the request. If the joint committee recommends and the Superintendent approves, a unit member may receive up to ninety-five (95) paid illness days.

B. Upon exhaustion of such paid catastrophic illness leave, the unit member may reapply for an additional paid illness leave of up to ninety-five (95) days. The granting of such additional leave is discretionary on the part of the Superintendent and is contingent upon the unit member applying for a disability retirement at the time of their application for an additional ninety-five (95) paid illness days and their resigning from employment with the City School District at the end of such leave. No seniority shall accrue during catastrophic illness leave.

15. Emergency Closings

Unit members may be required to report to their normal worksite at the discretion of the Superintendent when schools are closed due to weather conditions. The Unit member shall not be required to report sooner than 90 minutes after a public media announcement of such reporting requirement. Unit members will not receive any additional compensation or leave days when they report. If the Unit member does not report to work, the Unit member shall take a vacation day, unless ill. In the case of illness, an illness day may be taken if supported by a Certificate of Personal Illness. Unit members who reside in a county where a state of emergency has been declared shall not be required to report to work and shall not be required to take a leave day.

GPA-301

A. If the Superintendent determines to close one or more, but not all, schools because of an emergency, the foregoing terms and conditions shall govern only the members of the Unit assigned to the schools affected by the determination.

B. If the Superintendent determines to close one, some, or all schools because of an emergency, he or she shall have the absolute right, after consultation with the President of ASAR, to direct the day(s) on which missed classes shall be made up, provided that such directive shall be consistent with the Education Law and the Regulations of the Commissioner of Education.

C. If a school day must be made up, and if a Unit member was required to and worked on the day the school and/or office was closed, and if the make-up day extends the Unit member's work year beyond 220 paid work days, the Unit member shall be paid his or her daily rate for the make-up day.

D. If a countywide "State of Emergency" is declared which prohibits travel and a Unit member has already reported to work, the Unit member will be immediately released provided that no students are under the Unit member's care. If a countywide "State of Emergency" is declared in Monroe County, which prohibits travel before a Unit member reports to work, the Unit member will not be required to report to work.

16. Vacation

A. Effective July 1, 2016, only Bracket I and II Unit members are eligible for vacation benefits.

All eligible certificated bargaining unit members who were members of the unit as of June 30, 2010 will receive 30 vacation days effective July 1, 2010. All eligible Unit members hired into the unit on or after July 1, 2010 will receive 25 vacation days for the first five consecutive years of employment. On July 1, following the five year anniversary date the annual vacation accrual award will be increased to 30 days.

B. For eligible Unit members hired or transferred in after July 1 or who terminate, retire, go on unpaid leave or transfer to a non vacation eligible position, the annual vacation accrual will be prorated as follows:

1. For an annual accrual of 25 days, two days will be awarded for each full month worked.

2. For an annual accrual of 30 days, 2.5 days will be awarded for each full month worked.

3. For each partial month worked, the percentage for the month worked shall be calculated as follows:

26

SPA-302

- If less than 50% one day will be awarded
- If 50% or greater, the full monthly accrual will be awarded.

4. If a member terminates or transfers, and, after applying the above proration calculation:

  - Has used vacation days beyond the allowable amount, the value of the vacation days exceeding the prorated amount shall be deducted from the next paycheck.

  - Has vacation days remaining, he/she will be paid for the unused vacation days.

C. A member of the unit who is a member before July 1, 2016 may carry over unused vacation days to a maximum of forty (40). Unused vacation days beyond this maximum are lost on June 30th. Members who join the unit on or after July 1, 2016 may carry over no more than five (5) unused vacation days per year to a maximum of forty (40).

D. Request for vacation days must be submitted twenty (20) days in advance and must be approved by the unit member's immediate supervisor which shall not be unreasonably denied. If not approved, the unit member may appeal the supervisor's decision to the superintendent whose decision is final and is not subject to the grievance procedure. If vacation requests are not approved, the supervisor must approve the required number of days at the end of the work year so as to avoid the unit member's loss of vacation days. Building-based Unit members may use vacation days with prior supervisory approval except during the last two weeks in June, the last two weeks in August and the first two weeks in September unless extraordinary circumstances are shown.

E. In the year in which a unit member severs employment with the District or takes a position that is less than 12 months, the member shall be paid for unused vacation days on a prorated basis, except as for Bracket III, IV, and V unit members when they changed to less than 12-month employees effective July 1, 2016.

F. Effective July 1, 2016, eligible Unit members may cash-in no more than ten (10) vacation days annually at the rate of 1/260th of the base salary for the pay period the cash in is made.

G. Unit members shall cash-in accumulated unused vacation days upon separation from the District at the rate of 1/260 of their base salary for the pay period in which the cash in is made.

SPA-303

27

# ARTICLE 12
## GENERAL ABSENCE PROVISIONS – CIVIL SERVICE STAFF

1. <u>Illness Allowance</u>

   A. All full-time employees covered by this Agreement shall receive and accrue illness allowance at the rate of one (1) day per month. For the purpose of computing accruals, employees who work less than twelve (12) month assignments will accrue illness days only during the months of their employment. Proration will be made in accordance with Article 11, Section 5 (C) above.

   B. An employee may use up to ten (10) days per year for family illness absence for care of a spouse, parent or child.

   C. Accumulated illness allowance, including reserve illness allowance previously granted, may be used in any amount consistent with the procedures outlined in Section 2 below.

   D. Unit members who retire after completing 15 consecutive years of service in the district immediately preceding retirement are eligible to receive an attendance incentive if they have used no more than 15 total sick days in the 5 years immediately preceding retirement. The incentive of $10,000 will be paid to the member, deferral into a tax-sheltered plan, or placed into an account to be administered by the District for the member's use in retirement to enhance standard health and dental benefits until the credit is exhausted.

2. <u>Absence Procedures for Illness</u>

   A. For all absences, a Request for Absence must be submitted.

   B. For absences of more than three (3) consecutive days of illness, a Certificate of Personal Illness (C.P.I.) must be filed with the employee's supervisor upon their return to work:

      1. Stating the nature and extent of the illness

      2. Part II of the Certificate of Personal Illness must be completed by a duly registered physician, licensed chiropractor, or Christian Science Practitioner for each payroll period for all days taken regardless of the number.

      3. A Certificate of Personal Illness, completed as in Part II above, must be submitted if requested by the Superintendent of Schools or his/her designee:

         a) before or after holidays, and/or paid local recess days
         b) before or after paid scheduled recesses
         c) first and last day school is in session

28

SPA-304

    d)   at any time requested by the Superintendent of Schools or his/her designee

3.   <u>Extended Illness or Injury Leave</u>

An employee who is ill for a prolonged period and has used all sick leave allowance included under this Agreement shall be granted a leave of absence due to illness or injury as follows:

A. Extended Leave at One-Half Pay shall be authorized after sick leave accruals, unused vacation days, and personal leave days have been exhausted, with the approval of the Chief of Human Capital Initiatives. Such leave shall be granted only on the basis of a doctor's certificate, clearly stating the nature and expected length of disability. Said doctor's certificate is to be filed with the Chief of Human Capital Initiatives within seven (7) calendar days of the employee exhausting all full pay accruals. The Extended Sick Leave will be retroactive to the date of eligibility.

B. Eligibility: Extended Sick Leave at One-Half Pay shall be granted to employees with a minimum of one (1) year of continuous service. This benefit can only be used once every twelve (12) months no matter how short the duration of One Half Pay is used.

C. Initial Allowances: Based upon years of service to the City School District, employees will have the following allowances of Extended Sick Leave at One Half Pay for each of the service time periods indicated:

One full year but less than three years – 30 working days;

Three full years but less than six years – 60 working days;

Six full years or more – 90 working days.

Service time must be continuous years of service with the City School District of Rochester.

D. Additional Allowance: If an employee utilizes any amount of Extended Sick Leave at One-Half Pay, he/she will begin re-accumulating the allowance according to the schedule in Paragraph "C" as if a new employee. However, an employee will retain any unused Extended One-Half Sick Pay allowance previously accumulated. Retained allowances and additional allowance provided in this Section shall not be cumulative and in no event shall the total allowance exceed the maximum allowance set forth in Paragraph "C" of this section. An employee's eligibility for additional allowance will be calculated from the day the employee resumes working after having last used Extended Sick Leave at One-Half Pay.

E. Employees shall receive the following fringe benefits while on One-Half Pay Sick Leave: Pension, Blue Cross/Blue Shield, Medical and Hospital

29

SPA-305

benefits, Dental benefits, and Life Insurance. There shall be no accrual of vacation, sick or personal leave while on One-Half Pay Sick Leave.

F. An employee who is on an Extended Sick Leave at One-Half Pay shall not be eligible for Catastrophic Illness Leave, as described in Section 4. Employees diagnosed with an illness or injury of a catastrophic nature while on Extended Illness Leave at One-Half Pay, may also apply for Catastrophic Illness Leave retroactive to the date of the diagnosis.

G. Additional leave without pay may be granted upon the recommendation of the Chief of Human Capital Initiatives and approval of the Superintendent of Schools.

4. Catastrophic Illness

A. Upon complete exhaustion of paid illness allowance, personal leave, and vacation provisions of this Agreement, a unit member with a minimum of one (1) year continuous employment may request from the Superintendent of Schools a catastrophic illness leave. The Superintendent shall convene a joint committee chaired by the Chief of Human Capital Initiatives to review the request. If the joint committee recommends and the Superintendent approves, a unit member may receive up to ninety-five (95) paid illness days.

B. Upon exhaustion of such paid catastrophic illness leave, the employee may reapply for an additional paid illness leave of up to ninety-five (95) days. The granting of such additional leave is discretionary on the part of the Superintendent and is contingent upon the unit member applying for a disability retirement at the time of their application for an additional ninety-five (95) paid illness days and their resigning from employment with the City School District at the end of such leave if their disability retirement has been approved. No seniority shall accrue during catastrophic illness leave.

5. Personal Leave Days

A. All full-time employees covered by this Agreement shall receive three (3) personal leave days per year.

B. Personal leave days may be taken for personal business, religious observances, or family illness not covered in other sections of this Agreement and which require absence during work hours.

C. Application for personal leave shall be made at least three (3) working days in advance of taking such leave (except in the case of emergencies). The applicant shall state "Personal Leave" as the reason for taking such leave.

D. Personal leave shall not be granted under the following conditions:

30

SPA-306

1.  The day before or after a paid holiday or local recess day, except in matters of an emergency nature as shall be approved by the Superintendent of Schools or his/her designee.

2.  The first two (2) weeks or the last two (2) weeks school is in session except for religious holidays or in matters of an emergency nature as approved by the Superintendent of Schools or his/her designee.

3.  Time taken for personal business not included in or in excess of the amount allowed may not be made up, either prior to or subsequent to the absence, and shall result in salary loss.

4.  Personal leave days not taken will be carried over into the next school year as accumulated sick leave. Such accumulations shall be in addition to regularly accumulated sick leave.

6.  <u>Miscellaneous Paid Absences</u>

No deduction shall be made for absences not to exceed a total of eight (8) days in any one school year, under the conditions specified below including individual limitations for each incident at outlined. Exceptions to increase either the individual incident limitation or the total eight-days-in-one-year limitation, for situations considered abnormal or unusual, may be made only when approved by the Superintendent of Schools or his/her designee.

A.  Absences due to death in the immediate family[2], maximum of five (5) consecutive working days per incident including either the day of the death or the day of the funeral.

B.  Death of blood relatives (aunts, uncles, nieces, nephews, cousins) not to exceed one (1) day as requested with notice of death. If such blood relative was living in the employee's household, then three (3) days may be used.

C.  Jury Duty — As required and approved.

1.  All compensation received for services preformed as a juror while on required and/or approved jury duty shall be refunded to the City School District by check made out to the City School District and forwarded to the Personnel Department. Said refund need not include authorized transportation and/or parking fees for which funds are or are not provided.

D.  Military — Personnel in reserve military units will be paid as required by law. Copy of the military order must accompany the Request for Absence form.

---

[2] Immediate family: spouse, parent, sister, brother, child, grandparent or grandchild, by blood, marriage or legal adoption — excluding aunts, uncles, nieces and nephews who are blood relatives unless they were living in the same house.

31

SPA-307

E. Quarantine – By Health Bureau action, as needed.

F. Subpoena – If not interested party, as required and approved.

G. Moving Day – One (1) day per year.

H. Absence for two (2) days to the father for birth or parent for legal adoption of children.

I. Absence not to exceed two (2) days per year if necessitated by educational examinations conducted by New York State, Board of Education, or by an institution of collegiate grade, or for the attendance thereafter as a recipient of a degree or a diploma.

Absence of one (1) day (including travel time) to attend the presentation of an earned degree or diploma by an employee's spouse or child from a college or other post-secondary school, accredited institution, or high school graduation over one hundred (100) miles away or conflicting with the employee's scheduled work hours.

J. Miscellaneous Unpaid Absences – Personnel (Regular Deduction)

1. Absence due to illness in the immediate family[3] is basis for Regular Deduction and will be so treated for a total of ten (10) days in any one (1) school year.

7. <u>Other Leaves of Absence</u>

A. Leaves of absence for purposes of Maternity, Education, or ACTION Leave may be granted to employees covered by this Agreement consistent with the procedure established for the granting of such leaves for other District non-certificated personnel.

B. The Superintendent of Schools may recommend to the Board of Education for approval, other leaves of absence for employees covered by this Agreement. Such leaves if granted shall be upon such terms and conditions as the Board of Education may approve.

8. <u>Vacation Days</u>

A. Civil Service members shall receive 25 vacation days upon hire into the unit. On July 1, following the fifth anniversary of date of hire the vacation days shall increase to 30 days. For those members who completed their fifth anniversary date prior to July 1, 2015, they shall move to 30 vacation days (or a pro-rated portion thereof) for the 2015-2016 school year upon ratification of this agreement. All other Civil Service members shall move to 25 vacation days (or a pro-rated portion thereof) for the 2015-2016 school year upon ratification of this agreement.

---

[3] Immediate family: spouse, parent, sister, brother, child, grandparent or grandchild, by blood, marriage or legal adoption – excluding aunts, uncles, nieces and nephews who are blood relatives unless they were living in the same house.

32

GPA-308

B. The amount of vacation days which can be carried over will be limited to forty (40) days.

C. Unit employees will have the option of "cashing in" up to ten (10) days annually of their accumulated vacation days at anytime at their current daily rate of compensation. Cash in rate is 1/260 of current salary.

D. Civil Service members leaving the employ of the City School District of Rochester after July 1st of any year and having given written two (2) weeks' notice to the Human Capital Initiatives Department shall have their total pay adjusted to include annual vacation allowance computed on the basis of one twenty-sixth (1/26th) of their total annual vacation allowance for each full pay period worked or major portion thereof in addition to all previously accrued and unused vacation days. In the case of death, such payment shall be made to the employee's estate or beneficiary. Paid legal holidays occurring in accrued vacation time after the last day of work shall not be included.

9. <u>Emergency Closings</u>

A. Unit members may be required to report to their normal worksite at the discretion of the Superintendent when schools are closed due to weather conditions. The Unit member shall not be required to report sooner than 90 minutes after a public media announcement of such reporting requirement. Unit members will not receive any additional compensation or leave days when they report. If the Unit member does not report to work, the Unit member shall take a vacation day, unless ill. In the case of illness, an illness day may be taken if supported by a Certificate of Personal Illness. Unit members who reside in a county where a state of emergency has been declared shall not be required to report to work and shall not be required to take a leave day.

B. If a countywide "State of Emergency" is declared which prohibits travel and a Unit member has already reported to work, the Unit member will be immediately released. (Provided that no students are under the Unit Member's care.) If a countywide "State of Emergency" is declared which prohibits travel before a Unit member reports to work, the Unit member will not be required to report to work.

## ARTICLE 13
## <u>LEAVES OF ABSENCE – CERTIFICATED STAFF</u>

1. <u>Return After Leave; Tenure Status</u>

A tenured Unit member returning from a leave shall retain tenured status.

2. <u>Parental Leave</u>

SPA -309

33

A. Any Unit member on permanent appointment or on probationary status is eligible for parental leave without pay.

B. Where possible, not less than thirty calendar days prior to the commencement of the requested leave, a request for leave shall be made in writing to the Human Capital Initiatives indicating the dates of the leave. A physician's statement or a statement from an adoption agency must accompany the request for leave.

C. The Unit member must agree to write the Chief of Human Capital Initiatives not later than November 1 in the fall semester or March 1 in the spring semester before the expiration of the leave, concerning plans for the next school term. Unless an extension is requested and granted, the Unit member shall either return to service no later than the beginning of the 3rd full semester from the date such leave is granted, or the Board shall terminate services. Return to service shall be at the beginning of a school semester.

D. In the event an Unit member exercises the right to return at the end of the leave, the Unit member shall be entitled to receive all benefits accumulated prior to the time of the leave.

E. Where an employee has used her illness allowance due to a pregnancy related disability, upon termination of that pregnancy related disability, the employee must return to work or must request a parental leave in accordance with the provisions of this Article.

F. Leaves of absence without pay shall be granted for the purposes of parenting.

G. If the parental leave of absence is granted before the expiration of a probationary period, the Unit member must complete the unexpired portion of the probationary period satisfactorily upon return from leave before tenure appointment is granted.

H. All Unit members returning from leaves of absence under this section shall be restored to equivalent positions.

3. Exchange Administrator Leave

A. Upon the recommendation of the Superintendent of Schools, leave for exchange administrative positions under either national or international programs may be granted by the Board to Unit members who have successfully completed their entire probationary period in the City School District.

B. The Board shall compensate any Unit member granted exchange Administrator leave on the basis of said Unit member's regular salary status. Any period served as an exchange administrator shall be applied to

34

SPA- 310

the salary schedule annexed hereto as if such period had been served by the Unit member in the City School District.

4. Action Leave

   A. Leave of Absence without pay will be granted up to two (2) years to any Unit member who joins the Peace Corps or V.I.S.T.A. as a full-time participant in such program.

   B. During any period so served, the unit member's salary shall be increased in accordance with all provisions of this contract.

5. Sabbatical Leave for Accredited Study

   Regularly appointed Unit members who have served for five (5) years in the City School District and who have been granted tenure in his/her current position may, upon the recommendation of the Superintendent of Schools and with the approval of the Board, be granted leave of absence for accredited study upon the following conditions:

   A. Applicants must file with the Superintendent of Schools a statement of the definite purpose for which such leave of absence is desired. This statement must include the institution at which the individual is to study and courses to be pursued.

   B. Any change in the approved plans must be submitted in writing in advance to the Superintendent of Schools and the Board of Education for approval. Sabbatical leave pay will not be paid for change in plans not so approved.

   C. The Unit member's immediate supervisor and Cabinet level supervisor shall be asked to make their recommendations to the selection committee regarding the Unit member's application for a sabbatical leave.

   D. The CIAS Panel will review and make recommendations to the Superintendent regarding sabbatical applications for ASAR members.

   E. At the discretion of the CIAS Panel, sabbaticals may also be awarded for reasons other than accredited university study. Such leave applications must be directly connected/related to one of the following:

      1. The District's five (5) design tasks:

         a. Dimensions of leadership

         b. Knowledge of teaching and learning.

         c. Effective organizational management.

         d. Public engagement and collaboration with others.

         e. High performance management professional development reflective practice.

SPA-311

35

2. The school's three-year improvement plan.

3. The District's benchmarks.

F. Persons granted sabbatical leave of absence are required to report once each semester to the Superintendent of Schools during such absence, indicating the nature of the courses taken at a university and the application of these to the work of the individual. Those on sabbatical leave for travel shall submit a report of their travel.

G. Applicants must file with the Board a written agreement to remain in the service of the Board for three (3) years after the expiration of such leave. If an Unit member resigns from the service of the Board within the three (3) year period, the Unit member shall refund to the City School District such proportion of the salary paid during the leave of said period. If, upon return from sabbatical, the services of the Unit member are terminated through job abolition at any time during the three (3) year period, and if the Unit member is no longer employed by the City School District, the Unit member shall not be required to pay any prorated refund. Any refund owed to the City School District shall be repaid in equal monthly installments, as a minimum, so that the total amount owed to the City School District will be paid in full not later than five (5) years following the expiration date of the paid sabbatical leave.

H. Such leave shall not be granted for less than one (1) full semester nor more than one (1) year. Unit members taking leave shall not be eligible for such leave until five (5) years have expired after return.

I. An Unit member on sabbatical leave will receive 60% of base salary for the length of the leave.

J. At any time at least one (1%) percent but not more than two (2%) percent of the total number of Unit members shall be eligible for sabbatical leave, i.e., those who have served for five (5) years shall be eligible for a leave of absence. In case the number of applications shall exceed one (1%) percent, selection shall be made based primarily on length of service as an Unit member or supervisor in accordance with the following principles:

1. Preference being given to those longest in service.

2. Distribution by schools, care being taken that the number from any school shall not be comparatively excessive.

3. Nature of service, provision being made that the benefits of such leave of absence shall be distributed as fairly as possible among all positions covered by this Agreement.

K. Regular annual salary increases shall be given for the time of leave the same as for regular service in the school.

36

SPA-312

L. Applications for such leave of absence for any school year shall be acted on by the Board of Education not later than its first regular meeting in April of the preceding year.

M. If any applicant notifies the Board on or before March 30 of the inability to take the sabbatical, the Board shall extend the sabbatical to the next eligible Unit member on the list.

N. Deviations from the above may be recommended by the Superintendent.

In each school year, the District shall grant enough sabbatical leaves to total 1% but not more than 2% of the eligible Unit members.

6. Other Approved Leaves

A. Leave Without Pay

Permanently appointed Unit members who are members of the bargaining unit may, upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, be granted leave of absence without pay.

B. Salary Determination/Full-Time Study

Permanently appointed Unit members may, upon the recommendation of the Superintendent of Schools and with the approval of the Board of Education, be given their regular salary increase for full-time approved study at an accredited institution of higher learning. For purposes of complying with this Section, it is understood that full-time study shall be defined as a minimum of ten (10) semester hours of approved study each semester.

C. Deviations from the above may be recommended by the Superintendent.

7. Return After Leave of Absence

A. Unit members who have been granted leaves of absence shall notify the Superintendent of Schools in writing on or before the first day of November or March preceding the opening of the semester following the expiration of the leave of their intention to resume work at the beginning of the ensuing school semester.

B. All Unit members returning from leaves of absence shall, upon request, be restored at the same or equivalent positions they held at the time the leave was granted.

SPA-313

37

## ARTICLE 14
## MISCELLANEOUS FRINGE BENEFITS

1. **Allowance for Transportation**

   A. Unit members required to use their own automobile on official business or on an irregular basis shall be reimbursed at the highest minimum rate per mile in effect in the District at the time of such use. Approved parking expenses incurred in such travel shall also be reimbursed.

   B. Other Unit members not covered in "a" above shall receive a monthly transportation allowance based upon a schedule of allowances prepared by the Finance Department and approved by the Superintendent of Schools and shall be included in the regular salary check each pay period.

   C. Outside of District Travel. Each Unit member shall be allotted a base sum of $600 per year effective July 1, 2009, for approved conferences and out of district travel. Additional allowance for Unit members may be provided in the budget with the approval of the appropriate division head.

   D. Travel Funds not disbursed by the Association in a given school year shall be retained by the Association and shall "roll over" into the following year for the same purpose.

   E. Travel funds shall be paid in total to ASAR in July of the school year based on the ASAR membership at that time. In October, additional monies shall be paid to ASAR for any membership increase since July. The October payment shall be the final payment for the school year.

   F. In July of each year, ASAR will provide the District's Chief Financial Officer documentation of disbursements from the travel funds for the previous school year in the form and substance required by the Chief Financial Officer after consulting with the Executive Director of ASAR.

   G. The immediate supervisor of each Unit member shall approve or deny the Unit member's Request for Absence. Travel forms shall be approved and processed by ASAR. Requests for Absence for travel must be submitted to the immediate supervisor 30 calendar days prior to the absence unless there are extenuating circumstances.

2. **Medical Examination.** All medical examinations and tests related to application requirements for new Unit members shall be paid for by the City School District provided that with the approval of the Board of Education, an Unit member may be examined by a doctor of his own choice with the Unit member paying the difference between the cost of that examination and the District provided examination.

3. **Standard Immunization.** Standard immunization, if required by the Board of Education, shall be provided for all Unit members.

38

6PA-314

4.  Professional Development Funds.

   A.  Effective July 1, 2009, the District shall allocate annually to the Association $200 per member for a professional development fund to be managed and administered by ASAR. The purpose of this fund is to reimburse Unit members for advanced academic studies that are not designed or intended to lead to an advance degree or certificate. Effective upon the ratification of the 2001-2003 Agreement, professional development funds may be used to pay registration fees at conferences, seminars and training classes.

   B.  Professional development monies not disbursed by the Association in a given school year shall be retained by the Association and "rolled over" into the following year for the same purpose.

   C.  Professional development monies shall be paid in total to ASAR in July of the school year based on the ASAR membership at that time. In October, additional monies shall be paid to ASAR for any membership increase since July. The October payment shall be the final calculation for the school year.

   D.  In July, ASAR will provide to the District's chief Financial Officer documentation of disbursements from this fund for the previous year in the form and substance required by the Chief Financial Officer after consulting with ASAR's Executive Director.

   E.  Centralized professional development sponsored by ASAR, will be done in collaboration with District leadership development team and /or HCI.

## ARTICLE 15
## DISCIPLINE AND DISCHARGE
## NONTENURED CERTIFICATED STAFF

1.  Discipline and Discharge Probationary Unit members

   A.  Eligibility

      The provisions of this clause shall apply only to probationary Unit members.

   B.  Discipline

      1.  No eligible Unit member within the bargaining unit shall be disciplined without good and sufficient cause.

      2.  Disciplinary action or measures may include but not be limited to the following:

         a.  Oral reprimand

         b.  Written reprimand

39

SPA-315

  c. Suspension (with or without pay)

  d. Discharge

Any disciplinary action or measure imposed may be subject to the grievance procedure up to and including Level Three, except that in the case of such action against a non-tenured Unit member which is based on the results of a regular evaluation, the provisions of this Section shall not apply.

  3. Whenever an Unit member is required to give a statement that involves potential disciplinary action he or she shall have present a representative of ASAR to act on his or her behalf.

C. Discharge

The discharge of a probationary Unit member which is based upon the result of a regular evaluation shall be governed by Section 3031 of the Education Law except that nothing in this clause shall be construed to deny said probationary Unit member the opportunity to discuss the dismissal with any appropriate supervisory personnel.

## ARTICLE 16
## DISCIPLINE AND DISCHARGE
## TENURED CERTIFICATED STAFF ONLY

1. Eligibility

The provisions of this Article shall apply only to tenured Unit members.

2. Discipline and Discharge

A. No eligible Unit member within the bargaining unit shall be disciplined without good and sufficient cause.

B. Disciplinary action or measures may include, but not limited to the following:

  1) Oral reprimand

  2) Written reprimand

  3) Suspension (with or without pay)

  4) Salary withhold and/or performance incentive withhold

  5) Discharge

SPA-316

C.   Except as specified elsewhere in this Section, any disciplinary action imposed upon any eligible Unit member may be processed as a grievance through the regular grievance and arbitration procedure.

D.   Whenever an Unit member is required to give a statement that involves potential disciplinary action he or she shall have present a representative of the ASAR to act on his or her behalf.

E.   No eligible Unit member within the bargaining unit shall be suspended without pay or discharged without good and sufficient cause. If the City School District determines that there is good and sufficient cause for discharge, the Unit member and the Association shall be notified in writing. Notification shall also include whether or not the Unit member has been suspended pending an investigation and recommendation by the Superintendent to the Board of Education. Within seven (7) days of the initial notice, the Superintendent of Schools shall file with the clerk of the Board of Education a written statement of charges. Upon receipt of said charges, the clerk of the Board shall immediately notify the Board. Within five (5) days after receipt of the charges, the Board shall meet in executive session to determine, by a majority vote of the Board of Education, whether probable cause exists to pursue the recommended discharge. If the Board determines that probable cause does exist, a written statement specifying the charges in detail, and outlining the options available under this Agreement and under Section 3020-a of the Education Law shall be immediately forwarded to the Unit member by certified mail. Such notice shall include whether the Unit member is suspended pending determination of the charges. Within ten (10) days of receipt of the statement of charges, the employee shall notify the City School District whether he/she desires to pursue one of the following procedures:

   1.   No hearing

   2.   Panel hearing - 3020-a procedure

   3.   Arbitration - contractual procedure

F.   Failure of the employee to notify the clerk of his desire for a hearing within ten (10) days of the receipt of charges shall be deemed a waiver of rights to a hearing or arbitration.

G.   If the employee waives his right to the procedures provided in this Agreement, the Board of Education shall proceed within fifteen (15) days, by a majority vote of all members of the Board to determine the case and fix the penalty or punishment.

H.   It is understood that once the employee chooses one of the above procedures he/she shall be bound by the procedure chosen and shall not be permitted to pursue more than one procedure.

41

SPA-317

I.   If the Unit member chooses to pursue the statutory procedure, all applicable provisions of Section 3020-a shall apply.

J.   If the Unit member chooses to pursue the arbitration procedure, all applicable provisions of the arbitration section of this Agreement and the provisions of Article 75 of the Civil Practice Law and Rules shall apply.

## ARTICLE 17
## DISCIPLINE AND DISCHARGE
## CIVIL SERVICE STAFF ONLY

Civil Service unit members who have completed a one year probationary period in their job title are entitled to due process under the contract, including binding arbitration and joint selection of the hearing officer. ASAR and the District will share the costs of the hearing officer. ASAR will provide representation to the unit member. In the event that any unit member elects to be represented by any party other than ASAR, or its affiliate SAANYS, such unit member shall be individually responsible for all expenses which are incurred in connection with the disciplinary proceeding. Mutual discovery shall be permitted to the same extent as it is provided to tenured certificated employees. The District can suspend a member without pay for a maximum of 30 days. Members may be disciplined for acts that occurred up to 3 years earlier.

## ARTICLE 18
## ACTING ADMINISTRATIVE ASSIGNMENTS

1.   Acting positions shall not be for a period of more than one (1) year from the date of appointment. Unit members serving in acting positions shall have absolute right of return to their former positions.

2.   Appointments to acting positions shall be governed by Article 7 herein, unless the vacancy is created by an emergency.

## ARTICLE 19
## ALLOCATION OF BUILDING STAFF

1.   By June 1, a joint committee appointed by the Chief of Human Capital Initiatives and the President of ASAR will meet to review the proposed administrative structure and responsibilities in secondary schools for the next school year.

2.   Appropriate building Unit members shall be directly involved in the selection of teachers, paraprofessionals and Unit members to be assigned to their building.

42

SPA-318

3. During the first week in June, the District will meet with a five (5) member committee of ASAR for assistant principal allocation.

Tentative Assistant Principal assignments will be recommended during the first week of June. The assignments will be reviewed at the end of the first attendance period in October. Mutually agreed upon revisions in assignments will be made based upon the latest data.

The City School District has worked toward, and will continue to work toward the full assignment of Elementary School Assistant Principals to single Unit member elementary schools. We believe this is the means through which the greatest amount of concentrated instructional support can be provided to schools.

4. Appendix B sets forth an agreed upon formula to determine assistant principal allocations. The calculations under this formula will be used by the district in constructing the Annual District Budget.

## ARTICLE 20
## PROTECTION OF UNIT MEMBERS

1. <u>Assault and Battery Cases.</u>

   A. The Board shall maintain a policy of public support of prosecution of offenders in all cases of assault and/or battery upon Unit members who are engaged in the performance of their duty.

   B. Unit members shall be required to immediately report in writing all cases of assault and/or battery suffered by them in connection with their employment to the Superintendent of Schools or his designee, and the Association. This report will be forwarded immediately to the Superintendent who in turn shall report the information to the Board.

   C. The Superintendent and representative or Counsel shall inform the Unit member immediately upon receipt of the report of assault and/or battery of his/her rights under the law and shall provide such information in a written document.

2. <u>In Other Than Assault and Battery Cases.</u>

   A. The Board shall provide Counsel and pay court costs and judgments related to any administrative or judicial proceeding or suit involving an Unit member who has acted in the discharge of duties within the scope of his employment. The Unit member must, however, deliver copies of any legal papers served upon him/her to the office of the Board's Counsel not later than five (5) days after service. Disciplinary proceedings under the

SPA - 319

43

education law involving Unit members shall be excluded from the provisions of this Section.

B.   Pursuant to Section 3023 of the Education Law... "It shall be the duty of each Board of Education...in any school district having a population of less than one million...to save harmless and protect all teachers, practice and cadet teachers, and members of the supervisory and administrative staff, or employees from financial loss arising out of any claim, demand, suit or judgment by reason of alleged negligence or other acts resulting in accidental bodily injury to any person or accidental damage to the property of any person within or without the school building, provided such teacher, practice or cadet teacher, or member of the supervisory or administrative staff, or employee at the time of the accident was acting in the discharge of his duties within the scope of his employment and/or under the direction of said Board of Education..."

C.   If a complaint against a Unit member is not sustained, the Unit member shall be reinstated with full reimbursement of all compensation lost.

D.   When a Unit member acting in the discharge of duties within the scope of employment is involved in an administrative or judicial proceeding that requires meeting during the school day, the Unit member shall be released with full pay and the time shall not be charged against sick leave or personal leave time.

E.   The Board shall provide counsel and pay court costs and judgments related to any administrative or judicial proceeding or suit involving a unit member who has acted in the discharge of duties within the scope of his employment. In instances when the interest of the District and the unit member may conflict the District shall so notify the unit member and shall reimburse the unit member for his representation and any damages and court costs in an administrative or judicial proceeding or suit involving the Unit member who has acted in the discharge of duties within the scope of his/her employment.

## ARTICLE 21
## PERSONAL INJURY BENEFITS

1.   Coverage. All Unit members are covered by Workers Compensation insurance which protects them in case of accidents while on duty. In the event of such an accident, the Unit member shall immediately notify the Superintendent of Schools or his designee that the proper forms can be executed by the school authorities and attending physician.

SPA- 320

44

2. <u>Procedure</u>. Should an assault on a unit member occur, and if it results in loss of time, the unit member shall be paid in full for a period of six (6) months; this period may be renewed for successive six (6) month periods upon certification of the continuance of the disability by a District physician. Such paid absence shall not be deducted from any sick leave to which such Unit member is entitled under this Agreement.

3. <u>Reimbursement</u>. The City School District shall reimburse Unit members for the replacement cost of any clothing, dentures, eyeglasses, hearing aids, or other similar items which are damaged or destroyed while they were acting in the discharge of their duties, within the scope of their employment, provided that such replacement cost does not result in double reimbursement.

## ARTICLE 22
## <u>VACANCY AND TRANSFER</u>

1. For the purposes of this section, a bona fide vacancy is defined as occurring once a bargaining unit position becomes open to be filled with a probationary appointment.

2. When a vacancy exists, the District shall inform the President of ASAR in writing and post the vacancy in the district's weekly electronic bulletin.

3. All vacancies for bargaining unit positions including assignments to summer school positions shall be posted for five (5) business days unless the position will be filled with an acting assignment. The intent to fill the position on an acting basis shall be communicated to the President of ASAR by the Superintendent or his/her designee in advance of making the acting assignment.

4. Applications for unit positions shall be screened by the Department of Human Capital Initiatives to establish if the applicant meets minimum qualifications contained in the posting. Applications of qualified candidates will then be sent to the appropriate supervisor for additional screening and interviewing.

5. To be considered for a lateral transfer to a posted vacancy, a Unit member must indicate his or her interest, in writing, to the Chief of Human Capital Initiatives by 4:00 p.m. of the fifth business day of the week that the vacancy was posted.

6. During the period between July 1 and the first day of the April recess, any Unit member may submit a promotional application for a specific position at any location, an identified number of locations, or a specific location.

7. The District will announce annually that it is accepting promotional applications for titles when openings occur through the year.

SPA-321

45

8. Paragraphs 6 and 7 do not restrict the District from advertising for a particular position or title at any time. All Unit members are eligible to apply as a result of such advertising.

9. When a principal has given written notice to terminate employment with the District, or the District has created a new principalship, or the District has taken action to create an opening in a principalship, all principals in that level (elementary or secondary) shall be informed of the opening and be given an opportunity to request a transfer. The principals will be given five working days from the time the notice is mailed to respond in writing to the Superintendent. The transfer request is confidential and shall not be discussed beyond the Superintendent and his or her direct reports, unless the Superintendent decides to approve the transfer request.

10. Section 9 is not activated if the leaving principal requests that his or her departure be kept confidential for a reasonable period of time. If that request is made and honored by the District, Section 9 is activated after the period of confidentiality.

11. Unit members shall be notified at least thirty (30) days in advance of any change in assignment, unless an emergency situation exists.

12. The superintendent of the District may pre-select up to three individuals per year for permanent positions, without having to post those positions. Any pre-selections without posting beyond the three must be mutually agreed upon by the District and ASAR.

## ARTICLE 23
## OBSERVATION AND EVALUATION

### Tenured and Non Tenured Certificated Staff

1. A Unit member shall be evaluated annually by his or her immediate supervisor.

2. The evaluation process and form shall contain a level of performance described as "Highly Effective."

3. Every two years, a Unit member having tenure shall receive a $1,500 incentive if in that year the Unit member is evaluated by his or her immediate supervisor as "Highly Effective." Effective in the 2006-07 school year, tenured principals are no longer eligible for this incentive.

4. The appropriate Cabinet member may appeal this evaluation to the CIAS Panel, which will review and may reverse the evaluation by a majority of the full panel.

SPA-322

5. All observations and evaluations of non-tenured Unit members will be conducted in accordance with the present form or a new form developed and approved by the CIAS Panel. CIAS timeframes are guidelines only.

6. All observation of work performance of non-tenured Unit members shall be conducted openly, with full knowledge of the Unit member.

7. A non-tenured Unit member shall be given a copy of his/her final evaluation prepared by the supervisor upon request.

8. No reports shall be submitted to central administration or the CIAS Panel, placed in any Unit member's file or otherwise acted upon without prior review with the Unit member. A Unit member will be entitled to have a representative of ASAR present at the conference.

9. All observation and evaluation forms for non-tenured Unit members shall require the signature of the evaluator or observer and the Unit member. These standard forms shall contain the statement "I have read and (do/do not) agree with the above," followed by space for the Unit member's signature.

10. The Unit member shall also have the right to submit a written reply to such material and attach it to the file copy.

11. No material derogatory to an Unit member's conduct, service, character, or personality shall be placed in a personnel file unless the Unit member has received such material indicating he has had the opportunity to review it. This clause shall not apply to:

    A. Reference information supplied by former employers.

    B. Reference information supplied by colleges and universities.

    C. Reference information as required by the local promotional procedures.

    The Unit member shall also have the right to submit a written reply to such material and have it attached to the file copy.

12. No observation or evaluation forms of any kind shall become part of an Unit member's personnel file unless it has met the above conditions.

13. A. A Unit member shall have the right upon request and by appointment to review the contents of that Unit member's personnel and CIAS file except information supplied by reference sources. A Unit member will be entitled to have a representative of ASAR present during such review.

    B. No agency or group or ASAR representative shall have access to an Unit member's personnel or CIAS file without prior consent of the Unit member.

    C. The District shall maintain a list which shall become part of the personnel file of all personnel who review the Unit member's personnel or CIAS file, which list shall contain the name of the individual and the date

47

SPA-323

reviewed. An individual not known to the custodian of the file shall be required to identify themselves prior to gaining access to the file. No access except as provided herein to a Unit member's personnel or CIAS file shall be permitted.

14. A non-tenured Unit member may request an observation or evaluation be made by an appropriate Central Office staff member at any time during the school year.

### Civil Service Staff

1. Civil Service members will receive an annual evaluation according to the process and using the instrument developed by the District and the Association.

2. Any member rated as "exceeds expectation" overall will receive an off-base bonus of $1,000 payable during July or August of the following school year.

3. Any member rated as "unsatisfactory" overall will be subject to a salary increase withhold (the amount of which may be recoverable as a bonus with the approval of the Superintendent (or his/her designee) in the subsequent year, depending on performance.

4. Any member who has any portion of salary increase withheld by the Superintendent (or his/her designee) may contest this action through the grievance procedure.

5. The District will provide substantive training for evaluators as needed.

### ARTICLE 24
### GRIEVANCE PROCEDURE

1. Grievance.

   A grievance is a claim by one or more bargaining unit members, based on the occurrence of an actual event involving the member(s), that one or more specific provisions of this collective bargaining agreement, mutually recognized past practice, or policy adopted by the Board of Education have been violated by the District.

2. Level 1.

   A. A bargaining unit member shall submit his or her grievance to his or her principal or if the member does not work in a school or is a principal to his or her immediate supervisor. The grievance shall be submitted on a standard form and contain substantially all the information required by the form. The grievance shall be submitted so as to be received by the principal or immediate supervisor within ten (10) work days of the date on

48

GPA-324

which the member knew or should have known of the grievance. The member shall provide ASAR with a copy of the grievance.

B. The grievance shall be addressed by the principal or immediate supervisor within ten (10) work days of its receipt. Addressing the grievance may include one or more conversations between the member and the principal or immediate supervisor, and on such occasions the member shall be entitled to have an ASAR representative present and participate in the conversation(s).

C. If the grievance is not resolved to the satisfaction of the member by the conclusion of the tenth work day, the principal or immediate supervisor shall reduce his or her decision to writing and provide it to the member within five (5) further work days.

3. Level 2.

A. If the grievance has not been resolved to the satisfaction of the member and ASAR at Level 1, the member and ASAR may submit the grievance to the Superintendent or his/her designee. The contents of the submission shall be a copy of the grievance submitted at Level 1, the written decision of the principal or immediate supervisor at that level, and a concise statement by ASAR of its position on the grievance. The grievance shall be submitted so as to be received by the Superintendent or his/her designee within five (5) work days of the date of the decision of the principal or immediate supervisor at Level 1.

B. The grievance shall be addressed by the Superintendent or his/her designee within fifteen (15) work days of its receipt. Addressing the grievance shall include reviewing the decision of the principal or immediate supervisor at Level 1, and may including providing ASAR an opportunity to meet and discuss the grievance.

4. Arbitration.

If the grievance has not been resolved to the satisfaction of ASAR at Level 2 ASAR may submit the grievance to arbitration by filing a Demand for Arbitration with the Public Employment Relations Board (PERB) on the form and in the manner prescribed by PERB. If such a Demand is to be filed, it shall be filed by ASAR within fifteen (15) work days of ASAR's receipt of the decision of the Superintendent or his or her designee at Level 2. The Chief of Human Capital Initiatives shall be provided a copy of the Demand when it is filed. Thereafter, arbitration shall proceed in accordance with the rules of PERB and the Article 75 of the Civil Practice Law and Rules. The arbitrator shall have no authority or power to make any decision which requires the commission of an act prohibited by law, or which adds to, deletes from, or in any way changes, alters or modifies the terms of this Agreement. The decision

49

GPA-325

of the arbitrator shall be final and binding upon all parties. The cost of the services of the arbitrator shall be borne equally by the District and ASAR.

5. **Employer Arbitration.**

If the Superintendent or his or her designee believes that ASAR has violated one or more specific provisions of this collective bargaining agreement, he or she may file with PERB a Demand for Arbitration on the form and in the manner prescribed by PERB. If such a Demand is to be filed, it shall be filed by the Superintendent or his or her designee within thirty (30) work days of the date on which the Superintendent or his or her designee knew or should have known of the alleged violation. The President of ASAR shall be provided a copy of the Demand when it is filed. Thereafter, arbitration shall proceed in accordance with the rules of PERB and Article 75 of the Civil Practice Law and Rules.

6. **Miscellaneous.**

A. The member filing the grievance shall have the right and responsibility to appear at each meeting involving the grievance, unless the member, ASAR, and the District waive his or her appearance.

B. All meetings at Level 1 or 2 involving a grievance and the member filing the grievance shall be held during unassigned time during the school day or after school hours.

C. During the pendency of a grievance, all proceedings and records shall be confidential until a decision is made that becomes final. The final written decision on a grievance shall be public record.

D. All records dealing with a grievance shall be filed separately from the personnel file of the member filing the grievance.

E. A standard form for the submission of the grievances shall be prepared and distributed by the Superintendent or his or her designee. The design and content of the form shall be approved by the President of ASAR.

F. During the pendency of a grievance, ASAR shall take all steps necessary and appropriate to assure that all Unit members faithfully and fully discharge their job responsibilities.

G. There shall be no reprisals of any kids by non-bargaining unit supervisory or administrative personnel against any ASAR member or representative by reason of their participation in this grievance procedure.

H. One grievance may be submitted on behalf of a group of members, provided the grievance alleges a common violation or set of violations, and the members of the group do not have a common supervisor. In such

50

SPA-326

a case, the grievance shall be submitted by the President of ASAR initially at Level 2 utilizing the standard form for grievances.

I. Failure by the member or ASAR to submit to the next Level within the specified time limits shall terminate the grievance. Failure by the District to decide a grievance and communicate the decision to the member and ASAR within the specified time limits shall permit ASAR to submit the grievance to the next level within the specified time limits from the date of the District's failure. The President of ASAR shall determine who shall represent ASAR and the group in the processing of the grievance.

J. Nothing in these grievance procedures shall be deemed to prevent the parties from agreement to a mutually acceptable arbitrator without going through the process prescribed by PERB or Article 75 of the CPLR

7. <u>Grievance Hearings for Another Bargaining Unit.</u>

On occasion ASAR members are required to attend RTA Level 2 Grievances Hearings. RTA Level Grievance Hearings will initially be scheduled at the RTA offices. If an ASAR unit member whose attendance at this hearing is required wishes to object to the location, he or she will make the objection to the District's Hearing Officer. The hearing will then be scheduled for a designated room at a neutral site.

## ARTICLE 25
## JOB SECURITY

When a certificated member of the Administrative and Supervisory bargaining unit is laid off due to budget constraints and personnel reductions and there is a vacancy in a teaching position for which that Unit member has certification and where there is no preferred eligible list for that position that Unit member shall be offered that position. In the event of job abolition or layoff of a Civil Service member of the unit, he/she shall be given ninety (90) calendar days written notice. Such job abolition or layoff will be conducted according to statutory procedures and the employee will have reinstatement rights consistent with Civil Service rules and regulations.

## ARTICLE 26
## MAINTENANCE OF STANDARDS

All conditions of employment, including extra compensation for outside regular hours, relief periods, leaves, and general working conditions shall be maintained at not less than the highest minimum standards in effect in the system at the time this Contract is signed, provided that such conditions shall be improved for the benefit of the Unit members as required by the express condition of this Contract.

51

SPA-327

## ARTICLE 27
## MANAGEMENT RIGHTS

It is understood and agreed that the Board of Education possesses the sole right to operate the City School District, and that all management rights must be exercised consistent with the provisions of this Agreement.

Nothing contained in this Agreement shall be construed to waive or limit the power of the Board of Education to abolish, create or modify administrative/supervisory positions. It is further understood that the Board of Education has the management right to transfer members of the bargaining unit within their tenure area, to establish policies and procedures concerning promotion into and within the unit, and to establish the criteria for such promotion including the establishment and maintenance of residency within the District as a condition for such promotion and continued employment in that position.

## ARTICLE 28
## CONTRACT REPRODUCTION AND DISTRIBUTION

Copies of this Agreement shall be reproduced and distributed at Board expense and made available to all unit members now employed or hereafter employed by the Board within a reasonable period of time after its ratification or the beginning of such employment if that occurs later. The format of the Contract copy shall be jointly developed by ASAR and the Board.

## ARTICLE 29
## LEGISLATIVE APPROVAL

It is agreed by and between the parties that any provision of this agreement requiring legislative action to permit its implementation by amendment of law or by providing the additional funds therefore, shall not become effective until the appropriate legislative body has given approval.

## ARTICLE 30
## NO STRIKE

The Association in consideration of the terms and conditions of this Agreement, will not engage in, instigate, or condone any strike, work stoppage, or any concerted refusal to perform normal work duties on the part of any member of the bargaining unit covered by this Agreement, and will undertake to discourage any such acts by any such bargaining unit member.

52

SPA- 328

# ARTICLE 31
## SAVINGS CLAUSE

This Agreement and all provisions herein are subject to all applicable laws. In the event any provision of this Agreement is held to violate such laws, said provision shall not bind either of the parties, but the remainder of the Agreement shall remain in full force and effect as if the invalid provision had not been a part of this Agreement.

# ARTICLE 32
## GROUP ACCOUNTABILITY

Our system of accountability is shared accountability where expectations and standards are clearly defined; assessments are credible, measure true progress and provide information to improve practice; triggers of support, assistance and intervention are defined; and incentives to improve practice exist for individual educators (teachers, Unit members, support staff), groups of educators (schools, schools-within-schools, primary unit, intermediate unit, houses, etc.) and others (parents, community, human service agencies, governmental institutions and businesses).

Further, the Rochester City School District and ASAR recognize that schools or groups of educators within schools (schools-within-schools, primary unit, or intermediate unit) are the essential unit of accountability and that student achievement is the essential indicator of progress.

ASAR and RCSD therefore commit to establishing a group or school accountability plan that is based upon four key principles:

A. Student outcomes are the primary indicator of progress. Student growth and meeting learning standards will serve as the fundamental measure of school or school unit accountability.

B. Annual assessment of progress, including public reporting by each school or school unit, will occur.

C. Evidence of how school results have informed and led to changes in the school's improvement plan must be reported annually.

D. Incentives, including a Leadership Development/School Support Fund will be tied to school or school unit progress.

SPA-329

53

## 1.   STUDENT OUTCOMES AND ANNUAL ASSESSMENT OF PROGRESS

The annual progress reporting on all aspects of school performance would include but not be limited to, the following achievement measures and measures of school quality:

A.   Measures in language arts and math (primary and intermediate levels) to be combined, including developmental stages in listening and speaking, writing and reading, and math.

B.   Percent of students expected to perform at the next grade level without additional support.

C.   Progress/growth of cohort groups over 2-3 year period: primary K-2/3; intermediate, 3-5/4-6; middle, 6-8; and high school, 9-12.

D.   Feedback from receiving school.

E.   Percent of students who take and, where applicable, pass District, Regents, and national exams, including but not limited to, SAT/ACT and other authentic measures of student performance, e.g., New York State proposed Unitary Regents Examination.

F.   Portfolios with evidence of strong accomplishments in writing.

In addition to student achievement measures, ASAR and RCSD recognize the importance of indicators of school quality that must be included in an assessment of progress. Such school quality indicators will include but not be limited to:

A.   Parent Involvement, including evidence of parent direct impact on the educational process and evidence of staff connection/outreach to the parent/ home.

B.   Customer Satisfaction, including evidence of satisfaction with the quality of the educational experience, school environment and school/staff levels of responsiveness.

ASAR and the RCSD also recognize the importance of delivery standards which ensure the opportunity to learn by describing the support appropriate to achieve established District content and performance standards.

## 2.   LINKING RESULTS TO THE SCHOOL IMPROVEMENT PLAN

The annual public reporting by each school or school unit will describe how the school's results have informed the school and led to changes in the school improvement plan.

SPA- 330

54

3. INCENTIVES LINKED TO SCHOOL OR SCHOOL UNIT PROGRESS

A proportionate (per Unit member) amount of the funds (total amount not to exceed $85,000) will be made available to the building principal, program principal, teaching principal, or other structure resulting from Article 31. The fund would support efforts that promote effective leadership towards "Principles for Achieving Schools."

A. Schools that have high and rigorous standards for what all students should know and be able to do.

B. Schools that promote active, meaningful and real to life learning that focuses on critical and creative thinking and empower students to take greater responsibility for their learning.

C. Schools that have student learning assessments that are diversified and performance based and school assessments that focus on credible, diversified and fair (equitable) indicators of opportunities for all students.

D. Schools that have knowledge-based teaching that is responsible and responsive to student's needs, ensuring high standards for all students.

E. Schools that are small in size to permit supportive environments, where students are known.

F. Students that have shared decision-making and shared accountability for student success as well as democratic governance.

G. Schools that provide safe and democratic environments for learning.

H. Schools that provide incentives to promote student success and to create opportunities for all students, as well as logical sequences and disincentives for failing to do so.

I. Schools that work closely with students' families and seek to coordinate non-school services for students who need them.

Allocation of the fund to each school will be made by the Superintendent of Schools or his/her designee.

After the initial year of implementation, school Unit members will account for the results/benefits from the use of such resources.

Logical consequences must exist for schools or schools-within-schools that are unable to demonstrate progress toward agreed upon standards. The quality review and assessment of progress will identify barriers that must be addressed. A plan of corrective action may include a combination of the following:

A. Necessary support and assistance

B. Changes in procedures, staff and/or school operations

C. Prescribed training

SPA-331

55

D. Replacement or reconstituting of the school program or portion thereof

E. School closing

4. GOVERNANCE

Governance shall be provided by an Executive Committee of the School-Based Planning Committee, comprised of the Superintendent or designee, bargaining unit Presidents or designees, parent representative, and student/representative.

## ARTICLE 33
## PERFORMANCE APPRAISAL FOR CERTIFICATED UNIT MEMBERS

The District and ASAR recognize that administrative leadership is crucial to the success of schools. Therefore, the District and ASAR agree that the performance appraisal of Unit members shall be tied directly to critical success factors, utilizing multiple indicators. These indicators shall include the supervision and evaluation of subordinates and the District's five design tasks:

A. Dimensions of Leadership

B. Knowledge of Teaching and Learning

C. Effective Organizational Management

D. Public Engagement and Collaboration with Others

E. High Performance Management/Professional Development/Reflective Practice

The District expectations for tenured Unit members will be linked to evidence of individual, school and student performance. The CIAS Panel shall be responsible for providing professional development that will be tied directly to the District mission and purpose.

The CIAS Panel shall be responsible for professional expectations and standards. These expectations and standards shall be developed jointly by the CIAS Panel. The panel shall consist of five members appointed by the Superintendent, five members appointed by the ASAR President. The chair will rotate annually between the two parties with a panel year being defined as July 1 - June 30th. The joint governing panel will develop and make program and policy recommendations concerning the implementation of the CIAS Plan to the Superintendent of Schools and the ASAR President. The panel shall be compensated for services consistent with procedures developed by the panel and approved by the ASAR President and the Superintendent of Schools.

56

SAA-332

# ARTICLE 34
## PROFESSIONAL ATTIRE

The Rochester City School District's sole mission is to educate all the children entrusted to our care and custody so that they may become successful citizens of our community, our country, and our world. That mission, and the public nature of our work, requires us to be role models for our children, and also require us to interact effectively with parents, community and government leaders, employees and vendors of other organizations, representatives of the news media, and the general public.

We are all professionals, and the success of our mission depends in part on establishing and maintaining a professional business atmosphere, which is determined not only by professional conduct but also by the image we project. All employees are therefore expected to dress in attire that is neat and clean as well as consistent with the nature of their position and the particular work they perform. What constitutes appropriate attire is initially up to the good judgment of each employee. Employees who are in doubt or have a question about specific attire are to consult with their supervisor[4] and abide by his or her advice. A supervisor's advice regarding attire will not be based merely on taste, and will respect workplace rights relating to bona fide religious observance. Employees, who are inappropriately attired, in the judgment of the supervisor, will be directed to go home and return to work in appropriate attire. Refusal to follow such a directive will constitute insubordination. A subsequent occurrence will be treated as an unpaid leave of absence. Employees are also expected to observe good habits of grooming and personal hygiene at all times.

# ARTICLE 35
## LIVING CONTRACT COMMITTEE

1.  The parties agree to establish a joint committee to provide for discussions and decision-making on matters germane to improved union-management relations and more effective overall system operations. The Living Contract Committee shall be co-chaired by the Superintendent of Schools and the President of ASAR.

2.  The joint committee shall be authorized to discuss any issue of mutual interest or concern and to reach tentative agreements on issues in a timely manner without delaying action until the expiration and renegotiation of the collective bargaining agreement. The joint committee shall also have the power to amend

---

[4] For this purpose, supervisors are principals for schools; program administrators for the Family Learning Center; and the Parent Center; the Director of Transportation for the Service Center; and Cabinet members for employees who report to them at Central Office or elsewhere.

57

SPA-333

this Agreement, provided that any substantive amendments shall be subject to internal ratification and approval procedures of the District and Association.

3. Each party shall identify at least two (2) representatives and no more than four (4) representatives as permanent committee members

4. The Living Contract Committee shall meet the third week of October and May of each year. Either party may request additional meetings which shall be scheduled when requested.

## ARTICLE 36
## DURATION

The provisions of each Section attached hereto shall be effective July 1, 2014, unless otherwise noted, and shall continue in full force and effect until June 30, 2018, or until a subsequent Agreement is signed by both parties.

SPA-334

58

IN WITNESS WHEREOF, the parties hereunto set into their hands and seals.

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT
OF ROCHESTER, NEW YORK

By _____
Linda Cimusz
Superintendent of Schools

By _____
c. Steven Carling
Chief Negotiator

ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER

By _____
Timothy Cliby
President

By _____
C. Michael Robinson
Chief Negotiator

SPA-335

# APPENDIX A
## SCHOOL DEFINITION

The components of a school are as follows:

1. Serves students, kindergarten through grade 12, in any configuration or combination of grade levels.

2. Board approved as a school with a unique school name.

3. School-Based Planning Team with constituencies elected by staff, students, and parents of that school. Principal serves as chair.

4. Staff rights and responsibilities as contained in employee contractual agreements apply as defined in the agreements (i.e., seniority, transfer, representation, etc.) for a school.

5. Separate budget and staffing allocation based on District formulas for schools.

6. Student rights and responsibilities as contained in State Education law and Board policy apply as defined for a school.

### Bracket Definitions

**Bracket I:**

**School Principal:** A unit member Unit member who has full authority, responsibility, and accountability for a school as defined in Appendix A. The school may share a campus with another school or schools.

**Supervising Director:** A unit member who supervises directors as described in Bracket II.

**Coordinating Director:** A unit member who has central management authority and responsibility for major District initiatives

**Bracket II: Director**

A unit member Unit member with central management authority, responsibility, and accountability affecting all school sites or all school sites at an identified level such as elementary, middle school, high school, etc.

SPA-336

60

**Bracket III: Assistant School Principal**

A unit member who directly assists a school principal or similar title leader with school wide authority, responsibility and accountability,

OR

A unit member who, under the supervision of the school principal or similar title leader, has full authority, responsibility, and accountability for at least 200 students and, at minimum, the core academic teachers of those students,

OR

A unit member administrator who, under the supervision of the school principal or similar title leader, has full authority, responsibility, and accountability for at least 200 students and, at minimum, 15 teachers,

**Bracket IV: Administrator**

All other unit member administrators not defined in Brackets I, II, and III, but who are in tenure bearing positions.

**Bracket V: Grant Funded, Non-tenure Bearing Positions**

Unit members who are in positions that are funded exclusively by grants and are designated as non-tenure bearing by the District, pursuant to the Memorandum of Agreement signed by the District and ASAR on February 13, 2013.

<u>Titles</u>

The District, for internal organizational purposes, may utilize different administrative titles and, in collaboration with ASAR, develop and issue job descriptions for those titles. The District must negotiate with ASAR the placement of all titles within a salary bracket. This negotiation must be completed prior to the appointment of any individual to the title.

All ASAR members assigned to salary brackets as of July 1, 2001, shall retain both tenure and seniority in those brackets accruing to them from their previous assignments. If any member is assigned to another administrative title within their salary bracket, they shall retain their tenure and seniority.

6PA-337

61

# APPENDIX B
## ELEMENTARY ASSISTANT PRINCIPAL FORMULA

During the projected budget process, the Division of School Development and Operations identifies each elementary school's weighted Total Aidable Pupil Units (TAPU). Upon completion, the weighted TAPU is used to assign a weighted enrollment for each school. The schools are listed in descending rank order according to that weighting.

Schools that fall within the following ranges will be eligible, if budgeted, for the number of Assistant Principals as indicated:

| Weighted Enrollment | Total Number of APs |
|---|---|
| 700 and higher | 2 |
| 500 — 699 | 1 |

If a school falls below the range, the current allocated AP will be allocated to the next identified eligible school. If reductions in staff are needed, reductions will occur beginning from the bottom of the list. Any allocations of budgeted positions beyond the allocated formula positions are made at the sole discretion of the Superintendent.

SPA-338

62

# APPENDIX C
## ASAR – Civil Service Title Salary Ranges

| Bracket A   $60,000 - $100,000 |
| --- |
| Senior Database Administrator |
| Supervisor of Technology Services |
| Director of Transportation |
| Director of Educational Facilities |
| Director of Procurement and Supply |
| Director of School Food Service |
| Director of Information |
| Director of Accounting |
| Benefits Administrator |
| Director of Financial Management |
| Director of School Safety and Security |

| Bracket D   $45,000 - $80,000 |
| --- |
| Administrative Analyst |
| Assistant Director of School Food Services |
| Assistant Supervising Custodian Engineer |
| Budget Analyst |
| Contract Administrator |
| Coordinator of Environmental Safety |
| Maintenance Inspector |
| Plant Engineer |
| Senior Buyer |
| Supervisor of Plant Security |
| Supervisor of Storehouse |
| Youth Development Coordinator |
| Application Supports Specialist |
| Supervisor of Safety and Security |
| Assistant User Support Instructor I |
| Broadcasting Assistant |
| Community Liaison Specialist / Bilingual |
| Data Liaison Specialist |
| Data Management Specialist |
| Information Services Business Analyst |
| Senior Technical Director |
| Senior Computer Applications Specialist |
| Supervisor of Print Shop |
| Court Liaison |
| Executive Chef |
| Medicaid Analyst |
| Project Resource Manager |
| Adult Career Education Coordinator |

| Bracket B   $55,000 - $95,000 |
| --- |
| Data Base Administrator |
| Educational Facility Planner |
| Internal Auditor |
| Manager, Financial Reporting |
| Principal Management Analyst |
| Project Architect |
| Senior Programmer Analyst |
| Senior Systems Analyst |
| Supervising Accountant |
| Supervising Custodian Engineer |
| Supervisor of Plant Maintenance |
| Supervisor Payrolls |
| Principal Accountant |
| Senior Research Analyst |

| Bracket E   $40,000 - $70,000 |
| --- |
| Art Center Director |
| Hearing Officer |
| Purchasing Assistant |
| Webmaster |
| Senior Communications Assistant |
| Textbook Coordinator |

63

SPA -339

| Bracket C   $50,000 - $90,000 | Bracket F   $35,000 - $60,000 |
|---|---|
| Associate Architect | Assistant Personnel Analyst/Bilingual |
| Bus Maintenance Supervisor | Administrative Clerk |
| Bus Operations Supervisor | Volunteer Coordinator |
| Coordinator Human Services Systems | |
| Director of Parent/Community Involvement | |
| Operations Manager | |
| Position Control Specialist | |
| School Health Coordinator | |
| Senior Administrative Analyst | |
| Accounts Payable Supervisor | |
| Senior Budget Analyst | |
| Senior Information Services Business Analyst | **Bracket G   $30,000 - $55,000** |
| Senior Management Analyst | Secretary I/bilingual |
| Senior Systems Programmer | |
| Accounts Payable Supervisor | |
| Asst. Director of Transportation | |
| Parent Engagement Coordinator | |
| Emergency Management and PD Coordinator | |
| Purchasing Agent | |
| Data Management Programmer | |
| Grant Analyst | |

SPA- 340

# INDEX

| Title | Page |
| --- | --- |
| Absence Provisions: Certificated Staff | 18-27 |
| Absence Provisions: Civil Service Staff | 28-33 |
| Accumulations of Absence Days: Certificated Staff | 18 |
| Acting Administrative Assignments | 32, 35 |
| ACTION Leave: Certificated Staff | 33 |
| Addition of Spouse to Insurance Plan | 13 |
| Additional Time Worked: Certificated Staff | 9 |
| Administrative and Supervisory Positions: Certificated Staff | 12-13 |
| Administrative Titles: Certificated Staff | 61 |
| Agency Fees | 4 |
| Allocation of Building Staff | 42 |
| Allowance for Transportation | 38 |
| Alternative Health Care Plans/HMO | 15 |
| Assault and Battery Cases | 43 |
| Assistant Principal Allocation - Elementary | 62, 43 |
| Association Release Time | 4 |
| Association Representatives | 4 |
| Association Rights | 4 |
| Attendance Incentive: Certificated Staff | 9 |
| Attendance Incentive: Civil Service Staff | 28 |
| Attire | 57 |
| Birth or Adoption of Child: Civil Service Staff | 32 |
| Birth/Adoption Allowance: Certificated Staff | 22 |
| Bracket Definitions: Certificated Staff | 60 |
| Bracket Placement: Certificated Staff | 5 |
| Cafeteria Plan | 16 |
| Catastrophic Illness Leave: Certificated Staff | 25 |
| Catastrophic Illness: Civil Service Staff | 30 |
| Certificate of Personal Illness Requirement: Certificated Staff | 20 |
| Certificate of Personal Illness Requirement: Civil Service Staff | 28 |
| CIA/S Panel | 35, 56, 47 |
| Contract Reproduction and Distribution | 52 |
| Coordinating Administrator in Special Education Stipend | 8 |
| Council Meeting Times | 2 |
| Councils | 2 |
| Courier Service | 4 |
| Date of Resignation and Medical Insurance | 14 |
| Death in Immediate Family Allowance: Certificated Staff | 21 |
| Death in Immediate Family Allowance: Civil Service Staff | 31 |
| Death of Blood Relative Allowance: Certificated Staff | 21 |
| Death of Blood Relative Allowance: Civil Service Staff | 31 |
| Degree Recipient/Family: Certificated Staff | 22 |
| Degree Recipient/Family: Civil Service Staff | 32 |



## INDEX

### (continued)

Dental Insurance.................................................................15
Discipline & Discharge:  Civil Service Staff....................................42
Discipline and Discharge: Non-Tenured Certificated Staff.........................39
Discipline and Discharge: Tenured Certificated Staff............................40
Discipline: ASAR Representation..............................................40-41
Dues Deduction.....................................................................3
Duration..........................................................................58
Emergency Closings: Certificated Staff...........................................25
Emergency Closings: Civil Service Staff..........................................33
Exchange Administrator Leave: Certificated Staff.................................34
Extended Illness or Injury Leave: Civil Service Staff............................29
Family Illness Allowance: Certificated Staff.....................................20
Family Illness Allowance: Civil Service Staff....................................28
Grievance Procedure..............................................................48
Group Accountability.............................................................53
Hardship Absences: Certificated Staff............................................24
Health Insurance..................................................................13
Illness Allowance: Civil Service Staff...........................................28
Immunizations.....................................................................39
Job Security......................................................................51
Jury Duty: Certificated Staff....................................................22
Jury Duty: Civil Service Staff...................................................31
Leave Without Pay: Certificated Staff............................................37
Leaves of Absence: Certificated Staff............................................34
Legislative Approval..............................................................52
Living Contract Committee.........................................................57
Longevity Increments: Civil Service Staff........................................11
Maintenance of Standards.........................................................51
Make-up Days: Certificated Staff.................................................26
Management Rights.................................................................52

SPA - 342

**INDEX**

(continued)

Medical Examination ................................................................ 38
Military Leave: Civil Service Staff ............................................... 32
Military Obligation Allowance: Certificated Staff ............................ 22
Miscellaneous Fringe Benefits .................................................... 38
Miscellaneous Paid Absences: Civil Service Staff ............................ 31
Moving Day: Civil Service Staff ................................................. 32
Negotiations Procedures ........................................................... 1
Observation and Evaluation ....................................................... 46
Out of Title Work: Civil Service Staff .......................................... 11
Outside of District Travel ......................................................... 38
Paid Holidays ....................................................................... 17
Parental Leave: Certificated Staff .............................................. 34
Performance Appraisal for Certificated Administrators ..................... 56
Performance Incentive: Certificated Administrators ......................... 46
Performance Incentive: Civil Service Staff .................................... 48
Personal Injury Benefits .......................................................... 44
Personal Leave Days: Civil Service Staff ...................................... 30
Personal Leave: Certificated Staff .............................................. 23
Physical Exams: Certificated Staff .............................................. 38
Policy Changes ...................................................................... 2
Posting of Positions ............................................................... 45
President Release ................................................................... 4
Principal's Enrollment Stipends .................................................. 10
Principalship Openings ............................................................ 46
Professional Development Funds ................................................. 39
Promotional Applications .......................................................... 45
Promotional Increases: Certificated Staff ..................................... 7
Protection of Unit Members ...................................................... 42
Quarantine: Certificated Staff ................................................... 22
Quarantine: Civil Service Staff .................................................. 32
Ratification .......................................................................... 1
Recognition .......................................................................... 1
Reimbursement for Personal Items .............................................. 45
Representation in Other Than Assault and Battery Cases .................... 44

SPA-343

# INDEX

### (continued)

Retirement System Delegate: Certificated Staff .................................................. 23
Return After Leave - Notification: Certificated Staff ......................................... 37
Return to Service Following Absence: Certificated Staff...................................... 25
RTA Grievance Hearings ......................................................................................... 51
Sabbatical Leave: Certificated Staff........................................................................ 35
Salary Adjustments: Certificated Staff...................................................................... 8
Salary Brackets: Certificated Staff.................................................................... 5, 60
Salary Increase for Full-Time Study: Certificated Staff ...................................... 37
Salary Increases: Certificated Staff........................................................................... 5
Salary Increases: Civil Service Staff....................................................................... 10
Salary Payments: Certificated Staff........................................................................... 8
Salary Ranges and Titles: Civil Service Staff ......................................................... 63
Savings Clause ......................................................................................................... 53
School Coordinators of Health, Physical Education, Athletics Stipends ................ 8
School Definition ..................................................................................................... 60
Seniority: Certificated Staff....................................................................................... 5
Strike ........................................................................................................................ 52
Subpoena: Certificated Staff .................................................................................... 22
Summer School Compensation .................................................................................. 6
Summer Work Schedules for Principals ..................................................................... 7
Supervisor of Plant Security Premium .................................................................... 12
Tax Shelter Annuities............................................................................................... 17
Temporary Assignment: Certificated Staff......................................................... 8, 12
Tenure: Certificated Staff........................................................................................... 5
Unsatisfactory Rating: Civil Service Staff............................................................... 48
Vacancy and Transfer................................................................................................ 45
Vacation Day Carry Over: Certificated Staff.......................................................... 27
Vacation Day Carry Over: Civil Service Staff......................................................... 33
Vacation Cash In: Certificated Staff ....................................................................... 27
Vacation : Certificated Staff..................................................................................... 26
Vacation: Civil Staff.................................................................................................. 32
Work Day: Civil Service Staff .................................................................................... 9
Work Year: Certificated Staff .................................................................................... 6
Workers Compensation .................................................................................... 19, 43
Workers Compensation: Certificated Staff .............................................................. 20

GPA- 344

SPA - 345

# ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS

# OF ROCHESTER

# CONSTITUTION

### ARTICLE I
### NAME

The Organization shall be known as the ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER (ASAR).

### ARTICLE II
### PURPOSE

The mission of ASAR is to direct, serve and support our membership in a way that builds relationships among the separate elements of the education profession so that the quality of education and leadership in the Rochester City Schools is improved.

### ARTICLE III
### GOALS

- Improve the quality of education available to the students of Rochester.

- Improve the quality of education leadership in the Rochester City School District.

- Support the membership in their efforts to improve the working relationships among the separate elements of the education profession in Rochester.

- Provide a forum for the discussion of problems of mutual concern.

- Support and promote the position of the membership on significant local, state and national concerns to the educational community as well as to the public.

- Provide services that will support the development, maintenance, and growth of professional, economic and legal status of the membership.

July 1, 2013

Page 1

SPA-346

# ARTICLE IV
## MEMBERSHIP/DUES

Membership in ASAR shall be open to all certified personnel on the administrative and supervisory salary schedule as represented in the collective bargaining agreement between ASAR and the Rochester City School District. (Approved 03/13)

    A.  ASAR membership shall be for one year (July 1st through June 30th)

    B.  Annual dues for membership shall be determined by ASAR.

    C.  All dues shall be payable to ASAR through payroll deduction.

    D.  ASAR dues shall be computed at the rate of .001 of salary. (12/03)

    E.  Changes in the dues structure or additional assessments may be levied at any time provided that the approval is granted by the Executive Council and the General Membership.

    F.  The fiscal year for ASAR shall extend from July 1st through June 30th.

# ARTICLE V
## ORGANIZATION STRUCTURE/REPRESENTATION

Policy for ASAR shall be formulated by an Executive Council composed of representatives from each job title category in Section A according to the following formula:
    6-20 members 1 representative
    21-40 members 2 representatives
    41-50 members 3 representatives
    51-60 members 4 representatives
    61-70 members 5 representatives

and officers and appointed positions as indicated in B, C, and D.

    A. Any job title with 6 or more members (Approved 03/13)

The number of members in each job category will be reviewed and approved by Executive Council in April of each year. Reductions in a job category after that date will be reflected in the following year but will not result in a loss of a representative position during the year. An increase in the number of members in a job category will result in an increase in a representative position when it occurs. (Approved 6/05)

---

SPA-347

B. Elected Officers: President, First Vice President, Second Vice President, Secretary, Treasurer

C. ASAR Co-Chair of the Careers in Administration/Supervision (CIAIS) Panel

D. Chair of the Negotiating Team.

## ARTICLE VI
## OFFICERS

Officers shall be President, First Vice-President, Second Vice-President, Secretary, and Treasurer
A. President shall:
1. Preside over meetings of the Executive Council (or designate another officer or the Executive Director to preside over meetings of the Executive Council).
2. Schedule meetings of the Executive Council and the General Membership.
3. Serve as Ex-Officio Member of all committees.
4. Serve as Chief Spokesperson for ASAR.
5. Represent ASAR on the SAANYS Board of Directors (or may appoint a designee) (Approved 03/13)

B. First Vice-President shall:
1. Perform the duties of the President if needed because of absence or incapacity.
2. Conduct elections as prescribed in the Constitution.
3. Provide continuity of leadership.
4. Represent ASAR on the SAANYS Governmental Relations Committee (President may appoint one additional member) (Approved 03/13)
5. Chair the Grievance Committee

C. Second Vice-President shall:
1. Perform the duties of the President if needed because of absence or incapacity of the President and First Vice-President.
2. Provide continuity of leadership.
3. Oversee and be responsible for all aspects of professional development involving the Association.

D. Secretary shall:
1. Keep all records including proceedings of the Executive Council and of the General Membership.
2. Publish written reports as needed.

E. Treasurer shall:
1. Collect all monies due and payable.
2. Disburse money with the approval of the Executive Council.
3. Secure all funds in approved accounts and invest those funds not needed for current use.
4. Prepare and publish financial statements and an annual report to the membership.

July 1, 2013

Page 3

SPA-B48

# ARTICLE VII
## ELECTIONS AND VACANCIES

The Executive Council shall be chosen by each of the membership units in the proportion described in Article V.

A. Each membership unit shall elect representatives for a two-year term beginning July 1st of the year of their election.

B. Elections shall be made prior to June 30th (Approved 6/05)
In the event that an elected representative is unable to serve for any reason, including lack of attendance at three consecutive Executive Council meetings, the Executive Council may fill the vacancy from that unit for the remainder of the year. Input on candidates for the vacancy for representative will be received from the other representatives for that unit on Executive Council. (Approved *6/05*)

The President, Vice-Presidents (2), Secretary, and Treasurer shall be elected by the General Membership no later than May 15th.

1. The officers will serve a term of two years beginning July 1st of the year of election. (Approved 6/05)

2. Election will be by written ballot.

3. Nominations for the elected officers of President, Vice-President (2), Secretary and Treasurer shall be in writing to the Executive Council for the March meeting. Any active ASAR member in good standing may submit a nomination provided that the person nominated has been notified and has agreed to serve if elected. The Executive Council acting as a committee of the whole will determine the ballot for elections.

4. In the event that the President is temporarily unable to serve, the First Vice-President will assume the duties of the President until such time as the President can resume their duties. (Approved 03/13)

5. In the event that an officer (President, 1st Vice-President, 2nd Vice President
   a. Secretary, Treasurer) gives advance notice of his/her resignation, the following succession plan shall be executed:

SPA-349

1st Vice-President fills President's vacancy.

2nd Vice-President fills 1st Vice-President's vacancy.

Secretary fills 2nd Vice-President's vacancy. (Approved 03/13)

The length of this transition shall not extend beyond June 30th in the year of implementation. A general election will be held so that those elected by this special election shall be ready to take office by July 1st. (Approved 03/13)

The offices of Secretary and Treasurer perform unique functions and roles. If either of these officers are unable to complete their terms, Executive Council will elect their replacement by 2/3 majority vote. (Approved 03/13)

C. Prior Service: Any member of the association is eligible to run and hold office positions. Candidates for the positions of President, First-Vice President, and Second Vice-President must establish and provide documentation to Executive Council citing prior leadership experience in a district wide capacity by attendance at meetings, committee participation, and/or volunteerism for at least a two year period during their membership in ASAR (i.e. Executive Council, ASAR, RCEL, RCESL not to be exclusive).
(Approved 03/13)

## ARTICLE VIII
## MEETINGS

The General Membership of ASAR shall meet at least once a year and at the special call of the President.

A. Notice of the meeting must be published to all members one week in advance of the date.
B. Majority vote of those present shall prevail.

## ARTICLE IX
## MAIL VOTES

A mail ballot shall be used at the direction of the President and the Executive Council for appropriate issues.

A. A mail ballot *must* delineate the issue to be resolved.

B. A mail ballot must be concluded within twenty calendar days.

## ARTICLE X
## AMENDMENTS

SPA-350

An amendment to the constitution may be proposed at any Executive Council meeting or at any General Membership meeting.

A. A two-thirds vote of the Executive Council is required to approve an amendment to be submitted to the General Membership.

B. If the amendment is approved for submission to the General Membership, it must be done within ten school days of Executive Council approval.

C. within twenty school days from the date of submission, a mail vote will be taken.

D. A vote of two-thirds of the membership shall be required for ratification.

## ARTICLE XI
## FAIR PRACTICES

ASAR shall admit all persons, without discrimination, and without regard to sex, race, creed, color, handicap, national origin, marital status, or sexual orientation.

SPA-357

# OUTLINE OF ASAR
# NEGOTIATIONS PROCESS

- The Negotiations Committee, together with the Chief Negotiator, conducts the negotiations process with the City School District on behalf of the Association.

- The Committee shall make every effort to obtain member input including such tools as interviews, meetings, and surveys.

- The Committee shall communicate with the membership during the negotiations process, keeping the members as informed as possible consistent with the necessity for confidentiality in the bargaining process.

- The Committee is empowered to enter into a tentative agreement with the City School District, subject to approval by the Executive Council and the General Membership.

- Prior to entering into a tentative agreement, the Negotiations Committee shall meet and confer with the President and other Association officers.

- The Executive Council shall receive the tentative contractual agreement with the City School District from the Negotiating Committee and shall adopt or reject the agreement subject to final approval by the membership. In order to approve a contractual agreement, two-thirds of Executive Council voting must vote affirmatively.

- If a contract is approved in such a manner, both the Negotiating Team and the Council are expected to endorse and support the agreement in its presentation to the General Membership.

- While a contract may be adopted by the majority of the membership by either a voice vote or a written ballot, a written ballot shall be the preferred method. The decision to hold a written ballot shall be made by the Chief Negotiator and the President and submitted to Executive Council for approval.

- The contract shall be approved when there is an affirmative vote by a majority of the General Membership voting.

*Approved by Executive Council by unanimous vote on May 3, 1999.*

August 1, 2005

July 1, 2013

Page 7

SPA-352

## Superintendent's Regulation 0100-R

## REPORTING COMPLAINTS OF DISCRIMINATION
## OR HARASSMENT

Approved Upon Superintendent's Initials                    8/12/2015
                                                            Date

### Complaint Procedures

Any individual who believes that a) s/he has been subjected to unlawful discrimination or harassment, or b) who is made aware of and/or witnesses a possible occurrence of unlawful discrimination or harassment, shall report such actions as soon as possible after the alleged incident occurs in order to enable the District to promptly and effectively investigate and resolve the complaint. In order to facilitate a thorough investigation, those discriminated against, targeted, and/or harassed, and/or any witnesses, should document the discrimination or harassment as soon as it occurs, providing as much detail as possible.

Reports of unlawful discrimination or harassment should be made by completing the District Complaint Form (see #1510F) and then filing that form with the Office of Human Capital Initiatives (HCI), directed to the District's Compliance Officer, the Chief of Human Capital Initiatives.

### Employee Complaints or Student Complaints Against Employees:

Upon receipt of the complaint, the Chief of HCI or his/her designee will request an investigation of the complaint by the Office of Safety and Security. If the Chief of HCI or his/her designee believes that irreparable harm may occur before the investigation can be completed, then s/he may recommend appropriate interim relief, including temporary reassignment of job duties pending completion of the investigation. The complainant, the accused, and any witnesses will be directed to refrain from talking about the investigation while it is pending.

Upon completion of the investigation, the Office of Safety and Security will provide the Chief of HCI or his/her designee with a report of the investigation's findings. The Chief of HCI or his/her designee will determine what action, if any, is appropriate based on the outcome of the investigation and the applicable Board Policies, as well as state and federal laws and any applicable collective bargaining agreements. The Chief of HCI or his/her designee will issue a written determination within 90 days of the receipt of the complaint, unless extenuating circumstances warrant an extension of the time period. Complainant(s) and respondent(s) will be informed in writing of the determination. The information regarding the written recommendations may remain confidential.

SPA-353

If a violation of Board Policy is substantiated in the case of a complaint against an employee, the respondent's supervisor will confer with the Chief of HCI or his/her designee to determine what, if any, disciplinary action or corrective measures are appropriate.

It is the responsibility of the Chief of HCI or his/her designee to ensure that any appropriate corrective action is implemented.

## Student Complaints:

If the complaint is filed by a student against another student, the Chief of HCI, will, except in unusual circumstances, refer the complaint to the student's Principal or his/her designee for investigation and appropriate action. If the Principal or his/her designee believes that irreparable harm may occur before the investigation can be completed, then s/he should implement appropriate interim relief pending completion of the investigation (e.g., minimizing or eliminating contact between complainant and accused). A Principal who investigates a student complaint will also determine what, if any, disciplinary or corrective actions are appropriate at the conclusion of the investigation according to applicable laws and Board Policy. If the complaining student is dissatisfied with the outcome of the Principal's or designee's investigation, s/he may seek review of the investigation and determination made by the Principal or designee by filing a District Complaint Form (1510F) with the Chief of HCI within ten (10) school days, requesting such a review. The Chief of HCI or his/her designee, will notify the building principal/supervisor, complainant, and accused in writing of the determination after review within ten school days of receipt of the 1510F District Complaint Form.

## Limited Privacy Rights

As part of an investigation, the District has the right to search all school property and equipment including District computers and email accounts. Rooms, desks, cabinets, lockers, computers, etc. are the property of the District, provided for the use of students and staff; however, the users have no reasonable expectation of privacy with respect to these locations or equipment or materials stored therein.

## Retaliation Prohibited

Retaliation against any individual for filing a charge of unlawful discrimination and/or harassment, or reporting allegations of unlawful discrimination or harassment is illegal and prohibited. Regardless of the stage of the investigation, the complainant(s)/targeted individual(s) will be instructed by the supervisor or principal and/or Chief of HCI to report immediately if prohibited discriminatory or harassing behavior occurs again and/or if the accused or associates of said accused person(s) retaliates against the originally targeted individual(s). Any witnesses who cooperate in the investigation of the complaint will be similarly instructed to report to the supervisor or principal and/or Chief of HCI immediately as to any retaliatory action(s). The supervisor or principal and/or Chief of HCI should also follow up with complainants and

SPA-354

witnesses to verify that no retaliation or intimidation has occurred. Any employee or student who retaliates against another individual shall be subject to disciplinary action, as warranted, in accordance with legal guidelines, applicable contractual mandates and/or the Code of Conduct.

## Penalties

Based upon the result of the District's investigation into a report of unlawful discrimination, harassment or retaliation, immediate corrective action will be taken as appropriate:

Should the offending individual be a school employee, appropriate disciplinary measures will be imposed, up to and including termination of the offender's employment in accordance with contractual and legal guidelines;

Should the offending individual be a student, appropriate disciplinary measures will be imposed, up to and including suspension or expulsion in accordance with applicable law, regulations, and the Code of Conduct;

Vendors/contractors and other individuals who do business with the District who have been found to violate the terms of the non-discrimination/anti-harassment policy and/or regulations by engaging in prohibited conduct will be subject to appropriate sanctions up to and including loss of District business. School volunteers who are found to have violated District policy and regulation may face termination of volunteer status;

Should the offending individual be a visitor, guest or other third party, then any corrective action deemed appropriate will be taken including, but not limited to, expulsion and/or banishment from the District premises and/or school activities/events under the control and supervision of the District.

The imposition of such disciplinary measures by the District does not preclude the appropriate filing of civil and/or criminal charges as may be warranted.

## Finding That Unlawful Discrimination or Harassment Did Not Occur

At any level/stage of investigation of alleged discrimination, including harassment, if a determination is made that unlawful discrimination or harassment did not occur, the supervisor, principal or Chief of HCI or his/her designee will so notify the complainant and the alleged offender of this determination. Such a finding does not preclude the complainant from pursuing other legal avenues of recourse.

## Knowingly Making False Accusations

Employees and/or students who knowingly make false accusations of discrimination or harassment or knowingly provides false information in the course of investigation of a complaint may be subject to the same range of disciplinary actions enumerated above under

GPA-355

Penalties. A complaint which is deemed unfounded is not considered a false accusation, so long as the complaint was made in good faith.

## Informal Complaint

A.    An employee or student who believes that s/he has been subjected to unlawful discrimination or harassment, or anyone who is aware of, has knowledge of, or witnesses an occurrence of unlawful discrimination or harassment may file an informal complaint by immediately notifying his/her immediate supervisor or principal. The supervisor or principal will assist the student or employee in documenting the complaint in writing.

If the building principal/immediate supervisor is the alleged offender, then the complainant may report the discrimination or harassment directly to the Compliance Officer, who is the Chief of Human Capital Initiatives. The Chief of HCI shall designate another school official who will take the place of the building principal/supervisor in all applicable phases of the complaint process.

B.    Informal complaint procedures will generally take place at the building level and involve resolution steps short of a comprehensive investigation and/or formal hearing. For example, in attempting to resolve a complaint informally, the supervisor or Principal may separately interview the complainant and the accused, inform the accused of the complaint, question the accused about the alleged incidents, and review the District's policy and regulations regarding discrimination, including harassment.

C.    If the supervisor or principal concludes that the complaint is founded, then s/he will direct the perpetrator to immediately cease the offensive conduct, and will impose any appropriate discipline. The supervisor or principal will follow the provisions of any applicable collective bargaining agreement(s) throughout the course of such investigation(s).

D.    Within fifteen (15) school/working days after receipt of the complaint the supervisor or principal will take such action as is necessary to remedy the situation stated in the complaint if his/her investigation reveals that the complaint is valid.

The action taken by the supervisor or principal will be documented in writing.

1.    The supervisor or principal may consult with or seek the assistance of the Chief of HCI in resolving the complaint.

2.    If the supervisor or principal can not resolve the issues raised in the complaint within fifteen (15) school/working days, s/he shall notify all material parties of that fact before the expiration of the fifteen (15) school/working day period and s/he shall further indicate the approximate date on which his/her determination will be made.

SPA-356

3.     If the complaint is not resolved at the informal stage to the satisfaction of the parties, s/he/they may, individually, within ten (10) school/working days of the decision of the supervisor or principal ask that the Chief of HCI or his/her designee review the allegations and informal-level decision. The District complaint form [1510F] should be utilized for this purpose. The completed complaint may be given to the principal or supervisor for forwarding, or provided directly to the Chief of HCI.

4.     The Chief of HCI or his/her designee will review the file and, if necessary, conduct an additional investigation in accordance with federal or state laws and regulations and any applicable collective bargaining agreement(s).

5.     If the review by the Chief of HCI results in a finding different from the informal-level finding, the Chief of HCI or his/her designee, will notify the building principal/supervisor, complainant, and accused of the change in finding and any recommendations. If unlawful discrimination or harassment is found to have occurred, prompt disciplinary action in accordance with the terms of District policy and regulations, federal and state law and regulations, and/or the applicable collective bargaining agreement, will be imposed, together with such remedial measures as are appropriate.

## Confidentiality

The District will keep complaints and discussions as confidential as possible; however, the need for confidentiality must be balanced against the obligation to cooperate fully with lawful investigations, to provide due process to the accused, and/or to take necessary action to conciliate, investigate or resolve the complaint. Information will be disclosed only to the extent necessary to effectively investigate the complaint, pursue corrective action and/or as mandated by law or court order.

A written record of the investigation and any action taken will be established and maintained. Additionally, parents of students subjected to possible discrimination, including harassment, and/or students filing a discrimination and/or harassment complaint, as well as parents of accused students, may be notified by the appropriate administrator of such occurrence and/or allegations as warranted and in accordance with legal guidelines.

If the complainant attempts to withdraw a complaint, the Chief of HCI or designee will ensure that the withdrawal is not caused by retaliation and then document the complainant's reasons and ask the complainant to sign the documentation.

Subject to all applicable laws and collective bargaining agreements, the following guidelines shall be utilized in the investigation and resolution of discrimination complaints:

## Appeal/Redress

### Accused

The appeal process for student discipline which is contained in Board Policy 5300, The Code of Conduct, shall apply to any student who is disciplined based on a finding that s/he violated Board Policy 1510.

SPA 357

Equal Opportunity Employment Commission
Buffalo Local Office
6 Fountain Plaza, Suite 350
Buffalo, New York 14202
(800) 669-4000

http://www.eeoc.gov

**Limitations**

Nothing in this Regulation shall be construed as creating a cause of action. Neither the proscriptions of, nor actions taken pursuant to this Regulation shall on that basis estop the Board and/or its designee from fully arguing for or against the existence of any fact and the scope or meaning of any law in any forum.

First Reading:
Adoption:

Enacted _____; pursuant to Resolution No. _____

SPA – 358

The grievance processes contained in the collective bargaining agreement between an employee's union and the District, or, if applicable the Rules and Regulations of the Superintendent's Employees' Group, shall apply to any employee who is disciplined based on a finding that s/he violated Board Policy 1510.

### Complainant

The filing of a complaint, and/or the rendering of a decision regarding the complaint shall in no way prohibit, prevent or limit the complainant from taking appropriate legal action in accordance with state and federal law. The parties may, individually, while the investigation is on-going at the District, contact a personal attorney (at their own expense) or other advocacy groups or investigative agencies, including, but not limited to, any of the following:

New York State Education Department Appeal to the Commissioner
(pursuant to Education Law §§310 and 306)

Education Law §310 provides that persons considering themselves aggrieved by an action taken at a school district meeting or by school authorities may appeal to the Commissioner of Education for a review of such action. In addition, Education Law §306 allows the Commissioner of Education to remove a trustee, member of a board of education and certain other school officers for willful misconduct or neglect of duty.

http://www.counsel.nysed.gov/appeals/

Office for Civil Rights
U.S. Department of Education
32 Old Slip, 26th floor
New York, NY 10005-2500

Phone: 646-428-3900 / 800-421-3481
Fax: 646-428-3843
TDD: 877-521-2172
E-mail: OCR.NewYork@ed.gov

http://www2.ed.gov/about/offices/list/ocr/docs/howto.html

New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004

Phone: 212-607-3300
Fax: 212-607-3318

http://www.nyclu.org.

New York State Division of Human Rights
259 Monroe Avenue, Suite 308
Rochester, New York 14607
(585) 238-8250

http://www.dhr.ny.gov/

SPA- 352

## DISTRICT POLICY PROHIBITING DISCRIMINATION OR HARASSMENT OF STUDENTS OR EMPLOYEES

### 0100.0 General Policy Overview

The Board of Education affirms its commitment and responsibility to provide equal educational and employment opportunities in an environment which is free from discrimination, including harassment and intimidation and to comply with all applicable laws which prohibit unlawful discrimination. The Board of Education strictly prohibits and condemns all forms of unlawful discrimination, including harassment, on the basis of actual or perceived race, color, religion, creed, ethnicity, national origin, citizenship status, age, marital status, partnership status, disability, predisposing genetic characteristics, sexual orientation, gender (sex), military status, veteran status, domestic violence victim status or political affiliation by employees (including Commissioners of Board of Education and contractors), volunteers and students, as well as any third parties who are participating in, observing, or otherwise engaging in activities subject to the supervision and control of the District.

Specifically with respect to students, the Board additionally prohibits unlawful discrimination or harassment on the basis of actual or perceived race, color, national origin, ethnicity, disability, weight, sex, sexual orientation, religion, religious practice and gender, including gender identity and gender expression. The Board also prohibits retaliation based on an individual's opposition to discrimination or participation in a related investigation or complaint proceeding under this policy or anti-discrimination statutes.

It is a violation of this policy for District students or employees (including contractors) to engage in behavior that subjects any student, employee or applicant for employment to discrimination and/or harassment at a school/worksite location or in connection with an education or work-related function on the basis of any of the above-noted grounds where such conduct: (1) adversely affects any aspect of a student's educational opportunities, including the opportunity to participate in school activities; (2) adversely affects any aspect of an employee's/applicant's employment or the compensation, terms, conditions or privileges of employment; or (3) creates a hostile, offensive, or intimidating educational or work environment. It is also a violation of this policy for District employees to engage in unlawful discriminatory behavior and/or harassment with respect to applicants for employment and other individuals who do business with the District.

### 0100.1 Enforcement

The District will act to promptly and equitably investigate and respond appropriately to all complaints or allegations of unlawful discrimination, including harassment, based on any of the characteristics described above. District personnel will take appropriate action to protect individuals from retaliation and to promptly and equitably investigate and respond appropriately to all complaints of retaliation. The District makes no promise or warranty about the outcome of

GPA - 300

Rochester City School Board Policy Manual                                    0100

an investigation, nor any promise or assurance that it will exercise its discretion in a manner which will meet the desires or preferences of any particular party.

In order for the Board to enforce this policy and to take corrective measures as may be necessary, it is essential that any employee, prospective employee or student who believes s/he has been a victim of unlawful discrimination, including harassment, in the school environment and/or at programs, activities and events under the control and supervision of the District, as well as any individual who is aware of and/or who has knowledge of, or witnesses any possible occurrence of unlawful discrimination, including harassment, immediately report such alleged act. Such report shall be directed to or forwarded to the District's designated compliance officer(s) through informal and/or formal complaint procedures as developed by the District. Such complaints are recommended to be in writing, although verbal complaints of alleged unlawful discrimination, including harassment, will also be promptly investigated in accordance with the terms of this policy. In the event that the compliance officer is the alleged offender, the report will be directed to the next level of supervisory authority.

Upon receipt of a complaint, the District will conduct a prompt, thorough, and equitable investigation of the charges. However, even in the absence of a complaint, if the District has knowledge of any occurrence of unlawful discrimination, including harassment, the District will conduct a prompt, equitable, and thorough investigation and respond appropriately. To the extent possible all complaints will be treated as confidential and private. However, disclosure may occur to the extent necessary to complete a thorough investigation of the charges, follow through with corrective action and/or to notify law enforcement officials as warranted.

Based upon the results of an investigation, if the District determines that an employee and/or student has violated the terms of this policy and/or accompanying regulations, immediate, corrective action will be taken as appropriate. Should the offending individual be a student, appropriate disciplinary measures will be imposed, up to and including suspension or expulsion in accordance with applicable laws and/or regulations, District policy and regulation, and the District *Code of Conduct*. Should the offending individual be a school employee, appropriate disciplinary measures will be imposed, up to and including termination of the offender's employment in accordance with legal guidelines, District policies and regulations, and any applicable collective bargaining agreement(s). The imposition of such disciplinary measures by the District does not preclude the filing of civil and/or criminal charges as may be warranted.

The Board prohibits any retaliatory behavior directed against complainants, accused individuals, witnesses, and/or any other individuals who participated in the investigation of a complaint of unlawful discrimination, including harassment. Reasonable actions will be taken to prevent intimidation or retaliation against complainants, targeted individuals, witnesses, and/or any other individuals who participated in the investigation of a complaint of unlawful discrimination, including harassment. Any student or staff who believes that intimidation or retaliation has occurred or is occurring should make a report to the District's Compliance Officer, the Chief of Human Capital Initiatives, so that an investigation and any necessary corrective action can be undertaken.

Regulations corresponding with this policy will be developed for reporting, investigating,

May 28, 2015                                    SPA - 357

and remedying allegations of unlawful discrimination, including harassment, based on the characteristics described above.

This policy should not be read to abrogate other District policies and/or regulations or the District *Code of Conduct* prohibiting other forms of unlawful discrimination or inappropriate behavior within this District. It is the intent of the District that all such policies and/or regulations be read in conjunction to provide the highest level of protection from unlawful discrimination in the provision of employment/educational services and opportunities. However, different treatment of any student or employee which has a legitimate, legal purpose shall not be considered a violation of District policy.

### 0100.2 General Overview of Discrimination

Discrimination refers to the treatment or consideration of, or making a distinction in favor of or against, a person based on the group, class, or category to which that person belongs, rather than on individual merit. Discrimination can occur in individual circumstances or as the result of an established practice which has the effect of conferring privileges on a certain class or denying privileges to a certain class because of criteria such as age, race, color, sex, religion, national origin, or disability.
Discrimination is the unequal treatment of an individual (or group) for a reason which has nothing to do with legal rights or ability. Federal and state laws prohibit discrimination based on several characteristics, including race, color, national origin, sex, disability, gender and other characteristics.
Unlawful discrimination also includes harassment, including sexual harassment and/or sexual violence. Discrimination might mean that a person, or a group of persons, are excluded from a place or an activity, or are being denied benefits and/or services afforded others based on protected characteristics such as race, color, national origin, sex, and/or disability.

### 0100.3 Overview of Harassment

Harassment includes unwelcome verbal, written, graphic or physical conduct that offends, denigrates or belittles an individual based on that individual's actual or perceived race, color, religion, creed, ethnicity, national origin, citizenship status, age, marital status, partnership status, disability, predisposing genetic characteristics, sexual orientation, gender (sex), military status, veteran status, domestic violence victim status or political affiliation, and specifically with respect to students, on the basis of weight, gender identity, gender expression, and religious practices that:

A.    Has the purpose or effect of substantially or unreasonably interfering with an individual's work performance or is used as a basis for employment decisions (including terms and conditions of employment) affecting such individual; and/or creates an intimidating, hostile or offensive work environment, or;

B.    Has the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity, or

May 28, 2015

SPA - 362

Case 6:21-cv-06673-DGL Document 54 05/26/2022 6:324978 Page 449 of 468
Case 6:21-cv-06673-DGL Document 39-1 Filed 03/30/21 Page 158 of 234
Rochester City Sc.    ol Board Policy Manual                                    0100

creates an intimidating, hostile or offensive learning environment; and/or effectively bars the student's access to an educational opportunity or benefit, or;

    C.    Otherwise adversely affects the employment and/or educational opportunities and benefits provided by the District.

    Such conduct may include, but is not limited to, unsolicited derogatory remarks, jokes, demeaning comments or behavior, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threatening, bullying, extorting or the display or circulation of written materials or pictures.

### 0100.31 Examples of Specific Types of Harassment

1.    **Racial and/or Color Harassment**: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's race or color, such as nicknames emphasizing stereotypes, racial slurs, comments on manner of speaking, and negative references to racial customs.

2.    **Religious (Creed) Harassment**: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's religion or creed, such as derogatory comments regarding surnames, religious tradition, religious clothing, or religious slurs or graffiti.

3.    **National Origin Harassment**: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's national origin, such as negative comments regarding surnames, manner of speaking, customs, language, or ethnic slurs.

4.    **Marital Status Harassment**: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's marital status, such as derogatory comments regarding being single or divorced, or being a single parent.

5.    **Disability Harassment**: Can include harassment based on an individual's disabling mental or physical condition and includes any unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's disabling condition, such as imitating manner of speech or movement, or interference with necessary equipment.

6.    **Sexual Harassment**: Includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

    a.    Submission to that conduct is made either explicitly or implicitly a

6PA—363

term or condition of an educational or employment benefit or detriment; or

b.   Submission to or rejection of the conduct is used as the basis for any educational or employment decision affecting the harassed individual; or

c.   The conduct has the purpose or effect of unreasonably interfering with the harassed individual's educational or work performance, or creating an intimidating, hostile or offensive learning or working environment.

This applies whether the harassment is between individuals of the same or different gender. Sexual harassment can include unwelcome verbal, written, graphic or physical conduct directed at or related to an individual's gender such as sexual gossip or personal comments of a sexual nature; sexually suggestive or foul language; sexual jokes; whistling; spreading rumors or lies of a sexual nature about someone; demanding sexual favors; forcing sexual activity by threat of punishment or offer of an educational or job reward; obscene graffiti; exhibition or distribution of pornographic pictures or objects; offensive touching, pinching, grabbing, kissing or hugging; or restraining someone's movement in a sexual way.

### 0100.32 Examples of Specific Types of Sexual Harassment

1.   Sex/Gender Harassment:  Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's sex/gender, such as derogatory comments regarding pregnancy, or individual's participation in a non-traditional job or activity;

2.   Sexual Orientation Harassment:  Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's sexual orientation, such as negative name calling and imitating mannerisms.

**0100.4 Retaliation** – is a separate and distinct violation of this policy. Members of the school community are prohibited from retaliating against any person who reports alleged unlawful discrimination or harassment or against any individual who testifies, assists or participates in an investigation, proceeding, action or hearing relating to unlawful discrimination/harassment. An alleged harasser may be found to have violated this anti-retaliation provision even if the underlying complaint of unlawful discrimination/harassment is not found to be a violation of this policy.

Retaliation includes, but is not limited to, any form of intimidation, reprisal or harassment. It may be redressed through application of the same reporting, investigation, and

SPA - 364

Rochester City School Board Policy Manual                                      0100

enforcement procedures as for unlawful discrimination/ harassment.

## 0100.5 Knowingly Makes False Accusations

Employees and/or students who *knowingly* make false accusations against another individual as to allegations of unlawful discrimination, harassment or retaliation may also face appropriate disciplinary action.

Because of the damage that can be done to someone falsely accused, any individual who in bad faith knowingly makes a false complaint or report of unlawful discrimination, harassment or retaliation will be subject to disciplinary action up to and including suspension or termination in accordance with legal guidelines, District policy, and any applicable collective bargaining agreement(s). The term "false report" refers only to those made in bad faith and does not include a complaint that could not be corroborated or which did not rise to the level of unlawful discrimination, harassment or retaliation.

## 0100.6 Reporting Acts Constituting Child Abuse

Several behaviors listed as sexual harassment (i.e., sexual touching, grabbing, pinching, being forced to kiss someone, etc.) may also constitute child abuse. Sexual abuse of a child can include sexual molestation or exploitation of a child including, but not limited to, incest, prostitution, rape, sodomy, or lewd or lascivious conduct involving a child. Thus, under certain circumstances, alleged harassment may also constitute child abuse under state law. New York State law and Board Policy 5460 require school employees to report all incidents of child abuse and neglect, including sexual abuse.

## 0100.7 District Responsibility/Training

Regardless of whether a complaint has been filed, if the District knows of the occurrence or the possible occurrence of unlawful discrimination or harassment, the District will require a prompt, equitable and thorough investigation by appropriate personnel. In the event an anonymous complaint has been filed, the District will respond to the fullest extent possible.

The Superintendent or his/her designee will be responsible for informing students and staff on a yearly basis of District policy and regulations regarding the prohibition of unlawful discrimination and/or harassment, including:

- the procedures established for making a complaint;
- the procedures established for the investigation and resolution of complaints,
- the general legal issues pertaining to unlawful discrimination and harassment, including age-appropriate examples in age-appropriate language, and
- the rights and responsibilities of employees and students.

May 28, 2015                              SPA-365

## 0100.8 Dissemination of District Policy/Regulation and Evaluation

A copy of District policy and regulations pertaining to unlawful discrimination, including harassment, will be posted on the website; will be published in appropriate school publications such as teacher/employee handbooks, student handbooks, and/or school calendars; will appear on brochures and other appropriate District publications; and may be posted in various locations throughout each school building. A copy of the District policy and regulations pertaining to prohibition of unlawful discrimination, including harassment, will be available upon request at the District Central Office, at school building principals' offices, and in counselors' offices.

## 0100.9 Definitions

The following information is offered to provide guidance; this list is not exhaustive. Defined terms are listed in alphabetical order.

1. Age: actual or perceived age.

2. Alienage/Citizenship: actual or perceived immigration status or status as a citizen of a country other than the United States of America. It shall not be an unlawful discriminatory practice for any person to discriminate on the ground of alienage or citizenship status or to make inquiry as to a person's alienage or citizenship status or to give preference to a person who is a citizen or native of the United States when such preference is expressly permitted or required by a federal, city or state law or regulation.

3. Color: the apparent pigmentation of the skin, especially as an indication or possible indication of race.

4. Disability: actual or perceived disability, or history of disability. The term "disability" means any physical, medical, mental, or psychological impairment or history or record of such impairment, or a condition regarded by others as a disability. It is not discriminatory for an employer to require that an employee or applicant be able to perform the essential functions of a job with or without reasonable accommodation.

5. Ethnicity/National Origin: actual or perceived national origin or ethnic identity. National origin is distinct from race/color or religion/creed because people of several races and religions or their forbearers may come from one nation. The term "national origin" includes members of all national groups and groups of persons of common ancestry, heritage, or background; it also includes individuals who are married to or associated

May 28, 2015

SPA - 366

with a person or persons with a common heritage including language, culture, and often a shared or common religion and/or ideology that stresses ancestry.

6. <u>Gender</u>: actual or perceived gender/sex; socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for men and women. The prohibition against gender discrimination includes sexual harassment.

The term "gender" also includes a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

7. <u>Gender Expression</u>: How one is socially perceived; may include one's behaviors, dress, mannerisms, speech patterns, and/or social interactions; a person's external characteristics and behaviors that are socially defined as either masculine or feminine.

8. <u>Gender Identity</u>: One's personal view of one's own gender; a person's deeply-felt internal sense of being male or female.

9. <u>Marital Status</u>: actual or perceived marital status.

10. <u>Military Status</u>: a person's participation in the military service of the United States or the military service of the state, including but not limited to, the Armed Forces of the United States, the Army National Guard, the Air National Guard, the New York Naval Militia, the New York Guard and such additional forces as may be created by the federal or state government as authorized by law.

11. <u>National Origin</u>: a person's country of birth or ancestor's country of birth.

12. <u>Predisposing Genetic Characteristic</u>: any inherited gene or chromosome, or alteration thereof, determined by a genetic test or inferred from information derived from an individual or family member that is scientifically or medically believed to predispose an individual or the offspring of that individual to a disease or disability, or is associated with a statistically significant increased risk of development of a physical or mental disease or disability.

13. <u>Race/Color</u>: actual or perceived race or color.

14. <u>Religion/Creed</u>: actual or perceived religion or creed; a set of fundamental beliefs and practices generally agreed to by large numbers of the group or a body of persons adhering to a particular set of beliefs and practices.

15. <u>Religious practice</u>: practices and observances such as attending worship services, wearing religious garb or symbols, praying at prescribed times, displaying religious

SPA-367

objects, adhering to certain dietary rules, refraining from certain activities, proselytizing, etc.

16. <u>School Community</u>:   Includes but is not limited to all students, school employees (including contractors), school agents, bus drivers, volunteers, and any third party who are participating in, observing, or otherwise engaging in activities, including sporting events and other extracurricular activities subject to the supervision and control of the District.

17. <u>School Employee</u>:   Includes but is not limited to all teachers, support staff, administrators, custodians, cafeteria workers, coaches, contractors and School Board members.

18. <u>Sex</u>: a term used to describe the biological and physiological characteristics that define men and women. MALE and FEMALE denote "sex."

19. <u>Sexual Orientation</u>: actual or perceived sexual orientation; the sex to which a person is sexually attracted. Someone attracted primarily or exclusively to members of the opposite sex is characterized as straight or heterosexual. Someone attracted primarily or exclusively to members of the same sex is characterized as homosexual. A person with a strong or viable attraction to both genders is characterized as bisexual or pansexual.

20. <u>Victim of Domestic Violence, Sexual Offenses, or Stalking</u>: an actual or perceived victim of domestic violence is a person who has been subjected to acts or threats of violence, not including acts of self-defense, committed by a current or former spouse of the victim, by a person who is cohabitating with or who has cohabitated with the victim, by a person who is or has been in a continuing social relationship of a romantic or intimate nature or a person who is or has continuously or at regular intervals lived in the same household as the victim.

An actual or perceived victim of sex offenses or stalking is a person who has been subjected to such behavior as defined by the Penal Law.

An employee may request a reasonable accommodation due to his/her status as an actual or perceived victim of domestic violence, sex offenses or stalking in order to fulfill the essential requirements of a job. The employee may be asked to provide certification that he/she is a victim of domestic violence, sex offenses or stalking. An employee requesting the reasonable accommodation shall provide a copy of such certification within a reasonable period after the request is made. The certification requirement may be satisfied by providing a police or court record, documentation from an employee, agent, or volunteer of a victim services organization, an attorney, a member of the clergy, or a medical or other professional service provider that the employee or that employee's family or household member sought assistance as an actual or perceived victim of domestic violence, sex offenses, or stalking and/or the effects of the violence or stalking; or other information consistent with the employee's disclosure and the request for accommodation.

21. <u>Weight:</u> actual or perceived weight used in reference to a person's "size."

Cross-reference: 5300 Code of Conduct
9110 Equal Employment Opportunity

Reference: Americans with Disabilities Act, 42 U.S.C. §12101 et seq. ,
Title VI, Civil Rights Act of 1964, 42 U.S.C. §2000d et seq.
Title VII, Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.; 34 CFR §100 et seq.
Title IX, Education Amendments of 1972, 20 U.S.C. §1681 et seq.
§504, Rehabilitation Act of 1973, 29 U.S.C. §794
Individuals with Disabilities Education Law, 20 U.S.C §§1400 et seq.
Executive Law §290 et seq. (New York State Human Rights Law)
Education Law §§313(3), 3201, 3201-a
8 NYCRR 100.2(o), (l), (jj), (kk); 119.6
Dignity for All Students Act, Education Law, §10 – 18

Notes: Prior policy: 1510 District Policy Against Harassment of Students or Employees.
Adopted: June 15, 2006 pursuant to Resolution No. 2005-06: 881; June 28, 2012 pursuant to
Resolution No. 2011-12: 850; February 14, 2013 pursuant to Resolution No. 2012-13: 477; July
29, 2013 pursuant to Resolution No. 2013-14: 76.

6PA - 369

May 28, 2015

Rochester City School Board Policy Manual

0100

## DISTRICT POLICY PROHIBITING DISCRIMINATION OR HARASSMENT OF STUDENTS OR EMPLOYEES

### General Policy Overview

The Board of Education affirms its commitment and responsibility to provide equal educational and employment opportunities in an environment which is free from discrimination, including harassment and intimidation and to comply with all applicable laws that prohibit unlawful discrimination. The Board of Education strictly prohibits and condemns all forms of unlawful discrimination, including harassment, on the bases of actual or perceived:

- Race;
- Color;
- Weight;
- Religion or religious practice;
- Creed;
- Ethnicity;
- National origin;
- Citizenship status;
- Age;
- Marital status;
- Partnership status;
- Disability (physical or mental);
- Use of guide dog, hearing dog, or service dog;
- Predisposing genetic characteristics;
- Sexual orientation;
- Gender or sex (including pregnancy, childbirth, or related condition);
- Gender identity or expression;
- Military work or status;
- Veteran status;
- Domestic violence victim status; or
- Political affiliation

All forms of unlawful discrimination or harassment are prohibited by employees (including Commissioners of the Board of Education and contractors), volunteers and students, as well as any third parties who are participating in, observing, or otherwise engaging in activities

1

0100

subject to the supervision and control of the District.

It is a violation of this policy for District students or employees (including contractors) to engage in behavior that subjects any student, employee or applicant for employment to discrimination and/or harassment at a school/worksite location or in connection with an education or work-related function on the basis of any of the above-noted grounds where such conduct: (1) adversely affects any aspect of a student's educational opportunities, including the opportunity to participate in programs and activities; (2) adversely affects any aspect of an employee's/applicant's employment or the compensation, terms, conditions or privileges of employment; or (3) creates a hostile, offensive, or intimidating educational or work environment. It is also a violation of this policy for District employees to engage in unlawful discriminatory behavior and/or harassment with respect to applicants for employment and other individuals who do business with the District.

Nothing in this policy shall be construed to prohibit a denial of admission to, or exclusion from, a course of instruction or activity based on a person's gender that would be permissible under the law. Nothing in this policy shall be construed to prohibit, as discrimination based on disability, actions that would be permissible under the law.

The Board also prohibits retaliation based on an individual's opposition to discrimination or participation in a related investigation or complaint proceeding under this policy or anti-discrimination statutes.

### Definitions

The following information is offered to provide guidance; this list is not exhaustive. Defined terms are listed in alphabetical order.

1. Age: actual or perceived age.

2. Alienage/Citizenship: actual or perceived immigration status or status as a citizen of a country other than the United States of America. It shall not be an unlawful discriminatory practice for any person to discriminate on the ground of alienage or citizenship status or to make inquiry as to a person's alienage or citizenship status or to give preference to a person who is a citizen or native of the United States when such preference is expressly permitted or required by a federal, city or state law or regulation.

3. Color: the apparent pigmentation of the skin, especially as an indication or possible indication of race.

4. Disability: actual or perceived disability, or history of disability. The term "disability" means any physical, medical, mental, or psychological impairment or history or record of such impairment, or a condition regarded by others as a disability. It is not discriminatory for an employer to require that an employee or applicant be able to perform the essential functions of a job with or without reasonable accommodation.

5. Ethnicity/National Origin: actual or perceived national origin or ethnic identity. National

2

SPA-371

Rochester City School Board Policy Manual

0100

origin is distinct from race/color or religion/creed because people of several races and religions or their forbearers may come from one nation. The term "national origin" includes members of all national groups and groups of persons of common ancestry, heritage, or background; it also includes individuals who are married to or associated with a person or persons with a common heritage including language, culture, and often a shared or common religion and/or ideology that stresses ancestry.

6. Gender: actual or perceived gender/sex; socially constructed roles, behaviors, activities, and attributes that a given society considers appropriate for men and women. The prohibition against gender discrimination includes sexual harassment.

   The term "gender" also includes a person's gender identity, self-image, appearance, behavior or expression, whether or not that gender identity, self-image, appearance, behavior or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

7. Gender Expression: How one is socially perceived; may include one's behaviors, dress, mannerisms, speech patterns, and/or social interactions; a person's external characteristics and behaviors that are socially defined as either masculine or feminine.

8. Gender Identity: One's personal view of one's own gender; a person's deeply-felt internal sense of being male or female.

9. Marital Status: actual or perceived marital status.

10. Military Status: a person's participation in the military service of the United States or the military service of the State, including but not limited to, the Armed Forces of the United States, the Army National Guard, the Air National Guard, the New York Naval Militia, the New York Guard and such additional forces as may be created by the federal or state government as authorized by law.

11. National Origin: a person's country of birth or ancestor's country of birth.

12. Predisposing Genetic Characteristic: any inherited gene or chromosome, or alteration thereof, determined by a genetic test or inferred from information derived from an individual or family member that is scientifically or medically believed to predispose an individual or the offspring of that individual to a disease or disability, or is associated with a statistically significant increased risk of development of a physical or mental disease or disability.

13. Race/Color: actual or perceived race or color.

14. Religion/Creed: actual or perceived religion or creed; a set of fundamental beliefs and practices generally agreed to by large numbers of the group or a body of persons adhering to a particular set of beliefs and practices.

SPA- 372

3.

Rochester City School Board Policy Manual

0100

15. Religious practice: practices and observances such as attending worship services, wearing religious garb or symbols, praying at prescribed times, displaying religious objects, adhering to certain dietary rules, refraining from certain activities, proselytizing, etc.

16. School Community: Includes but is not limited to all students, school employees (including contractors), school agents, bus drivers, volunteers, and any third party who are participating in, observing, or otherwise engaging in activities, including sporting events and other extracurricular activities subject to the supervision and control of the District.

17. School Employee: Includes but is not limited to all teachers, support staff, administrators, custodians, cafeteria workers, coaches, contractors and School Board members.

18. Sex: a term used to describe the biological and physiological characteristics that define men and women. MALE and FEMALE denote "sex."

19. Sexual Orientation: actual or perceived sexual orientation; the sex to which a person is sexually attracted. Someone attracted primarily or exclusively to members of the opposite sex is characterized as straight or heterosexual. Someone attracted primarily or exclusively to members of the same sex is characterized as homosexual. A person with a strong or viable attraction to both genders is characterized as bisexual or pansexual.

20. Victim of Domestic Violence, Sexual Offenses, or Stalking: an actual or perceived victim of domestic violence is a person who has been subjected to acts or threats of violence, not including acts of self-defense, committed by a current or former spouse of the victim, by a person who is cohabitating with or who has cohabitated with the victim, by a person who is or has been in a continuing social relationship of a romantic or intimate nature or a person who is or has continuously or at regular intervals lived in the same household as the victim.

An actual or perceived victim of sex offenses or stalking is a person who has been subjected to such behavior as defined by the Penal Law.

An employee may request a reasonable accommodation due to his/her status as an actual or perceived victim of domestic violence, sex offenses or stalking in order to fulfill the essential requirements of a job. The employee may be asked to provide certification that he/she is a victim of domestic violence, sex offenses or stalking. An employee requesting the reasonable accommodation shall provide a copy of such certification within a reasonable period after the request is made. The certification requirement may be satisfied by providing a police or court record, documentation from an employee, agent, or volunteer of a victim services organization, an attorney, a member of the clergy, or a medical or other professional service provider that the employee or that employee's family or household member sought assistance as an actual or perceived victim of domestic violence, sex offenses, or stalking and/or the effects of the violence or stalking;

4

SPA- 373

0100

or other information consistent with the employee's disclosure and the request for accommodation.

21. Weight: actual or perceived weight used in reference to a person's "size."

## General Overview of Discrimination

Discrimination refers to the treatment or consideration of, or making a distinction in favor of or against, a person based on the group, class, or category to which that person belongs, rather than on individual merit. Discrimination can occur in individual circumstances or as the result of an established practice which has the effect of conferring privileges on a certain class or denying privileges to a certain class because of criteria such as age, race, color, sex, religion, national origin, or disability.

Discrimination is the unequal treatment of an individual (or group) for a reason which has nothing to do with legal rights or ability. Federal and state laws prohibit discrimination based on several characteristics, including race, color, national origin, sex, disability, gender and other characteristics.

Unlawful discrimination also includes harassment, including sexual harassment and/or sexual violence. Discrimination might mean that a person, or a group of persons, are excluded from a place or an activity, or are being denied benefits and/or services afforded others based on protected characteristics such as race, color, national origin, sex, and/or disability.

## Overview of Harassment

Harassment includes unwelcome verbal, written, graphic or physical conduct that offends, denigrates or belittles an individual based on that individual's actual or perceived race, color, religion, creed, ethnicity, national origin, citizenship status, age, marital status, partnership status, disability, predisposing genetic characteristics, sexual orientation, gender (sex), military status, veteran status, domestic violence victim status or political affiliation, and specifically with respect to students, on the basis of weight, gender identity, gender expression, and religious practices that:

A. Has the purpose or effect of substantially or unreasonably interfering with an individual's work performance or is used as a basis for employment decisions (including terms and conditions of employment) affecting such individual; and/or creates an intimidating, hostile or offensive work environment, or;

B. Has the purpose or effect of substantially or unreasonably interfering with a student's academic performance or participation in an educational or extracurricular activity, or creates an intimidating, hostile or offensive learning environment; and/or effectively bars the student's access to an educational opportunity or benefit, or;

C. Otherwise adversely affects the employment and/or educational opportunities and benefits provided by the District.

SPA-374

5

Such conduct may include, but is not limited to, unsolicited derogatory remarks, jokes, demeaning comments or behavior, slurs, mimicking, name calling, graffiti, innuendo, gestures, physical contact, stalking, threatening, bullying, extorting or the display or circulation of written materials or pictures.

### Examples of Specific Types of Harassment

1. Racial and/or Color Harassment: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's race or color, such as nicknames emphasizing stereotypes, racial slurs, comments on manner of speaking, and negative references to racial customs.

2. Religious (Creed) Harassment: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's religion or creed, such as derogatory comments regarding surnames, religious tradition, religious clothing, or religious slurs or graffiti.

3. National Origin Harassment: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's national origin, such as negative comments regarding surnames, manner of speaking, customs, language, or ethnic slurs.

4. Marital Status Harassment: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's marital status, such as derogatory comments regarding being single or divorced, or being a single parent.

5. Disability Harassment: Can include harassment based on an individual's disabling mental or physical condition and includes any unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's disabling condition, such as imitating manner of speech or movement, or interference with necessary equipment.

6. Sexual Harassment: Includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

   a. Submission to that conduct is made either explicitly or implicitly a term or condition of an educational or employment benefit or detriment; or

   b. Submission to or rejection of the conduct is used as the basis for any educational or employment decision affecting the harassed individual; or

SPA-375

6

Case 21-2683, Document 54, 05/26/2022, 3324938, Page462 of 1468
Case 6:17-cv-06878-DGL Document 39-1 Filed 03/30/21 Page 171 of 234
Rochester City School Board Policy Manual

0100

c. **The conduct has the purpose or effect of unreasonably interfering** with the harassed individual's educational or work performance, or creating an intimidating, hostile or offensive learning or working environment.

This applies whether the harassment is between individuals of the same or different gender. Sexual harassment can include unwelcome verbal, written, graphic or physical conduct directed at or related to an individual's gender such as sexual gossip or personal comments of a sexual nature; sexually suggestive or foul language; sexual jokes; whistling; spreading rumors or lies of a sexual nature about someone; demanding sexual favors; forcing sexual activity by threat of punishment or offer of an educational or job reward; obscene graffiti; exhibition or distribution of pornographic pictures or objects; offensive touching, pinching, grabbing, kissing or hugging; or restraining someone's movement in a sexual way.

<u>Examples of Specific Types of Sexual Harassment</u>

1. <u>Sex/Gender Harassment</u>: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's sex/gender, such as derogatory comments regarding pregnancy, or individual's participation in a non-traditional job or activity;

2. <u>Sexual Orientation Harassment</u>: Can include unwelcome verbal, written, graphic or physical conduct directed at the characteristics of an individual's sexual orientation, such as negative name calling and imitating mannerisms.

<u>Retaliation</u> - is a separate and distinct violation of this policy. Members of the school community are prohibited from retaliating against any person who reports alleged unlawful discrimination or harassment or against any individual who testifies, assists or participates in an investigation, proceeding, action or hearing relating to unlawful discrimination/harassment. An alleged harasser may be found to have violated this anti-retaliation provision even if the underlying complaint of unlawful discrimination/harassment is not found to be a violation of this policy.

Retaliation includes, but is not limited to, any form of intimidation, reprisal or harassment. It may be redressed through application of the same reporting, investigation, and enforcement procedures as for unlawful discrimination/harassment.

<u>Reporting and Investigation</u>

The District will act to promptly and equitably investigate and respond appropriately to all complaints or allegations of unlawful discrimination, including harassment, based on any of the characteristics described above. District personnel will take appropriate action to protect individuals from retaliation and to promptly and equitably investigate and respond appropriately to all complaints of retaliation. The District makes no promise or warranty about the outcome of an investigation, nor any promise or assurance that it will exercise its discretion in a manner

7

GPA-376

which will meet the desires or preferences of any particular party.

In order for the Board to enforce this policy and to take corrective measures as may be necessary, it is essential that any employee, prospective employee or student who believes s/he has been a victim of unlawful discrimination, including harassment, in the school environment and/or at programs, activities and events under the control and supervision of the District, as well as any individual who is aware of and/or who has knowledge of, or witnesses any possible occurrence of unlawful discrimination, including harassment, immediately report such alleged act. Such report shall be directed to or forwarded to the District's designated compliance officer(s) in accordance with the procedures outlined in the corresponding regulation (0100-R, "Regulation regarding Reporting Incidents of Discrimination or Harassment"). Such complaints are recommended to be in writing, although verbal complaints of alleged unlawful discrimination, including harassment, will also be promptly investigated in accordance with the terms of this policy. In the event that the compliance officer is the alleged offender, the report will be directed to the next level of supervisory authority.

Upon receipt of a tenable complaint, the District will conduct a prompt, thorough, and equitable investigation of the charges. However, even in the absence of a complaint, if the District has knowledge of any occurrence of unlawful discrimination, including harassment, the District will conduct a prompt, equitable, and thorough investigation and respond appropriately. To the extent possible all complaints will be treated as confidential and private. However, disclosure may occur to the extent necessary to complete a thorough investigation of the charges, follow through with corrective action and/or to notify law enforcement officials as warranted.

Based upon the results of an investigation, if the District determines that an employee and/or student has violated the terms of this policy and/or accompanying regulations, immediate, corrective action will be taken as appropriate. Should the offending individual be a student, appropriate disciplinary measures will be imposed, up to and including suspension in accordance with applicable laws and/or regulations, District policy and regulation, and the District *Code of Conduct*. Should the offending individual be a school employee, appropriate disciplinary measures will be imposed, up to and including termination of the offender's employment in accordance with legal guidelines, District policies and regulations, and any applicable collective bargaining agreement(s). The imposition of such disciplinary measures by the District does not preclude the filing of civil and/or criminal charges as may be warranted.

The Board prohibits any retaliatory behavior directed against complainants, accused individuals, witnesses, and/or any other individuals who participated in the investigation of a complaint of unlawful discrimination, including harassment. Reasonable actions will be taken to prevent intimidation or retaliation against complainants, targeted individuals, witnesses, and/or any other individuals who participated in the investigation of a complaint of unlawful discrimination, including harassment. Any student or staff who believes that intimidation or retaliation has occurred or is occurring should make a report to the District's Compliance Officer, the Chief of Human Capital Initiatives, so that an investigation and any necessary corrective action can be undertaken.

Regulations corresponding with this policy will be developed for reporting, investigating, and remedying allegations of unlawful discrimination, including harassment, based on the

8

SPA-377

Case 21-2683, Document 54, 05/26/2022, 3320936, Page173 of 234
Case 6:17-cv-06878-DGL  Document 39-1  Filed 03/30/21  Page 173 of 234

Rochester City School Board Policy Manual

0100

characteristics described above.

This policy should not be read to abrogate other District policies and/or regulations or the District *Code of Conduct* prohibiting other forms of unlawful discrimination or inappropriate behavior within this District. It is the intent of the District that all such policies and/or regulations be read in conjunction to provide the highest level of protection from unlawful discrimination in the provision of employment/educational services and opportunities. However, different treatment of any student or employee which has a legitimate, legal purpose shall not be considered a violation of District policy.

**Knowingly Making False Accusations**

Employees and/or students who *knowingly* make false accusations against another individual as to allegations of unlawful discrimination, harassment or retaliation may also face appropriate disciplinary action.

Because of the damage that can be done to someone falsely accused, any individual who in bad faith knowingly makes a false complaint or report of unlawful discrimination, harassment or retaliation will be subject to disciplinary action up to and including suspension or termination in accordance with legal guidelines, District policy, and any applicable collective bargaining agreement(s). The term "false report" refers only to those made in bad faith and does not include a complaint that could not be corroborated or which did not rise to the level of unlawful discrimination, harassment or retaliation.

**Reporting Acts Constituting Child Abuse**

Several behaviors listed as sexual harassment (i.e., sexual touching, grabbing, pinching, being forced to kiss someone, etc.) may also constitute child abuse. Sexual abuse of a child can include sexual molestation or exploitation of a child including, but not limited to, incest, prostitution, rape, sodomy, or lewd or lascivious conduct involving a child. Thus, under certain circumstances, alleged harassment may also constitute child abuse under state law. New York State law and Board Policy 5460 require school employees to report all incidents of child abuse and neglect, including sexual abuse.

**District Responsibility/Training**

Regardless of whether a complaint has been filed, if the District knows of the occurrence or the possible occurrence of unlawful discrimination or harassment, the District will require a prompt, equitable and thorough investigation by appropriate personnel. In the event an anonymous complaint has been filed, the District will respond to the fullest extent possible.

The Superintendent or his/her designee will be responsible for informing students and staff on a yearly basis of District policy and regulations regarding the prohibition of unlawful discrimination and/or harassment, including:

- the procedures established for making a complaint;

Rochester City School Board Policy Manual

0100

- the procedures established for the investigation and resolution of complaints,
- the general legal issues pertaining to unlawful discrimination and harassment, including age-appropriate examples in age-appropriate language, and
- the rights and responsibilities of employees and students.

## Dissemination of District Policy/Regulation and Evaluation

A copy of District policy and regulations pertaining to unlawful discrimination, including harassment, will be posted on the District website; will be published in appropriate school publications such as teacher/employee handbooks, student handbooks, and/or school calendars; will appear on brochures and other appropriate District publications; and may be posted in various locations throughout each school building. A copy of the District policy and regulations pertaining to prohibition of unlawful discrimination, including harassment, will be available upon request at the District Central Office, at school building principals' offices, and in counselors' offices.

Cross-reference:   5300 Code of Conduct
9110 Equal Employment Opportunity

Reference:   Americans with Disabilities Act, 42 U.S.C. §12101 et seq.
Title VI, Civil Rights Act of 1964, 42 U.S.C. §2000d et seq.
Title VII, Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.; 34 CFR §100 et seq.
Title IX, Education Amendments of 1972, 20 U.S.C. §1681 et seq.
§504, Rehabilitation Act of 1973, 29 U.S.C. §794
Individuals with Disabilities Education Law, 20 U.S.C §§1400 et seq.
Executive Law §290 et seq. (New York State Human Rights Law)
Education Law §§313(3), 3201, 3201-a
8 NYCRR 100.2(c), (l), (jj), (kk); 119.6
Dignity for All Students Act, Education Law, §10 – 18

Notes: Prior policy: 1510 District Policy Against Harassment of Students or Employees.
Adopted: June, 15, 2006 pursuant to Resolution No. 2005-06: 881; June 28, 2012 pursuant to Resolution No. 2011-12: 850; February 14, 2013 pursuant to Resolution No. 2012-13: 477; July 29, 2013 pursuant to Resolution No. 2013-14: 76; Amended October 26, 2017 pursuant to Resolution No. 2017-18: 352.

SPA-379

10

 **ORIGINAL**

# Nos. 21-2683 and 21-2700
# CONSOLIDATED CIVIL APPEALS

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| BERNICE CURRY-MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | WDNY Civil Docket No.: 18-cv-6450 (*Malcolm III*) Honorable David G. Larimer, J. |
| | ) | |
| ROCHESTER CITY SCHOOL DISTRICT, | ) | |
| BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No.: 21-2683, Lead Docket Number |

| | | |
|---|---|---|
| BERNICE C MALCOLM | ) | On Appeal from the United States District Court for the Western District of New York (ROCHESTER) |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | WDNY Civil Docket No.: 17-cv-6878 (*Malcolm I*) Honorable David G. Larimer, J. |
| ASSOCIATION OF SUPERVISORS AND ADMINISTRATORS OF ROCHESTER ("ASAR"), TIMOTHY CLIBY, President and Individually, and John Rowe, Vice President and Individually, ROCHESTER CITY SCHOOL DISTRICT, BARBARA DEANE-WILLIAMS, Superintendent of Schools and Individually and Collectively, | ) | |
| Defendants-Appellees. | ) | U.S.C.A. Civil Docket No. 21-2700, Consolidated Member |

## CERTIFICATE OF SERVICE

I, Mrs. Bernice Curry-Malcolm, hereby certify under the penalty of perjury that on the 29th day of May 2022, that I served by United States Postal Express Overnight mail and United States Priority Mail the Plaintiff-Appellant Brief w/Special Appendix and Appellant Separate Appendix on the following as follows:

68

(via U.S. Postal Service Overnight Priority Express Mail)
United States Court of Appeals
For the Second Circuit
Thurgood Marshall U.S. Court House
40 Foley Square
New York, New York 10007

(via U.S. Postal Priority Mail)

Rochester City School District Department of Law
Attention: Alison Moyer, Counsel for the Defendants-Appellees Rochester City
School District, Barbara-Deane Williams, Superintendent of Schools, Sandra
Simpson, Chief of Schools, Interim Executive Director of Specialized Services,
Teresa Root, Zone Director of Specialized Services
131 West Broad Street,
Rochester, New York, 14614
Telephone: (585) 262-8550
Email: Alison.moyer@rcsdk12.org

School Administrators Association of New York State ("SAANYS")
Counsel for the Association of Supervisors and Administrators of Rochester
("ASAR"
Attention: Jennifer Carlson, SAANYS; Deputy Counsel
8 Airport Park Blvd.
Latham, New York 12110
Telephone (518) 782-0600
Email: jcarlson@saanys.org

Bernice Curry-Malcolm, *pro se*
6 Gingerwood Way
West Henrietta, New York 14586

*Pro se Plaintiff-Appellant*

69

MAY 24, 22
1007
10007
**AMOUNT**
**$131.25**
R2305M145915-07

# UNITED STATES POSTAL SERVICE ®

## PRIORITY MAIL EXPRESS®

EI 208 435 848 US

CUSTOMER USE ONLY

**FROM:** (PLEASE PRINT)    **PHONE (    )**

Mrs. Bernice Curry-Malcolm
6 Gingerwood Way
West Henrietta, NY 14586

**Signature Required**

**PAYMENT BY ACCOUNT** (if applicable)
USPS® Corporate Acct. No.    Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day  ☐ 2-Day  ☐ Military  ☐ DPO

PO ZIP Code: 14467
Scheduled Delivery Date (MM/DD/YY): 5/25/22
Postage: $ 131.25

Date Accepted (MM/DD/YY): 5/24/22
Scheduled Delivery Time: ☑ 3:00 PM
Insurance Fee: $    COD Fee: $

Time Accepted: 3:09  ☐ AM  ☐ PM
Return Receipt Fee: $    Live Animal Transportation Fee: $

Special Handling/Fragile: $    Sunday/Holiday Premium Fee: $
Total Postage & Fees: $ 131.25

Weight: 25 lbs. 9 oz.  ☐ Flat Rate
Acceptance Employee Initials:

**DELIVERY OPTIONS (Customer Use Only)**

☑ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)    **PHONE (    )**

Office of the Clerk
United State Court of Appeals 2nd Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, New York 10007

ZIP + 4® (U.S. ADDRESSES ONLY)
1 0 0 0 7 —

☐ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
☐ $100.00 insurance included.

**DELIVERY (POSTAL SERVICE USE ONLY)**

Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature

Delivery Attempt (MM/DD/YY)  Time  ☐ AM ☐ PM  Employee Signature

LABEL 11-B, MAY 2021    PSN 7690-02-000-9996

☞ PEEL FROM THIS CORNER

s Court of Appeals
Circuit
hall, U.S. Courthouse
quare
ork 10007



ILGER7P6BH26

ROC -> FX    XE LGA

WGT: 026  TOTAL: 00043
AIR: LGA AT 07:32  ORG: ROC 21
LV: ROC AT 21:00  05/24/22

LGA
ILGER7P6BH
E

...ping Supplies &